1  C. D. Michel – SBN 144258
   cmichel@michellawyers.com
2  Joshua Robert Dale – SBN 209942
   jdale@michellawyers.com
3  Konstadinos T. Moros – SBN 306610
   kmoros@michellawyers.com
4  Alexander A. Frank – SBN 311718
   afrank@michellawyers.com
5  MICHEL & ASSOCIATES, P.C.
   180 E. Ocean Blvd., Suite 200
6  Long Beach, CA 90802
   Telephone: (562) 216-4444
7
8  Donald Kilmer-SBN 179986
   Law Offices of Donald Kilmer, APC
9  14085 Silver Ridge Road
   Caldwell, Idaho 83607
10 Telephone: (408) 264-8489
   Email: Don@DKLawOffice.com

11 Attorneys for Plaintiffs

12            **UNITED STATES DISTRICT COURT**

13            **CENTRAL DISTRICT OF CALIFORNIA**

14 CALIFORNIA RIFLE & PISTOL            Case No.: 2:23-cv-10169-SPG
   ASSOCIATION, INCORPORATED; THE       (ADSx)
15 SECOND AMENDMENT FOUNDATION;
   GUN OWNERS OF AMERICA, INC.;         **MEMORANDUM OF POINTS**
16 GUN OWNERS FOUNDATION; GUN           **AND AUTHORITIES IN**
   OWNERS OF CALIFORNIA, INC.; ERICK    **SUPPORT OF PLAINTIFFS'**
17 VELASQUEZ, an individual; CHARLES    **MOTION FOR PRELIMINARY**
   MESSEL, an individual; BRIAN WEIMER, **INJUNCTION**
18 an individual; CLARENCE RIGALI, an
   individual; KEITH REEVES, an individual, Hearing Date: March 13, 2024
19 CYNTHIA GABALDON, an individual; and Hearing Time: 1:30 p.m.
   STEPHEN HOOVER, an individual,       Courtroom:  5C
20                                       Judge: Hon. Sherilyn Peace Garnett
                Plaintiffs,
21         v.

22 LOS ANGELES COUNTY SHERIFF'S
   DEPARTMENT; SHERIFF ROBERT
23 LUNA, in his official capacity; LA VERNE
   POLICE DEPARTMENT; LA VERNE
24 CHIEF OF POLICE COLLEEN FLORES,
   in her official capacity; ROBERT BONTA,
25 in his official capacity as Attorney General
   of the State of California and DOES 1-10,
26
                Defendants.
27

28

---

MEMO. OF POINTS & AUTHORITIES IN SUPPORT OF MOT. PRELIM. INJ.

# TABLE OF CONTENTS

**Page(s)**

Table of Contents.................................................................................................ii

Table of Authorities...........................................................................................iii

I.    Introduction...............................................................................................1

II.   Argument ..................................................................................................3

   A.    Plaintiffs are likely to succeed on the merits. ................................3

     1.    Historical analysis under the Second Amendment. ................3

     2.    *Bruen* already decided most issues of this case. ........................4

     3.    LASD's lengthy waiting periods are unconstitutional. ............5

     4.    La Verne's fees are unconstitutional. ......................................10

     5.    LASD's discretionary denials are unconstitutional. ...............14

     6.    LVPD's psychological exam is unconstitutional.....................17

     7.    California must recognize out-of-state CCW permits. ............18

   B.    Plaintiffs will suffer irreparable harm if denied relief. ................23

   C.    Balancing of the Equities sharply favors plaintiffs......................23

   D.    Preliminary injunctive relief is in the public interest...................24

III.  Conclusion...............................................................................................25

Certificate of Service ........................................................................................27

TABLE OF CONTENTS

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Addington v. Texas,*

   441 U.S. 418 (1979) ........................................................................18

*Am. Trucking Ass'ns v. City of Los Angeles,*

   559 F.3d 1046 (9th Cir. 2009) .........................................................3

*Baird v. Bonta,*

   81 F.4th 1036 (9th Cir. 2023) ..............................................8, 23, 24

*Brown v. Board of Education,*

   347 U.S. 483 (1954) ..................................................................7, 18

*Brown v. Board of Education*

   349 U.S. 294 (1955) ........................................................................7

*Bullock v. Carter,*

   405 U.S. 134 (1972) ......................................................................14

*Cantwell v. Connecticut,*

   310 U.S. 296 (1940) ........................................................................5

*Commonwealth v. Donnell,*

   No. 2211CR2835 (Mass. Dist. Ct. Aug. 3, 2023) ...................21, 22

*Cooper v. Aaron,*

   358 U.S. 1 (1958) ......................................................................7, 18

*District of Columbia v. Heller,*

   554 U.S. 570 (2008) ..................................................................3, 16

*Elrod v. Burns,*

   427 U.S. 347 (1976) ......................................................................23

*Ezell v. City of Chicago,*

   651 F.3d 684 (7th Cir. 2011) .........................................................23

iii

TABLE OF AUTHORITIES

*FEC v. Wisc. Rt. to Life, Inc.*,

   551 U.S. 449 (2007) .................................................................................. 7

*Invisible Empire Knights of Ku Klux Klan v. City of W. Haven*,

   600 F. Supp. 1427 (D. Conn. 1985) ....................................................... 14

*Klein v. City of San Clemente*,

   584 F.3d 1196 (9th Cir. 2009) ................................................................ 24

*Koons v. Platkin*,

   2023 WL 3478604, at *108 (D.N.J. May 16, 2023) .............................. 24

*Kwong v. Bloomberg*,

   723 F.3d 160 (2d Cir. 2013) ................................................................... 13

*May v. Bonta*,

   2023 WL 8946212, at *19 (C.D. Cal. Dec. 20, 2023) ........................... 24

*McDonald v. City of Chicago*,

   561 U.S. 742 (2010) .................................................................................. 3

*Melendres v. Arpaio*,

   695 F.3d 990 (9th Cir. 2012) .................................................................. 23

*Memorial Hospital v. Maricopa County*,

   415 U.S. 250 (1974) .................................................................................. 7

*Monterey Mech. Co. v. Wilson*,

   125 F.3d 702, 715 (9th Cir. 1997) .......................................................... 23

*Murphy v. Guerrero*,

   2016 WL 5508998, at *24 (D. N. Mar. I. Sept. 28, 2016) .................... 12

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,

   597 U.S. 1 (2022) ............................................................................. passim

*Obergefell v. Hodges*,

   576 U.S. 644 (2015) ................................................................................ 19

iv

TABLE OF AUTHORITIES

*Preminger v. Principi*,

    422 F.3d 815 (9th Cir. 2005)................................................................................24

*Rodriguez v. Robbins*,

    715 F.3d 1127 (9th Cir 2013)...........................................................................23

*Rogers v. Hacker*, 2023 WL 5529812, at *8 (S.D. Ill. Aug. 28, 2023).....................6

