ROB BONTA
Attorney General of California
MARK R BECKINGTON
Supervising Deputy Attorney General
JANE E. REILLEY
Deputy Attorney General
State Bar No. 314766
CHRISTINA R.B. LÓPEZ
Deputy Attorney General
State Bar No. 312610
 300 South Spring Street, Suite 1702
 Los Angeles, CA 90013-1230
 Telephone: (213) 269-6106
 Fax: (916) 324-8835
 E-mail: Christina.Lopez@doj.ca.gov
*Attorneys for Defendant Rob Bonta*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED; THE SECOND AMENDMENT FOUNDATION; GUN OWNERS OF AMERICA, INC.; GUN OWNERS FOUNDATION; GUN OWNERS OF CALIFORNIA, INC.; ERICK VELASQUEZ, an individual; CHARLES MESSEL, an individual; BRIAN WEIMER, an individual; CLARENCE RIGALI, an individual; KEITH REEVES, an individual; CYNTHIA GABALDON, an individual; and STEPHEN HOOVER, an individual, | 2:23-cv-10169 |
| | **DEFENDANT ROB BONTA'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| | Date: March 13, 2024 |
| | Time: 1:30 p.m. |
| | Courtroom: 5C |
| | Judge: The Honorable Sherilyn Peace Garnett |
| Plaintiffs, | |
| v. | |
| LOS ANGELES COUNTY SHERIFF'S DEPARTMENT; SHERIFF ROBERT LUNA, in his official capacity; LA VERNE POLICE DEPARTMENT; LA VERNE CHIEF OF POLICE COLLEEN FLORES, in her official capacity; ROBERT BONTA, in his official capacity as Attorney General of the State of California; and DOES 1-10, | |
| Defendants. | |

1

**TABLE OF CONTENTS**

2

Page

3    Introduction ........................................................................................................1

4    Background..........................................................................................................2

     Legal Standard ...................................................................................................2

5    Argument .............................................................................................................3

6        I.    Plaintiffs Are Unlikely to Succeed on the Merits ..............................3

7              A.    The *Bruen* Framework ............................................................3

               B.    Out-of-State Licenses.................................................................4

8                    1.    States May Maintain Licensing Schemes and
9                          Approaches May Vary from State to State .....................4

                     2.    There Is a Historical Tradition of Local Firearm
10                         Regulation, Including Restricting Licenses ...................7

11                   3.    California's CCW Scheme Does Not Violate the
                           Privileges and Immunities Clause ................................11

12             C.    Option to Require Psychological Testing ...............................14

13                   1.    Plaintiffs Have Not Raised and Cannot Raise a
                           Facial Challenge ............................................................14

14                   2.    The Psychological Assessment Statute Does Not
                           Implicate the Second Amendment's Plain Text.............15

15                   3.    The Psychological Assessment Statute Is
16                         Consistent with the Historical Tradition of Firearm
                           Regulation ......................................................................17

17                   4.    The Psychological Assessment Statute Is Not
                           Impermissibly Discretionary or a Violation of Due
18                         Process............................................................................18

19       II.   The Remaining Preliminary Injunction Factors Weigh Against
               an Injunction.....................................................................................20

20             A.    Plaintiffs Fail to Show Irreparable Harm................................20

21             B.    The Equities and Public Interest Do Not Support an
                     Injunction.................................................................................20

22   Conclusion.........................................................................................................21

23

24

25

26

27

28

1

**TABLE OF AUTHORITIES**

2

**Page**

3

4
C<small>ASES</small>

5
*Antonyuk v. Chiumento*
      89 F.4th 271 (2d Cir. 2023).................................................................10, 19
6

7
*Bach v. Pataki*
      408 F.3d 75 (2d Cir. 2005)...............................................................12, 13, 14
8

9
*Baird v. Bonta*
      --- F. Supp. 3d ----, 2023 WL 9050959 (E.D. Cal. Dec. 29, 2023) ....................6

10

11
*Barnard v. Thorstenn*
      489 U.S. 546 (1989).........................................................................................12

12

13
*Caribbean Marine Services Co., Inc. v. Baldrige*
      844 F.2d 668 (9th Cir. 1988)............................................................................20

14

15
*Commonwealth v. Donnell*
      No. 2211CR2835 (Mass. Dist. Ct. Aug. 3, 2023) ...........................................14

16

17
*Culp v. Raoul*
      921 F.3d 646 (7th Cir. 2019)....................................................................13, 14

18

19
*Dahl v. HEM Pharms. Corp.*
      7 F.3d 1399 (9th Cir. 1993).............................................................................3

20
*District of Columbia v. Heller*
      554 U.S. 570 (2008)..............................................................................5, 6, 17

21

22
*Drakes Bay Oyster Co. v. Jewell*
      747 F.3d 1073 (9th Cir. 2014)........................................................................20

23

24
*Ellington v. Denning*
      138 S.W. 453 (Ark. 1911)................................................................................11

25

26
*F.T.C. v. Qualcomm Inc.*
      935 F.3d 752 (9th Cir. 2019)...........................................................................21

27

28
*Kanter v. Barr*
      919 F.3d 437 (7th Cir. 2019) .........................................................................17

1

2

## TABLE OF AUTHORITIES
### (continued)

Page

3

*Kolbe v. Hogan*
    849 F.3d 114 (4th Cir. 2017) ...............................................................5

4

5

*Maryland v. King*
    567 U.S. 1301 (2012) ........................................................................20

6

7

*McDonald v. City of Chicago*
    561 U.S. 742 (2010) .................................................................3, 5, 6

8

9

*Miller for & on Behalf of N.L.R.B. v. California Pacific Medical Center*
    991 F.2d 536 (9th Cir. 1993).............................................................20

10

11

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*
    597 U.S. 1 (2022)..................................................................*passim*

12

13

*Obergefell v. Hodges*
    576 U.S. 644 (2015)............................................................................6

14

15

*Peruta v. County of San Diego*
    758 F. Supp. 2d 1106 (S.D. Cal. 2010) ...........................................14

16

17

*Peterson v. Martinez*
    707 F.3d 1197 (10th Cir. 2013)..................................................12, 14

18

19

*Rosaman v. City of Okolona*
    37 So. 641 (Miss. 1905) ...................................................................11

20

21

*Saenz v. Roe*
    526 U.S. 489 (1999) .........................................................................12

22

*Starks v. County of Los Angeles*
    2023 WL 1344986 (C.D. Cal. March 28, 2022) ...................................1

23

24

*Superior Court of New Hampshire v. Piper*
    470 U.S. 274 (1985).........................................................................12

25

26

*Superior Court of Virginia v. Friedman*
    487 U.S. 59 (1988)...........................................................................12

27

28

*Tracy Rifle & Pistol LLC v. Harris*
    118 F. Supp. 3d 1182 (E.D. Cal. 2015) ...........................................20

