1  ROB BONTA
   Attorney General of California
2  MARK R BECKINGTON
   Supervising Deputy Attorney General
3  JANE E. REILLEY
   Deputy Attorney General
4  State Bar No. 314766
   CHRISTINA R.B. LÓPEZ
5  Deputy Attorney General
   State Bar No. 312610
6   300 South Spring Street, Suite 1702
    Los Angeles, CA  90013-1230
7   Telephone:  (213) 269-6106
    Fax:  (916) 324-8835
8   E-mail:  Christina.Lopez@doj.ca.gov
   *Attorneys for Defendant Rob Bonta*
9

10           IN THE UNITED STATES DISTRICT COURT
           FOR THE CENTRAL DISTRICT OF CALIFORNIA
11

12  CALIFORNIA RIFLE & PISTOL            2:23-cv-10169
    ASSOCIATION, INCORPORATED;
13  THE SECOND AMENDMENT                 **DECLARATION OF PROFESSOR**
    FOUNDATION; GUN OWNERS OF            **BRENNAN GARDNER RIVAS IN**
14  AMERICA, INC.; GUN OWNERS            **SUPPORT OF DEFENDANT ROB**
    FOUNDATION; GUN OWNERS OF            **BONTA'S OPPOSITION TO**
15  CALIFORNIA, INC.; ERICK              **PLAINTIFFS' MOTION FOR**
    VELASQUEZ, an individual;            **PRELIMINARY INJUNCTION**
16  CHARLES MESSEL, an individual;
    BRIAN WEIMER, an individual;         Date:      March 13, 2024
17  CLARENCE RIGALI, an individual;      Time:      1:30 p.m.
    KEITH REEVES, an individual;         Courtroom: 5C
18  CYNTHIA GABALDON, an individual;     Judge:     The Honorable Sherilyn
    and STEPHEN HOOVER, an                          Peace Garnett
19  individual,

20                    Plaintiffs,

21        v.

22  LOS ANGELES COUNTY SHERIFF'S
    DEPARTMENT; SHERIFF ROBERT
23  LUNA, in his official capacity; LA
    VERNE POLICE DEPARTMENT; LA
24  VERNE CHIEF OF POLICE
    COLLEEN FLORES, in her official
25  capacity; ROBERT BONTA, in his
    official capacity as Attorney General of
26  the State of California; and DOES 1-10,

27                    Defendants.

28

**DECLARATION OF DR. BRENNAN GARDNER RIVAS**

I, Dr. Brennan Gardner Rivas, declare under penalty of perjury that the following is true and correct:

1.    I have been retained by the Office of the Attorney General of the California Department of Justice to provide expert opinions and testimony in this case. I submit this declaration on the basis of my training, professional expertise, and research. For this engagement, I was asked to provide expert opinions about historical gun regulations—including, but not limited to, licensing requirements—that were implemented and enforced by different states and localities throughout the United States.

2.    This declaration is based on my own personal knowledge and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

**BACKGROUND AND QUALIFICATIONS**

3.    I am a Ph.D. historian and independent scholar. During the 2021-2022 academic year, I was the Lloyd Lewis Fellow in American History at The Newberry Library. From 2020 to 2021, I was a Bill & Rita Clements Fellow for the Study of Southwestern America within the Clements Center for Southwest Studies at Southern Methodist University. From 2019 to 2020, I was a Lecturer in American History at Texas Christian University (TCU). My educational background includes a Ph.D. in History from TCU, where my dissertation was on the development, evolution, and enforcement of gun and weapon policy in Texas from the era of Mexican independence to the 1930s.

4.    My expertise includes historical weapon regulations in the United States. I have authored multiple publications on this topic, including peer-reviewed articles in the *Southwestern Historical Quarterly* and a chapter in an edited collection published by Oxford University Press; in 2022, my article, "Enforcement of Public Carry Restrictions: Texas as a Case Study" (June 2022), was published in the *UC*

Declaration of Dr. Brennan Gardner Rivas
Case No. 2:23-cv-10169

*Davis Law Review*. I am currently completing a book manuscript based upon my dissertation research.

5.  A true and correct copy of my current curriculum vitae, which details my education, experience, and publications, is attached as **Exhibit 1** to this declaration. It contains all publications that I have authored within the last ten years, including a number of articles related to the regulation of guns, especially as to the history of nineteenth-century weapons policies and the socio-political context that made them possible.

6.  I am being compensated for services performed in the above-entitled case at an hourly rate of $200/hour for research, $250/hour for document preparation, and $350/hour for deposition and trial testimony. My compensation is not contingent on the results of my analysis or the substance of my testimony.

7.  The opinions I provide in this declaration are based on my education, expertise, research in the history of firearms and firearm regulation, and my review and analysis of a wide range of primary and secondary sources.

8.  This declaration is a work of historical scholarship, informed by analysis of primary and secondary sources. Having studied the subject of historical gun regulations for several years now, I have drawn upon knowledge gained form reading numerous peer-reviewed books and articles, in addition to law review articles and media such as blogs and news articles. I have also drawn upon primary sources, such as historical laws and ordinances found in digital databases like Hein Online and Hathi Trust, and historical newspaper articles from databases like Chronicling America, ProQuest Databases, Newspapers.com, America's Historical Newspapers, and more. The writing and composition of scholarly works of history require the historian to evaluate both primary and secondary sources—using secondary sources to contextualize and interpret primary sources in ways that illuminate the past rather than confuse or obscure it.

Declaration of Dr. Brennan Gardner Rivas
Case No. 2:23-cv-10169

**SUMMARY OF OPINIONS**

9.     This declaration provides an overview of the various weapons regulations that were crafted by different states and localities throughout American history. These weapons regulations—which include, but are not limited to, licensing requirements and criteria, laws and ordinances governing concealed and/or open carry of weapons, sensitive places restrictions, and taxes on the sale and/or possession of weapons—demonstrate a historical tradition of American states and localities possessing the authority to implement and enforce their own weapons regulations within their jurisdictions.

10.     This declaration also discusses how historical weapons regulations varied in urban versus rural locales, which reflected the different policy considerations and practical concerns applicable to those places.

11.     Additionally, this declaration addresses the limitations on the "traveler" exception to certain historical firearms regulations, including a discussion of how this exception was narrowly defined by state appellate courts to include only long-distance travelers separated from the protections of organized communities.

12.     Finally, this declaration discusses "dangerousness" as understood in the nineteenth century, how weapon-carrying figured into a person's status as "dangerous," and the extent to which it would have been an acceptable factor in determining whether a person could bear arms in historical weapons licensing regimes.

**OPINIONS**

13.     Throughout the nineteenth century, Americans treated deadly weapons differently than militia arms and regulated their presence in public spaces. Laws regarding the carrying or concealment of such weapons in public spaces were statutory enactments derived from longstanding English common law customs. Nineteenth-century Americans enacted these laws to preserve order, protect the peace, and reduce violent crime. Rates of homicide and crime fluctuated over time

Declaration of Dr. Brennan Gardner Rivas
Case No. 2:23-cv-10169

and by locale, but were generally made worse by easier access to inexpensive weapons like bowie knives and pocket pistols that were not only conducive to concealment, but designed for it. The proliferation of these weapons, and particularly pocket pistols, in the post-Civil War era unleashed a staggering wave of gun crime which American communities tried to staunch through a host of regulatory measures.

14.     It has not been uncommon in American history for towns and cities to be subject to different deadly weapon policies than the state more broadly. There are examples of cities enacting local public carry ordinances within states that lacked a public carry law. Many of these examples come from the state of California and involve licensing requirements for carrying deadly weapons. Public carry laws, for both concealed weapons and the open-carry of weapons, have often reserved special exemptions for "travelers" as defined under state law, reinforcing the idea that population density was a factor in developing and enforcing weapon policies in the nineteenth century.

15.     This report identifies various regulatory measures implemented and enforced by different localities, including public carry laws that targeted open- as well as concealed-carry of weapons, and licensing laws, and examines differing restrictions based on the needs of different jurisdictions.

## APPROACHES TO PUBLIC CARRY REGULATION IN THE NINETEENTH CENTURY

**Restrictions on Public Carry and Exceptions for Self-Defense and Emergencies**

16.     In the early nineteenth century, state legislatures began enacting new statutes against the carrying of weapons in response to rising levels of violence, often focused on the regulation of carrying concealed weapons.[1] Some of these statutes were challenged in state courts as violations of either the Second Amendment or an

---

[1] On violence in American history, including fluctuations over time and by region, see Randolph Roth, *American Homicide* (Cambridge: Belknap Press of Harvard University Press, 2009).

Declaration of Dr. Brennan Gardner Rivas
Case No. 2:23-cv-10169

analogous state right. With a few exceptions[2], the case law that developed held that concealed carry statutes did not violate the right to bear arms.

17.   Even though nineteenth-century case law generally coalesced around the principle that concealed weapon laws were constitutional, that did not mean that people wishing to *openly* carry deadly weapons as a form of preemptive self-defense were engaging in what was considered constitutionally protected behavior—or acceptable behavior at all. The text of public carry laws themselves, when taken together, show quite plainly that nineteenth-century Americans did not understand concealed carry laws to de facto allow everyday open-carrying of deadly weapons. Some states specifically prohibited open carry, and others tailored open-carry exceptions to be as narrow as possible in order to prevent people engaging in everyday open carry as a mode of preemptive self-defense.[3] But more importantly, the everyday open carrying of deadly weapons was not particularly common in the nineteenth century, and primary source evidence shows that it was not socially acceptable outside of emergency circumstances.

18.   Deadly weapons like knives and pistols were designed to be carried concealed, so concealed carry regulations struck at the primary, preferred mode of

---

[2] The most significant of these few exceptions was *Bliss v. Commonwealth*, 12 Ky. 90 (1822) ("…there is no difference between a law prohibiting the wearing concealed arms, and a law forbidding the wearing such as are exposed; and if the former be unconstitutional, the latter must be so likewise.").

[3] For example, see 1882 West Virginia ch. 110, 317 § 8; 1871 Texas ch. 34, "An Act to Regulate the Keeping and Bearing of Deadly Weapons," 25–27; 1870 Tenn. 13, p. 28-29. In response to appellate court decisions, lawmakers in Arkansas and Tennessee enacted public carry laws with an open-carry exception that was as tightly restricted as possible. Their "open in his hands" exception allowed open-carry only in a real emergency (not preemptive armed self-defense as a matter of course) and only applied to certain kinds of firearms (not pocket pistols). *See* 1871 Tenn. 90, p. 81-82; Ark. 1881 ch. 96. A public carry law from the Florida Territory (1835) allowed for open carry, but the legislation proved to be ineffective—presumably because so many people were choosing to avail themselves of the open carry exception. In 1838, lawmakers enacted a prohibitively high tax upon anyone wishing to engage in open carry, showing that Floridians and their elected lawmakers did not view unrestrained open carry as a benign activity and indeed tried to discourage the behavior as much as possible. 1835 Florida ch. 860, "An Act to prevent any person in this Territory from carrying arms secretly," 318; 1838 Florida, ch. 24. The title of the 1838 tax was "An Act in addition to An Act, (approved January 30, 1835) entitled "An Act to prevent any person in this Territory from carrying arms secretly.""

Declaration of Dr. Brennan Gardner Rivas
Case No. 2:23-cv-10169

carrying them. A commentator writing in 1877 said, "The very fact that men are careful to conceal their revolvers argues that they are doubtful as to the propriety of carrying of them," and that if a young man were to walk along the street "with his silver-mounted deringer hanging from his waist belt, he would expose himself to unlimited ridicule."[4] The tendency toward concealing deadly weapons rather than carrying them openly was in fact so strong that in the latter nineteenth century, men's trousers were often sold with a *pistol pocket* sewn into the rear hip.[5]

19.     In 1856, a Louisiana court reasoned that partially exposed weapons were "the result of accident or want of capacity in the pocket to contain, or clothes fully to cover the weapon, and not the extremely unusual case of the carrying of such weapon in full open view, and partially covered by the pocket or clothes."[6] An Arkansas case from 1879 upheld the idea that a partially exposed weapon constituted an attempt at concealment.[7]

20.     There was some acceptance of the idea that a true emergency situation might justify the open carrying of a deadly weapon temporarily. A version of Delaware's 1881 concealed carry law provides some insight into what nineteenth-century Americans understood their concealed carry laws to allow in terms of open carry. The law as-passed ended up being substantially different from the version

---

[4] "Carrying Concealed Weapons: True Comment on an Almost Universal American Custom," *Daily Constitution* (Atlanta, Georgia), May 23, 1877, 1. Reprinted from *Baltimore American*. Some of the manners and etiquette books of the nineteenth century also addressed the impropriety of carrying deadly weapons. For example, see William A. Alcott, *Advice to a Young Gentleman on Entering Society* (Philadelphia: Lea and Blanchard, 1839), 147-149, https://books.google.com/books?id=430_rAHEPn8C&newbks=1&newbks_redir=0&source=gbs_navlinks_s.