*Saenz v. Roe*,

    526 U.S. 489 (1999) ...........................................................................................20

*Shapiro v. Thompson*,

    394 U.S. 618 (1969) ...........................................................................................20

*Shuttlesworth v. Birmingham*,

    394 U.S. 147(1969) .....................................................................................5, 9, 15

*Silvester v. Harris,*

    843 F.3d 816 (9th Cir. 2016)...............................................................................8

*Srour v. New York City*,

    2023 WL 7005172, at *14 (S.D.N.Y. Oct. 24, 2023) .......................................15

*Staub v. City of Baxley*,

    355 U.S. 313 (1958) ...........................................................................................15

*Toomer v. Witsell*,

    334 U.S. 385 (1948) ...........................................................................................20

*U. S. Lab. Party v. Codd*,

    527 F.2d 118 (2d Cir. 1975)...............................................................................14

*United States v. Daniels*,

    77 F.4th 337 (5th Cir. 2023)...............................................................................16

*Valle del Sol Inc. v. Whitting*,

    732 F.3d 1006 (9th Cir. 2013)...........................................................................24

*Watson v. Stone*,

    4 So.2d 700 (1941)...........................................................................................16

v

TABLE OF AUTHORITIES

*Winter v. Nat. Res. Def. Council, Inc.*,

   55 U.S. 7 (2008) ................................................................................. 3

*Wolford v. Lopez*,

   2023 WL 5043805, at *32 (D. Haw. Aug. 8, 2023 ............................. 24

**Statutes**

18 USC section 922 .............................................................................. 22

Ariz. Rev. Stat. § 13-3112(E)(6) &(N) (2024) ..................................... 22

Cal. Penal Code § 26155 ...................................................................... 22

Cal. Penal Code § 26190 (f) ................................................................... 2

Cal. Penal Code § 26190(e) .................................................................... 2

Cal. Penal Code § 26190(g) .................................................................. 18

Cal. Penal Code § 26205 ........................................................................ 8

Cal. Penal Code § 28220 ........................................................................ 8

Cal. Penal Code § 30000 ........................................................................ 8

Cal. Penal Code §26150 .................................................................... 2, 22

Utah Code Ann. § 53-5-704 (West 2024) ............................................ 22

**Other Authorities**

11A Charles Alan Wright et al., <u>Federal Practice and Procedure</u>

   § 2948.1 (2d ed. 1995) ..................................................................... 23

ake Fogelman, *California City to Charge More Than $1,000 for Gun Carry*

   *Permits*, The Reload, Mar. 1, 2023 ................................................. 10

Fred L. Button, ed., General Municipal Ordinances of the City of Oakland,

   California (Oakland, CA; Enquirer, 1895) ........................................ 21

Jim Guy, *California concealed weapons instructors pushed out by new rules,*

   *causing shortage*, Fresno Bee, Jan. 9, 2024 ..................................... 9

Tony Saavedra, *Police might not know where their guns are, and the law says*

   *that's OK*, Orange Cnty. Reg. (Cal.), Sept. 28, 2016 ........................ 15

vi

Valerie Richardson and Matt Delaney, *Baltimore police arrest 'good guy with the gun' who stopped armed attacker*, Wash. Times (D.C.), Sept. 2, 2022 ...............20

Will Daniel, *'Turbulence ahead': Nearly 4 in 10 Americans lack enough money to cover a $400 emergency expense, Fed survey shows*, Fortune Mag., May 23, 2023 ....................................................................................................................13

**Rules**

Fed. R. Civ. P. 65(a)(2)..............................................................................................25

TABLE OF AUTHORITIES

## I.   INTRODUCTION

California conditions the exercise of the enumerated right to public carry on the prior issuance of a concealed handgun license ("CCW permit"). But as the Supreme Court instructs, if such permits are to be required at all, they must be issued on a "shall issue" basis where, so long as a CCW permit applicant is eligible to lawfully possess a firearm and satisfies basic, objective, administrative requirements (such as not being a convicted felon), the issuing authority must issue the permit.

This action challenges the constitutionality of carry permit issuance policies that violate the Second Amendment by imposing abusive delays and exorbitant fees or by prohibiting Plaintiffs from obtaining CCW permits altogether, in contravention of the express warning of *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 38 n.9 (2022) ("*Bruen*"), that permitting schemes (to the extent they exist at all) not be "abusive."

Defendants are contravening the Supreme Court's ruling in several ways:

(1) The Los Angeles County Sheriff's Department ("LASD") takes 18 months or more to issue CCW permits. *See* Decl. of Richard Minnich in Supp. of Pls.' Mot. for Prelim. Inj., ¶ 8; Decl. of Charles Messel in Supp. of Pls.' Mot. for Prelim. Inj., ¶ 7; Decl. of Brian Weimer in Supp. of Pls.' Mot. for Prelim. Inj., ¶¶ 5-6; Decl. of Jack Skadsem in Supp. of Pls.' Mot. for Prelim. Inj., ¶ 6; and Decl. of Woodrow Stalter in Supp. of Pls.' Mot. for Prelim. Inj., ¶ 6;

(2) To obtain a CCW permit from the La Verne Police Department ("LVPD"), an applicant must be prepared to spend $1,000 in fees, an oppressive "poll tax" on the exercise of a constitutional right; and this amount will increase to approximately $1,200 in 2024. *See* Decl. of Clarence Rigali in Supp. Of Pls.' Mot. For Prelim. Inj., ¶ 5; Decl. of Keith Reeves in Supp. Of Pls.' Mot. For Prelim. Inj., ¶ 5; Decl. of Cynthia Gabaldon in Supp. Of Pls.' Mot. For Prelim. Inj., ¶ 5; Decl. of Jim Carlson in Supp. Of Pls.' Mot. For Prelim. Inj., ¶ 11;

MEMO. OF POINTS & AUTHORITIES IN SUPPORT OF MOT. PRELIM. INJ.

(3) Both LASD and LVPD engage in forbidden suitability determinations, i.e., LASD has denied one Plaintiff—not for committing some sort of disqualifying crime—but rather for being *the victim* of crime (*see* Velasquez Decl., *passim*), while another member of Plaintiff California Rifle & Pistol Association, Incorporated ("CRPA") was denied a CCW permit by LASD because he was subject to a temporary restraining order which was promptly dissolved after a hearing. *See* Decl. of Sherwin David Partowashraf in Supp. of Pls.' Mot. for Prelim. Inj., ¶¶ 3-7; and

(4) LVPD requires all applicants to take invasive, time-consuming, and impermissibly subjective psychological exams, relegating the bearing of arms to constitutional steerage. *See* Rigali Decl., ¶¶ 7-11; Reeves Decl., ¶ 6; Gabaldon Decl., ¶ 6; and Carlson Decl., ¶ 4. As justification for this last obstacle, LVPD cites California Penal Code section 26190(e),[1] which is a state law that allows issuing authorities to mandate psychological testing if they so choose. Both such psychological testing itself, and the discretion to mandate it as a qualification for a permit to exercise a constitutional right, are unconstitutional.

Finally, California law only recognizes CCW permits issued in California, and does not allow permits to be issued to out-of-state residents, no matter how often they conduct business in California or are otherwise present in the state. Plaintiff Hoover is a Florida resident and has a Florida-issued CCW permit. California does not honor his Florida permit when he visits California, nor may he obtain a California permit because he is not a California resident. *See* Decl. of Stephen Hoover in Supp. of Pls.' Mot. for Prelim. Inj., ¶ 4; and Cal. Penal Code § 26150(a)(3) (West 2024). In other words, Hoover's constitutional right *ends* when he crosses California's state line, as if he has entered another country entirely. Other members of the associational plaintiffs who live outside of California likewise are denied the right to carry in California, including one who is a retired

---

[1] This section was designated 26190 (f) prior to the passage of SB 2.

MEMO. OF POINTS & AUTHORITIES IN SUPPORT OF MOT. PRELIM. INJ.

California prosecutor now living in Nevada, who held California CCW permits for decades, and who still owns property in California that he visits frequently. *See* Decl. of David Broady in Supp. of Pls.' Mot. for Prelim. Inj., ¶ 3. Such individuals, who the Second Amendment unabashedly declares possess a broad right to "bear arms," are forbidden from carrying in *any manner* in California under the challenged law.