1
2

**TABLE OF AUTHORITIES**
**(continued)**

Page

3
4
*United States v. Salerno*
    481 U.S. 739 (1987)...............................................................................15

5
6
*Washington State Grange v. Washington State Republican Party*
    552 U.S. 442 (2008)...............................................................................15

7
8
*Watson v. Stone*
    4 So.2d 700 (Fl. 1941) ...........................................................................9

9
*Winter v. Natural Resources Defense Council, Inc.*
    555 U.S. 7 (2008)....................................................................................2

10

S<small>TATUTES</small>

11
12
United States Code, Title 18 § 926A ........................................................11

13
1801 Tenn. Laws 259-60, ch. 22, § 6 ........................................................7

14
1849 Cal. Stat. 245, div. 11, § 127 ............................................................8

15
1887 Terr. of N.M. Laws, § 9.....................................................................11

16
430 Ill. Comp. Stat. Ann. 66/40 .................................................................4

17
18
Alaska Stat. § 18.65.705 .............................................................................13

19
California Penal Code
    § 25850(a)..............................................................................................4

20
    § 26150...................................................................................................2

21
    § 26150(a)............................................................................................2, 7
    § 26190............................................................................................1, 2, 19

22
    § 26195(b)(1)(D) ...................................................................................13

23
    § 26202.............................................................................................*passim*
    § 26206..................................................................................................19

24
    § 26210(a)(3) (2012)..............................................................................2

25
Colo. Rev. Stat. Ann. §§ 18-12-203(1)(a), 18-12-206 ............................4

26
1910 Ga. Laws 134, No. 432.......................................................................10

27
28
1795 Mass. Acts 436, Chapter 2.................................................................7

iv

**TABLE OF AUTHORITIES**
(continued)

Page

1837 Miss. Laws 294, § 5 ...................................................................8

1839 Miss. Laws 385–86, Chapter 168, § 5 ......................................8

1840 Miss. Laws 180–81, Chapter 111, § 5 ......................................8

1921 Mo. Laws 692, H.B. 168, § 2 ...................................................10

1912 N.J. Laws 364–66, Chapter 225 ...............................................10

1913 Or. Laws 497, Chapter 256 ......................................................10

1851 Pa. Laws 382, no. 239, § 4 ........................................................8

1925 W.Va. Acts 25, Chapter 3, § 7(a) ............................................10

C. B. Pierce, *Charter and Ordinances of the City of Leavenworth, with
   an Appendix* 45 (1863), § 23 .......................................................8

Charles H. Hamilton, ed., *The General Ordinances of the City of
   Milwaukee to January 1, 1896* 692–93, § 25 ...............................10

*Madison, Charter & General Ordinances* 292 (1917), ch. 22, § 2 .......10

S.B. 2 (reg. sess. 2023-2024) ...................................................2, 16, 21

S.B. 1080, Stats. 2010, c. 711, § 6 ....................................................2

**CONSTITUTIONAL PROVISIONS**

United States Constitution
   Second Amendment ...............................................................*passim*
   Fourteenth Amendment ......................................................11, 12, 14

**OTHER AUTHORITIES**

1 W. & M., c. 2, § 7, in 3 Eng. Stat. at Large 441 (1689) ....................17

1 William Blackstone, *Commentaries on the Laws of England* 139 ......17

American Psychological Association, "APA Guidelines for
   Psychological Assessment and Evaluation" ..................................19

**TABLE OF AUTHORITIES**
**(continued)**

Page

Gerald N. Grob, *The Mad Among Us: A History of the Care of America's Mentally Ill* 5-21 (1994) .................................................................18

Joseph Blocher, *Firearm Localism*, 123 Yale L.J. 82 (2013) ..................................7

Mary Ann Jimenez, *Changing Faces of Madness: Early American Attitudes and Treatment of the Insane* 92 (1987)..............................................18

Saul Cornell, *The Long Arc of Arms Regulation in Public: From Surety to Permitting, 1328-1928* .........................................................................7

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

Plaintiffs move for a preliminary injunction on Second Amendment and other grounds.  As to Defendant Bonta, the motion is narrow:  Plaintiffs assert that California's concealed carry weapon ("CCW") licensing scheme "must recognize out-of-state CCW permits."  ECF No. 20-1 ("Mem.") at 18 (emphasis omitted).[1] Plaintiffs fail to show that they are likely to succeed in establishing that California's CCW licensing scheme violates the Constitution.  The Second Amendment does not preclude states from ensuring that individuals licensed to carry a concealed weapon in public are responsible, law-abiding citizens.  The Supreme Court confirmed as much in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022).  Nor does the Second Amendment require states to displace their own licensing regimes by honoring out-of-state licenses or otherwise catering to non-residents.  Subject to certain constitutional limits, each state remains free to regulate public carry in the manner that best suits the needs of its populace.

To the extent Plaintiffs also challenge the statutory provision authorizing local licensing authorities to require psychological testing,[2] that claim is meritless as well.  Because Plaintiffs cannot show a likelihood of success on the merits of their claims and do not meet the remaining factors for injunctive relief, this Court should deny the motion for a preliminary injunction.

---

[1] Despite asserting that non-residents may not apply for a California CCW license, Plaintiffs do not seek any relief on this front in their Motion (ECF No. 20) or Proposed Order (ECF No. 20-28).  *See* Fed. R. Civ. P. 7(b)(1)(B), (C) (moving party must state the relief sought and grounds for order "with particularity"); C.D. Cal. Civ. L.R. 7-4 (similar); *Starks v. Cnty. of Los Angeles*, 2022 WL 1344986, *1 (C.D. Cal. March 28, 2022) (denying motion as "unacceptably ambiguous with respect to the relief requested" where relief sought in motion was inconsistent with relief sought in proposed order).

[2] Although Plaintiffs briefly reference the psychological assessment statute (California Penal Code § 26190(e)), Mem. at 2, the motion focuses on their as-applied challenge, Mem. at 17–18, and the Proposed Order does not seek to enjoin § 26190(e) on its face, ECF No. 20-28.

1

1

## BACKGROUND

2   Following *Bruen*, California enacted Senate Bill 2 (reg. sess. 2023-2024) to

3   implement a shall-issue permitting regime for the concealed carry of firearms.  SB

4   2 amended certain aspects of the CCW licensing scheme, but left others

5   unchanged.[3]  Penal Code § 26150 allows applicants who meet certain criteria to

6   apply for a CCW license in the county or city where they are a "resident" or where

7   their "principal place of employment or business" is located.  Cal. Penal Code

8   § 26150(a)(3).  And under § 26190, local licensing authorities may refer the

9   applicant "to a licensed psychologist" and evaluate "the results of [such]

10  psychological assessment" when carrying out their obligation to ensure that the

11  applicant is not "reasonably likely to be a danger to self, others, or the community

12  at large."  *Id.* §§ 26190(e), 26202(a)(1).  These aspects of the scheme—which were

13  part of the initial CCW licensing scheme and remained unchanged by SB 2—have

14  been in effect for at least twelve years.  *See* S.B. 1080, Stats. 2010, c. 711, § 6; Cal.