[5] Scott Way, "A Few Random Remarks about Pockets," *Puck* 16 (January 1885), 294 ("We will merely glance at the pistol-pocket, in which a concealed deadly weapon is often carried, especially in Prohibition districts, and then pass on to the coat-tail pocket."); "The Pistol Pocket," *Chicago Daily Tribune* (Chicago, Illinois), February 11, 1885, 3 ("An important step toward securing an abolition of the practice of pistol-carrying, a Galveston (Tex.) paper suggests that the pistol-pocket should be prohibited by law."); "The Hygiene of Pockets," *Phrenological Journal and Science of Health* (March 1886), 176 ("It is common now-a-days for trousers to be made with a pocket placed little below the band in the back part of the garment. It is commonly termed the hip or pistol pocket.").

[6] *State v. Smith*, 11 La. Ann. 633 (1856).

[7] *Carr v. State*, 34 Ark. 448 (1879).

Declaration of Dr. Brennan Gardner Rivas
Case No. 2:23-cv-10169

1    summarized by a newspaper while the legislature was still debating and amending

2    the bill, and that earlier bill version contained a level of detail and context rarely

3    found in historical public carry laws.[8] The bill prohibited concealed carry and also

4    prohibited anyone "to carry a gun or other deadly weapon in the street, except in a

5    vertical position, and with the muzzle pointed toward the zenith."[9] This is the kind of

6    open carry which certain drafters of the bill envisioned—one that prioritized public

7    safety and precluded habitual open carry as an acceptable mode of preemptive self-

8    defense. Other elements of the bill, some of which ended up in the law that passed,

9    addressed other impermissible ways of using, carrying, and handling firearms. "It is

10   likewise unlawful for any person to point a gun or other firearm at any person, either

11   in jest or earnest," and there were specific penalties for anyone who might draw a

12   concealed weapon in a crowd or display one in public.[10]

13        21.    Nineteenth-century public carry laws were also understood to coexist

14   with the right to defend oneself. In Texas, where deadly weapons could not be carried

15   in public at all, a self-defense exception was actually written into the law.[11] A

16   weapon-carrier who was technically breaking the law simply by carrying could plead

17   self-defense, show a judge or jury that his/her circumstances justified the behavior,

18   and receive an acquittal or dismissal. Public carry laws were designed to stop

19   individuals from preemptively going out armed on a habitual basis, not to foreclose

20   people in deadly emergencies from defending themselves in accordance with the law

21   of self-defense.

22        [8] Text of a bill in the Delaware legislature, quoted in "Doings of the Legislature," *Smyrna*
23   *Times* (Smyrna, Delaware), March 30, 1881, 2,
     https://chroniclingamerica.loc.gov/lccn/sn84020422/1881-03-30/ed-1/seq-2/.
         [9] *Id.*
24       [10] *Id.* For the law as passed, see 1881 Delaware ch. 548 "Of Offenses Against Public Justice:
     An Act providing for the punishment of persons carrying concealed deadly weapons," 716-717.
25       [11] 1871 Texas, ch. 34, § 2 ("Any person charged under the first section of this act, who may
26   offer to prove, by way of defense, that he was in danger of an attack on his person or unlawful
     interference with his property, shall be required to show that such danger was immediate and
27   pressing, and was of such a nature as to alarm a person of ordinary courage; and that the weapon
     so carried was borne openly and not concealed beneath the clothing; and if it shall appear that this
     danger had its origin in a difficulty first commenced by the accused, it shall not be considered as a
28   legal defense.").

Declaration of Dr. Brennan Gardner Rivas
                                                     Case No. 2:23-cv-10169

22.   Where gun-toters were convicted despite a plea of self-defense, it typically resulted from a failure to demonstrate that they had actually engaged in lawful self-defense—such as occasions where personal conflicts and wounded pride led to violence. Appellate rulings and legislative enactments aimed to preclude men in such circumstances from pleading self-defense. This happened to an Alabama man in 1840 who argued that he needed to conceal a weapon in order to defend himself from an attack; the court disagreed, stating that, "If the emergency is pressing, there can be no necessity for concealing the weapon, and if the threatened violence, will allow of it, the individual may be arrested and constrained to find sureties to keep the peace, or committed to jail." [12] The nineteenth-century tendency toward not specifically outlawing the open carrying of deadly weapons is more a byproduct of that era's persistent and torturous acceptance of a violent male honor culture than it is evidence of widespread acceptance of the open-carry of weapons for preemptive armed self-defense.

23.   In Arkansas and Tennessee, post-Civil War public carry restrictions were part of a back-and-forth between legislatures and appellate courts, illustrating a commitment to restricting public carry that understood open-carry to be primarily related to militia service and secondarily reserved for emergency situations. Both states enacted laws that prohibited the public carrying of pistols with very limited exceptions.[13] Courts in both states struck down early versions of the laws because they applied to all revolvers, including those being issued to certain classes of soldiers by the United States military.[14] But the respective legislatures of Arkansas and Tennessee quickly changed the rule to exclude "army and navy pistols"—those types or models in use by the US military—when carried openly in the hand. By exempting

---

[12] *State v. Reid*, 1 Ala. 612 (1840).

[13] See 1869-1870 Tenn. Pub. Acts, 2d. Sess., An Act to Preserve the Peace and Prevent Homicide, ch. 13, § 1; 1874-1875 Acts of Ark., An Act to Prohibit the Carrying of Side-Arms, and Other Deadly Weapons, at p. 155, § 1.

[14] *Andrews v. State*, 50 Tenn. 165 (1871); *Wilson v. State*, 33 Ark. 557 (1878).

these models, Arkansas and Tennessee lawmakers made their gun policies comport with the reigning Second Amendment jurisprudence of their day, which held that militia arms were to be regulated differently than deadly weapons.[15] The revised Tennessee law held that "it shall not be lawful for any person to publicly carry a dirk, sword cane, Spanish stiletto, belt or pocket pistol, or revolver, other than an army pistol, or such as are commonly carried and used in the United States army, and in no case shall it be lawful for any person to carry such army pistol publicly or privately about his person in any other manner than openly in his hands."[16] Arkansas's replacement statute was similar to that of Tennessee.[17] Tennessee and Arkansas courts did not strike down these revised public carry statutes as they had done previously.[18]

24.     Interpreted within the context of rising levels of gun violence and political instability in the American South in the post-Civil War era, these laws and their tightly restricted open-carry exceptions illustrate a widespread social contempt

---

[15] Unlike today, where laws generally prevent the civilian sale of military-grade weapons while carving out protections for self-defense weapons, Americans of the nineteenth century did just the opposite; case law at that time held that a citizen's militia obligation conferred upon certain kinds of firearms, especially muskets and rifles, a protected status under the law as "militia arms," while those smaller weapons which lent themselves to concealability and were more conducive to interpersonal violence could be prohibited. This view of arms and their place in society changed in the twentieth century as a result of substantial alterations to the militia system (and the development of the National Guard) as well as the advent of automatic weapons (capable of firing repeatedly with a single pull of the trigger) and select-fire weapons (capable of either automatic or semiautomatic fire) for military use.

[16] 1871 Tenn. Pub. Acts 81, An Act to Preserve the Peace and to Prevent Homicide, ch. 90, § 1; *State v. Wilburn*, 66 Tenn. 57, 61 (1872). It is worth noting that even the exempted army/navy pistols could not be carried concealed, or even visible within a waistband or hip holster; the only way to carry legally exempted pistols was to hold them in one's hand. The purpose of this additional phrase was to curtail as much as possible the carrying of these weapons in public spaces so that a person would only do so in the event of a real emergency.

[17] 1881 Ark. Acts 191, An Act to Preserve the Public Peace and Prevent Crime, chap. XCVI, § 1-2 ("That any person who shall wear or carry, in any manner whatever, as a weapon, any dirk or bowie knife, or a sword, or a spear in a cane, brass or metal knucks, razor, or any pistol of any kind whatever, except such pistols as are used in the army or navy of the United States, shall be guilty of a misdemeanor. . . . Any person, excepting such officers or persons on a journey, and on his premises, as are mentioned in section one of this act, who shall wear or carry any such pistol as i[s] used in the army or navy of the United States, in any manner except uncovered, and in his hand, shall be guilty of a misdemeanor.").

[18] See *State v. Wilburn*, 66 Tenn. 57, 61 (1872); *Haile v. State*, 38 Ark. 564 (1882).

Declaration of Dr. Brennan Gardner Rivas
Case No. 2:23-cv-10169

for publicly carrying deadly weapons. These statutes represented the best efforts of lawmakers to emulate the kind of comprehensive public carry prohibition that was in force in Texas[19] while also respecting the parameters set forth by their state supreme courts. The amendatory statutes did not simply provide an exemption for army/navy pistols—they specified that even those pistols could not be carried in public unless openly in the hand. Just like today, it was not common at that time to see a person walking along a public street carrying a gun in hand; such behavior would have been understood as an emergency requiring the intervention of local officers of the law.

25.    Concealed carry laws did not automatically protect open carry as a mode of being preemptively armed in public. In fact, preemptive arming is precisely what nineteenth-century Americans condemned. An 1838 Virginia statute prohibited "habitual" carrying of deadly weapons—its purpose was to penalize those who carried weapons as an everyday matter of course.[20] An 1813 Louisiana statute included a lengthy preamble explaining why the legislature was taking this action. It is worth quoting in full:

> Whereas assassination and attempts to commit the same, have of late been of such frequent occurrence as to become a subject of serious alarm to the peaceable and well disposed inhabitants of this state; and whereas the same is in a great measure to be attributed to the dangerous and wicked practice of carrying about in public places concealed and deadly weapons, or going to the same [public places] armed in an unnecessary

---

[19] Texas featured a comprehensive deadly weapon law that prohibited the open or concealed carrying of "any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie knife, or any other kind of knife manufactured or sold for the purposes of offense or defense." There were a few exceptions, such as for travelers, peace officers, and anyone who "has reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing." *General Laws of Texas*, ch. XXXIV, §1 (1871). The original statutes in Arkansas and Tennessee indicate legislative intent to enact a comprehensive law like this one, but the decisions from their state courts in *Wilson* and *Andrews*, respectively, prevented them from doing so; in Texas, on the other hand, cases *English* and *Duke* upheld the constitutionality of the deadly weapon law without requiring an army/navy exception. *See English v. State of Texas*, 35 Tex. 473 (1872); *State of Texas v. Duke* 42 Tex. 455 (1874).

[20] 1838 Virginia ch. 101, "An Act to prevent the carrying of concealed weapons," 76 § 1 ("That if any person shall hereafter habitually or generally keep or carry about his person any pistol, dirk, bowie knife, or any other weapon of the like kind, from the use of which the death of any person might probably ensue, and the same be hidden or concealed from common observation . . . .").

manner . . . .[21]

An appellate judge in North Carolina went so far as to say that "there is scarcely a man in the community who does not own and occasionally use a gun of some sort," but that "No man amongst us carries it about with him, as one of his every day accoutrements—as a part of his dress—and never we trust will the day come when any deadly weapon will be worn or wielded in our peace loving and law-abiding State, as an appendage of manly equipment."[22] Public carry laws, whether they used the terms "concealed" or "open," were fundamentally about protecting public spaces by keeping deadly weapons away from them.

**The "Traveler" Exception to Certain Concealed Carry Laws**

26.    In addition to exceptions for true emergencies and self-defense described above, some public carry laws included exceptions for "travelers." The statutes that contained such an exception varied from one state to another, and many left the definition of terms like "travel" and "journey" quite ambiguous. In Texas, for example, even exempted travelers were required to place their weapons in their baggage, which did not include saddlebags.[23]

27.    Far from a blanket exception for people to go armed at all times outside their homes, the travel exception was narrowly defined by state appellate courts. The kind of "travel" which it described as not the everyday movement through public spaces like town squares and commercial districts. Instead, it encompassed a type of travel that separated a person, small group, or family from the protections of the law that went hand-in-hand with organized society and were a fundamental feature of community life—courts, magistrates, constables, and the security of being among

---

[21] 1813 La. Acts 172, An Act Against Carrying Concealed Weapons, and Going Armed in Public Places in an Unnecessary Manner § 1.

[22] *State v. Huntley*, 25 N.C. 418 (1843).

[23] Brennan Gardner Rivas, "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State, 1836-1930," PhD diss. (Texas Christian university, 2019), 108-110. John Thomas Shepherd, "Who Is the Arkansas Traveler: Analyzing Arkansas's Journey Exception to the Offence of Carrying a Weapon," Arkansas Law Review 66, no. 2 (2013): 463-484.

one's neighbors. To be a traveler was to venture outside one's community sphere and become vulnerable to dangers such as robbers and predatory animals.