No court would tolerate abuses like this for any other constitutional right. If the right to vote was conditioned on an 18-month registration timeline, a $1,000 registration fee, or subjective psychological testing, an injunction would issue before the ink dried on a plaintiff's complaint. Similarly, if a state denied the First Amendment right of a visiting resident of another state to take Sunday mass, courts would strike down that law without hesitation. The same relief is required here. The Second Amendment is not "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010); and *Bruen*, 597 U.S. at 70.

## II. ARGUMENT

To obtain a preliminary injunction, the moving party must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 55 U.S. 7, 20 (2008).

### A. Plaintiffs are likely to succeed on the merits.

#### 1. Historical analysis under the Second Amendment.

In 2022, the Supreme Court unequivocally reaffirmed the original public meaning standard for analyzing Second Amendment challenges set forth in *District of Columbia v. Heller*, 554 U.S. 570 (2008). Applying that test, the Supreme Court found that the Second Amendment protects the right to armed self-defense in

3

public. *Bruen*, 597 U.S. at 19, 31-33. The *Bruen* Court reiterated that courts may not engage in any form of "intermediate scrutiny" or even "strict scrutiny" in Second Amendment cases. *Id.* at 23.

The Supreme Court unambiguously instructed how a proper Second Amendment analysis is to be conducted by a reviewing court:

> We reiterate that the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 24. Lest there be any confusion, the Court explained the burden that the Second Amendment imposes: "[T]he *government must demonstrate* that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 17 (emphasis added); *see also id.* at 19, 24, 58 n.25, 59 & 70.

Moreover, the government cannot simply proffer just any historical law that vaguely references firearms (which would be wholly irrelevant to the court's analysis under the rules of evidence anyway). Rather, when challenged laws regulate features, conduct, or circumstances that already existed at the time of the Founding, the absence of widespread historical laws restricting those same features, conduct, or circumstances indicates that the Founders understood the Second Amendment to preclude such regulation. *Id.* at 27.

### 2. *Bruen* already decided most issues of this case.

Except for California's refusal to issue permits to out-of-state residents, discussed *infra*, the Supreme Court already has repudiated Defendants' abusive practices. In a footnote contrasting shall-issue permitting systems with categorically-impermissible may-issue regimes, the Court explained as follows:

4

MEMO. OF POINTS & AUTHORITIES IN SUPPORT OF MOT. PRELIM. INJ.

[Shall-issue permitting systems] appear to contain only "narrow, objective, and definite standards" guiding licensing officials, *Shuttlesworth v. Birmingham*, 394 U.S. 147, 151, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969), **rather than requiring the "appraisal of facts, the exercise of judgment, and the formation of an opinion**," *Cantwell v. Connecticut*, 310 U.S. 296, 305, 60 S.Ct. 900, 84 L.Ed. 1213 (1940)—features that typify proper-cause standards like New York's. That said, because any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes **where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry**.

*Bruen*, 597 U.S. at 38 n.9 (emphasis added).

It is all but certain that Defendants will fail to proffer evidence showing a representative historical tradition of forcing citizens to wait 18 months or pay over $1,000 in fees before exercising the right to carry, or any laws denying the right to carry based on subjective suitability determinations like psychoanalysis or crime victimhood status. There is no need for a drawn-out historical analysis in this case.

### 3.    LASD's lengthy waiting periods are unconstitutional.

To call LASD's permitting delays egregious would be an understatement. By taking over 18 months—*one and a half years of Plaintiffs' lives*—to complete an entirely ministerial task, LASD has created precisely the "lengthy wait times in processing license applications … [that] deny ordinary citizens their right to public carry" that *Bruen* prohibited. 597 U.S. at 38 n.9; *and see* Messel Decl., ¶ 7; Weimer Decl., ¶¶ 5-6; Skadsem Decl., ¶ 6; and Stalter Decl., ¶ 6.  To make matters worse, LASD has compounded these constitutionally and morally intolerable waiting periods by delaying applicants' previously scheduled appointments by an additional *six months*. *See* Minnich Decl., ¶ 7.

To put the absurdity of this rights-denial regime into perspective, LASD expects applicants to wait up to 24 months to be granted *permission* to exercise a right already enumerated in the Constitution.  In that timeframe, applicants can plan to have a child, *have* that child, and then watch as their baby begins walking and talking – but they cannot protect that new family in public, regardless of their

5

objective eligibility. Indeed, engaging in the slow, deliberate process of raising the next generation evidently is *easier* to accomplish than stamping an approval on a sheet of paper.

Of course, the premise that Plaintiffs must submit to a permitting process to exercise a natural right clearly articulated in the plain text of the Constitution – on pain of criminal consequences – is historically and therefore constitutionally unsound. The Founders never conditioned the right to public carry on government licensure, a thoroughly modern invention that "does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen*, 597 U.S. at 66 n.28. Accordingly, a majority of states have recognized this historical reality and corrected their ahistorical permitting regimes via "constitutional carry" legislation where no permit is required to "bear arms."

Odious to the original meaning of the Bill of Rights as permitting regimes may be, many states that continue to require some form of carry licensure impose *no* waiting periods at all. For example, Cumberland County, Pennsylvania issues Pennsylvania Licenses to Carry Firearms almost *instantaneously*, even with a required background check. *See* License to Carry Firearms, Cumberland Cnty., Pa. https://www.cumberlandcountypa.gov/3094/License-to-Carry-Firearms (last visited Jan. 24, 2024), a copy of which is attached to the Req. for Judicial Not. in Supp. of Pls.' Mot. for Prelim. Inj. ("RJN") as Ex. A. Applicants can choose to either apply online, or on paper in person, where they wait on the premises until the background check clears and the permit is printed. Many state sheriffs across the country operate similarly—walk in, complete a background check, and walk out a few minutes later with a permit.

LASD may demur that it is moving as quickly as it can, but is simply overwhelmed. But in numerous contexts, the Constitution forecloses conditioning the exercise of rights on lengthy waiting periods. *See, e.g.*, *Rogers v. Hacker*, 2023 WL 5529812, at *8 (S.D. Ill. Aug. 28, 2023) (finding a waiting period of *five*

6

*months* to issue a firearm owners ID card constituted a concrete injury); *Memorial Hospital v. Maricopa County*, 415 U.S. 250, 263-64 (1974) (an Arizona statute imposing a *one-year waiting period* for new residents to become eligible for state medical assistance impermissibly interfered with the constitutional right to freedom of interstate immigration). In *Cooper v. Aaron,* 358 U.S. 1 (1958), the Supreme Court was confronted with similar bureaucratic foot dragging in implementing public school integration. Much like California localities' disparate degrees of *Bruen* compliance today, some parts of Arkansas' government were acting in good faith, while others were not. *See* Compl., ¶¶ 4-6, 78-91, ECF No. 1. Given the open defiance of the Supreme Court's opinion in *Brown I*[2] and *Brown II*,[3] the Court did not tolerate finger-pointing, simply observing that "delay in any guise in order to deny . . . constitutional rights . . . could not be countenanced, and that only a prompt start, diligently and earnestly pursued . . . could constitute good faith compliance." 358 U.S. at 7.

When it comes to exercising a constitutional right, LASD's purported internal delays are neither Plaintiffs' nor any applicants' problem.  If issuing permits to law-abiding gun owners is such a burdensome task, then California may accord with early historical tradition and join states like Arizona, Vermont, and Utah – dispensing with the permit requirement altogether and becoming a constitutional carry state.