15  Penal Code §§ 26150(a)(3), 26190(f) (2012).

16  SB 2 was enacted on September 26, 2023 and took effect on January 1, 2024.

17  Plaintiffs filed their motion for a preliminary injunction on January 26, 2024.  ECF

18  No. 20.

19

## LEGAL STANDARD

20  "A preliminary injunction is an extraordinary remedy never awarded as of

21  right."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  A plaintiff

22  seeking a preliminary injunction must demonstrate "that he is likely to succeed on

23  the merits, that he is likely to suffer irreparable harm in the absence of preliminary

24  relief, that the balance of equities tips in his favor, and that an injunction is in the

25  public interest."  *Id.* at 20.  Because Plaintiffs seek relief that would change the

26  status quo, their request is "subject to heightened scrutiny and should not be issued

27

---

28  [3] For the complete text, see https://leginfo.legislature.ca.gov/faces/billNavClient.xhtml?bill_id=202320240SB2.

unless the facts and law clearly favor" them. *Dahl v. HEM Pharms. Corp.*, 7 F.3d 1399, 1403 (9th Cir. 1993).

## ARGUMENT

### I.   PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS

#### A.   The *Bruen* Framework

In *Bruen*, the Supreme Court announced a new standard for adjudicating Second Amendment claims "centered on constitutional text and history." 597 U.S. at 22. Under this text-and-history approach, courts must first determine that "the Second Amendment's plain text covers an individual's conduct." *Id.* at 24. If it does, "the Constitution presumptively protects that conduct," and "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.*

Yet the Second Amendment is not a "regulatory straightjacket." *Bruen*, 597 U.S. at 30. It does not prevent states from adopting a "'variety' of gun regulations," *id.* at 80 (Kavanaugh, J., concurring) (quoting *Dist. of Columbia v. Heller*, 554 U.S. 570, 636 (2008)), or "experiment[ing] with reasonable firearms regulations" to address threats to the public, *McDonald v. City of Chicago*, 561 U.S. 742, 785 (2010) (plurality opinion). And governments need not identify "a historical *twin*" or "dead ringer" to support a modern law—only a history or tradition of "relevantly similar" regulation. *Bruen*, 597 U.S. at 29–30 (quotation marks omitted).

*Bruen* "decide[d] nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun" and did not disturb any of the Court's prior statements "about restrictions that may be imposed on the possession or carrying of guns." *Bruen*, 597 U.S. at 72 (Alito, J., concurring); *see also id.* at 81 (Kavanaugh, J., concurring) ("[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill . . . ." (quoting *Heller*, 554 U.S. at 626–27 & n.26)). And *Bruen* made clear that "nothing in [its] analysis" called into question licensing regimes as a

whole. *Id.* at 38 n.9 (majority op.). Indeed, the Court expressly approved of licensing regimes "designed to ensure" that "those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens,'" including laws requiring "a background check" or "firearms safety course." *Id.* (quoting *Heller*, 554 U.S. at 635).

## B.   Out-of-State Licenses

### 1.   States May Maintain Licensing Schemes and Approaches May Vary from State to State

Plaintiffs contend that the Second Amendment requires California to honor CCW licenses issued in other jurisdictions and request a preliminary injunction barring public officials from enforcing "California Penal Code § 25850(a) against individuals who have unexpired CCW permits valid in *any other state* in the United States, or valid in the District of Columbia." Proposed Order at 3 (emphasis added). Nothing in the text of the Second Amendment protects a traveler's right to rely on a foreign license to carry within the State of California. *See Bruen*, 597 U.S. at 17 (textual inquiry examines whether "Second Amendment's plain text covers an individual's conduct"). Indeed, in *Bruen*, the Supreme Court explicitly stated that "nothing in [its] analysis should be interpreted to suggest the unconstitutionality of" the 43 <u>different</u> "'shall issue' licensing regimes" then in effect. *Id.* at 38 n.9. These regimes vary in their particulars, and include some that do not recognize licenses from other states (*e.g.*, 430 Ill. Comp. Stat. Ann. 66/40) as well as some that do not allow non-residents to apply (*e.g.*, Colo. Rev. Stat. Ann. §§ 18-12-203(1)(a), 18-12-206). *Bruen*, 597 U.S. at 13 & n.1.

*Bruen* indicated that shall-issue licensing schemes—even those that differ from state to state—pass muster at the first step of the Court's two-step framework because these schemes merely ensure that those authorized to publicly carry "are, in fact, 'law-abiding, responsible citizens.'" *Id.* at 38 n.9 (quoting *Heller*, 554 U.S. at 635). Until an individual has been confirmed as law-abiding and responsible in the

jurisdiction where he or she proposes to carry, that individual does not presumptively fall within "the people" to whom the Second Amendment refers.  *See Bruen*, 597 U.S. at 31–32 (no dispute that plaintiffs were part of "the people" because they were "ordinary, law-abiding, adult citizens"); *Heller*, 554 U.S. at 635 (Second Amendment protects "the right of law-abiding, responsible citizens to use arms").

That *Bruen* approves of states imposing licensing requirements that "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens'"—*i.e.*, the 'people'—is not surprising.  *Bruen*, 597 U.S. at 38 n.9 (quoting *Heller*, 554 U.S. at 635).  Although the Supreme Court has defined the outer bounds of permissible regulations, it has not "abrogate[d]" states' "core responsibility" of "[p]roviding for the safety of citizens within their borders." *Kolbe v. Hogan*, 849 F.3d 114, 150 (4th Cir. 2017) (en banc) (Wilkinson, J., concurring) (quoting *Heller*, 554 U.S. at 635), *abrogated on other grounds by Bruen*, 597 U.S. 1.  Indeed, the Supreme Court has repeatedly affirmed the important role states play in regulating firearms, consistent with our Nation's historical tradition.  In *Heller*, the Court made clear that the right to keep and bear arms is "not unlimited"; states still possess "a variety of tools" to combat the problem of gun violence in a way that is responsive to the needs of their communities.  554 U.S. at 626, 636.  The Court reiterated this point in *McDonald*, emphasizing that the Second Amendment "by no means eliminates" a state's "ability to devise solutions to social problems that suit local needs and values."  561 U.S. at 785.  Recognizing that "conditions and problems differ from locality to locality," *id.* at 783, the Court made clear that "state and local experimentation with reasonable firearms regulations" could and should continue "under the Second Amendment," *id.* at 785 (marks omitted).