28.     This notion of "travel" is important and worth reiterating. It was a designation that applied to people who were isolated from their communities, not people who were embedded safely within them. Americans' representative leaders protected the peace and promoted public safety by pursuing regulatory policies that discouraged or prohibited the presence of weapons in places where people gathered together, interacted, and exchanged goods and services. The sensitive place laws clearly show that nineteenth-century lawmakers were concerned about firearms and other weapons in crowds, and the ways in which they rendered innocent people vulnerable to injury or death. The travel exception to public carry laws was not a contravention of that policy—instead, it was a corollary which allowed for weapon-carrying in isolated and potentially dangerous places in contradistinction to those enjoying the protections of community.

29.     An appellate case from 1879 (involving a travel exception) held that: "The court decided the case on the ground that defendant, whilst stopping over at Marianna, could not be said to be on a journey, and should, to avoid a breach of the law, have deposited his pistols with his baggage, and not carried them on his person. This is correct, if the appellant was really wearing them, or either of them, as a weapon. The exception in the statute is to enable travelers to protect themselves on the highways, or in transit through populous places—not to allow them the privilege of mixing with the people in ordinary intercourse, about the streets, armed in a manner which, upon a sudden fit of passion, might endanger the lives of others. Travelers do not need weapons, whilst stopping in towns, any more than citizens do. They should lay them aside, unless the delay be slight, and the journey soon resumed."[24] An Alabama appellate court affirmed the decision of a lower court judge who, even though he acquiesced that the defendant had a right to carry a concealed

---

[24] *Carr v. State*, 34 Ark. 448 (1879).

Declaration of Dr. Brennan Gardner Rivas
Case No. 2:23-cv-10169

weapon while traveling on a dangerous stretch of road, instructed the jury that "if they further believed, from all the evidence in the case, that the defendant was in the daily habit of coming to the city, engaging in his business in the city from morning until evening, mingling with the inhabitants of the city in business and social intercourse, and carried a pistol concealed about his person during this time, not being justified or excused otherwise than for the reason of his having to travel" along the dangerous stretch of roadway, "then he would be guilty, as charged in the indictment."[25] A Tennessee decision rejected the idea that a "journey" meeting the standards of a travel exception "should embrace a mere ramble in one's own neighborhood across the lines of contiguous counties."[26] The court's final word was that "The evil intended to be corrected is the carrying of deadly weapons on the streets, in society, in the community, or among the people with whom we are in the habit of associating—a habit which will ultimately convert a good man into an assassin, and a brave man into a coward."[27] These are only a small sample of the travel-related cases that formed the corpus of traveler-exception jurisprudence associated with nineteenth century concealed weapon laws.[28]

30.     Judges recognized that terms like "travel" and "journey" needed to be interpreted, and that hard-and-fast rules must remain elusive. According to an Arkansas court, "The jury, or court sitting as such, can best judge of all the circumstances, and determine whether the spirit of the law has been violated. No rule with regard to this can be formulated. The intent governs, and the question of fact is, was the defendant really prosecuting his journey, only stopping for a temporary purpose; or had he stopped to stay awhile, mingling generally with the citizens, either

[25] *Eslava v. State*, 49 Ala. 355 (1873).
[26] *Smith v. State*, 50 Tenn. 511 (1872).
[27] *Smith v. State*, 50 Tenn. 511 (1872).
[28] See also *Darby v. State*, 23 Tex. Ct. App. 407 (1880), "He was not a traveler. He resided in Williamson county, and was merely going from his residence to the county site of said county, a distance of about eighteen miles, intending to return the next day. These facts certainly did not constitute him a traveler, within the common meaning of that word, and within the spirit of the statute." See also Shepherd, "Who Is the Arkansas Traveler," 466-482.

Declaration of Dr. Brennan Gardner Rivas
Case No. 2:23-cv-10169

for business or pleasure."[29] A contemporary Tennessee court emphasized legislative intent by saying "It is true, the Legislature has not undertaken to define a journey, or to say whether it shall be a long or short one, but has left the courts to interpret it in the light of good sense, and with regard to the spirit and intent of the statute itself, with the positive injunction in the fourth section of the Act that the courts shall give it a liberal construction so as to carry out its true intent and meaning"—which was to reduce the needless carrying of weapons in public.[30]

31.     An illustrative travel-related case arose in Texas in 1889. A man was convicted of violating the state's public carry law (which prohibited openly borne as well as concealed deadly weapons) by carrying a pistol on his travels to a distant town and keeping it on his person while he visited various establishments there. When he appealed his conviction on the ground that he was a traveler in an unfamiliar city, the appellate court disagreed. He had the right to carry the pistol on the road, in the wagon yard upon his arrival in town, and within the town "for a legitimate purpose, such as to procure a conveyance, or provisions, or to transact other business connected with the prosecution of his journey."  But that protection ceased when his purpose changed from business to leisure—it did not confer upon him a right to "idly stroll through its streets and visit its gambling dens and saloons and public places, armed with a pistol."  To do otherwise would "cause our cities and towns to be infested with armed men, while the citizens of such places would be prohibited from carrying arms to protect themselves from these privileged characters."  The judge's statement clearly shows that townspeople and locals going about their everyday lives were not understood to fall within the statute's traveler exemption.

32.     Public carry laws in force during the late eighteenth and nineteenth centuries, whether they employed language from English common law or took the

---

[29] *Carr v. State*, 34 Ark. 448 (1879).

[30] *Smith v. State*, 50 Tenn. 511 (1872), "The evil intended to be corrected is the carrying of deadly weapons on the streets, in society, in the community, or among the people with whom we are in the habit of associating—a habit which will ultimately convert a good man into an assassin, and a brave man into a coward."

Declaration of Dr. Brennan Gardner Rivas
Case No. 2:23-cv-10169

shape of concealed-carry laws, applied to public spaces in American communities large and small. The exceptions which some concealed weapon laws carved out for travelers remained closely guarded by appellate courts and did not apply to everyday travel.

**Regulations of Public Carry Through Penal Code and Criminal Enactments**

33.    Even though the English common law inherited by the colonies had provided an avenue for disarming public spaces through the Statute of Northampton, nineteenth-century Americans chose to address the problem of weapon-carrying through new criminal enactments. Some of the earlier statutes and ordinances originated in southern and southwestern[31] areas and spread across much of the country by the Civil War Era. Regulations carried on unabated in the postbellum era.

34.    An early example of an American state government translating a common law violation of the Statute of Northampton into a state-level statute occurred in Massachusetts in 1795. Justices of the peace were empowered to "cause to be staid and arrested" anyone who disturbed the peace, engaged in assault or affray, or "shall ride or go armed offensively, to the fear or terror of the good citizens of this Commonwealth."[32] Much of the statute's text repeated phrasing and clauses from within the Statute of Northampton, and prohibited the carrying of arms into public spaces without a justifiable reason. Anyone violating this rule would have been subject to questioning by local officials and "bound" to the peace through a peace bond or surety, which was itself part of the common law inheritance.[33] Decades later, Delaware adopted a nearly identical policy.[34]

---

[31] In the antebellum era, the Old Southwest stretched from Louisiana to Missouri, Kentucky, and Alabama.

[32] 1795 Mass. Ch. 2, 436; from *Acts and Laws Passed by the General Court of Massachusetts: Begun and held at Boston, in the County of Suffolk, on Wednesday the Twenty-eighth Day of May, Anno Domini 1794; and from thence continued by adjournment, to Wednesday, the Fourteenth of January, 1795.* The act was passed on January 29, 1795.

[33] For more on peace bonds and surety, see Paragraph 61.

[34] *Revised Statutes of the State of Delaware, to the Year of Our Lord 1852* (Dover: S. Kimmey, 1852), Title XV, ch. 97, 333 § 13. "Any justice of the peace may also cause to be arrested and bind to surety of the peace all affrayers, rioters, breakers and disturbers of the peace, and all who go armed offensively to the terror of the people, or are otherwise disorderly and dangerous."

Declaration of Dr. Brennan Gardner Rivas
Case No. 2:23-cv-10169

35.     The 1795 Massachusetts law, which addressed going armed within the context of riot, affray, and disturbing the peace, was translated into a penal code edition published in 1836, and in that process the "going armed" portion was isolated into its own section. It read: "If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may, on complaint of any person having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided."[35] The statute clarified the law by showing that "going armed" was a separate offense from disturbing the peace, riot, and affray.

36.     The early nineteenth century was a time when many states were drafting legal codes—making the law known and accessible to the people, which was part of the democratic spirit of the age. In undertaking that process, numerous states adopted verbatim the penal code version of the Massachusetts public carry law. It was repeated in Wisconsin (1839), Maine (1840), Michigan (1846), Virginia (1847), Minnesota (1851), and Oregon (1853).[36] Much like Massachusetts, Maine had a preexisting statute vesting justices of the peace with necessary powers to arrest and penalize affrayers and disturbers of the peace.[37] But for Wisconsin, Michigan,

---

[35] *Revised Statutes of the Commonwealth of Massachusetts, Passed November 4, 1835* (Boston: Dutton & Wentworth, 1836), ch. 134, 70 § 16. This section cites "Persons who go armed may be required to find sureties for the peace &c., 1794, 26 § 2," which appears to be a reference to 1795 Mass. ch. 2, 436; *see also supra*, n. 41.

[36] 1838-1839, Wisconsin, *Statutes of Wisconsin*, "An Act to Prevent the Commission of Crimes," 381 § 16; *Revised Statutes of the State of Maine, Passed October 22, 1840* (Augusta: W. R. Smith, 1841), ch. 169, "Of Proceedings for the Prevention of Crimes," 709 § 16; *Revised Statutes of the State of Michigan, Passed and Approved May 18, 1846* (Detroit: Bagg & Harmon, 1846), Title 31, ch. 162, "Of Proceedings to Prevent the Commission of Crime," 692 § 16; 1847 Virginia, 1847-1848 Session, Title 3, ch. 14, "Of Proceeding to Prevent the Commission of Crimes," 129, §16; *Revised Statutes of the Territory of Minnesota, Passed at the Second Session of the Legislative Assembly, Commencing January 1, 1851* (St. Paul: J. M. Goodhue, 1851), ch. 12, "Of Proceedings to Prevent the Commission of Crimes," 528 § 18; 1853 Oregon, General Laws, 5th Regular Session, 220 § 17.

[37] 1821 Maine ch. 76, "An Act describing the power of Justices of the Peace in Civil and Criminal Cases," 285, §1.

Declaration of Dr. Brennan Gardner Rivas
Case No. 2:23-cv-10169

Minnesota, and Oregon, this was their first public carry law.

37.     Virginia, like Maine, had previously enacted a public carry law; but unlike Maine, that statute was not identical to the Massachusetts approach adopted in 1836. In 1838, Virginia had enacted a different type of law—one that explicitly prohibited the carrying of concealed weapons and punished such behavior by fine and/or jail time.[38] The extent to which this 1838 statute coexisted and overlapped with the 1847 statute remains unknown[39], but the example of Virginia highlights the fact that there were different approaches to public carry legislation during the antebellum nineteenth century. The other approach—which was more common in southern states—also grew out of the Statute of Northampton, but tended to prohibit *concealed* weapons and require criminal penalties for violation rather than sureties to keep the peace.

38.     A good example of the southern, concealed-carry approach to public carry legislation comes from Tennessee. An 1801 public carry law made use of longstanding common law language and phrases providing that anyone who "shall publicly ride or go armed to the terror of the people, or privately carry any dirk, large knife, pistol or any other dangerous weapon, to the fear or terror of any person" would be required to post a bond, go to jail, or "be punished as for a breach of the peace, or riot at common law."[40] An updated statute from 1821 read: "Every person so degrading himself by carrying a dirk, sword cane, Spanish stiletto, belt or pocket pistols, either public or private, shall pay a fine of five dollars for every such offence."[41] The language had been simplified substantially, and the list of prohibited

---

[38] 1838 Virginia ch. 101, "An Act to prevent the carrying of concealed weapons," 76 § 1. "That if any person shall hereafter habitually or generally keep or carry about his person any pistol, dirk, bowie knife, or any other weapon of the like kind, from the use of which the death of any person might probably ensue, and the same be hidden or concealed from common observation . . . ."

[39] It is unclear whether the 1847 Virginia penal code section pertaining to going armed effectively repealed the statute put in place in 1838.

[40] Judge Edward Scott, Laws of the State of Tennessee: Including Those of North Carolina Now in Force in this State: From the Year 1715 to the Year 1820, Inclusive Page 710, Image 714 (Vol. 1, 1821), The Making of Modern Law: Primary Sources.

[41] Robert Looney Caruthers, A Compilation of the Statutes of Tennessee, of a General and

weapons (a deviation from the traditional Statute of Northampton and common law phrasing) formed the basis for the statute.