It seems axiomatic that a state may not deliberately impose roadblocks to the exercise of enumerated rights.  Yet LASD's interview process is "prophylaxis upon prophylaxis" (*FEC v. Wisc. Rt. to Life, Inc.*, 551 U.S. 449, 478-79 (2007)), designed merely to cause delay, cost, and consternation to applicants, without providing any information useful to a "shall issue" permitting regime.  To even apply for a CCW permit, one must specifically identify firearms that they own and

---

[2] *Brown v. Board of Education*, 347 U.S. 483 (1954).
[3] *Brown v. Board of Education*, 349 U.S. 294 (1955).

intend to have listed on that permit. To purchase a firearm to list on that permit, applicants already will have undergone a criminal background check and a check for incidents of mental health hospitalization as a prerequisite of purchase. *See Silvester v. Harris,* 843 F.3d 816, 825 (9th Cir. 2016), *overruled in part on other grounds by Baird v. Bonta,* 81 F.4th 1036, 1043 (9th Cir. 2023); *see also* Cal. Penal Code § 28220 (West 2024). And if any CCW applicant has engaged in disqualifying conduct since that purchase, they already will have been placed on the State's Armed Prohibited Persons System list. Cal. Penal Code §§ 30000, *et seq.* (West 2024). Furthermore, the criminal background and mental health check process is automatically conducted *again* once the CCW permit application is submitted. *Id.* §§ 26202 & 26150(a)(1) (West 2024). LASD's interview process therefore is redundant, and provides no additional useful objective information about an applicant's qualification to carry. To the extent it would help LASD issue permits within a constitutionally permissible time period, the unnecessary and entirely unhelpful interview process can and should be permanently enjoined.

This Court also need not agonize over what is or is not a "lengthy wait time" under *Bruen*, because California has already set an upper-bound time limit on CCW permit issuance which is flouted by LASD. Under recently revised Penal Code section 26205, operative in January of 2024, a licensing authority:

> shall give this notice [of approval or denial of a CCW permit] **within 120 days** of receiving the completed application for a new license, or 30 days after receipt of the information and report from the Department of Justice described in paragraph (2) of subdivision (a) of Section 26185, whichever is later. The licensing authority shall give this notice within 120 days[4] of receiving the completed application for a license renewal.

(Emphasis added).

To be sure, Plaintiffs do not believe a waiting period of *four months* to exercise a right is remotely constitutional—according to controlling early historical tradition (where no permit was ever required), or when compared to *other*

---

[4] The 120-day time limit was 90 days prior to the passage of SB 2.

8

enumerated rights (where no permit is required). Yet it is notable that, even outside the *Bruen* framework, California law mandates a 120-day maximum period for issuance or denial, and LASD is not complying even with that limit. Given some CRPA members have waited *over 18 months* (*see* Messel Decl., ¶ 7; Weimer Decl., ¶¶ 5-6; Skadsem Decl., ¶ 6; and Stalter Decl., ¶ 6), LASD adhering to even the statutory period would provide dramatic relief.

Thus, this Court should, at a minimum, and in accordance with the statute, order LASD to comply with the statute, and issue permits once applicants have completed their background check and CCW training course[5] or on day 121 from application submission, whichever is later. In the free speech context, an individual "faced with such an unconstitutional licensing law may ignore it and engage with impunity in the exercise of the right of free expression for which the law purports to require a license." *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 151 (1969). The same principle should apply here. *See Bruen*, 597 U.S. at 70 (warning Second Amendment is not "a second-class right"). In other words, unless and until LASD can bring its actions into constitutional compliance (if a permitting system can even achieve that standard), no permit should be required.

After attempting informal resolution of these issues, CRPA purposefully held off on this litigation to give LASD time to come into compliance with *Bruen*. Indeed, many other sheriff's departments *have* improved their processing times. *See*

---

[5] Based on recent events, even the required training course has become more constitutionally suspect. Just a few weeks ago, the California Department of Justice launched a bizarre attack against CCW training course providers, implementing new "emergency" regulations that disqualify the great majority of them. This latest Second Amendment attack will only exacerbate the waiting times issue. *See* Jim Guy, *California concealed weapons instructors pushed out by new rules, causing shortage*, Fresno Bee, Jan. 9, 2024, https://www.fresnobee.com/news/california/article283842733.html, (last visited Jan. 13, 2024).

Plaintiffs CRPA and GOC submitted a comment letter to notify DOJ of the issues the new rules would cause, to no avail. *CRPA & GOC File Comments on Proposed DOJ CCW Regulations*, CRPA.org, Dec. 19, 2023, https://crpa.org/news/blogs/crpa-goc-files-comments-on-proposed-doj-ccw-regulations/, (last visited Jan. 13, 2024).

MEMO. OF POINTS & AUTHORITIES IN SUPPORT OF MOT. PRELIM. INJ.

Minnich Decl., ¶ 5. Unfortunately, LASD's wait times got worse, not better. It is now time for LASD to finally start issuing permits promptly and, *at a minimum*, within the bounds of California law, even if not the Second Amendment.

### 4.       La Verne's fees are unconstitutional.

When LVPD's exorbitant CCW permit fees were announced, they were so shocking that they inspired news articles. *See, e.g.*, Jake Fogelman, *California City to Charge More Than $1,000 for Gun Carry Permits*, The Reload, Mar. 1, 2023, https://thereload.com/california-city-charges-more-than-1000-for-gun-carry-permits/ (last visited Jan. 4, 2024).

Broken down item by item, La Verne's current fee schedule includes $398 for "processing," $100 for administrative fees, a $93 licensing fee, $20 for livescan (but this "may be subject to additional fees"), $150 for the psychological exam that the City requires, and $175 (estimated) for the training course. *See* La Verne Police Department CCW Fee Schedule, https://docs.google.com/document/d/1g_o OI4RbXAmUa3SiqwhFTvlBaY5ZIs_VOUtSdQocOEU/preview (last visited Jan. 23, 2024), a copy of which is attached as Ex. B to the RJN.

In a best-case scenario, if the fees do not go any higher than LVPD states, an applicant will pay $936 to exercise the constitutional right to bear arms. Yet it is Plaintiffs' understanding that, in line with recent changes to California law that lifted the $150 maximum that could be charged for the psychological examination, La Verne may increase the cost of the examination to $400. *See* Minnich Decl., ¶ 11. If that happens, applicants will soon be expected to shell out almost $1,200 to exercise an enumerated right. According to counsel for the La Verne defendants, the City Council has not yet decided whether the fee for the psychological exam will increase. *See* Decl. of Konstadinos T. Moros in Supp. of Pls.' Mot. for Prelim. Inj., ¶ 2.

Whether $900 or $1,200, this is dramatically more (many orders of magnitude more) than what citizens of other states pay. For example, in Arizona,

10

where applying for a permit is *entirely optional* because Arizona is a constitutional carry state, the application fee is $60 plus the cost of fingerprinting that must be submitted with the application. *See* Concealed Weapons & Permits, Ariz. Dep't of Pub. Safety, https://www.azdps.gov/services/public/cwp (last visited Jan. 23, 2024), a copy of which is attached as Ex. C to the RJN.