*Bruen* reaffirmed these principles, specifically in the licensing context.  And because each state remains free to enact a licensing regime tailored to the needs of

5

its populace, nothing in the Supreme Court's Second Amendment jurisprudence supports the notion that a state must accept licenses issued by other jurisdictions which may have very different licensing requirements (or no requirements at all). Plaintiffs' proposed rule—that every state must recognize CCW licenses issued by every other state, *see* Proposed Order at 3—cannot be reconciled with *Heller*, *McDonald*, and *Bruen*.  Such a rule would also potentially allow a single state to nullify the laws of its co-equal sovereigns simply by relaxing its own licensing rules—or eliminating them altogether.  Taken to its logical conclusion, Plaintiffs' argument would eviscerate the State's right to impose *any* CCW licensing requirements because even a citizen of a "constitutional carry" state—who has not undergone any background check or any firearm training, Mem. at 6—would be entitled to carry a concealed weapon in California.  *Bruen*—which "all but confirmed that states may require people to obtain licenses before they carry firearms in public," *Baird v. Bonta*, --- F. Supp. 3d ----, 2023 WL 9050959, at *22–26 (E.D. Cal. Dec. 29, 2023)—disclaims such a result.

Plaintiffs cite no relevant authority for their position.  Instead, they argue that *Obergefell v. Hodges*, 576 U.S. 644 (2015), presented an "analogous issue."  Mem. at 19.  That suggestion is misplaced.  Based on principles of equal protection and substantive due process, *Obergefell* held that all states were "required by the Constitution to issue marriage licenses to same-sex couples."  576 U.S. at 680.  Ancillary to that holding, the Court also concluded that there was "no lawful basis for a State to refuse to recognize a lawful same-sex marriage performed in another State on the ground of its same-sex character."  *Id.* at 681.  Unlike in *Obergefell*, California is not refusing anyone a license based on a protected trait.  California's CCW licensing scheme merely ensures that local licensing authorities have access to all information necessary to verify an individual's eligibility to lawfully carry arms in California.  *See infra* Part I.B.

## 2. There Is a Historical Tradition of Local Firearm Regulation, Including Restricting Licenses

Even if this court were to reach the second step of the *Bruen* analysis, California's approach finds ample support in historical tradition. Firearm regulation at the state and local level is a longstanding American tradition, and that tradition includes localized approaches to licensing.[4] *See generally* Joseph Blocher, *Firearm Localism*, 123 Yale L.J. 82 (2013). Visitors have always been subject to local laws; if a person during the founding or Reconstruction eras were carrying a firearm, they would have had to comply with a local jurisdiction's laws when they reached its border, regardless of any differing laws in their home state or locality.

From the 1700s to the early 1900s, public carry laws prohibited carrying concealed weapons in particular localities. Spitzer Decl. ¶ 18; Rivas Decl. ¶ 16. In 1686, New Jersey prohibited wearing weapons "privately." Grants, Concessions, and Original Constitutions of The Province of New Jersey 289-90 (1881). In 1795, Massachusetts authorized the arrest of anyone who "shall ride or go armed offensively, to the fear or terror of the good citizens of this commonwealth," 1795 Mass. Acts 436, ch. 2, which encompassed the "mere act of traveling armed" with a firearm, Saul Cornell, *The Long Arc of Arms Regulation in Public: From Surety to Permitting, 1328-1928*, 55 U.C. Davis L.R. 2573–74 (2022). And in 1801, Tennessee enacted a law providing that anyone who "shall ride or go armed to the terror of the people, or privately carry any . . . dangerous weapon to the fear or terror of any person" without a surety, would be punished or jailed. 1801 Tenn. Laws 259–60, ch. 22, § 6.

It was not uncommon for municipalities to have different policies governing particularly lethal weapons than the state as a whole, based on each locality's

---

[4] This tradition continues in modern times. *See, e.g.*, Cal. Penal Code §§ 26150(a), 26202(b) (setting forth statewide criteria for local licensing authorities to apply and "minimum requirements" for investigation thereof).

particular needs and interests.  Rivas Decl. ¶¶ 40, 52–54; Spitzer Decl. ¶ 17.  For instance, an 1837 Mississippi law authorized the town of Sharon to enact "the total inhibition of the odious and savage practice" of carrying dirks, Bowie knives, or pistols.  1837 Miss. Laws 294, § 5.[5]  In 1849, San Francisco enacted a prohibition on carrying deadly weapons, 1849 Cal. Stat. 245, div. 11, § 127.[6]  Between 1870 and 1917, municipalities ranging in size from Los Angeles and San Francisco to Lompoc and St. Helena issued carry licenses to qualified applicants, despite there being no comparable statewide law.  Rivas Decl. ¶ 53.  Immediately after the Civil War, several Texas towns of varying size enacted ordinances against the carrying of weapons, and state lawmakers encouraged them to do so.  *Id.*[7]  And Kansas's deadly weapon policy specifically authorized towns to regulate the carrying of weapons "concealed or otherwise."  *Id.*; *see also* C. B. Pierce, *Charter and Ordinances of the City of Leavenworth, with an Appendix* 45 (1863), § 23.  Municipalities across the country followed suit with their own local firearm regulations during Reconstruction.  Vorenberg Decl. ¶¶ 18–19.  These laws reflected the local nature of restrictions on the carriage of firearms.

State and local licensing laws further confirm the history and tradition underlying California's CCW licensing scheme.  Licensing laws date back to the 1700s[8] and became more wide-ranging and widespread in the 1800s[9] and early 1900s, when governing units began to relax comprehensive carry restrictions and

---

[5] *See also* 1839 Miss. Laws 385–86, ch. 168, § 5 (town of Emery); 1840 Miss. Laws 180–81, ch. 111, § 5 (town of Hernando).

[6] *See also* 1851 Pa. Laws 382, no. 239, § 4 (Philadelphia).

[7] It was not until 1870-1871 that Texas pursued a statewide gun-safety policy by enacting a sensitive places law along with a public carry law.  Rivas Decl. ¶ 53.

[8] For instance, the colony (and then state) of Pennsylvania enacted a series of laws in the early-to-mid 1700s for licensing the discharge of a firearm, and the colony of Connecticut enacted a gunpowder licensing law in 1775.  Spitzer Decl. ¶ 40, Ex. B.