39.     Tennessee was not the only state to adopt this language to regulate public carry during the early nineteenth century. Corresponding weapon restrictions were enacted in Louisiana and Kentucky in 1813, at a time when both states were experiencing dramatic population growth and economic expansion as a result of river transportation.[42] Like Tennessee, their statutes provided a list of prohibited deadly weapons that could not be concealed on the person and penalized violators with a fine and/or jail time.[43] States and territories following this model included: Indiana (1819), Florida (1835), Georgia (1837), Virginia (1838), Alabama (1839), Ohio (1859), and New Mexico (1859).[44]

40.     In the post-Civil War period, when access to pistols and political instability were fostering a rise in gun violence, a first step in many communities was to enact or strengthen public carry laws. Jurisdictions that did not already have such

Permanent Nature, from the Commencement of the Government to the Present time: With References to Judicial Decisions, in Notes, to Which is Appended a New Collection of Forms Page 100, Image 105 (1836) available at The Making of Modern Law: Primary Sources.

[42] *See* 1813 La. Acts 172, An Act Against Carrying Concealed Weapons, and Going Armed in Public Places in an Unnecessary Manner § 1 ("any person who shall be found with any concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon concealed in his bosom, coat, or in any other place about him that do not appear in full open view . . ."); 813 Ky. Acts 100, An Act to Prevent Persons in this Commonwealth from Wearing Concealed Arms, Except in Certain Cases, ch. 89 § 1 (" any person in this Commonwealth, who shall hereafter wear a pocket pistol, dirk, large knife, or sword in a cane, concealed as a weapon, unless when travelling on a journey, shall be fined in any sum, not less than one hundred dollars . . . .");.

[43] Kentucky mandated a fine of not less than $100, half of which to go to the informer. Louisiana provided for a fine of $20 to $50, with half to go to the informer; violations occurring before a court received a find of not less than $100 and imprisonment up to six months. *See* 1813 Ky. Acts 100, An Act to Prevent Persons in this Commonwealth from Wearing Concealed Arms, Except in Certain Cases, ch. 89 § 1; 1813 La. Acts 172, An Act Against Carrying Concealed Weapons, and Going Armed in Public Places in an Unnecessary Manner § 1.

[44] 1819 Indiana ch. 23, "An Act to prohibit the wearing of concealed weapons," 39; 1835 Florida ch. 860, "An Act to prevent any person in this Territory from carrying arms secretly," 318; 1837 Georgia, "An Act to guard and protect the citizens of this State, against the unwarrantable and too prevalent use of deadly weapons," 90; 1838 Virginia ch. 101, "An Act to prevent the carrying of concealed weapons," 76; 1838 Alabama ch. 77, "An Act to suppress the evil practice of carrying weapons secretly," 67-68; 1859 Ohio "An Act to prohibit the carrying or wearing of concealed weapons," 3:56; 1859-1860 New Mexico "An Act prohibiting the carrying of Weapons, concealed or otherwise," 94–99 (English and Spanish).

Declaration of Dr. Brennan Gardner Rivas
Case No. 2:23-cv-10169

laws began enacting them, and those using the older mechanism of sureties to keep the peace often transitioned toward the implementation of criminal statutes mandating fines and/or jail time for violators.[45] The closing third of the nineteenth century saw a flurry of this activity as states and municipalities tried new penalties, added new weapons to the lists of prohibited weapons, and generally attempted to eliminate small, easily concealable weapons from the public sphere.[46] By the turn of the twentieth century, no fewer than sixteen more states and territories had enacted public carry laws—in other words, at least 35 of the 50 states and territories (including the District of Columbia) in existence as of 1899 had public carry laws.[47]

---

[45] The Repository of Historical Gun Laws, a database maintained by the Duke Center for Firearms Law, reflects that American state and local governments enacted statutes and ordinances specifically relating to "carrying weapons" in large numbers during the period from the close of the Civil War in 1865 through the end of the nineteenth century. *See* https://firearmslaw.duke.edu/repository/search-the-repository/.

[46] In the second half of the nineteenth century, items like metal knuckles and razor blades became targets for proscription alongside bowie knives, pistols, and sword canes. For example, see 1883 Ariz., ch. 36 ("dirk, dirk-knife, bowie-knife, slung-shot, brass-knuckles, or pistol . . ."); 1882 W.V., ch. 85 ("revolver or other pistol, dirk, bowie knife, razor, slung shot, billy, metallic or other false knuckles, or any other dangerous or deadly weapon of the like kind or character . . ."); 1871 Tex., ch. 34 ("any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purposes of offense or defense . . ."; 1886 Md., ch. 375 ("any pistol, dirk-knife, bowie-knife, slung-shot, billy, sand-club, metal knuckles, razor or any other dangerous or deadly weapon of any kind whatsoever, (penknives excepted) . . ."); 1873 Penn., ch. 810 ("any pistol, dirk-knife, slung-shot or deadly weapon . . ."); 1879 N.C., ch. 127 ("any pistol, bowie-knife, dirk, dagger, slung-shot, loaded cane, brass, iron or metallic knuckles, or other deadly weapon of like kind . . ."); 1866 N.Y., ch. 716 ("any instrument or weapon of the kind commonly known as slung-shot, billy, sand club or metal knuckles, and any dirk or dagger (not contained as a blade of a pocket knife), or sword cane or air gun . . ."). This is not an exhaustive list.

[47] *See supra*, pp. 17–24 and corresponding citations; 1862 Colorado ch. 4, "An Act to Prevent the Carrying of Concealed Deadly Weapons in the Cities and Towns of this Territory," 56; 1863 California ch. 485, "An Act to prohibit the Carrying of Concealed Weapons," 748-749; 1864 Montana ch. 43, "An Act to Prevent the Carrying of Concealed Deadly Weapons in the Cities and Towns of this Territory," 355; 1864 Dakota Territory *Penal Code* § 455; 1871 Texas ch. 34, "An Act to Regulate the Keeping and Bearing of Deadly Weapons," 25–27; Harvey B. Hurd, editor, *Revised Statutes of the State of Illinois* (Springfield: Illinois Journal Co., 1874), ch. 38 § 56, "Disturbing the Peace"; 1878 Mississippi ch. 46, "An Act to prevent the carrying of concealed weapons, and for other purposes," 175–76; Guy A. Brown, compiler, *Compiled Statutes of the State of Nebraska* (Omaha: Gibson, Miller & Richardson, 1881), ch. 5, "Offenses Against Public Peace and Justice," § 25; Washington (State), *Code of Washington* (Olympia: C. B. Bagley, 1881), 181 § 929; 1882 West Virginia ch. 110, 317 § 8; 1883 Missouri 76; 1888 Idaho "An Act Regulating the Use and Carrying of Deadly Weapons in Idaho Territory," 23; 1889 Arizona ch. 13, "An Act Defining and Punishing Certain Offenses Against the Public Peace," 30–31; 1890 Oklahoma "Crimes and Punishment," ch. 25, Art. 38, "Of Crimes Against the Public Health and Safety," 476 § 20; "To Punish the Carrying or Selling of Deadly or Dangerous Weapons within the District of

Declaration of Dr. Brennan Gardner Rivas
Case No. 2:23-cv-10169

Hawaii, which became a territory in 1900, had enforced public carry regulations since 1852.[48] Those states which did not have public carry laws generally had local ordinances on the subject in the larger towns or had other statutes pertaining to carrying weapons with intent to assault, burglarize, etc.[49]

**Taxation and Sensitive Places Statutes as Regulations on Public Carry**

41.    Other methods of gun and weapon regulation than public carry existed in the nineteenth century, including taxation policies and disarmament requirements at certain sensitive places. These laws often coexisted with public carry laws, adding another regulatory layer to Americans' relationships to their weapons and their communities. These policies were designed to protect the public by discouraging people from being armed in public spaces, or established standards for dealers in firearms that could appropriately regulate the trade in and access to deadly weapons within American communities.

**A.    Taxation**

42.    One mode of regulating weapons during the antebellum nineteenth century involved taxation.[50] The taxing power exists to raise revenue, but it has also

Columbia, and for other Purposes," ch. 159, 52 Congress, Public Law 52–159, 27 Stat. 116 (1892), 116-117; *Revised Codes of the State of North Dakota* (Bismarck: Tribune Co., 1895), "Penal Code: Public Health and Safety," 1293 § 7313; Fred F. Barker, *Compilation of the Acts of Congress and Treaties Relating to Alaska: From March 30, 1867 to March 3, 1905* (Washington, D.C.: U.S. Gov. Print. Off., 1906), "Appendix A.," ch. 6, "Offenses Against the Public Peace," 139–140 § 118.

[48] "An Act to Prevent the Carrying of Deadly Weapons," *Hawaii: Kingdom of Kamehameha*, III-V, Regular Sessions (1852), 19.

[49] Jersey City, New Jersey had local public carry and registration laws, illustrating the approach of using ordinances in the larger cities of states without a public carry statute. See *Ordinances of Jersey City, Passed by the Board of Aldermen since May 1, 1871* (1874), 41, 86–87. California also pursued what was essentially a local option for license-to-carry programs. See infra, pp. 47–48 and corresponding citations. New York used the approach of penalizing being in possession of certain weapons with intent to commit a crime. See John W. Edmonds, editor, *Statutes at Large of the State of New York* (Albany: Weed, Parsons & Company, 1874), ch. 716, "An Act to prevent the furtive possession and use of slung-shot and other dangerous weapons," 810–811.

[50] The Duke Repository of Historical Gun Laws identifies more than one hundred "taxation/registration" laws across the colonial period to 1930. Further research has uncovered (and will likely continue to uncover) additional laws, at both the state and local level. *See, e.g.* Dave Kopel, "Bowie Knife Statutes," *The Volokh Conspiracy* (November 20, 2022), https://reason.com/volokh/2022/11/20/bowie-knife-statutes-1837-1899/ (describing personal taxes upon weapons not in Repository). But some example regulations from the Repository include:

Declaration of Dr. Brennan Gardner Rivas
Case No. 2:23-cv-10169

historically been exercised as part of the police power. Sometimes taxes were straightforward attempts to prohibit the carrying of weapons without saying so explicitly. This approach was practiced in Florida during its territorial phase and remained a policy option for much of the nineteenth century.[51] In 1835, the territorial government enacted a public carry law with a steep fine of $50 to $500 for violations and an exemption for "carrying arms openly, outside of all their clothes."[52] Unsatisfied with the public carry law, leaders established a new series of prohibitive taxes designed to further reduce the presence of deadly weapons in public. This 1838 enactment held that anyone who chose "to vend dirks, pocket pistols, sword canes, or bowie knives" had to first pay an annual tax of $200, "and all persons carrying said weapons openly shall pay…a tax of ten dollars annually."[53] In 2023 dollars, the annual occupation tax would amount to approximately $6,300, and the annual open carry tax would amount to approximately $320.[54] In a sparsely populated, rural environment, these taxes were clearly designed to discourage trade in and public carry of deadly weapons. The architects of the statute saw it as intrinsically connected to the previously enacted concealed carry restriction—as a way of more effectively

---

Chas. Ben. Darwin, Ordinances of the City of Burlington, with Head Notes and an Analytic Index Page 149–50, Image 149–150 (1856) available at The Making of Modern Law: Primary Sources (taxing shooting batteries within the city); 1851 R.I. Pub. Laws 9, An Act In Amendment Of An Act Entitled An Act Relating To Theatrical Exhibitions And Places Of Amusement §§ 1, 2 (levying an annual tax of no more than $200 on anyone owning rifle galleries or pistol galleries in the city); John W.A. Sanford, The Code of the City of Montgomery, Prepared in Pursuance of an Order of the City Council of Montgomery Page 7–9, Image 12 (1861) available at The Making of Modern Law: Primary Sources (levying an annual tax of unspecified value upon pistol galleries within the city).

[51] In some ways, possession taxes came close to being carry taxes or even proto-licensing policies. Taxation as a form of public carry regulation was considered in Texas in 1866 as well as in Tennessee in 1893. See infra, n. 124; "Tennessee State News," *Bolivar Bulletin* (Bolivar, Tennessee) February 10, 1893, 1, https://chroniclingamerica.loc.gov/lccn/sn89058007/1893-02-10/ed-1/seq-1/.

[52] John P. Duval, Compilation of the Public Acts of the Legislative Council of the Territory of Florida, Passed Prior to 1840 Page 423, Image 425 (1839) available at The Making of Modern Law: Primary Sources. *See supra*, nn. 53, 57.

[53] 1838 Fla., ch. 24.

[54] The amounts reach $319.14 and $6,382.73. *See*: https://www.in2013dollars.com/us/inflation/1838?amount=200.