In Texas, another constitutional carry state, the application fee is $40. *See* Licensing & Registration, Tex. Dep't of Pub. Safety, https://www.dps.texas.gov/section/handgun-licensing/licensing-registration (last visited Jan. 23, 2024), a copy of which is attached as Ex. D to the RJN. Likewise, Utah charges $53.25 for Utah residents, and $63.25 for nonresidents. *See* How do I Apply for a Concealed Firearm Permit?, Utah Dep't of Pub. Safety, https://bci.utah.gov/concealed-firearm/how-do-i-apply-for-a-concealed-firearm-permit (last visited Jan. 23, 2024), a copy of which is attached as Ex. E to the RJN. Washington State charges $36 plus fingerprinting fees. *See* Fees: Firearms, Wash. St. Dep't of Licensing, https://www.dol.wa.gov/professional-licenses/firearms-dealers/fees-firearms-dealers (last visited Jan. 23, 2024), a copy of which is attached as Ex. F to the RJN.

While California CCW permit fees generally are costlier than other jurisdictions across the country, the fees La Verne charges eclipse even other issuing authorities *within California*. LASD, for example, charges a $43 initial fee, a $170 issuance fee, plus the cost of training and livescan, which applicants do on their own through a third party. *See* Los Angeles County Sheriff's Department Concealed Carry Weapon License, Permitium, https://lasd.permitium.com/entry (last visited Jan. 23, 2024), a copy of which is attached as Ex. G to the RJN. La Verne's next-door neighbor Glendora charges only $243 in total for processing (including livescan) despite having a comparable population and resources. *See* Glendora Police Department License to Carry a Concealed Weapon, Permitium, https://glendorapdca.permitium.com/ccw/start (last visited Jan. 23, 2024), a copy of which is attached as Ex. H to the RJN.

11

Several other examples of jurisdictions with significantly less onerous application fees were provided in the Complaint at ¶ 98. Moreover, none of the examples listed above or in the Complaint requires a psychological exam, which saves applicants $150, not to mention their time, dignity, and additional violation of their rights. Finally, permit renewal fees are generally under $100, while La Verne still charges $348 for renewals every two years, plus the cost of the training course.

While most applicants in California will spend around $400-$600 to get their permits—already an unconstitutional impediment to exercise a right—such a cost is a comparative bargain compared to LVPD's astronomical $1,000 price tag for government *permission* to bear arms in public.

A similarly exorbitant fee to exercise Second Amendment rights was already rejected as unconstitutional, pre-*Bruen*, under a *less* stringent standard. The Northern Mariana Islands had previously placed a $1,000 excise tax on handguns in a move, like La Verne's, either to chill the exercise of a constitutional right or at least to limit it to a more privileged segment of the population. That tax imposed "a tremendous burden on the rights of responsible law-abiding citizens in the CNMI to obtain handguns." *Murphy v. Guerrero*, 2016 WL 5508998, at *24 (D. N. Mar. I. Sept. 28, 2016). If $1,000 is too much of a burden on the right to *keep* arms, then such an expense is equally unacceptable *bearing those* arms. Decided prior to *Bruen,* the *Murphy* Court made the (now forbidden) finding that, *even under interest balancing*, "[p]ublic safety cannot be the legitimate interest, unless the [City] seeks to safeguard the community by disarming the poor." *Id.* at 82.

La Verne likely will argue that it is simply passing its costs on to applicants. That argument fails for two reasons. First, the *Bruen* Court clearly disapproved of "exorbitant fees [that] deny ordinary citizens their right to public carry." *Bruen*, 597 U.S. at 38 n.9 (emphasis added). It does not matter if La Verne is merely charging its own costs, if those costs effectively deny ordinary citizens their right to carry. At a time when nearly 4 in 10 Americans would not be able to afford a $400

12

emergency expense, LVPD's exorbitant fees price many would-be applicants out of California's unconstitutional black market for constitutional rights. *See* Rigali Decl., ¶ 5; Reeves Decl., ¶ 5; and Gabaldon Decl., ¶ 5; *see also* Will Daniel, *'Turbulence ahead': Nearly 4 in 10 Americans lack enough money to cover a $400 emergency expense, Fed survey shows*, Fortune Mag., May 23, 2023, https://fortune.com/2023/05/23/inflation-economy-consumer-finances-americans-cant-cover-emergency-expense-federal-reserve/ (last visited Jan. 5, 2024).

Even pre-*Bruen* cases, decided before the Supreme Court clarified the sanctity of the carry right, implicitly recognized that $1,000 is a constitutionally unreasonable sum to charge for a CCW permit. In *Kwong v. Bloomberg*, 723 F.3d 160 (2d Cir. 2013), the CCW permit application fees there were "designed to defray (and not exceed) the administrative costs associated with the licensing scheme" and were therefore deemed acceptable. *See id.* at 165-69. But the fees in *Kwong* totaled a mere $350 for a permit valid for three years, not two. La Verne's fee scheme is drastically more expensive by comparison: "[W]e find it difficult to say that the licensing fee, which amounts to just over $100 per year, is anything more than a 'marginal, incremental or even appreciable restraint' on one's Second Amendment rights—especially considering that plaintiffs have put forth *no evidence* to support their position that the fee is prohibitively expensive." *Id.* at 167.

Here, Plaintiffs have presented such evidence. *See* Rigali Decl., ¶ 5; Reeves Decl., ¶ 5; and Gabaldon Decl., ¶ 5; La Verne Police Department CCW Fee Schedule, Ex. B to the RJN (fees are a minimum of $436 per year, and increasing to $600-plus once SB 2 fee increases allow the psychological exam fee to be increased). Although *Kwong* was decided pre-*Bruen* when courts still wrongly believed that a law was permissible if it did not completely eliminate or destroy the Second Amendment right, even under *Kwong's* less constitutionally-faithful reasoning, it undercuts any argument La Verne could make to justify its exorbitant costs, whether "passed on" or otherwise.

13

Second, in other constitutional contexts, courts uniformly have held that fees cannot inhibit people from exercising their rights. In the First Amendment context, for example, "[a]lthough a permit fee may be allowed for the limited purpose of covering administrative costs, such administrative costs are normally minor and unlikely to inhibit anyone from exercising his or her First Amendment rights. . . . The imposition of police costs, however, will frequently create a substantial financial burden." *Invisible Empire Knights of Ku Klux Klan v. City of W. Haven*, 600 F. Supp. 1427, 1434 (D. Conn. 1985) (citing *U. S. Lab. Party v. Codd*, 527 F.2d 118, 119 (2d Cir. 1975)).

Likewise, in the context of free and fair elections, imposing high fees for candidates to access the ballot is unconstitutional even under repudiated interest balancing because, "[b]y requiring candidates to shoulder the costs of conducting primary elections through filing fees and by providing no reasonable alternative means of access to the ballot, the [State] has erected a system that utilizes the criterion of ability to pay as a condition to being on the ballot, thus excluding some candidates otherwise qualified and denying an undetermined number of voters the opportunity to vote for candidates of their choice." *Bullock v. Carter*, 405 U.S. 134, 149 (1972). Just as in *Bullock*, "[t]he city's interest in recouping the costs of its already existing duty of protecting its citizens in the exercise of their constitutional rights cannot justify the massive burden [the expense] imposes upon those rights." *Id.*

In sum, LVPD's exorbitant fees are odious to the Second Amendment, contrary to *Bruen*, and would violate the exorbitant-fee principles used in the context of other constitutional rights.

### 5. LASD's discretionary denials are unconstitutional.

*Bruen* expressly forbids discretionary criteria in CCW permit issuance. *Bruen*, 597 U.S. at 38 n.9. This prohibition is hardly surprising, as it is in line with First Amendment jurisprudence and other constitutional rights subject to permit

14

processes. *See Shuttlesworth v. City of Birmingham*, 394 U.S. 147 (1969), *Schneider v. New Jersey*, 308 U.S. 147 (1939), and *Staub v. City of Baxley*, 355 U.S. 313 (1958).  In contrast, *Bruen* discusses "narrow, objective, and definite" standards, perhaps to include something like the DOJ's background check, and confirmation that applicants have completed a training course. Regardless, *Bruen* flatly prohibits standards that require the "appraisal of facts, the exercise of judgment, and the formation of an opinion." *Bruen*, 597 U.S. at 38 n.9. Both LASD and LVPD flout this requirement through their discretionary criteria.