[9] These included firearm discharge licensing requirements in Charleston, South Carolina; Portsmouth, New Hampshire; Schenectady, New York; Marietta, Ohio; New London and New Haven, Connecticut; Quincy, Illinois; Jeffersonville, Indiana; and Richmond, Virginia.  Spitzer Decl. ¶ 41.

allow legal weapons carrying through licensing, subject to review by local officials who were empowered to grant carry licenses. Spitzer Decl. ¶ 20. Licensing allowed localities to tailor prohibitions to public safety threats and gather relevant information about who was publicly carrying, instead of just prohibiting carrying or use of firearms outright. *Id.*

By the Reconstruction era, municipalities across the country began enacting their own licensing schemes. For instance, in 1866, the mayor of Memphis, Tennessee issued permits for the carrying of concealed weapons. Vorenberg Decl. ¶ 28. St. Louis, Missouri and New Orleans, Louisiana followed suit shortly thereafter. *Id.*; Spitzer Decl. ¶ 21. In the 1870s and 1880s, Jersey City, New Jersey; Elko, Nevada; Omaha, Nebraska; Hyde Park, Nashville, and Chicago, Illinois; New York City, New York; Ironton, Missouri; Arkansas City and Beloit, Kansas; Astoria, Oregon; Wheeling, West Virginia; St. Paul, Minnesota; Salt Lake City, Utah; and Eureka, Napa, Sacramento, and San Francisco, California established permitting systems as well. Spitzer Decl. ¶¶ 22–28; Vorenberg Decl. ¶¶ 29–33. Other municipalities around the county followed suit in the ensuing decades, including in Connecticut, California, Nebraska, Washington, Wisconsin, and the District of Columbia. Spitzer Decl. ¶¶ 29–31, 34–36. State-wide licensing schemes were also enacted in the late 1800s and early 1900s, including in Florida,[10] Montana, New Jersey, Hawaii, Indiana, Michigan, New Hampshire, North Carolina, North Dakota, Ohio, Oregon, Pennsylvania, Rhode Island, and South Carolina. *Id.* ¶¶ 32–33, 37–38.

---

[10] Citing one concurrence that purports to "know something of the history of th[e Florida] legislation" without further citation, *id.* at 703 (Buford, J., concurring), Plaintiffs discount all early permitting laws as allegedly race-based. Mem. at 16. But they do not (and cannot) dispute that the licensing schemes existed. *Id.* And in *Watson v. Stone*, 4 So.2d 700 (Fl. 1941) (en banc), the Florida Supreme Court overturned a conviction under the scheme not based on any Second Amendment claim, but because, as a matter of statutory construction, the law did not apply to the defendant's conduct.

Many early licensing laws, by their terms, did not recognize licenses from other localities or allow non-residents to apply.  For instance, a Georgia law made it "unlawful for any person to have or carry about his person, in any county in the State of Georgia, any pistol or revolver without first taking out a license from the Ordinary of the respective counties in which the party resides, before such person shall be at liberty to carry around with him on his person, or to have in his manual possession outside of his own home or place of business."  1910 Ga. Laws 134, No. 432.  An Oregon law required anyone purchasing a pocket pistol or revolver in Oregon to "have a permit . . . signed by the municipal judge or city recorder of the city or county judge or a justice of the peace of the county wherein such person resides."  1913 Or. Laws 497, ch. 256.  And a West Virginia law required anyone wanting to carry dangerous or deadly weapons (including pistols) in West Virginia not only "to obtain a state license to carry," but to have been "a *bona fide* resident of [that] state for at least one year" and "of the county" in which they filed their application applied for "sixty days."  1925 W.Va. Acts 25, ch. 3, § 7(a).[11] Municipalities offered licenses only to residents as well.  *See, e.g.*, Charles H. Hamilton, ed., *The General Ordinances of the City of Milwaukee to January 1, 1896* 692–93, § 25 (allowing the chief of police to grant a license to any eligible person "residing within the city of Milwaukee"); *Madison, Charter & General Ordinances* 292 (1917), ch. 22, § 2 (same for Madison).  These more recent laws— which are not only consistent with carry restrictions of the past, but are a direct outgrowth of them, Spitzer Decl. ¶¶ 13, 20—confirm that California's CCW licensing scheme fits comfortably within the Nation's history and tradition of firearm regulation.  *See Bruen*, 597 U.S. at 36; *Antonyuk v. Chiumento*, 89 F.4th 271, 319 n.32 (2d Cir. 2023) ("[W]hen laws which otherwise might be too recent when considered in isolation nonetheless reflect previously settled practices and

---

[11] *See also, e.g.*, 1912 N.J. Laws 364–66, ch. 225; 1921 Mo. Laws 692, H.B. 168, § 2.

assumptions, they remain probative as to the existence of an American tradition of regulation.").

Plaintiffs refer to "traveler's exceptions" in historical concealed carry laws, Mem. at 21, but misunderstand their meaning. The type of "travel" contemplated by these exceptions separated individuals from the protections of organized society and subjected them to uniquely rural dangers like highway robbers or predatory animals. Rivas Decl. ¶¶ 27–29.[12] And the definition of "travel" was limited to the period when a person was actually on their "journey" but had not yet arrived in the next locale. *Id.* ¶¶ 30–31.[13] Finally, mirroring current federal firearm transportation requirements, *see* 18 U.S.C. § 926A, even exempted travelers were required to store their weapons in their baggage in Texas. *Id.* ¶ 26. In other words, "traveler" was a designation for those who were isolated from communities during the particular timeframe in which they were en route from one place to another and might have a travel-specific, emergent need to use a firearm. That is not the kind of "travel" in which Plaintiffs purportedly wish to engage here, and thus statutes containing a "traveler's exception" provide no support for their argument.

### 3. California's CCW Scheme Does Not Violate the Privileges and Immunities Clause

"Separately from" their Second Amendment argument, Plaintiffs claim that the lack of CCW licensing for non-residents violates the right to travel and the Privileges and Immunities Clause. Mem. at 20. These claims are one and the same.

---

[12] *See Ellington v. Denning*, 138 S.W. 453, 453 (Ark. 1911) (recognizing that, in "modern civilization," there were "no perils of the highway against which the traveler needs for protection a deadly weapon," and it was "absurd to say that he needs a pistol to protect himself from attack").

[13] The law of at least one jurisdiction provided that if purported "travelers stop at any settlement for a longer time than fifteen minutes they" are no longer "actually prosecuting their journey," and therefore "shall remove all arms from their person or persons, and not resume the same until upon eve of departure." 1887 Terr. of N.M. Laws, § 9; *see also Rosaman v. City of Okolona*, 37 So. 641, 641-42 (Miss. 1905) (individual who arrived in town Friday evening was "not a traveler" on Saturday).

Although Plaintiffs characterize the right to travel as rooted in equal protection, *id.*, the Supreme Court has made clear that Plaintiffs' claim—"the right to be treated as a welcome visitor" in a state—derives from the Privileges and Immunities Clause. *Saenz v. Roe*, 526 U.S. 489, 500–01 (1999) (cited at Mem. 20); *see also Peterson v. Martinez*, 707 F.3d 1197, 1213 (10th Cir. 2013) (holding right-to-travel claim based on CCW licensing residency requirement to be "coterminous with [the] privileges and immunities argument"); *Bach v. Pataki*, 408 F.3d 75, 87 (2d Cir. 2005) ("[T]he 'right to travel,' at least in [the firearm licensing] context, is simply a shorthand for the protections of the Privileges and Immunities Clause of Article IV . . . ."), *overruled on other grounds by McDonald*, 561 U.S. 742.