Declaration of Dr. Brennan Gardner Rivas
Case No. 2:23-cv-10169

reducing the number of weapons carried in public spaces.[55]

43.   Some southern states also placed annual taxes upon the owners of deadly weapons. Real property exceeding certain thresholds would be taxed, "intangible" property like investments were taxed, and moveable property (especially luxury goods or items associated with vices) could be taxed at standard rates as well.[56] Bowie knives, dirks, and pistols sometimes made their way into the lists of taxable items.[57] A North Carolina revenue measure from 1850 provides an example of moveable property taxes in the antebellum South. The law spanned nine pages and included nineteen sections spelling out which forms of property could be taxed, at what rates, how they were to be paid, the manner in which tax information should be reported, and the penalties for failure to comply with the law.[58] Section 5 provided for ad valorem taxes upon "plate, jewelry, vehicles, &c.," a category that included items like buggies, pianofortes, watches, billiard tables, and playing cards alongside pistols and bowie knives.[59] The items on the list were decidedly *not* necessities, and they included accoutrements associated with gambling, drinking, sumptuous living, and the reckless carrying of weapons—in other words, items associated with extravagance, vice, and irresponsibility.[60] The rate of tax upon pistols and knives was relatively high: $1 on all pistols ("except such as shall be used exclusively for

---

[55] The title of the 1838 tax was "An Act in addition to An Act, (approved January 30, 1835,) entitled An Act to prevent any person in this Territory from carrying arms secretly." *See supra*, n. 68.

[56] Brian Sawers, "The Poll Tax before Jim Crow," *American Journal of Legal History* 57, no. 2 (June 2017),175–78.

[57] For example, see 1850 NC, ch. 121; 1856 N.C., ch. 34; 1866 N.C. ch. 21; Anderson Hutchinson, Code of Mississippi: Being an Analytical Compilation of the Public and General Statutes of the Territory and State, with Tabular References to the Local and Private Acts, from 1798 to 1848, Page 182, Image 182 (1848) available at The Making of Modern Law: Primary Sources. This is not an exhaustive list. Mississippi repealed its tax upon "Bowie-knives, Sword-canes and Dirk-knifes" during the first year of fighting in the Civil War. 1861 Miss. Ch. 125.

[58] 1850 North Carolina, ch. 121.

[59] *See id.* § 5.

[60] Law and policy scholars writing about taxation have historically understood the tax power as being invoked sometimes for the raising of revenue and at other times for the discouragement of problematic activities or behaviors. *See supra*, n. 65.

Declaration of Dr. Brennan Gardner Rivas
Case No. 2:23-cv-10169

mustering") and bowie knives, and $0.50 on all dirks and sword canes.[61] One dollar was the same rate of taxation as that for buggies and carriages valued at $100-200. The relatively high tax rate on knives and pistols seems to have prompted the addition of a proviso that limited its scope to "only such pistols, bowie knives, dirks, and sword canes, as are used, worn or carried about the person of the owner."[62] In other words, a person wanting to avoid the tax upon these deadly weapons need only leave them at home rather than carry them habitually. This North Carolina tax was not necessarily prohibitive, but it certainly incentivized public disarmament through potential tax savings. In this way, the 1850 North Carolina possession tax functioned much like the 1835 Florida open carry tax in its purpose of discouraging the public carry of deadly weapons.

44.    Occupation taxes and sales taxes were another taxation method employed by postbellum lawmakers. For instance, an occupation tax in Alabama applied to "dealers in pistols, or pistol cartridges, or bowie-knives, or dirk-knives, whether principal stock in trade or not." The dealer had to pay an annual licensing fee of $300 in order to legally conduct business, which amounts to nearly $10,000 today.[63] In 1894, Georgia enacted a new occupation tax law that applied to "dealers in pistols and other weapons." A dealer in "pistols, toy pistols shooting cartridges, pistol or rifle cartridges, dirks, bowie-knives, or metal knucks" had to pay twenty-five dollars per place of business—which would be nearly $900 today.[64]

---

[61] There was an exception for these weapons that were "kept in shops and stores for sale." *See supra*, n. 75.

[62] *Id.*

[63] *See* 1892 Alabama ch. 95, 183; and Robert C. Brickwell, et al, *Code of Alabama, Adopted by Act of the General Assembly Approved February 28, 1887* (Nashville: Marshall & Bruce, 1887), ch. 9, Art. I § 629. The $300 licensing fee was in effect some time prior to 1887, and an 1892 amendment closed a loophole for dealers in "pistol cartridges." The subsequent Article specifies that all licenses expire annually; *see* ch. 9, Art. II § 634.

[64] Acts of the General Assembly of the State of Georgia (1894) available online from the Digital Library of Georgia; *see* https://dlg.usg.edu/record/dlg_zlgl_75343012/fulltext.text and https://dlg.usg.edu/collection/dlg_zlgl?range%5Byear_facet%5D%5Bbegin%5D=1880&range%5Byear_facet%5D%5Bend%5D=1899&sort=year+desc. Also, there were likely many more occupation taxes, though they have not

Declaration of Dr. Brennan Gardner Rivas
Case No. 2:23-cv-10169

45.     In the early twentieth century, members of the Texas legislature put in place a 50% tax on the gross receipts from the sale of pistols. All dealers had to report quarterly the number sold along with payment, which functioned as an occupation tax for them to remain in business.[65] The intention of the measure was to make pistols prohibitively expensive. Dealers and buyers found loopholes, which the lawmakers did not attempt to close. But a trade organization representing gun dealers opposed the law and challenged it in state court. A Texas appellate court upheld the stringent sales tax, describing the business of selling pistols as one "hurtful to the welfare of society" and among that class of occupations "detrimental to the health, morals, or good order of society." As a result, the court reasoned that the legislature "would have the right, not only to levy an excessive tax, which would be prohibitory thereof, but could go further and absolutely prohibit any one from engaging therein."[66]

## B.     Sensitive Places

46.     Statutes disarming certain sensitive places date to the colonial era and were already longstanding by the 1870s, but the escalating gun violence prompted an overt expansion of that policy to meet the needs of the day. Where historical laws had protected polling places and court buildings (which were the major occasions for public gatherings in rural early America—not just sites of government activity), updated laws added theaters, open-air presentations, and even private parties to the assemblies protected through disarmament. In 1869, Tennessee lawmakers prohibited the carrying of deadly weapons "concealed or otherwise" at elections or "any fair, race course, or other public assembly of the people."[67] Similarly in 1870,

---

been comprehensively indexed as of yet. Twenty-five dollars in 1894 would be $874.53 in 2023 dollars. *See* https://www.in2013dollars.com/us/inflation/1894?amount=25.

[65] 1907 Texas ch. 18, "An Act providing for the levy and collection of an occupation tax . . .[]" 485 § 12.

[66] *Caswell & Smith v. State*, 148 S.W. 1159 (Tex. App. 1912).

[67] Ch. 22, 1869 Tenn. Pub. Acts 23[22] (36th Assembly, 1st Sess.), "An Act to Amend the Criminal Laws of the State," § 2 (Ex. M). The section read in full: "That it shall not be lawful for any qualified voter or other person attending any election in this State, or for any person attending any fair, race course, or other public assembly of the people, to carry about his person, concealed

Declaration of Dr. Brennan Gardner Rivas
Case No. 2:23-cv-10169

Georgia lawmakers prohibited the carrying of deadly weapons "to any court of justice, or any election ground or precinct, or any place of public worship, or any other public gathering in this State, except militia muster-grounds."[68] A law from Texas prohibited all deadly weapons, including "fire-arms, wither known as a six shooter, gun or pistol of any kind" at a host of events ranging from churches to polling places "or other social gathering composed of ladies and gentlemen."[69] Laws in effect in Missouri in 1879 and Oklahoma Territory in 1890 were nearly identical to it.[70] Vermont and Mississippi both prohibited weapons inside schools, with the Mississippi legislature prohibiting students at colleges from possessing deadly weapons on campuses or within two miles of them (effectively disarming college students within the limits of college towns).[71] Other laws prohibited the carrying of weapons within the general vicinity of polling places, churches, and parks.[72]

---

or otherwise, any pistol, dirk, Bowie-knife, Arkansas toothpick, or weapon in form, shape, or size resembling a Bowie knife or Arkansas tooth-pick, or other deadly or dangerous weapon." The following section (§ 3) stated: "That all persons convicted under the second section of this act shall be punished by fine of not less than fifty dollars, and by imprisonment, or both, at the discretion of the court."

[68] Act No. 285, 1870 Ga. Laws 421 (Ex. N). The list of prohibited weapons included "any dirk bowie-knife, pistol or revolver, or any kind of deadly weapon." There was also no implicit or explicit exception for open carry. Violators convicted received a fine ($20–50), imprisonment (10–20 days), or both.

[69] 1870 Tex. Gen. Laws 63, ch. 46 § 1.

[70] *Revised Statutes of the State of Missouri* (1879), ch. 24 § 1274; 1890 Okla. Stat. 495–96.

[71] *Annotated Code of the General Statute Laws of the State of Mississippi* (1892), "Crimes and Misdemeanors," § 1030. "A student at any university, college, or school, who shall carry, bring, receive, own, or have on the campus, college or school grounds, or within two miles thereof, any weapon the carrying of which concealed is prohibited, or a teacher instructor, or professor who shall knowingly suffer or permit any such weapon to be carried, or so brought, received, owned, or had by a student or pupil, shall be guilty of a misdemeanor, and, on conviction, be fined not exceeding three hundred dollars or imprisoned in the county jail not exceeding three months, or both." *Laws of Vermont*, Special Session (1891), No. 85 § 2. "A person who shall carry or have in his possession while a member of and in attendance upon any school, any firearms, dirk knife, bowie knife, dagger or other dangerous or deadly weapon shall, upon conviction thereof, be fined not exceeding twenty dollars." It is worth noting that disarmament laws and policies had been in effect at both public and private colleges long before this time. For example, *see* The Minutes of the Senatus Academicus of the State of Georgia, 1799–1842, at 86 (1810); University of Virginia Board of Visitors Minutes, 6–7 (October 4–5, 1824); Acts of the General Assembly and Ordinances of the Trustees, for the Organization and Government of the University of North Carolina, Laws for the Government of the University, at 15 Chapter V (1838). This is not an exhaustive list.

[72] 1870 La. Acts 159–60, "An Act to Regulate the Conduct and to Maintain the Freedom of Party Election," § 73 (no carry concealed or unconcealed within a half mile of polling places on election day or registration places on days of voter registration); George Washington Paschal, *A*

Declaration of Dr. Brennan Gardner Rivas
Case No. 2:23-cv-10169

**History of Public Carry Licensing**

47.     As structural forces like industrialization and urbanization propelled the growth of more sophisticated governmental administration in the United States, gun policies evolved in ways that increased official oversight of weapon sales and carrying. The sales registries enumerated above placed special requirements on dealers, but the intention behind them was to empower police and other officials to solve crimes by providing them with information.[73] In a similar way, licensing either for purchase of a pistol or for public carry of one grew out of American traditions of regulating deadly weapons.

48.     One of the earliest proponents of licensing as a way of regulating the carrying of pistols was California. The state had enacted a public carry law that prohibited concealed deadly weapons, but residents grew frustrated that it did not seem to be effective. In 1866, members of the state legislature divided over what to do about the problem.[74] One camp proposed issuing licenses to people who needed a pistol for personal protection. The state did not adopt this proposal and instead repealed the public carry law. In the aftermath of that decision, California municipal governments began passing ordinances that provided for licensing in order to carry a

---

*Digest of the Laws of Texas*, 3rd ed. (1873) II: 1317–1318 (no carry concealed or unconcealed within a half mile of polling places on election day or registration places on days of voter registration); John Prentiss Poe, *The Maryland Code : Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888* (Vol. 2, 1888), 1457 (no carry by any person in Kent County on days of an election); 1886 Md. Laws 315, An Act to Prevent the Carrying of Guns, Pistols, Dirk-knives, Razors, Billies or Bludgeons by any Person in Calvert County, on the Days of Election in said County, ch. 189 § 1 (no carry by any person in Calvert County within 300 yards of polls on election day); 1877 Va. Acts 305, Offenses Against The Peace § 21 (no weapons in church during services, or anywhere beyond one's on premises on Sundays); Oscar F. Greene, *Revised Ordinances of the City of Boulder* (1899), 157 (no one save city police officers shall carry weapons into public parks).

[73] The examples cited above (*supra*, n. 151, n. 152) included requirements that registries be open for the review of police and others.