For example, LASD denied one plaintiff a CCW permit renewal because he was the victim of a crime. *See* Velasquez Decl., ¶¶ 6-10.[6] Another CRPA member was denied a CCW permit because a temporary restraining order was filed against him, even though that order was promptly dissolved upon a hearing and his firearms were returned to him. *See* Partowashraf Decl., ¶¶ 3-7. Both were told they may not appeal these subjective denials.

LASD is thus still behaving as if it may deny an enumerated right based on the thinnest of pretexts. It may not. Under *Bruen*, issuing authorities are not empowered to "decide not to issue a permit or license for a firearm based on that official's discretionary assessment of the applicant's 'good moral character' . . . permitting denial of a firearms license based on a government official's 'good moral character' or 'good cause' assessment has the effect of 'prevent[ing] law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms.'" *Srour v. New York City*, 2023 WL 7005172, at *14 (S.D.N.Y. Oct. 24, 2023) (citing *Bruen*, 597 U.S. at 69).

---

[6] If being the victim of firearm theft is sufficient grounds to deny the right to carry, then many LASD personnel would also need to be disarmed, given that "at least 103 L.A. County Sheriff's Department guns, ranging from service handguns to shotguns, were lost or stolen [between 2011 and 2016]." Tony Saavedra, *Police might not know where their guns are, and the law says that's OK*, Orange Cnty. Reg. (Cal.), Sept. 28, 2016, https://www.ocregister.com/2016/09/28/police-might-not-know-where-their-guns-are-and-the-law-says-thats-ok/amp/ (last visited Jan. 24, 2024).

MEMO. OF POINTS & AUTHORITIES IN SUPPORT OF MOT. PRELIM. INJ.

While the Plaintiffs and declarants in this matter are each model citizens, even if some government official believed otherwise, that subjective belief alone is not reason enough to deny them CCW permits. More than just "model" citizens have the right to bear arms. *District of Columbia v. Heller*, 554 U.S. at 580 (defining "the people"); *United States v. Daniels*, 77 F.4th 337, 342 (5th Cir. 2023). Background checks may not become subjective tests where the police allow only "desirables" to exercise their rights.

*Bruen*'s flat bar against subjective tests is not only constitutionally required, but necessary based on historical experience. In prior eras, hostile state governments tried to stop various disfavored groups from being armed. One example is freed former slaves during Reconstruction. President Grant complained in a letter to Congress that the Ku Klux Klan's objectives were "by force and terror, to prevent all political action not in accord with the views of the members, *to deprive colored citizens of the right to bear arms* . . . and to reduce the colored people to a condition closely akin to that of slavery." H.J., 42nd Cong., 2d Sess. 716 (1872) (emphasis added). The few permitting laws of the 19th century that did spring up were often meant to stop Black Americans from being armed. *See, e.g.*, *Watson v. Stone*, 4 So.2d 700, 703 (1941) (Buford, J., concurring) (discussing an 1893 repeating rifle permitting law that "was passed for the purpose of disarming the negro laborers. . . . The statute was never intended to be applied to the white population and in practice has never been so applied. … there has never been, within my knowledge, any effort of enforce the provisions of this statute as to white people, because it has been generally conceded to be in contravention to the Constitution and non-enforceable if contested.").

The odious and obviously unconstitutional goal of disarming citizens based on race or ethnicity, through use of discretionary denials of permits, may seem anachronistic, but the only concrete way to ensure that Defendants are not engaged in impermissibly subjective assessments is to strike down all such subjective

16

assessments. In the context of exercising constitutional rights, the use of discretionary and subjective criteria should be considered *per se* government misconduct. Under a true "shall issue" permit regime, if someone can pass a background check and perhaps meet a requisite training standard, they receive their CCW permit regardless of the druthers of government officials. History demands as much, given that permitting of this sort did not even exist prior to the 20th century. As *Bruen* teaches, any such system may not be operated in a way that excludes people from their rights arbitrarily.

### 6.   LVPD's psychological exam is unconstitutional.

LVPD's psychological examination requirement fails for similar reasons that LASD's discretionary denials fail. A psychological exam is inherently subjective and discretionary, particularly when there is no process to appeal or get a second opinion. LVPD's examination is abusive in other ways too, appearing designed to dissuade applicants from even applying. The exam is administered at a facility in San Bernardino on weekdays, thereby excluding those who may be unable to take time off work during normal business hours. *See* Carlson Decl., ¶ 4. That drive takes approximately an hour each way for a typical La Verne resident. *Id.* The facility that applicants are required to use was designed to test applicants applying for roles in law enforcement, not citizens exercising their Second Amendment rights. *See* Psychological Assessment, City of La Verne Police Dep't, https://www.lvpd.org/uploads/Psychological%20Assesment.pdf (last visited Jan. 23, 2024), a copy of which is attached as Ex. I to the RJN.

Yet for reasons having no grounding in science or empirical evidence, LVPD requires CCW permit applicants to take a psychological exam asking applicants the same questions that are used to screen its law enforcement personnel. Applicants are then interviewed by a psychologist, who ultimately makes a recommendation to the City based on that individual psychologist's subjective impressions as to whether the person should be entrusted with Second Amendment rights.

17

The psychological exam process also violates due process protections, as deprivation of life, liberty, or property on grounds of mental illness must be conditioned on full due process rights, including judicial hearings, evidentiary standards, the right to call supporting witnesses, and the right of appeal. *See generally Addington v. Texas*, 441 U.S. 418 (1979). The current scheme of psychological exams required by LVPD has no such safeguards.

Nothing in the Second Amendment requires Plaintiffs to subject themselves to the indignity of a subjective exam as a precondition to exercise their constitutional rights. *See* Rigali Decl., ¶¶ 7-11; Reeves Decl., ¶ 6; and Gabaldon Decl., ¶ 6. As such, such a subjective determination is inherently in conflict with the Second Amendment *See Bruen*, 597 U.S. at 38 n.9. This Court should enjoin Penal Code section 26190(g), which allows psychological examinations at the issuing authority's discretion.

### 7.   California must recognize out-of-state CCW permits.

Plaintiffs should not be required to endure the expenses, arbitrary and pretextual requirements, delays, and other abuses imposed on them by local governments that refuse to recognize or honor their residents' Second Amendment rights. A city or county that never issued permits previously and completely denied its citizens any right to carry until *Bruen* (and only grudgingly purports to issue them now) is foreseeably unlikely to faithfully, promptly, and constitutionally respect the rights of its citizens going forward.  To expect holdout local governments to follow *Bruen* and respect the Second Amendment, absent those governments being the direct targets of costly and lengthy lawsuits such as this, is akin to expecting all states to have immediately respected and complied with *Brown I*. History bears out that such an expectation, sadly, has been a folly. *Cooper v. Aaron*, 358 U.S. 1 (1958). Expecting as much now from recalcitrant cities as to CCW permits would be an equal folly.