Plaintiffs' Privileges and Immunities Clause claim is meritless. States "must accord residents and nonresidents equal treatment" "only with respect to those privileges and immunities bearing on the vitality of the Nation as a single entity" or "sufficiently basic to the livelihood of the Nation." *Super. Ct. of N.H. v. Piper*, 470 U.S. 274, 279 (1985) (marks omitted); *Super. Ct. of Va. v. Friedman*, 487 U.S. 59, 64 (1988) (quotation marks omitted). State and local governments have long restricted the concealed carry of firearms, *see supra* Part I.B.2, which demonstrates that such carry does not meet that standard. *See Peterson*, 707 F.3d at 1216 (pointing to "the fact that concealed carry was prohibited for resident and non-resident alike for much of our history" as evidence that it was not "sufficiently basic to the livelihood of the Nation" (quotation marks omitted)).

Even assuming that CCW licensing implicates some right protected by the Privileges and Immunities Clause, California's CCW licensing scheme would be constitutional. A state may deprive nonresidents of a protected privilege where there is substantial reason to justify the discriminatory impact and the state's approach bears a substantial relationship to its objective. *See, e.g.*, *Barnard v. Thorstenn*, 489 U.S. 546, 552 (1989). California's requirement that an individual apply for a CCW license in the county where they live or work meets that standard.

Various conditions disqualify an individual from holding a California CCW license, including being convicted of certain crimes; abusing controlled substances; and being the subject of a domestic restraining order. *See* Cal. Penal Code § 26202(a). The licensing agency must review "information provided by the [California] Department of Justice" to determine whether the individual is disqualified by these criteria at the outset, *id.* subs. (b)(5), and the license must be revoked if a licensee later becomes disqualified for any reason, *id.* § 26195(b)(1)(D). In other words, licensing agencies must continuously monitor the eligibility of CCW license holders to ensure that "those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Bruen*, 597 U.S. at 38 n.9 (quoting *Heller*, 554 U.S. at 635). And the State has an interest "in continually obtaining relevant behavioral information" to do so. *Bach*, 408 F.3d at 91.

Declining to recognize out-of-state CCW licenses and requiring an individual to be a resident of California to obtain a California CCW license both serve this monitoring objective. While California is privy to relevant behavioral information about its own residents on an ongoing basis, it does not necessarily have access to that information for non-residents. *See Culp v. Raoul*, 921 F.3d 646, 657 (7th Cir. 2019) (describing "monitoring barrier" and "information deficit" as to non-residents); *Bach*, 408 F.3d at 92 ("The State can only monitor those activities that actually take place in New York."). And it is "self-evident" that states with different licensing requirements "need not engage in monitoring of [their] licensees similar to [California's] monitoring." *Bach*, 408 F.3d at 92–93. For instance, an individual subject to a restraining order could continue to hold their Alaska CCW permit, despite not meeting California's criteria. *See* Alaska Stat. § 18.65.705. And although Plaintiffs concede that non-residents "who are prohibited from owning firearms" may not do so "regardless of if they acquired a CCW permit prior to becoming prohibited," Proposed Order at 3, they do not explain how California would necessarily know as much.

At least two circuits have thus concluded that states need not recognize out-of-state CCW licenses or permit non-residents to apply to satisfy the Privileges and Immunities Clause. *See Culp*, 921 F.3d at 657–58; *Bach*, 408 F.3d at 91–94.[14]  And a district court in this circuit came to the same conclusion. *See Peruta v. Cnty. of San Diego*, 758 F. Supp. 2d 1106, 1119–20 (S.D. Cal. 2010), *aff'd*, 824 F.3d 919 (9th Cir. 2016) (en banc).[15]  *Bruen* does not change the outcome in these cases; it has no bearing on the justifications the State may present in the second part of a Privileges and Immunities analysis.  Given this body of federal precedent, the out-of-state trial court opinion cited by Plaintiffs is not persuasive.  Mem. at 21–22 (discussing *Commonwealth v. Donnell*, No. 2211CR2835 (Mass. Dist. Ct. Aug. 3, 2023), *application for immediate Supreme Judicial Court review granted*, DAR-29602 (Mass.)).[16]

C.   **Option to Require Psychological Testing**

1.   **Plaintiffs Have Not Raised and Cannot Raise a Facial Challenge**

Plaintiffs do not appear to facially challenge the option for licensing agencies to require psychological testing.  *See supra* n.2.  Any belated attempt by Plaintiffs to enjoin the statute in its entirety should be rejected.

Even if Plaintiffs had challenged California's psychological assessment statute on its face, they would be unlikely to succeed on the merits of that claim.  Facial

---

[14] Another upheld a requirement that an applicant be a resident of the state before applying for a CCW license under the first part of the Privileges and Immunities analysis. *Peterson*, 707 F.3d at 1215–16.

[15] At the first of the two-step test applied to Second Amendment claims pre-*Bruen*, the Ninth Circuit held that the Second Amendment did not apply to carrying concealed firearms in public. *Peruta*, 824 F.3d at 927, 939.  The court did not separately evaluate the residency argument or the district court's Privileges and Immunities analysis. *See id.* at 942.

[16] The *Donnell* court disregarded the *Bruen* concurrences and failed entirely to discuss footnote 9 of the majority opinion. Mem. of Decision on Def.'s Mot. to Dismiss at 4 & n.3.  And while the court found that the Commonwealth had "not point[ed] to any historical precedent for" "disarming [an] individual while he is traveling within the state," *id.* at 5, the record here demonstrates the opposite, *see supra* Part I.B.2.

challenges are "disfavored." *Wa. State Grange v. Wa. State Republican Party*, 552 U.S. 442, 450 (2008). They are "the most difficult challenge[s] to mount successfully, since the challenger must establish that no set of circumstances exists under which the [law] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987); *Wa. State Grange*, 552 U.S. at 449 ("[A] facial challenge must fail where the statute has a plainly legitimate sweep." (quotation marks omitted)).

Plaintiffs have not even attempted to meet the *Salerno* standard. Plaintiffs' motion is focused on La Verne's specific psychological assessment requirements. Mem. at 17–18. Plaintiffs do not and cannot show that there is no individual for whom a local licensing authority somewhere in California could require a psychological assessment in connection with their CCW license application. Indeed, there could be any number of reasons a licensing authority would need a psychological assessment to confirm that an individual is a "law-abiding, responsible citizen[]" who is not "likely to be a danger to self, others, or the community at large." *Bruen*, 597 U.S. at 26, 38 n.9 (quoting *Heller*, 554 U.S. at 635); Cal. Penal Code § 26202(a)(1). *Bruen* clearly contemplates that states may investigate applicants before issuing a CCW license. *Bruen*, 597 U.S. at 80 (Kavanaugh, J., concurring) ("[S]hall-issue regimes may require a license applicant to undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements."). Plaintiffs' failure to make a clear showing (or any showing) that no set of circumstances exists in which the psychological assessment statute is constitutional is fatal to their motion. *See Salerno*, 481 U.S. at 745.