[74] Theodore Henry Hittell, *The General Laws of the State of California, from 1850 to 1864, Inclusive* (1868), "An Act to prohibit the carrying of concealed weapons," 261 § 1–2. On frustration among the public, see "Concealed Weapons," *Morning Union* (Grass Valley, California), February 20, 1869 ("The object was to prevent indiscriminate shooting among a class about whose welfare there need not have been any extraordinary solicitude; but the result has been to place the law-abiding portion of the community at the mercy of night-prowlers, footpods, and garroters.").

pistol in public.[75] The policy proved popular, and by the turn of the twentieth century a majority of California residents lived in municipalities that had implemented a permitting process for the public carry of concealed weapons.[76] Municipalities elsewhere during the nineteenth century implemented licensing policies: Jersey City, New Jersey did so in 1873 and the District of Columbia in 1892.[77]

49.    Nineteenth-century licensing laws tended to be discretionary in the sense that public officials exercised judgment in determining who might obtain a license. The procedures involved varied tremendously from one jurisdiction to another. For instance, Sacramento's 1876 law required a written permit from the Police Commissioners, and specified that those commissioners "may grant written permission to any peaceable person, whose profession or occupation may require him to be out at late hours of the night… ."[78] Applicants had to pass a two-part test: first, be "peaceable"—an attribute open to interpretation and likely a matter of personal history, demeanor, and reputation; and second, be required by employment to be out late at night. In other words, not all "peaceable" people were eligible for a license at all, such as a clerk whose employer did not require him to work at night; and not all nighttime workers could be considered "peaceable." In fact, a large portion of people

---

[75] For example, *see* Ordinance No. 84: Prohibiting the Carrying of Concealed Deadly Weapons, Apr. 24, 1876, reprinted in R. M. Clarken, editor, *Charter and Ordinances of the City of Sacramento* (1896), 173; Prohibiting the Carrying of Concealed Deadly Weapons, Sep. 17, 1880, reprinted in *General Orders of the Board of Supervisors Providing Regulations for the Government of the City and County of San Francisco* (1884), 8; "Concealed Weapons," *Napa Daily Register* (Napa, California), November 10, 1880, 2. This is not an exhaustive list. See also Patrick J. Charles, "The Fugazi Second Amendment: *Bruen*'s Text, History, and Tradition Problem and How to Fix It," *Cleveland State Law Review* 71, no. 3 (2023), 660 ("Although it is impossible to state with historical precision when and where the first armed carriage licensing law was enacted, based on the historical evidence available, it appears that California was at the forefront.").

[76] Saul Cornell, "The Right to Regulate Arms in the Era of the Fourteenth Amendment," *UC Davis Law Review Online* 55 (September 2021), 84.

[77] *Ordinances of Jersey City, Passed by the Board of Aldermen since May 1, 1871* (1874), "An Ordinance in Relation to the Carrying of Dangerous Weapons," § 3 (*supra*, n. 116); *supra*, n. 115 § 2.

[78] Ordinance No. 84, Prohibiting the Carrying of Concealed Weapons, April 24, 1876, reprinted in R. M. Clarken, ed., *Charter and Ordinances of the City of Sacramento* (1896), 173. Quoted in Brief of Amicus Curiae Patrick J. Charles, Appendix 1, p. 2-3, *New York State Rifle and Pistol Ass'n. v. Bruen*, 597 U.S. 1 (2022).

1   whose occupations kept them out late at night were the very ones who appeared to

2   threaten the physical safety of the "peaceable" people seeking concealed-carry

3   permits in the first place.

4       50.    Several cities in New York, including New York City and Brooklyn,

5   which were among the most populous cities in the country in the late-nineteenth

6   century, also required some showing of good character from the permit applicant. A

7   person over twenty-one (21) years "who has occasion to carry a pistol for his

8   protection" could apply to local police, who, "if satisfied that the applicant is a proper

9   and law-abiding person," could recommend the applicant to yet higher police

10  authorities for a permit "allowing him [the applicant] to carry a pistol of any

11  description."[79] Assessing whether a person was "proper and law-abiding" was a

12  matter of official determination, seemingly based upon an applicant's criminal

13  history in addition to his/her reputation for or appearance of propriety.

14      51.    Other jurisdictions had different rules, like Lincoln, Nebraska, whose

15  law prohibited concealed carry except for officers of the law, "persons whose

16  business or occupation may seem to require the carrying of weapons for their

17  protection," and licensees. There was some discretion for people to assess their

18  personal safety and carry weapons *based upon their business or occupation*, not their

19  individual preferences. Other than being good for a term of one year and requiring a

20  fee of $0.50, the procedure for obtaining a license was completely open-ended. The

21  law held that "The Mayor may grant to so many and such persons as he may think

22  proper, licenses to carry concealed weapons, and may revoke any and all such

23  licenses at his pleasure."[80] Wide discretion for officials was common among

24      [79] Pistols—Carrying Of: Ordinance to Regulate the Carrying of Pistols, October 25, 1880,

25  reprinted in *Brooklyn Daily Eagle* (Brooklyn, New York), October 26, 1880, 1; Article XXVII: Carrying of Pistols, reprinted in Elliott F. Shepard et al, eds., *Ordinances of the Mayor, Aldermen*

26  *and Commonalty of the City of New York, in Force January 1, 1881* (1881), 214-216. Brief of Amicus Curiae Patrick J. Charles, Appendix 1, p. 21-24, *New York State Rifle and Pistol Ass'n. v.*

27  *Bruen*, 597 U.S. 1 (2022).
        [80] Article XVI: Concealed Weapons, An Ordinance Regulating the Carrying of Concealed

28  Weapons in the City of Lincoln, August 26, 1895, reprinted in *Revised Ordinances of Lincoln*

licensing laws. Consider Coffeyville, Kansas, for example, whose 1890 deadly weapon law prohibited open- and concealed-carry "without first having obtained permission from the Mayor" without identifying any specific permitting procedure or requirements.[81]

**Nineteenth Century Distinctions Between Locales in Weapons Regulations**

52.     In American history, it has been common for people to draw distinctions about the relative dangers of deadly weapons in urban versus rural locales. As previously discussed, public carry laws often featured modified rules for long-distance travelers venturing beyond the safety of their local communities. When exposed to the dangers of the highway bushwhacker or the prowling coyote that went along with nineteenth-century horseback travel, laws generally allowed the carrying of weapons—including those statutorily restricted as deadly weapons.[82] But as discussed above, these travel exceptions were closely guarded by appellate courts, who typically required the travel to last overnight, cross county lines (which was a much more significant marker of distance in then than it is now), or otherwise take a person beyond his "circle of neighbors."[83] Another requirement was often that a

_Nebraska_ (1895), 209-210. Quoted in Brief of Amicus Curiae Patrick J. Charles, Appendix 1, p. 40-42, _New York Rifle and Pistol Ass'n v. Bruen_, 597 U.S. 1 (2022).

[81] Ordinance No. 201: To Prohibit the Carrying of Firearms or Deadly Weapons, and Providing Penalties Therefore, February 5, 1890, reprinted in _Coffeyville Weekly Journal_ (Coffeyville, Kansas), February 7, 1890, 2. Quoted in Brief of Amicus Curiae Patrick J. Charles, Appendix 1, p. 16-17, _New York State Rifle and Pistol Ass'n. v. Bruen_, 597 U.S. 1 (2022).

[82] 1840 Ala., ch. 7, "Of Miscellaneous Offenses," 148-149 ("Every one who shall hereafter carry concealed about his person, a bowie knife…or any other deadly weapon, pistol or any species of fire arms, or air gun, unless such person be…setting out on a journey…"); 1878 Mississippi ch. 46, "An Act to prevent the carrying of concealed weapons, and for other purposes," 175–76 ("That any person not…traveling (not being a tramp) or setting out on a journey…who carries concealed, in whole or in part, any bowie knife, pistol, brass knuckles, slung shot or other deadly weapon…"); 1871 Texas ch. 34, "An Act to Regulate the Keeping and Bearing of Deadly Weapons," 25–27, § 1 ("Provided, that this section shall not be so construed as…to prohibit persons traveling in the State from keeping or carrying arms with their baggage."); 1831, Indiana – Revised Laws, 15th Session, Chapter 26, "An Act relative to Crime and Punishment, 180-199 at 192, §58 ("That every person, not being a traveller, who shall wear or carry any dirk, pistol, sword in a cane, or other dangerous weapon concealed…"); 1871Tenn., ch. 90, "An Act to preserve the peace and prevent homicide," 81-82, § 3 ("That the provisions of the first section of this Act shall not apply to…any person who is on a journey out of his county or State.").

[83] _Carr v. State_, 34 Ark. 448 (1879); _Eslava v. State_, 49 Ala. 355 (1873); _Smith v. State_, 50 Tenn. 511 (1872); _Darby v. State_, 23 Tex. Ct. App. 407 (1880). See also, John Thomas Shepherd,

Declaration of Dr. Brennan Gardner Rivas
Case No. 2:23-cv-10169

traveler check his weapons upon arriving to a town or to depart town as soon as his business was finished without visiting shops or restaurants.

53.    There are examples of cities and towns, many of them in California, enacting local public carry ordinances in jurisdictions that did not have statewide laws. Between 1870 and 1917, California did not have a statewide public carry law. Instead, municipalities themselves—ranging in size from Los Angeles and San Francisco to Lompoc and St. Helena—issued licenses to applicants who could show that they were particularly vulnerable to attack and therefore in need of a weapon for self-defense.[84] In the immediate aftermath of the Civil War, several towns of varying size within Texas enacted ordinances against the carrying of weapons.[85] At that time, the state did not have a public carry law; rather than try to stop the cities from pursuing policies that promoted safety, the legislature provided protection to their public carry laws. For instance, Galveston's public carry law went into effect in 1865[86], and the following year state lawmakers issued a new charter to the City of Galveston, granting its leadership the power "[t]o regulate the carrying of weapons, and prevent the carrying of the same concealed."[87] It was not until 1870-1871 that Texas pursued a statewide gun-safety policy by enacting a sensitive places law along with a public carry law. Kansas's deadly weapon policy specifically authorized towns to regulate the carrying of weapons "concealed or otherwise."[88]

_____

"Who Is the Arkansas Traveler: Analyzing Arkansas's Journey Exception to the Offense of Carrying a Weapon," *Arkansas Law Review* 66, no. 2 (2013): 463-484.

[84] See Saul Cornell, "The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America," *US Davis Law Review Online* 55 (September 2021), 65-90 at 84-85 (see Table 3: Municipalities with Permit Schemes in Post-Civil War California).

[85] "Proceedings of the City Council," *Flake's Bulletin* (Galveston, Texas), December 28, 1865; "Ordinances Passed," *Goliad Intelligencer* (Goliad, Texas) March 17, 1866; "Ordinance Concerning Deadly Weapons," *Texas Countryman* (Hempstead, Texas) August 10, 1867.

[86] Ibid.

[87] 1866 Texas ch. 173, "An Act to Reincorporate the City of Galveston," Title 4: Of the City Council—Its General Powers and Duties, § 27, 13th,320, quoted in H. P. N. Gammel, ed., *The Laws of Texas, 1822-1897*, vol. 5 (Austin: Gammel Book Company, 1898),1540.

[88] See *Salina v. Blaksley*, 72 Kan. 230 (1905); 1881 Kan. Sess. Laws 92, c. 37, § 24.

Declaration of Dr. Brennan Gardner Rivas
                                                      Case No. 2:23-cv-10169

54.     And in the American West more broadly, different rules often applied in organized towns than in the expansive countryside beyond their borders. Colorado, Idaho, Montana, Arizona, New Mexico, and Wyoming explicitly prohibited the carrying of concealed weapons in towns and settlements.[89] Dodge City, Kansas and some of the other cattle towns at western railheads famously prohibited the carrying of guns within city and town limits.[90] While it may be tempting to interpret these laws as allowing an "anything goes" attitude toward deadly weapons outside of towns and cities, such a conclusion would be a mistake. People traveling in isolated areas may have carried a bowie knife or pistol on their belt for protection, and such behavior would be in line with the longstanding travel exceptions that had been in force in much of the country for decades. But more importantly, a person traveling long distances and subject to attack from bushwhackers or wild animals would be much more likely to turn to a rifle for self-preservation than a pistol. Breech-loading rifles (as opposed to muzzle-loaders) were becoming the national standard in the post-Civil War period. Single-shot breech-loaders could be reloaded much more quickly than muzzle-loaders, and repeat-fire rifles were increasing in number and popularity. Lever-action rifles like the Winchester could often hold upwards of five rounds (and in the late 1860s and early 1870s, more than ten rounds) in the tubular magazine affixed below the gun's barrel. Rifles could shoot farther and more accurately than a pistol, and generally carried a higher caliber. Though Winchester lever-action rifles not commonly possessed in the US during Reconstruction, Americans venturing into the rural West during the late-nineteenth century as

---

[89] 1852 New Mexico, "An Act Prohibiting the carrying of a certain class of Arms, within the Settlements and in Balls," 67-70 (in English and Spanish); 1862 Colorado ch. 4, "An Act to Prevent the Carrying of Concealed Deadly Weapons in the Cities and Towns of this Territory," 56; 1864 Montana ch. 43, "An Act to Prevent the Carrying of Concealed Deadly Weapons in the Cities and Towns of this Territory," 355; 1888 Idaho "An Act Regulating the Use and Carrying of Deadly Weapons in Idaho Territory," 23; 1889 Arizona ch. 13, "An Act Defining and Punishing Certain Offenses Against the Public Peace," 30–31.

[90] For the famous photo and a brief explanation of Dodge City and other western ordinances, see Matt Jancer, "Gun Control Is as Old as the Old West," *Smithsonian Magazine*, February 5, 2018, https://www.smithsonianmag.com/history/gun-control-old-west-180968013/ .

immigrants or hunters would certainly have turned to a rifle for protection, and their exemption for carrying deadly weapons in uninhabited or sparsely inhabited zones was essentially a recapitulation of the exemption for travelers that had taken root in some Old Southwest states (Texas, Arkansas, Missouri, etc.).