No other constitutional right ends at state borders. Yet non-Californians have

18

no ability to exercise the right to carry in this state, including Plaintiff Hoover. *See* Hoover Decl., ¶ 4. Members of the associational Plaintiffs are also affected, including one who is a former California Deputy District Attorney who had a CCW permit in this state for decades, but now lives in Nevada. *See* Broady Decl., ¶ 3. In addition, some of the Plaintiffs here, as well as other members of the associational Plaintiffs, are California residents who have permits issued by other states which California refuses to honor. *See* Rigali Decl., ¶ 5; Reeves Decl., ¶ 4; and Minnich Decl., ¶ 14.

An analogous issue was already decided in 2015. Because Ohio would not allow for same-sex marriages, James Obergefell and John Arthur decided to marry in Maryland. After learning that Ohio would not recognize their marriage, they filed a lawsuit. The Supreme Court ultimately held that the Fourteenth Amendment requires a State to recognize a marriage between two people of the same sex when their marriage was lawfully licensed and performed out-of-state. *Obergefell v. Hodges*, 576 U.S. 644, 681 (2015). In reaching this conclusion, the Court explained that:

> For some couples, even an ordinary drive into a neighboring State to visit family or friends risks causing severe hardship in the event of a spouse's hospitalization while across state lines. In light of the fact that many States already allow same-sex marriage—and hundreds of thousands of these marriages already have occurred—the disruption caused by the recognition bans is significant and ever-growing. As counsel for the respondents acknowledged at argument, if States are required by the Constitution to issue marriage licenses to same-sex couples, the justifications for refusing to recognize those marriages performed elsewhere are undermined.

*Id.* at 680-81. This holding and its logic, with respect to an unenumerated Substantive Due Process right to marry, should apply with equal force to the enumerated right to bear arms found in the Second Amendment. Indeed, the danger present "in an ordinary drive into a neighboring State" is even greater when it comes to the right to carry. While it did not occur in California, a recent example is illustrative of the precarious situation that Americans with carry permits face when

19

they cross into a state that does not recognize other states' permits. Lloyd Muldrow, a marine veteran and self-defense instructor, stopped an attack by an armed assailant in a Baltimore bar by using his concealed weapon. "[P]olice thanked him — and then they arrested him. . . . Mr. Muldrow, a North Carolina security specialist, holds a concealed weapons permit, but it was issued in Virginia, not Maryland," and Maryland does not honor the permit. *See* Valerie Richardson and Matt Delaney, *Baltimore police arrest 'good guy with the gun' who stopped armed attacker*, Wash. Times (D.C.), Sept. 2, 2022, https://www.washingtontimes.com/news/2022/sep/2/good-samaritan-faces-charges-after-stopping-armed-/ (last visited Jan. 17, 2024).

Separately from Plaintiffs' Second Amendment claim, the United States Supreme Court has also and consistently held that regulations and classifications that impose a penalty or an impermissible burden on the right to travel violate the Equal Protection Clause of the Fourteenth Amendment, unless absolutely necessary to promote a compelling government interest. *See Saenz v. Roe*, 526 U.S. 489, 501-02 (1999); and *Shapiro v. Thompson*, 394 U.S. 618, 629-30 (1969). Accordingly, California's policy of denying out-of-state residents the ability to lawfully exercise their constitutionally protected right to be armed in public inhibits the free interstate passage of citizens and violates equal protection doctrines by treating Americans differently merely on account of their state of residency.

Furthermore, the Privileges and Immunities Clause of Article IV, § 2 of the Constitution provides that "[t]he Citizens of each State shall be entitled to all privileges and immunities of Citizens in the several States." The Privileges and Immunities Clause bars discrimination against citizens of other states based on their status as a citizen of another state. *See Toomer v. Witsell*, 334 U.S. 385, 397-98 (1948). California's refusal to honor the CCW permits/licenses issued by its sister states is frustrating this constitutionally mandated policy.

While the application of privileges and immunities and equal protection for

20

out-of-state residents seeking to carry has not yet been adjudicated on the federal level in the post-*Bruen* era, a state court in Massachusetts has addressed this issue on Second Amendment grounds and offers valuable guidance. *See Commonwealth v. Donnell*, No. 2211CR2835 (Mass. Dist. Ct. Aug. 3, 2023).[7]  In *Donnell*, a resident of New Hampshire was charged with carrying a firearm in Massachusetts. Mr. Donnell was not otherwise barred from owning or carrying firearms, and his conduct would have been legal in his home state.

The court explained that Massachusetts failed to show any historical Second Amendment laws analogous to Massachusetts' modern disparate and second-class treatment of nonresidents. *See Donnell*, *passim*. In fact, a plethora of historical laws existed that provided "traveler's exceptions" to carry laws, effectively giving nonresidents *more* leeway to carry. California used to be no exception. *See, e.g.*, Fred L. Button, ed., General Municipal Ordinances of the City of Oakland, California (Oakland, CA; Enquirer, 1895), p. 218, Sec. 1, citing An Ordinance to Prohibit the Carrying of Concealed Weapons, No. 1141 ("It shall be unlawful for any person in the City of Oakland, not being a public officer **or a traveler** actually engaged in making a journey, to wear or carry concealed about his person without a permit, as hereinafter provided, any pistol"); *see also* Ordinance no. 84, Charter and Ordinances of the City of Sacramento, Prohibiting the Carrying of Concealed Deadly Weapons (1876) ("It shall be unlawful for any person, not being a public officer **or traveler**, or not having a permit from the Police Commissioners of the City of Sacramento, to wear or carry, concealed, any pistol, dirk, or other dangerous or deadly weapon.").  Copies of these ordinances are attached as Exs. J-K to the RJN.

Indeed, one "can think of no other constitutional right which a person loses simply by traveling beyond his home state's border into another state continuing to

---

[7] Republished online at https://www.docdroid.net/524o4XV/opinion-coffey-comm-v-donnell-pdf (last visited Jan. 6, 2024).

MEMO. OF POINTS & AUTHORITIES IN SUPPORT OF MOT. PRELIM. INJ.

exercise that right and instantaneously becomes a felon subject to mandatory minimum sentence and incarceration." *Donnell*, No. 2211CR2835 at 7-8.

Moreover, it was not enough that Massachusetts had a process to issue nonresident CCW permits, because the nonresident version of the CCW permit was only valid for one year (as opposed to five years for a Massachusetts resident), thereby violating Equal Protection. *See id.* at 5-6. The Court concluded:

> An individual only loses a constitutional right if he commits an offense or is or has been engaged in certain behavior that is covered by 18 USC section 922. He doesn't lose that right simply by traveling into an adjoining state whose statute mandate that residents of that state obtain a license prior to exercising their constitutional right. To hold otherwise would inexplicably treat Second Amendment rights differently than other individually held rights.

*Id.* at 8.

Yet as constitutionally infirm as Massachusetts's system is, even it, unlike California, provides some pathway for nonresidents to obtain a Massachusetts CCW permit to carry in Massachusetts. Nonresidents are barred in California from obtaining a CCW permit; issuing authorities are only authorized by the Penal Code to issue CCW permits to residents of their jurisdiction or to people who are principally employed within the jurisdiction. *See* Cal. Penal Code §§ 26150 & 26155 (West 2024). That is the reason why Plaintiff Hoover was denied a permit. *See* Hoover Decl., ¶ 4.

Nor are there indicia that other states' permitting requirements are less rigorous than California's, or result in permits being issued to prohibited people. E.g., while all States require background checks before issuing CCW permits, many, such as Utah and Arizona, also require training courses just as California does. *See* Ariz. Rev. Stat. § 13-3112(E)(6) &(N) (2024); Utah Code Ann. § 53-5-704 (West 2024).