**2.    The Psychological Assessment Statute Does Not Implicate the Second Amendment's Plain Text**

In any event, the psychological assessment statute passes constitutional muster. As a threshold matter, the option to require psychological testing does not fall within the Second Amendment's plain text because it does not prevent any

1  "people" from "keep[ing]" or "bear[ing]" "Arms" for lawful purposes.  U.S. Const.

2  amend. II.  California's psychological assessment statute provides local licensing

3  authorities with a means of determining whether a CCW applicant "[i]s reasonably

4  likely to be a danger to self, others, or the community at large," Cal. Penal Code

5  § 26202(a)(1), to ensure that the applicant is the type of "law-abiding, responsible

6  citizen[]" entitled to Second Amendment rights, *Bruen*, 597 U.S. at 26, 38 n.9

7  (quoting *Heller*, 554 U.S. at 635).

8        The Court need look no further than *Bruen* itself for examples of

9  presumptively constitutional licensing requirements that resemble § 26202(a)(1).

10  Although *Bruen* struck down New York's "proper cause" provision—which

11  required "a special need for self-protection" to obtain a firearm permit—it did not

12  invalidate New York's "good moral character" requirement.  *Bruen*, 597 U.S. at

13  11–12 (acknowledging (without criticizing) New York's requirement that an

14  applicant prove they are "of good moral character").  *Bruen* also approvingly cited

15  three similar licensing statutes: (1) a Delaware statute requiring applicants to be "of

16  full age and good moral character"; (2) a Connecticut statute prohibiting the

17  granting of licenses to applicants "lacking the essential character or temperament

18  necessary to be trusted with a weapon"; and (3) a Rhode Island statute requiring

19  proof that the applicant "is a suitable person to be so licensed."  *Id.* at 13 n.1.

20  Indeed, *Bruen* favorably referenced at least 21 licensing laws that authorize

21  officials to deny licenses to persons "found not to be law-abiding or responsible

22  based on a determination that the applicant lacks the character or temperament to

23  carry firearms in public spaces or otherwise presents a danger to self, others, or the

24  community at large."  SB 2, § 1(c).[17]  And *Bruen* also makes clear that states may

25  require all applicants to take affirmative steps to demonstrate their license

26  _____

27  [17] *See Bruen*, 597 U.S. at 13 n.1 (citing such laws in Alabama, Arkansas, Colorado, Connecticut, Delaware, Georgia, Illinois, Indiana, Iowa, Maine, Minnesota, Missouri, Montana, North Dakota, Oregon, Pennsylvania, Rhode Island, South Dakota, Utah, Virginia, and Wyoming).

28

eligibility.  *See* 597 U.S. at 38 n.9 (approving of licensing regimes that "require applicants to . . . pass a firearms safety course").

California's psychological assessment statute falls comfortably within the spectrum of licensing requirements approved by *Bruen*.  Because the statute is designed to ensure that public carry is limited to law-abiding, responsible citizens, it does not implicate the Second Amendment's plain text.

### 3.    The Psychological Assessment Statute Is Consistent with the Historical Tradition of Firearm Regulation

California's psychological assessment statute is also consistent with the well-established historical tradition of regulating the carry of weapons by persons perceived to be untrustworthy, dangerous, or mentally unstable.

Firearm regulation, including of particular groups, dates back to at least the sixteenth century.  The English Bill of Rights, which has "long been understood to be the predecessor to our Second Amendment," *Heller*, 554 U.S. at 593, permitted Protestants to carry arms for self-defense only "as allowed by law."  1 W. & M., c. 2, § 7, in 3 Eng. Stat. at Large 441 (1689).  And British common law granted people a right to have arms for self-defense "suitable to their condition and degree" and "under due restrictions."  1 William Blackstone, *Commentaries on the Laws of England* 139.  The "necessary restraints" on this right were intended to prevent harm to the armed person or others.  *Id.* at 140.  The tradition of prohibiting persons deemed dangerous or mentally unstable from having and bearing arms was also carried over from England to early America, as founding-era colonies and states disarmed persons thought to pose "immediate threats to public safety and stability." *Kanter v. Barr*, 919 F.3d 437, 458 (7th Cir. 2019) (Barrett, J., dissenting).

Weapons laws did not regulate mentally ill persons—usually referenced with the term "unsound mind"—until the modern field of psychology was established in

the late 1800s and early 1900s.  Spitzer Decl. ¶ 52 & n.79, Ex. D.[18]  But before the

advent of modern psychology, there was already a tradition of regulating persons

who exhibited "aberrant or abnormal behavior."  These individuals were often

identified in the law as "vagrants," "tramps," and the "intoxicated," and were

"singled out [] as a suspect category with respect to weapons acquisition and use."

*Id.* ¶¶ 52–56, 58–72, Exs. E, F (citing laws); *see also* Rivas Decl. ¶¶ 56–63

(discussing traditional use of "dangerousness" as acceptable disqualifier in

historical licensing regimes).  Under the historical understanding of those terms,

individuals identified by law as "vagrants" or "tramps" undoubtedly included some

who today would be considered as suffering from mental illness.  Spitzer Decl.

¶ 53.

Throughout American history, governmental authorities at every level have

enacted laws to prevent persons deemed dangerous or mentally unstable from

bearing arms.  These laws are analogous to California's psychological assessment

statute, which similarly seeks to protect the public from violence and disorder by

ensuring that only law-abiding, responsible citizens publicly carry dangerous

weapons.

### 4.  The Psychological Assessment Statute Is Not Impermissibly Discretionary or a Violation of Due Process

Rather than engaging in the analysis mandated by *Bruen*, Plaintiffs make

conclusory assertions that the psychological assessment requirement is "inherently

subjective and discretionary" and violates due process.  Mem. at 17–18.  Both

contentions fail.

---

[18] Prior regulation was likely unnecessary because persons of "unsound mind" were often physically isolated from the community through home or institutional confinement and would not have had the ability to carry firearms in public.  Gerald N. Grob, *The Mad Among Us: A History of the Care of America's Mentally Ill* 5–21, 29, 43 (1994); Mary Ann Jimenez, *Changing Faces of Madness: Early American Attitudes and Treatment of the Insane* 92, 103–04 (1987).