55.    When considering how nineteenth-century Americans viewed the locality distinctions and their consequences for gun policy, sensitive places laws are particularly helpful. They identified as protected those spaces of gathering and assembly that define life in an organized, incorporated community—meeting halls, entertainment venues, educational facilities, city parks, and social parties. These laws often prohibited *all firearms* in addition to deadly weapons, and effectively turned any gathering space into a de facto disarmed zone; they show us that nineteenth-century Americans believed that gatherings—the quintessential feature of town or city life—and guns simply did not go together.

**Dangerousness and Weapons in the Nineteenth Century**

56.    In the nineteenth century United States, a person could be considered "dangerous" based upon various factors. These included one's status as either a law-abiding person or a member of the criminal classes. It also embraced one's reputation within the community, which was based at least in part on known or observed behaviors, like going armed on a daily basis.[91]

---

[91] Because the eighteenth- and nineteenth-century United States was a racially hierarchical society, skin color served as another salient factor in determining a person's perceived dangerousness in the eyes of local officials. Laws targeting Black Americans, slave and free alike, are repugnant to us today even while they demonstrate that race and status were part of the calculus in assessing dangerousness. On racist laws in early American history, see Kate Masur, *Until Justice Be Done: America's First Civil Rights Movement, from the Revolution to Reconstruction* (New York: W. W. Norton & Company, 2021). On free-Black firearm licensing laws in the antebellum nineteenth century, see Antwain K. Hunter, " 'In the Exercise of a Sound Discretion, Who, of This Class of Persons, Shall Have a Right to the License…': Family, Race, and Firearms in Antebellum North Carolina," *Journal of Family History* 44, No. 4 (October 2019), 392-412; and Antwain K. Hunter, " 'A Nuisance Requiring Correction': Firearm Laws, Black Mobility, and White Property in Antebellum Eastern North Carolina," *North Carolina Historical Review* 93, no. 4 (October 2016), 386-404.

## A.    Status in Society

57.    Growing from older notions of persons "not of good fame," American law labeled certain people "disorderly." Madams whose brothels were raided by police were charged with operating a disorderly house contrary to law. Vagrants were also "disorderly" people who seemingly did not fit into the community by reason of their refusal or inability to work. People who were understood to be vagrants, nuisances, or disorderly were not the "proper" or "law-abiding" citizens referred to by late-nineteenth-century firearm licensing laws.[92] To be labeled a disorderly person, vagrant, or nuisance carried significant consequences.

58.    Unlike today, when we conceptualize law as penalizing certain actions that violate the mutual trust required to live in our society, medieval and early modern law operated on the basis of punishing people for *being* a problem within the community. To be punished for vagrancy, a person did not simply behave like a vagrant—he or she *was* a vagrant, detached from a household and devoid of a proper role, and that status was punishable by law. Similarly, some people (like eavesdroppers) and some inanimate objects (like disorderly houses) were nuisances.[93] In the words of a scholar of the police power in Anglo-American law, "*Being* a nuisance was a state of being, a status. The eavesdropper was a nuisance because he *was* an eavesdropper. The offense was not eavesdropping, but being

---

[92] Regulations providing for concealed-carry permits at times described the kinds of people who were eligible (at other times that determination was solely within the discretion of the mayor, judge, or other official who reviewed such requests). A phrase that was used sometimes was a "proper and law-abiding person." For example, see Carrying of Pistols, N.Y.C., *Ordinances* ch. 8, art. 27, § 265 (1881) ("Any person…who has occasion to carry a pistol for his protection, may apply to the officer…and such officer, *if satisfied that the applicant is a proper and law-abiding person*, shall give said person a recommendation… ." [emphasis added].

[93] On vagrancy and disorderly persons in Anglo-American law, see Markus Dirk Dubber, *The Police Power: Patriarchy and the Foundations of American Government* (New York: Columbia University Press, 2005), 47-62. See also William J. Novak, *The People's Welfare: Law & Regulation in Nineteenth-Century America* (Chapel Hill: University of North Carolina Press, 1996), 167-168, 155-156.

Declaration of Dr. Brennan Gardner Rivas
Case No. 2:23-cv-10169

someone who eavesdrops."[94] Beyond merely damaging their reputations within the community, people labeled nuisances, vagrants, and other disorderly persons risked corporal punishment and loss of their liberty. The most egregious offenders were deemed "rogues and vagabonds" or "incorrigible rogues." These dangerous people faced limitations far more severe than restricted access to weapons.[95] In fact, the mere possession of weapons by a known "rogue" or "vagabond" was likely to be interpreted as an intention to commit a crime.[96]

59.    Disorderly and dangerous people were controlled through police powers, and the power of police was about *prevention* of disorder rather than *punishment* of wrongs already committed. As a scholar on the subject explains: "The whole point of the police was, after all, the prevention of threats, not their frantic limitation. Police regulations sought to prevent fires, rather than extinguish them. So they called for fire proof buildings, minimum distances between buildings, and so on. The idea was to prevent the exigency. And so the possibility of an exigency became the justification for police power actions, rather than the exigency itself."[97] Labeling idle, non-conforming and other dangerous persons as "vagabonds," "rogues," or a part of the "criminal classes"—and restricting their freedoms on the basis of that status—was a critical role of law in American society until the relatively recent past.[98] Possession offenses, including concerns over who possesses a gun in public places, are derivatives of this part of the Anglo-American legal tradition that

---

[94] Dubber, *The Police Power*, 96. See also pp. 136: "Vagrancy, however, lacked not only a *mens rea*. More important, it lacked an *actus reus*. The offense consisted of being a vagrant, i.e., a status, rather than an act, not becoming a vagrant, or acting like a vagrant. Thus people were not 'convicted' of vagrancy as the might be of, say, robbery, they were 'deemed' and 'declared' a vagrant instead."

[95] Dubber, *The Police Power*, 53-54.

[96] On the importance of local reputation in policing, and especially in policing "notorious" offenders, see Novak, *The People's Welfare*, 168-170.

[97] Dubber, *The Police Power*, 118.

[98] On the difference between current and historical views of criminal law, and the post-Revolutionary era as one of heightened police regulation, see Novak, *The People's Welfare*, 149-152.

Declaration of Dr. Brennan Gardner Rivas
Case No. 2:23-cv-10169

seeks to *prevent* threats to the public peace rather than wait for violence to occur.[99]

60.     Although a person's reputation remains a valuable commodity today, it was even more so during the nineteenth century—a time when most Americans lived in small communities and relied on their good name for social if not financial credit. In small, insular communities and tight-knit urban neighborhoods, an unblinking eye of neighborly observation tracked people's visible, public activities. Collective evaluation of visible, observed, and even rumored behavior effectively forged a reputation that affected one's standing within the community. To be in possession of a good reputation and its socio-economic benefits, a person needed to properly fulfill their role within what was a hierarchical society. To step outside one's proper place or behave in a manor unbecoming one's position compromised that person's standing within the community and damaged his/her reputation.[100]

61.     A person's reputation could carry significant legal consequences. In early America, local magistrates and officials held tremendous power. They not only heard complaints and acted in a judicial capacity, but had the discretionary authority to initiate prosecution of offenses at common law. Vagrancy was among these, as were riot, affray, and disturbances of the peace like inappropriate weapon carrying.[101] The surety process, part of America's common law heritage, was at times a part of these prosecutions, and some states specifically chose to regulate weapon-carrying

---

[99] On possession offenses as "inchoate inchoate offenses" that are "an attempt to commit an attempt to commit a crime," see Dubber, *The Police Power*, 172.

[100] On reputation and social standing in the antebellum nineteenth century, described as "individuals' credit," see Laura F. Edwards, *The People and Their Peace: Legal Culture and the Transformation of Inequality in the Post-Revolutionary South* (Chapel Hill: University of North Carolina Press, 2009), 111-131; Bertram Wyatt-Brown, *Southern Honor: Ethics and Behavior in the Old South* (New York: Oxford University Press, 1982). For a broader look at the significance of reputation and behavior in the early modern Anglo-American legal tradition, see Barbara J. Shapiro, *Beyond Reasonable Doubt and Probable Cause: Historical Perspectives on the Anglo-American Law of Evidence* (Berkeley: University of California Press, 1991). See also Michael Tadman, "The Reputation of the Slave Trader in Southern History and the Social Memory of the South," *American Nineteenth Century History* 8, no. 3 (2007), 259-263.

[101] On common law criminal offenses, see, Novak, *The People's Welfare*, 149-155.

Declaration of Dr. Brennan Gardner Rivas
Case No. 2:23-cv-10169

by way of surety.[102] In this process, people with sufficient wealth or assets put their own money on the line to promise good behavior or court appearance by the person being complained of.[103] To have a good reputation undoubtedly facilitated the collection of such support while being known as a scoundrel, drunk, or otherwise unreliable person obstructed it. Surety represented a deep wellspring of preventive police power that could be invoked not only upon a legitimate complaint but based upon the discretion of a local magistrate—not a mechanism for tentatively allowing behavior that *might* pose a danger later on.[104] In early America, where organized police forces did not exist, surety provided an avenue for members of the community to protect the peace by policing themselves. Those who behaved in a way that broke the peace or threatened violence were answerable to the law and accountable to their neighbors.[105]

62.    Delineating which people pose a special threat to organized society is a longstanding, fundamental purpose of law, and there is such a tradition within the Anglo-American legal heritage. In that tradition, people labeled dangerous and disorderly, such as rogues and vagabonds, faced substantial limitations to their rights that far exceeded restrictions upon the public carrying of weapons. Becoming such a

---

[102] For examples, see Wisconsin, *Statutes* (1841), 381 §16; Maine, *Revised Statutes* (1841), ch. 169, §16; Michigan, Revised Statutes (1846), ch. 162, §16; 1847 Virginia, Title 3, ch. 14, 129, §16; Minnesota, *Revised Statutes* (1851), ch. 112, §18; Oregon, *Statutes* (1853), ch. 26, §17.

[103] On sureties and weapon-carrying in the Anglo-American legal tradition, see Patrick J. Charles, "The Faces of the Second Amendment Outside the Home, Take Two: How We Got Here and Why It Matters," *Cleveland State Law Review* 64, no. 3 (2016), 389, 403; Saul Cornell, "History, Text, Tradition, and the Future of Second Amendment Jurisprudence: Limits on Armed Travel Under Anglo-American Law, 1688-1868," *Law and Contemporary Problems* 83 (2020), 90-92.

[104] Dubber, *The Police Power*, 54.

[105] See Saul Cornell, "Right to Carry Firearms outside of the Home: Separating Historical Myths from Historical Realities," *Fordham Urban Law Journal* 39, no. 5 (October 2012), 1719-1723; Edwards, *The People and Their Peace*, 73-74, 96. Edwards's passage on peace bonds is worth quoting at length: "Peace bonds threw enforcement back on the community, summoning family, friends, and neighbors to police the troublemakers. Bonds required one or more other people to put up the amount, making them liable if the accused broke the peace again. That economic obligation represented the signers' promise to keep the offender in line. Peace bonds put everyone else in the community on notice as well, investing them with the responsibility of policing the peace until the end of the probation period."

Declaration of Dr. Brennan Gardner Rivas
Case No. 2:23-cv-10169

person—or taking on such a label—was the product of known behavior, past offenses, and reputation. The act of carrying weapons was in and of itself an indication of dangerousness.[106] An openly seen gun, and especially a pistol visible in someone's hand, was a sign of emergency; a weapon concealed within the clothes of someone on the street was understood to be an indication of malintent and a lack of concern for the safety of others.[107]

63.     Laws enacted in the nineteenth century, rather than identifying which people could possess weapons as against those who could not, instead aimed at minimizing the presence of the weapons themselves. Concealed-carry prohibitions did not include caveats for peaceable people—only for factors like being a traveler, a law officer, or a person in an emergency. How members of a community might interpret someone's visible, open carrying of a deadly weapon was contingent upon that person's reputation. This challenge to concealed-carry laws—their lack of exception for well-meaning, "proper and law-abiding" people—inspired the discretionary licensing laws that emerged in the latter half of the nineteenth century. A person's criminal record, known status as a criminal, and reputation for violence within the community contributed to his/her ability to obtain a license for carrying concealed weapons.

## CONCLUSIONS

64.     This declaration has assembled evidence showing that there is a long history of regulating the carrying and sale of weapons in the United States. Various regulatory policies—primarily public carry laws but also tax policies and sensitive place restrictions—worked together to reduce the number of deadly weapons circulating in public spaces.

---

[106] *Stockdale v. State*, 32 Ga. 225 (1861) ("What the Legislature did intend, was to compel persons who carried those weapons to so wear them about their persons, that others, who might come into contact with them, might see that they were armed, and dangerous persons, who were to be avoided in consequence.").

[107] On the unusualness of openly carried firearms in urban locales, see Mark Anthony Frassetto, "The Myth of Open Carry," *U.C. Davis Law Review* 55 (June 2022), 2538-2539. On historical negative views of concealed-carry, see Charles, *Armed in America*, 145-146.