California may not deny law-abiding Americans the right to carry in California just because they are not residents, just as the state court in *Donnell* recognized. And just as with the out-of-state marriage licenses in *Obergefell*,

22

California may not deny the out-of-state CCW permits of its own residents. This Court should rule accordingly.[8]

**B. Plaintiffs will suffer irreparable harm if denied relief.**

In this circuit, "[i]t is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); 11A Charles Alan Wright et al., *Federal Practice and Procedure* § 2948.1 (2d ed. 1995). The Ninth Circuit has imported the First Amendment's irreparable-if-only-for-a-minute rule to cases involving other rights and, in doing so, has held a deprivation of these rights irreparable harm per se. *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997). Most recently, the Ninth Circuit has reaffirmed the importance of the likelihood-of-success step, explaining that "[i]f a plaintiff bringing such a [constitutional] claim shows he is likely to prevail on the merits, that showing will almost always demonstrate he is suffering irreparable harm as well." *Baird,* 81 F.4th at 1042.

The Second Amendment should be treated no differently. *See McDonald*, 561 U.S. at 780 (refusing to treat the Second Amendment as a second-class right subject to different rules); *see also Ezell v. City of Chicago*, 651 F.3d 684, 700 (7th Cir. 2011) (a deprivation of the right to arms is "irreparable and ha[s] no adequate remedy at law").

**C. Balancing of the Equities sharply favors plaintiffs.**

In contrast to Plaintiffs' injury of being denied or delayed their Second Amendment right to bear arms, Defendants suffer no injury because there is no plausible, identifiable interest served by infringing Plaintiffs' constitutional rights. Indeed, Defendants "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir 2013); *see*

---

[8] Such a ruling would also provide relief to Plaintiffs on the issues of wait times and expense, as states like Arizona and Utah process nonresident CCW permit applications quickly and for under $100.

23

1   also *Valle del Sol Inc. v. Whitting*, 732 F.3d 1006, 1029 (9th Cir. 2013) ("it is clear

2   that it would not be equitable . . . to allow the state . . . to violate the requirements

3   of federal law. . . .").

4        La Verne and LASD undoubtedly will both argue that their discretionary

5   criteria could theoretically stop some dangerous person from being armed, as if any

6   criminal intent on violent crime would be dissuaded by any permit requirement.

7   Even if we ignore that *Bruen* abrogated this sort of interest-balancing argument,

8   597 U.S. at 26, the argument is unsupported hogwash. Most states with CCW

9   permit regimes (and most California counties) do not have any subjective criteria in

10  their issuance policies, yet the data clearly establishes that Americans with CCW

11  permits are an overwhelmingly law-abiding demographic, as three courts have

12  recently confirmed, including in this district. *See May v. Bonta*, 2023 WL 8946212,

13  at *19 (C.D. Cal. Dec. 20, 2023) ("Simply put, CCW permitholders are not the gun

14  wielders legislators should fear"); *Wolford v. Lopez*, 2023 WL 5043805, at *32 (D.

15  Haw. Aug. 8, 2023) ("the vast majority of conceal carry permit holders are law-

16  abiding"); and *Koons v. Platkin*, 2023 WL 3478604, at *108 (D.N.J. May 16, 2023)

17  ("despite ample opportunity for an evidentiary hearing, the State has failed to offer

18  any evidence that law-abiding responsible citizens who carry firearms in public for

19  self-defense are responsible for an increase in gun violence").

20       **D.**    **Preliminary injunctive relief is in the public interest.**

21       "A plaintiff's likelihood of success on the merits of a constitutional claim

22  also tips the merged third and fourth factors decisively in his favor. Because 'public

23  interest concerns are implicated when a constitutional right has been violated, ... all

24  citizens have a stake in upholding the Constitution,'" *Baird,* 81 F.4th at 1042 (citing

25  *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005)). When challenging

26  government action that affects the exercise of constitutional rights, "[t]he public

27  interest . . . tip[s] sharply in favor of enjoining the" law. *Klein v. City of San*

28  *Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009). Therefore, injunctive relief is in the

1   public interest. *Id.*

2   **III.   CONCLUSION**

3       For the reasons above, Plaintiffs pray this Court will grant the requested

4   preliminary relief and end the unconstitutional practices that delay or deny

5   Plaintiffs' constitutional right to carry. Given the lack of factual disputes and clear

6   constitutional questions present in this motion, this Court should also consider

7   applying Fed. R. Civ. P. 65(a)(2) to this motion and grant permanent relief to

8   Plaintiffs.

9       Respectfully Submitted,

10  Dated:  January 26, 2024          **MICHEL & ASSOCIATES, P.C.**

11                                    */s/ C.D. Michel*
                                      C.D. Michel
12                                    Counsel for Plaintiffs

13

14  Dated:  January 26, 2024          **LAW OFFICES OF DON KILMER**

15                                    */s/ Don Kilmer*
                                      Don Kilmer
16                                    Counsel for Plaintiff The Second Amendment
                                      Foundation

17

18

19

20

21

22

23

24

25

26

27

28

MEMO. OF POINTS & AUTHORITIES IN SUPPORT OF MOT. PRELIM. INJ.

## ATTESTATION OF E-FILED SIGNATURES

I, C.D. Michel, am the ECF User whose ID and password are being used to file this MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION. In compliance with Central District of California L.R. 5-4.3.4, I attest that all signatories are registered CM/ECF filers and have concurred in this filing.

Dated: January 26, 2024                      */s/ C.D. Michel*
                                              C.D. Michel

## LOCAL RULE 11-6.2 CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiffs, certifies that this brief does not exceed 25 pages in length using Times New Roman 14-point font, which complies with this Court's Standing Order of October 24, 2023.

Dated: January 26, 2024                      */s/ C.D. Michel*
                                              C.D. Michel

MEMO. OF POINTS & AUTHORITIES IN SUPPORT OF MOT. PRELIM. INJ.

**CERTIFICATE OF SERVICE**
IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

Case Name: *California Rifle and Pistol Association, et al., v. Los Angeles County Sheriff's Dept., et al.*

Case No.:    8:23-cv-10169-SPG (ADSx)

IT IS HEREBY CERTIFIED THAT:

I, the undersigned, am a citizen of the United States and am at least eighteen years of age. My business address is 180 East Ocean Boulevard, Suite 200, Long Beach, California 90802.

I am not a party to the above-entitled action. I have caused service of:

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

on the following parties, as follows:

Mark R Beckington
Jane E. Reilley
Christina R.B. Lopez, Deputy Attorney General
California Department of Justice
Office of the Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1230
jane.reilley@doj.ca.gov
Christina.Lopez@doj.ca.gov
    *Attorney for Defendants*

by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

Additionally, the following parties were served by transmitting a true copy via electronic mail as follows:

Dawyn R. Harrison, County Counsel
Caroline Shahinian, Deputy County Counsel
Office of the County Counsel
500 W Temple St Ste 648
Los Angeles, CA 90012-3196
cshahinian@counsel.lacounty.gov

*Attorneys for Defendants Los Angeles County Sheriff's Department and Sheriff Robert Luna*

Bruce A. Lindsay
Monica Choi Arredondo
JONES MAYER
3777 N. Harbor Blvd.
Fullerton, CA  92835
bal@jones-mayer.com
mca@jones-mayer.com

*Attorneys for Defendants La Verne Police Department and La Verne Chief of Police Colleen Flores*

CERTIFICATE OF SERVICE

I declare under penalty of perjury that the foregoing is true and correct.

Executed January 26, 2024

Christina Castron

CERTIFICATE OF SERVICE