The psychological assessment statute is not impermissibly discretionary. Mem. at 17. The assessments must be performed by "licensed psychologist[s]," who have specialized training and are bound by professional standards and guidelines when administering and evaluating the results. *See* Cal. Penal Code § 26190(e)(1); American Psychological Association, "APA GUIDELINES FOR PSYCHOLOGICAL ASSESSMENT AND EVALUATION" 5 ("Psychologists are guided by professional standards of practice in engaging in psychological testing, assessment, and evaluation to be compliant with competency expectations and to avoid harm to clients."), *available at* https://www.apa.org/practice/guidelines/. Such professional standards ensure that the assessments are performed in a fair, objective, and consistent manner. In any event, "*Bruen* does not forbid discretion in licensing regimes—on the contrary, the *Bruen* Court specifically stated that its decision did not imperil the validity of more than a dozen licensing schemes that confer discretion" upon licensing authorities. *Antonyuk*, 89 F.4th at 312; *id.* at 318–20 (collecting historical licensing laws that authorized discretion in granting or denying firearms licenses).

Finally, Plaintiffs' nominal claim that the psychological assessment statute deprives them of "full due process rights, including judicial hearings, evidentiary standards, the right to call supporting witnesses, and the right of appeal" (Mem. at 18) lacks merit. Under Penal Code § 26206, any person whose application for a CCW permit is denied is entitled to petition the superior court, during which the government bears the burden of proving that the applicant is not entitled to a license. That procedure satisfies due process.

## II. THE REMAINING PRELIMINARY INJUNCTION FACTORS WEIGH AGAINST AN INJUNCTION

### A. Plaintiffs Fail to Show Irreparable Harm

"At a minimum, a plaintiff seeking preliminary injunctive relief must demonstrate . . . irreparable harm." *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). Plaintiffs' only claimed irreparable harm is the alleged deprivation of their constitutional rights. Mem. at 23. But as explained above, none of the laws at issue violate Plaintiffs' Second Amendment or any other rights. And the requirements Plaintiffs now challenge have been in effect for many years. Plaintiffs' "long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm." *Miller for & on Behalf of N.L.R.B. v. Cal. Pac. Med. Ctr.*, 991 F.2d 536, 544 (9th Cir. 1993) (quotation marks omitted). Plaintiffs' failure to make this required showing mandates denial of their motion.

### B. The Equities and Public Interest Do Not Support an Injunction

The balancing of the equities and the public interest—which merge when the government is a party, *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014)—weigh against an injunction. "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (marks omitted). That is especially true here, where the challenged laws serve the State's compelling interest in public safety by ensuring that only law-abiding, responsible citizens publicly carry concealed weapons. *See Tracy Rifle & Pistol LLC v. Harris*, 118 F. Supp. 3d 1182, 1193 (E.D. Cal. 2015) (public interest favored the government because an injunction would have a detrimental effect on gun crime and violence), *aff'd*, 637 F. App'x 401 (9th Cir. 2016).

As discussed above, California's CCW licensing scheme is constitutionally sound, so enjoining any aspect of it neither redresses any constitutional injury nor

serves any public interest.  To the contrary, an injunction would hamper the State's strong public safety interest in enforcing sensible regulations on the public carry of concealed weapons.  "[S]tudies overwhelmingly support the conclusion that more carrying of firearms in public leads to an increase in crime:  of the 35 social science studies looking at this issue since . . . 2005, 23 found an increase in crime . . . ."  SB 2, § 1(i).  According to one study, in the 33 states with permissive "right-to-carry" laws, "violent crime was substantially higher—13 to 15 percent higher—10 years after the laws were adopted than it would have been" otherwise.  *Id*. § 1(d).  And "[l]aws requiring an assessment of dangerousness in connection with obtaining firearms have saved lives."  *Id*. § 1(l).[19]

The balance of equities and public interest strongly favor preserving a licensing scheme that prevents firearm violence by reasonably regulating the issuance of CCW licenses.  Enjoining, even temporarily, California's ability to thoroughly evaluate and monitor whether each CCW applicant is a law-abiding, responsible citizen would be detrimental to public safety.

## CONCLUSION

Plaintiffs' motion for preliminary injunction should be denied.[20]

---

[19] Plaintiffs' contention that CCW permit holders "are an overwhelmingly law-abiding demographic" misses the mark.  Mem. at 24.  To the extent that is true, it is because California's licensing regime effectively limits the issuance of CCW permits to law-abiding, responsible citizens. Thus, Plaintiffs actually underscore the necessity for the challenged statute.

[20] If the Court were inclined to issue an injunction, the Attorney General respectfully requests that the injunction be stayed pending appeal to "suspend[] judicial alteration of the status quo" during the appellate process.  *See F.T.C. v. Qualcomm Inc.*, 935 F.3d 752, 757 (9th Cir. 2019) (quotation marks omitted).

1    Dated:  February 21, 2024                Respectfully submitted,

2                                     ROB BONTA
                                      Attorney General of California

3                                     MARK R. BECKINGTON
                                      Supervising Deputy Attorney General

4                                     JANE E. REILLEY
                                      Deputy Attorney General

5

6                                *s/ Christina R.B. López*

7                                     CHRISTINA R.B. LÓPEZ
                                    Deputy Attorney General

8                                     *Attorneys for Defendant Rob Bonta*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
**CERTIFICATE OF COMPLIANCE**

2
The undersigned, counsel of record for Defendant Rob Bonta, certifies that

3
this brief contains 7,000 words, which complies with the word limit of L.R. 11-6.1.

4
Dated:  February 21, 2024                     Respectfully submitted,

5
                                                              ROB BONTA
                                                              Attorney General of California
6
                                                              MARK R. BECKINGTON
                                                              Supervising Deputy Attorney General
7
                                                              JANE E. REILLEY
                                                              Deputy Attorney General
8

9
                                                              *s/ Christina R.B. López*

10
                                                              CHRISTINA R.B. LÓPEZ
                                                              Deputy Attorney General
11
                                                              *Attorneys for Defendant Rob Bonta*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

Case Name:   ***California Rifle & Pistol Ass'n,***      Case No.   **2:23-cv-10169**
***Inc., et al. v. Los Angeles County***
***Sheriff's Department, et al.***

I hereby certify that on <u>February 21, 2024</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

1. **DEFENDANT ROB BONTA'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

2. **DECLARATION OF PROFESSOR BRENNAN GARDNER RIVAS IN SUPPORT OF DEFENDANT ROB BONTA'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

3. **DECLARATION OF PROFESSOR ROBERT SPITZER IN SUPPORT OF DEFENDANT ROB BONTA'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

4. **DECLARATION OF PROFESSOR MICHAEL VORENBERG IN SUPPORT OF DEFENDANT ROB BONTA'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>February 21, 2024</u>, at San Francisco, California.

| | |
|---|---|
| M. Mendiola | *M. Mendiola* |
| Declarant | Signature |

SA2023306497
44071894.docx