65. The tradition of regulating the public carrying of weapons has its roots in the medieval Statute of Northampton and evolved over the course of the nineteenth century to take the shape of criminal statutes restricting concealed and/or open carry, as well as laws and ordinances laying out the terms by which applicants could be issued a concealed-carry permit. These regulatory developments were in large part a response to the rise of modern concerns in American society, like dramatic population growth, urbanization, and the bureaucratization of state and local government. They were also, importantly, a response to rising levels of violence and homicide in American communities which coincided with technological innovations that rendered deadly weapons more widely available and more lethal than they had been in the past.

66. One common theme among nineteenth-century weapon regulations was variability based on local concerns. In some areas, laws restricted only concealed-carry while in others open carry was also prohibited or tightly restricted. Some states retained the common-law-inspired approach to policing that relied upon sureties to keep the peace while others were quick adopters of criminal statutes for unlawfully carrying arms. Though numerous municipalities adopted discretionary licensing laws in the nineteenth century, not all did. In this same vein, it was not uncommon or perceived to be out of constitutional bounds for organized cities and towns to operate under different rules than unincorporated, rural areas.

67. Finally, this declaration has presented information about how a person's dangerousness would have been assessed in the nineteenth century, explaining that a criminal history or reputation for irresponsibility likely precluded the acquisition of a concealed-carry permit under discretionary licensing laws.

Declaration of Dr. Brennan Gardner Rivas
Case No. 2:23-cv-10169

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 19, 2024, at Fort Worth, Texas.

_____
Dr. Brennan Gardner Rivas

Declaration of Dr. Brennan Gardner Rivas
Case No. 2:23-cv-10169

# EXHIBIT 1

Exhibit 1
41

# Brennan Gardner Rivas
## Curriculum Vitae · Oct 2023

## Employment

Lloyd Lewis Fellow in American History, The Newberry Library, 2021-2022

Bill & Rita Clements Fellow for the Study of Southwestern America, Southern Methodist
University, Clements Center for Southwest Studies, 2020-2021

Lecturer in American History (full-time), Texas Christian University, Department of History,
2019-2020

## Education

Ph.D., History, Texas Christian University, 2019
Thesis: "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, & Knuckles in
the Lone Star State, 1836-1930"
Advisor: Gregg Cantrell

M.A., History, Texas Christian University, 2013
Thesis: "Texas Antitrust Law: Formulation and Enforcement, 1889-1903"

B.A. with Honors, History, Oklahoma State University, 2010

## Publications

*Refereed Journal Articles*

"An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas, 1836-
1900," *Southwestern Historical Quarterly* 121 (Jan 2018): 284-303.

*Law Articles*

"Strange Bedfellows: Racism and Gun Rights in American History and Current Scholarship"
in Joseph Blocher and Jake Charles, eds., *New Histories of Gun Rights and Regulation: Essays
on the Place of Guns in American Law and Society* (New York: Oxford University Press,
2023)

"Enforcement of Public Carry Restrictions: Texas as a Case Study," *U.C. Davis Law Review*
(May 2022)

"The Problem with Assumptions: Reassessing the Historical Gun Policies of Arkansas and
Tennessee," *Second Thoughts*, Duke Center for Firearms Law (Jan 2022)

*Short Pieces*

"Reflections on the American Gun Control Culture," *The Panorama: Expansive Views from the
Journal of the Early Republic*, October 17, 2023.

"Charles F. Cooley," in *Wanted in America: Posters Collected by the Fort Worth Police
Department, 1898-1903*, edited by LeAnna Schooley and Tom Kellam. Fort Worth: TCU
Press, 2019.

Review of David R. Berman, *George Hunt: Arizona's Crusading Seven-Term Governor*, in
*Southwestern Historical Quarterly* 114, no. 3 (January 2016): 327-329.

Exhibit 1
42

## Public History

"In the Past, Americans Confronted Gun Violence by Taking Action," *Washington Post: Made by History Blog* (Jun 2022)
~ Op-ed showcasing open-mindedness of 19th century Americans about experimenting with new gun control measures

"The Origin of Public Carry Laws in Texas," *Texas Gun Sense Blog* (Feb 2021)

"Texas Gun Laws," Online Primary Source Collection, hosted by Omeka
~ Online collection featuring primary sources from my research; feature exhibit titled "Crafting a Public Carry Law"

"The Deadly Weapon Laws of Texas," Preserving Our Past: Community History Workshop, Center for Texas Studies at TCU (Nov 2020)
~ Public lecture featuring special insights for genealogical researchers

"The Deadly Weapon Laws of Texas," Graduate/Undergraduate Public History Seminar, Tarleton State University (Sept 2020)
~ Research presentation focusing on interpretation of county court records

"When Texas Was the National Leader in Gun Control: How the Land of Gunslinger Mythology Regulated Weapons to Reduce Violence," *Washington Post: Made by History Blog* (Sept 2019)
~ Op-ed highlighting long history of weapon regulation in Texas

## Fellowships and Awards

Firearm Issues Research Grant, 2023-2024
~ Awarded by the Harvard Injury Control Research Center, from grant funding from the Robert Wood Johnson Foundation, for research related to firearm issues

Lloyd Lewis Fellowship in American History, 2021-2022
~ Awarded by the Newberry Library to scholars using its collection to research topics in American history

Bill & Rita Clements Fellowship for the Study of Southwestern America, 2020-2021
~ Awarded by the SMU Clements Center for Southwest Studies to two scholars of Texas, the Southwest, or the U.S.-Mexico borderlands who are developing first books

The Benjamin W. Schmidt Memorial Scholarship, 2018-2019
~ Awarded by the TCU Department of History to a PhD candidate who shows exceptional professional promise; highest departmental prize for graduate students

Texas Christian University Department of History, Shinko and Thomas McDonald Research Prize in Texas History, 2019, 2017
~ Awarded by the TCU Department of History to a graduate student with the best research on antebellum Texas history

## Works in Progress

*The Revolver Must Go: The Rise and Fall of a Gun Control Movement in Texas*

Aim: Scholarly monograph exploring the rise of a gun control movement in nineteenth-century Texas and the regulatory strategies which it embraced. Widespread acceptance of strict, ambitious gun control laws in the "Wild West" belies current assumptions about Texas and challenges the reigning interpretation of the Second Amendment as a guarantor of expansive gun rights.

Status: Editing manuscript

Exhibit 1
43

"Going Armed: The Law and Culture of Carrying Deadly Weapons in the Nineteenth Century"
Aim: Scholarly article uncovering the ways in which nineteenth-century gun-toters carried their deadly weapons, and why they generally did so concealed.
Status: Writing in progress

## University Teaching Experience
*Instructor of Record*
Lecturer in American History, Texas Christian University                    2019-2020
    "American History to 1877: Social Movements & the Politics of Slavery" (HIST 10603)
    "American History since 1877: The Quest for Equality" (HIST 10613)
    "History of Texas: A Transnational Look at the American Southwest" (HIST 40743)

*Graduate Student Instructor*
Teaching Assistant, Texas Christian University                    2017-2018
    American History to 1877 (HIST 10603)
    American History since 1877 (HIST 10613)

*Teaching Interests*
American History, Legal History, Southwestern Borderlands, Civil War Era, American West, Gilded Age & Progressive Era, Women's History

## Conference Presentations & Invited Talks
Panelist, "Use and Abuse of History in Second Amendment Litigation," and "Going Armed: Nineteenth Century Views on Open Carry," Current Perspectives on the History of Guns and Society, Wesleyan University, Middletown, Connecticut, October 2023

"Masculinity, Honor-Violence, and Gun Reform in the Early U.S.," Race, Gender, and Firearms in the Early Republic, Society for Historians of the Early American Republic Annual Meeting, Philadelphia, Pennsylvania, July 2023

"Second Amendment Panel—Issues in Cases Post-*Bruen*," Strategic Litigation Convening: Anti-Democracy Efforts and Political Violence Post-*Bruen*, Institute for Constitutional Advocacy and Protection, Georgetown Law, Washington, D. C., June 2023

"A Case for More Case Studies," Originalism, the Supreme Court, Gun Laws, and History, Late-Breaking Roundtable, American Historical Association Annual Meeting, Philadelphia, Pennsylvania, January 2023

"Military Disarmament Orders and the Role of Reconstruction Historiography after *Bruen*," Current Perspectives on the History of Guns and Society Symposium, Wesleyan University, Middletown, Connecticut, October 2022

"Reassessing Assumptions about Historical Arkansas and Tennessee Handgun Regulations," Race and Guns Roundtable, Duke Center for Firearms Law, Durham, North Carolina, November 2021

"Enforcement of Public Carry Restrictions: Texas as a Case Study," The Second Amendment at the Supreme Court: 700 Years of History and the Modern Effects of Guns in Public, Davis, California, October 2021

"Race & Guns," Newberry Library Colloquium, Chicago, Illinois, October 2021

"Unlawful Carrying: Enforcing the Pistol Law in Texas, 1870-1920," Texas State Historical Association Annual Meeting, Corpus Christi, Texas, February 2019

Exhibit 1
44

"Regulating Deadly Weapons in Nineteenth-Century Texas," Invited Lecturer, Los Bexareños Hispanic Genealogical and Historical Conference, San Antonio, Texas, September 2018

"Impregnable Citadels of Capital: American Monopolies in the British Radical Press," Southern Conference on British Studies Annual Meeting, St. Pete Beach, Florida, November 2016

"Dating Violence in Texas: Why the State Family Code Obstructs Accurate Reporting about Sexual Assault," TCU Women & Gender Studies Research Symposium, 2015

## Service

Invited Guest, "How to Make the Most of Your Time in Graduate School," Dept. of History Orientation Day, 2020
~ Advise incoming graduate students on strategies for success in the PhD program, emphasizing importance of intellectual development

Panelist, "Everything You Wanted to Know about TCU but Were Too Afraid to Ask," Dept. of History Orientation Day, 2016
~ Provide honest and confidential information to prospective graduate students

Graduate Student Mentor, 2015
~ Informal departmental program designed to ease the transition for incoming graduate students

## Second Amendment Subject Matter Expert

*Duncan et al v. Bonta*, California, Case No. 17-1017-BEN-JLB, S.D. Cal.

*Miller et al v. Bonta*, California, Case No. 3:19-cv-01537-BEN-JLB, S.D. Cal.

*Angelo et al v. District of Columbia et al*, Washington, D.C., Civ. Act. No. 1:22-cv-01878-RDM, D. D.C.

*Hanson et al v. District of Columbia et al*, Washington, D.C., Civ. Act. No. 1:22-cv-02256-RC, D. D.C.

*Christian et al v. Nigrelli et al*, New York, No. 22-cv-00695 (JLS), W.D. N.Y.

*Frey et al v. Nigrelli et al*, New York, Case No. 21 Civ. 5334 (NSR), S.D. N.Y.

*Brumback et al v. Ferguson et al*, Washington, No. 1:22-cv-03093-MKD, E.D. Wash.

*Sullivan et al v. Ferguson et al*, Washington, Case No. 3:22-cv-5403, W.D. Wash.

*Siegel v. Platkin,* New Jersey, No. 22-CV-7463 (RMB) (AMD), D. N.J.

*NAGR v. Campbell*, Massachusetts, No. 1:22-cv-11431-FDS, D. Mass.

*Oregon Firearms Federation, Inc. v. Kotek*, Oregon, No. 2:22-cv-01815-IM, D. Ore.

*NSSF v. Jennings*, Delaware, No. 22-cv-01499-RGA, D. Del.

*Chavez v. Bonta*, California, No. 3:19-cv-01226-L-AHG, S.D. Cal. (f/k/a *Jones v. Bonta*)

*Nguyen v. Bonta*, California, No. 3:20-cv-02470-WQH-BGS, S.D. Cal.

*Baird v. Bonta*, California, No. 2:19-cv-00617-KJM-AC, E.D. Cal.

*Nichols v. Bonta*, California, No. 3:11-cv-09916-SJO-SS, C.D. Cal.

*Wiese v. Bonta*, California, No. 2:17-cv-00903-WBS-KJN, E.D. Cal.

*Rocky Mountain Gun Owners v. Polis*, Colorado, No. 23-cv-01077-JLK, D. Col.

*Wolford v. Lopez*, Hawaii, No. 1:23-cv-00265-LEK-WRP, D. Haw.

*Novotny v. Moore*, Maryland, No. 1:23-cv-01295-GRL, D. Mary.

*Kipke v. Moore*, Maryland, No. 1:23-cv-01293-GRL, D. Mary.

*Ohio v. Columbus*, Ohio, No. 2022-cv-00657, Ct. Com. Pleas, Fairfield Cty, Ohio

4

Exhibit 1
45

**Professional Memberships**

Society for Historians of the Gilded Age and Progressive Era
Texas State Historical Association
Southern Historical Association
American Historical Association

Exhibit 1