C. D. Michel – SBN 144258
cmichel@michellawyers.com
Joshua Robert Dale – SBN 209942
jdale@michellawyers.com
Konstadinos T. Moros – SBN 306610
kmoros@michellawyers.com
Alexander A. Frank – SBN 311718
afrank@michellawyers.com
MICHEL & ASSOCIATES, P.C.
180 E. Ocean Blvd., Suite 200
Long Beach, CA 90802
Telephone: (562) 216-4444

Donald Kilmer-SBN 179986
Law Offices of Donald Kilmer, APC
14085 Silver Ridge Road
Caldwell, Idaho 83607
Telephone: (408) 264-8489
Email: Don@DKLawOffice.com

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED; THE SECOND AMENDMENT FOUNDATION; GUN OWNERS OF AMERICA, INC.; GUN OWNERS FOUNDATION; GUN OWNERS OF CALIFORNIA, INC.; ERICK VELASQUEZ, an individual; CHARLES MESSEL, an individual; BRIAN WEIMER, an individual; CLARENCE RIGALI, an individual; KEITH REEVES, an individual, CYNTHIA GABALDON, an individual; and STEPHEN HOOVER, an individual, <br><br> Plaintiffs, <br><br> v. <br><br> LOS ANGELES COUNTY SHERIFF'S DEPARTMENT; SHERIFF ROBERT LUNA, in his official capacity; LA VERNE POLICE DEPARTMENT; LA VERNE CHIEF OF POLICE COLLEEN FLORES, in her official capacity; ROBERT BONTA, in his official capacity as Attorney General of the State of California and DOES 1-10, <br><br> Defendants. | Case No.: 2:23-cv-10169-SPG (ADSx) <br><br> **COMBINED REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** <br><br> Hearing Date: March 13, 2024 <br> Hearing Time: 1:30 p.m. <br> Courtroom:  5C <br> Judge: Hon. Sherilyn Peace Garnett |

# TABLE OF CONTENTS

**Page(s)**

Table of Contents..................................................................................................ii

Table of Authorities............................................................................................iii

I.     Introduction.............................................................................................1

II.    Argument .................................................................................................2

  A.   LASD's and Luna's Opposition. ...........................................................2

    1.   The admittedly lengthy wait times of LASD's permit scheme are
      unconstitutional regardless of cause.................................................2

    2.   The subjective criteria employed by LASD are patent and
      unconstitutional. ...............................................................................7

      *a. Plaintiff Velasquez* .....................................................................7

      *b. CRPA member Partowashraf* ....................................................9

  B.   Attorney General Bonta's Opposition..................................................11

    1.   Not allowing nonresident carry is constitutionally indefensible. ...............11

    2.   Psychological examinations are inherently suitability determinations
      divorced from modern mental health prohibitions.....................................16

  C.   La Verne and Flores's Opposition. ......................................................20

    1.   *Bruen* expressly prohibits La Verne's high fees..........................20

    2.   La Verne does not attempt to defend even the more invidious aspects of its
      unique psychological exam requirement.....................................26

  D.   The Remaining Preliminary Injunction Factors Favor Plaintiffs...................27

III.   Conclusion............................................................................................30

TABLE OF CONTENTS

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aguayo for & on Behalf of N.L.R.B. v. Tomco Carburetor Co.,*
   853 F.2d 744 (9th Cir. 1988)..................................................................28

*Anderson v. United States,*
   612 F.2d 1112 (9th Cir.1979)................................................................29

*Antonyuk v. Chiumento,*
   89 F.4th 271 (2d Cir. 2023)..............................................................3, 19

*Arizona Dream Act Coal. v. Brewer,*
   757 F.3d 1053 (9th Cir. 2014)...............................................................27

*Bach v. Pataki,*
   408 F.3d 75 (2d Cir. 2005)....................................................................15

*Baird v. Bonta,*
   81 F.4th 1036 (9th Cir. 2023)......................................................6, 27, 28

*Baldwin v. Redwood City,*
   540 F.2d 1360 (9th Cir. 1976)...............................................................23

*Brown v. Board of Education (I),*
   347 U.S. 483 (1954) ...............................................................................1

*Brown v. Board of Education (II),*
   349 U.S. 294 (1955) ...............................................................................1

*Bullock v. Carter,*
   405 U.S. 134 (1972)........................................................................24, 25

*Cantwell v. State of Connecticut,*
   310 U.S. 296 (1940) .............................................................................17

*Commonwealth v. Donnell,*
   No. 2211CR2835 (Mass. Dist. Ct. Aug. 3, 2023)................................15

*Cooper v. Aaron,*
   358 U.S. 1 (1958) ...................................................................................1

TABLE OF AUTHORITIES

*Cox v. New Hampshire*,
   312 U.S. 569 (1941) ..................................................................................25

*Culp v. Raoul*,
   921 F.3d 646 (7th Cir. 2019)...................................................................15

*Cuviello v. City of Vallejo*,
   944 F.3d 816 (9th Cir. 2019)...................................................................28

*Duncan v. Bonta*,
   2023 WL 6180472 (S.D. Cal. Sept. 22, 2023) ..........................................6

*Elrod v. Burns*,
   427 U.S. 347 (1976) ................................................................................27

*Espinoza v. Montana Dep't of Revenue*,
    591 U.S. __, 140 S. Ct. 2246 (2020) ........................................................6

*Herb Reed Enterprises, LLC v. Fla. Ent. Mgmt., Inc.*,
   736 F.3d 1239 (9th Cir. 2013)..................................................................20

*Invisible Empire Knights of Ku Klux Klan v. City of W. Haven*,
   600 F. Supp. 1427 (D. Conn. 1985) .........................................................24

*Kamenshchik v. Ryder*,
   (No. 612719/22) (Nassau Cty., NY Sup. Ct. Feb. 22, 2024) ............4, 18

*Klein v. City of San Clemente*,
   584 F.3d 1196 (9th Cir. 2009)..................................................................28

*Koons v. Platkin*,
   2023 WL 3478604 (D.N.J. May 16, 2023) ...................................3, 18, 30

*Kwong v. Bloomberg*,
    723 F.3d 160 (2d Cir. 2013)....................................................................28

*Mai v. United States*,
   974 F.3d 1082 (9th Cir. 2020)..................................................................19

iv

TABLE OF AUTHORITIES

*Maryland Shall Issue, Inc. v. Moore*,

   86 F.4th 1038 (4th Cir. 2023) .............................................................................. 4, 18

*May v. Bonta*,

   2023 WL 8946212 (C.D. Cal. Dec. 20, 2023) ...................................................... 12, 30

*McDonald v. City of Chicago, Ill.*,

   561 U.S. 742 (2010) ............................................................................................. 23, 29

*McGarr v. Hayford*,

   52 F.R.D. 219 (S.D. Cal. 1971) ................................................................................ 16

*Melendres v. Arpaio*,

   695 F.3d 990 (9th Cir. 2012) .................................................................................... 27

*Murphy v. Guerrero*,

   2016 WL 5508998 (D.N. Mar. I. Sept. 28, 2016) ..................................................... 24

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,

   597 U.S. 1 (2022) ............................................................................................ *passim*

*Nken v. Holder*,

   556 U.S. 418 (2009) ................................................................................................. 28

*Oregon Advoc. Ctr. v. Mink*,

   322 F.3d 1101 (9th Cir. 2003) .................................................................................. 29

*Oregon Barter Fair v. Jackson County*,

   372 F.3d 1128 (9th Cir. 2004) .................................................................................... 6

*People v. Gunn*,

   2023 IL App. (1st) 221032 ......................................................................................... 4

*Peruta v. Cnty. of San Diego*,

   758 F. Supp. 2d 1106 (S.D. Cal. 2010) .................................................................... 15

*Plessy v. Ferguson*,

   163 U.S. 537 (1896) ................................................................................................... 1

*Range v. Att'y Gen. United States of Am.*,

    69 F.4th 96 (3d Cir. 2023) .................................................................6, 10

*Rogers v. Hacker*,

    2023 WL 5529812 (S.D. Ill. Aug. 28, 2023) ...........................................4

*Shuttlesworth v. City of Birmingham*,

    394 U.S. 147 (1969) ...................................................................................7

*Snow Covered Cap., LLC v. Fonfa*,

    2023 WL 205774 (D. Nev. Jan. 17, 2023) ...............................................3

*Starks v. Cnty. of Los Angeles*,

    2022 WL 1344986 (C.D. Cal. Mar. 28, 2022) .......................................16

*Sullivan v. City of Augusta*,

    511 F.3d 16 (1st Cir. 2007) .....................................................................23

*Thomas v. Chicago Park Dist*,

    534 U.S. 316 (2002). ................................................................................4

*Torcaso v. Watkins*,

    367 U.S. 488 (1961) ..................................................................................4

*U. S. Lab. Party v. Codd*,

    527 F.2d 118 (2d Cir. 1975) ...................................................................24

*United States v. Daniels*,

    77 F.4th 337 (5th Cir. 2023) ...................................................................10

*Wolford v. Lopez*,

    2023 WL 5043805 ...................................................................................30

**Statutes**

18 U.S.C. § 922 ............................................................................................18

1887 Terr. of N.M. Laws, § 9 ......................................................................14

42 U.S.C. § 1983 ...........................................................................................4

42 U.S.C. § 1988 ...........................................................................................4

Cal. Pen. Code § 25140 ........................................................................8

Cal. Pen. Code § 25610 ........................................................................8

Cal. Pen. Code § 26155 ......................................................................25

Cal. Pen. Code § 26202 ......................................................................10

Cal. Pen. Code § 26205 ........................................................................4

**Other Authorities**

Acceptable Firearms Training Documentation, Florida Department of Agriculture
and Consumer Services, https://www.fdacs.gov/Consumer-Resources/Concealed-
Weapon-License/Applying-for-a-Concealed-Weapon-License/Acceptable-
Firearms-Training-Documentation ........................................................12

Cindy Chang, *Rise in accidental gunshots by L.A. County deputies follows new
firearm*, LA Times, (June 13, 2015) https://www.latimes.com/local/california/la-
me-sheriff-guns-20150614-story.html ....................................................9

Eligibility Requirements for a Florida Concealed Weapon License, Florida
Department of Agriculture and Consumer Services,
https://www.fdacs.gov/Consumer-Resources/Concealed-Weapon-
License/Applying-for-a-Concealed-Weapon-License/Eligibility-Requirements . 12

Erika D. Smith and Anna Chabria, *Column: California says its new gun law is
about public safety. But what about these women?*, LA Times (Jan. 19, 2024),
https://www.latimes.com/california/story/2024-01-19/california-gun-concealed-
carry-law-women-domestic-violence-newsom ......................................27

Henry Care, *English Liberties, or the Free-born Subject's Inheritance* .................19

LASD's Survey of Historical Laws ....................................................5, 6

Order on Mot. to Consolidate, *May v. Bonta*, No. 23-4356 (9th Cir. Dec. 22, 2023),
ECF No. 20.1 ....................................................................................12

Order Re Summary Judgment, *Linton v. Becerra* (No 18-cv-07653-JD) (N.D. Cal.
Dec. 20, 2018), ECF No. 76 ................................................................10

TABLE OF AUTHORITIES

Robert Vallelunga, *How to Break Into a Car*, WikiHow, Dec. 9, 2023,

    https://www.wikihow.com/Break-Into-a-Car ...........................................................8

San Bernardino County Sheriff's Department, Permitium,

    https://sbcsd.permitium.com/ccw/start.................................................................22

SB 2 Press Conference, YouTube.com (Feb. 1, 2023)...............................................2

Tony Saavedra, *Police might not know where their guns are, and the law says*

    *that's OK*, Orange Cnty. Reg. (Cal.), (Sept. 28, 2016),

    https://www.ocregister.com/2016/09/28/police-might-not-know-where-their-

    guns-are-and-the-law-says-thats-ok/amp/ ............................................................9

**Rules**

C.D. Cal. Civ. L.R. 7-4 ..............................................................................................16

TABLE OF AUTHORITIES

## I.   INTRODUCTION

In all three of Defendants' oppositions, one general theme predominates: all of them rely on the unspoken premise that the Second Amendment is a second-class right. The City of La Verne and its sheriff considers it "reasonable" to pay over $1,000 to exercise an enumerated constitutional right; the Los Angeles Sheriff's Department ("LASD") and its sheriff believe an 18-month wait and arbitrary denials are acceptable, and the State and its Attorney General argue that 88 percent of Americans have no right to carry in California. And all Defendants defend suitability determinations the Supreme Court expressly forbade.

American history teaches that, when state and local governments are forced to comply with Supreme Court rulings they disfavor, provincial defiance must be promptly quashed before it becomes the sort of ingrained custom, habit, or practice that grew out of *Plessy v. Ferguson,* 163 U.S. 537 (1896). It bears repeating that *Cooper v. Aaron,* 358 U.S. 1 (1958) dealt specifically with bureaucratic delay in implementing public school integration. *See Brown v. Board of Education (I)*, 347 U.S. 483 (1954), and *Brown v. Board of Education (II),* 349 U.S. 294 (1955). At the time, Senator Byrd had issued the call for "Massive Resistance," and a grotesque corpus of enactments designed to flout *Brown's* call for integration emerged. This Court, like the *Cooper* Court, should sweep aside the excuse-making by state actors by simply make the finding that "[D]elay in any guise in order to deny [..] constitutional rights [..] [should] not be countenanced, and that only a prompt start, diligently and earnestly pursued [..] [can] constitute good faith compliance." *Id.* at 7. To countenance this form of "resistance" when it comes to Second Amendment rights in a post-*Bruen* landscape invites the same constitutional anarchy that prevailed between *Plessy* and *Brown*.

Last year, when he announced a new bill restricting carry in response to *Bruen*, Governor Newsom (like his spiritual predecessor Governor Orval Faubus of Arkansas) angrily criticized the Supreme Court for the *Bruen* ruling, and ridiculed

1

the notion of a right to carry with sarcastic air quotes. *See* SB 2 Press Conference, YouTube.com (Feb. 1, 2023), https://www.youtube.com/watch?v=Kpxpj6yvFIo (at 36:10) (last visited Feb. 22, 2024). Now local issuing authorities, hostile to the right to carry described in *Bruen,* are aping the Governor's defiance of the Supreme Court and attempting to stifle the right by other means.

The subtext of the Defendants' Oppositions is their suggestion that concealed handgun permitting is at issue in this case. It is not. What is at issue are lengthy wait times, exorbitant fees, discretionary criteria, and the complete denial of the right to carry to nonresidents. To be sure, the Supreme Court did not broadly opine as to the constitutionality of permitting schemes.  But it did expressly foreclose Defendants' practices here. Remediating them here is the absolute bare minimum that *Bruen* requires.[1]

## II.   ARGUMENT

### A.   LASD's and Luna's Opposition.

#### 1.   The admittedly lengthy wait times of LASD's permit scheme are unconstitutional regardless of cause.

The staggering admissions made in Defendant LASD's briefing reveal that the situation is worse than Plaintiffs imagined. LASD boasts that it is processing 45 first-time permit applications per week. *See* Defs. Los Angeles Cnty. Sheriff's Dep't and Sheriff Robert Luna's Opp. to Pls.' Motion for Prelim. Inj. ("LASD Opp.") at 4:3-8. At that pace, LASD would process only 2,340 applications per year, and the Chavez declaration states that the LASD backlog currently stands at 9,400 first-time applications waiting to be processed. *See* Decl. of Regina R. Chavez in Supp. of Defs. Los Angeles Cnty. Sheriff's Dep't and Sheriff Robert Luna's Opp. to Pls.'

---

[1] Two of the three sets of Defendants present historical laws for consideration which they argue support their respective positions, and the State presents declarations from three historians. Plaintiffs have submitted their own brief rebuttal declaration from their own historian, Clayton Cramer identifying the laws that Defendants and their experts do not present accurately to the Court. *See* Rebuttal Decl. of Clayton Cramer in Supp. of Pls.' Mot. for Prelim. Inj., *passim*, and Ex. 4.

2

Mot. for Prelim. Inj., ¶ 10. Thus, even wrongly assuming LASD does not receive any additional applications, it currently will take LASD **four years** to process the existing backlog of first-time applications.

Astonishingly, LASD argues that this wait time does not even implicate the Second Amendment. LASD Opp. at 9:11-15. To make that argument, LASD construes Plaintiffs' proposed course of conduct as acquiring a CCW permit "on a specific timeline where the agency issuing the permits is confronting unprecedented backlogs following a sea change in the governing law." *Id*.  In other words, constitutional rights must yield to government inconvenience.  But *Bruen* did not describe the proposed course of conduct there as "carrying a handgun without a good reason to do so sufficient to be issued a carry permit," but rather as "carrying handguns publicly for self-defense." *Bruen*, 597 U.S. at 4; *see also Koons v. Platkin,* 2023 WL 3478604, at *18 (D.N.J. May 16, 2023) (plain text implicated by the mere existence of permitting system). That is the exact same course of conduct Plaintiffs here wish to engage in; carrying handguns in public for self-defense, despite LASD's demurrer that it is very, very busy.

Even more astonishingly, LASD contends there is *no* right to a carry permit within any timeframe at all, and that its years-long wait cannot be construed as abusive. LASD Opp. at 9:11-15, 11:5-10. But any inherent time necessary to issue a permit (officials in many states issue concealed carry permits on the spot, "while you wait") is not a blank check to impose years' long delays. It is axiomatic that "a right delayed is a right denied," a maxim that emerged from Gladstone's "justice delayed is justice denied" proposition. *Snow Covered Cap., LLC v. Fonfa*, 2023 WL 205774, at *2 (D. Nev. Jan. 17, 2023). LASD may not jettison this hornbook principle.

Since *Bruen*, various courts have tolerated some amount of permit processing time (days or a couple months), but none comes even close to LASD's delay.  When the wait is more than a few months long, courts have taken issue. *See Antonyuk v.*

*Chiumento*, 89 F.4th 271, 315 n.24 (2d Cir. 2023) (30-day review period for firearm purchase is reasonable); *Maryland Shall Issue, Inc. v. Moore,* 86 F.4th 1038, 1054 n.6 (4th Cir. 2023) (Keenan, J., dissenting) (finding handgun licensing with a 30-day waiting period is permissible, and noting that several states have time limits for CCW permit issuance, but none higher than 90 days); *Rogers v. Hacker*, 2023 WL 5529812, at *8 (S.D. Ill. Aug. 28, 2023) (waiting period of five months to issue a firearm owners ID card constituted a concrete injury); Order Granting Prelim. Inj. and to Show Cause, *Kamenshchik v. Ryder* (No. 612719/22) (Nassau Cty., NY Sup. Ct. Feb. 22, 2024) at p. 13 (accessible at: https://iapps.courts.state.ny.us/ nyscef/ViewDocument?docIndex=YAzIxNWUH83WonX87mAkVg==) (last visited Feb. 27, 2024) (ordering police explanation for 8-month delay in the CCW permit process); *People v. Gunn*, 2023 IL App. (1st) 221032, ¶ 28 (90-day wait time for a CCW permit is reasonable); *In re D.B.*, 2023 IL App. (1st) 231146-U, n.1 (51-day wait for a firearm owner's ID card is not unconstitutional). LASD's argument that the current situation raises no constitutional issues, and is per se not abusive because it is not intentional (LASD Opp. at 11:5-10), fails to clear the starting gate.

Surprisingly, LASD cites a case that ostensibly supports Plaintiffs on this issue. In *Thomas v. Chicago Park Dist.*, the Supreme Court upheld a local regulation that required permits for public assemblies and gave officials 28 days to review applications. 534 U.S. 316, 324 (2002). Ironically, most Californians no doubt would consider California Penal Code section 26205's 120 days (more than four times the 28 days in *Thomas*) a marked improvement.[2] And in the other case

---

[2] LASD argues that Plaintiffs may not enforce the California Penal Code though Section 1983 actions. LASD Opp. at 1:15-17 & n.2. Plaintiffs do not seek to enforce state law; they seek to enforce the Second Amendment. *See* 42 U.S.C. §§ 1983, 1988. State statutes and state constitutions can inform the decisions of federal courts, even if the state law merely sets a *bare minimum* standard for government conduct in the face of regulating or infringing on enumerated rights. *See generally Torcaso v. Watkins,* 367 U.S. 488 (1961) (state law mandating a religious oath in violation of First Amendment is proper subject for federal court adjudication.).

Moreover, California's statutory 120-day limit (whether enforceable by non-government parties) is still a standard that acts like a judicial admission by the

4

LASD cited, *Southern Oregon Barter Fair v. Jackson County,* never-ending wait times were a mere "theoretical possibility," not being suffered by plaintiffs there as they are actually suffered by Plaintiffs here. 372 F.3d 1128, 1138 (9th Cir. 2004).

As to historical laws, LASD cites several laws to defend permitting *in general*. LASD Opp. at 13:21-14:5. But LASD has marshaled zero evidence of any historical laws that involved the years' long wait its CCW applicants experience. And when comparing a modern law or practice to proposed historical analogues, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense" is a central consideration. *Bruen*, 597 U.S. at 29. There is simply nothing in LASD's compilation of historical laws that justify its extraordinary wait times.

The historical laws presented also fail for other reasons. For example, most of the restrictions only applied to concealed carry, not open carry, which was unrestricted. *See, e.g.,* LASD's Survey of Historical Laws, *passim*. In contrast, California generally does not allow open carry, and certainly not without a CCW permit, so CCW permits are the only option. The comparable burden thus differs greatly. Further, most of LASD's cited laws are from the late 19th century, and were primarily local ordinances, not state laws. But *Bruen* demands an "enduring American tradition of *state* regulation." 597 U.S. at 29, and "the bare existence of these localized restrictions cannot overcome the overwhelming evidence of an otherwise enduring American tradition permitting public carry." *Id*. at 67. LASD also cites 20th-century history, which is utterly irrelevant to the analysis. The Supreme Court noted that it would not even bother to address such history, as it was

---

sovereign here on a Procedural Due Process claim. That the Department of Justice does not act to end the illegal wait times and other Penal Code violations described in this case shows its corresponding lack of respect for the Second Amendment.

Plaintiffs believe that the Second Amendment requires they be provided permits with greater alacrity than a 120-day statutory period.  Regardless of how LASD attempts to frame the relief sought, delays well beyond this length of time even mandated by state law violate the Second Amendment.

COMBINED REPLY IN SUPPORT OF MOT. FOR PRELIM. INJ.

too far removed from the founding era to shed light on the Founding era understanding of the right's scope. *Id.* at 66 n.28.

Tellingly, LASD presents *no laws* of any relevance from the Founding era, the critical period.[3] To be sure, LASD does marshal evidence of *some* laws from that general era: explicitly racist laws that have no place here. LASD's Survey of Historical Laws at 1-9. The fact that laws existed prohibiting slaves and Black Americans from having arms does not, and really should not, be exhumed from the nation's skeleton closet to carry water for unconstitutional enactments today. *See e.g., Bruen* at 62-63 (discussing how despite the Southern States' historical antebellum tradition of disarming blacks from carrying through racist laws, blacks still carried firearms for protection, and further discussing how the commander of the military district set up postbellum to administer the recently-defeated Confederacy struck down such black codes so as to allow carry by blacks in South Carolina). Indeed, the Thirteenth and Fourteenth Amendments terminated the validity of race-based gun control laws, and other courts have properly rejected reliance on such laws in the *Bruen* context. *See, e.g., Baird v. Bonta*, 81 F.4th 1036, 1047 (9th Cir. 2023) (citing *Range v. Att'y Gen. United States of Am.*, 69 F.4th 96, 105 (3d Cir. 2023)). This Court likewise should "give such discriminatory laws little or no weight." *Duncan v. Bonta*, 2023 WL 6180472, at *22 (S.D. Cal. Sept. 22, 2023).

Certainly, *Bruen* triggered a surge in permit applications. But that was nearly two years ago, and Plaintiffs have given LASD more than enough time to adjust to the new status quo. *See* Decl. of Richard Minnich in Supp. of Pls.' Mot. for Prelim. Inj., ¶ 5-6. But far from improving, LASD's excessive delays have only worsened.

---

[3] "[T]oday's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights." *Bruen*, 597 U.S. at 83 (Barrett, J., concurring); *see also Espinoza v. Montana Dep't of Revenue*, 591 U.S. __, 140 S. Ct. 2246, 2258 (2020) (practice that "arose in the second half of the 19th century . . . cannot by itself establish an early American tradition" informing our understanding of the First Amendment.).

6

*Id.* Whether the delay is a product of LASD's decision to understaff its CCW division, or something else, is not truly relevant. *Bruen* expressly forbade lengthy wait times that deny ordinary citizens the right to carry; no scienter is required. 597 U.S. at 38 n.9. Thus, this Court must order LASD to end its abusive delays, and guarantee that Second Amendment rights are not relegated to "second class" status—or, in LASD's case, constitutional steerage.  The fact that LASD has not already assigned as many personnel as are necessary to liquidate the backlog shows its gross disrespect for the enumerated rights of Californians. A right delayed is a right denied.  Unless and until LASD gets its house in order, this Court should allow Plaintiffs to carry without a permit pending a decision on their applications. *See Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 151 (1969). More than half the states in the union require no permit at all; thus, it is farcical to entertain the notion that extensive and redundant vetting of law-abiding gun owners that results in years' long delays is anything but abusive.

### 2.   The subjective criteria employed by LASD are patent and unconstitutional.

*Bruen* made clear that permit issuance guidelines must be "narrow, objective, and definite" and not allow for "appraisal of facts, the exercise of judgment, and the formation of an opinion." *Bruen*, 597 U.S. at 38 n.9. LASD has implemented the latter sort of scheme, hiding behind California Penal Code sections which themselves are subjective. These subjective determinations are why certain Plaintiffs have been denied permits, in violation of *Bruen*.

#### a.   *Plaintiff Velasquez.*

LASD claims that Plaintiff Velasquez was denied, in part, because of an unintentional discharge in the home.  LASD Opp. at 18:1-16.  But LASD omits that Velasquez immediately called the police. Chavez Decl., Ex. 2 (Downey Police Department Case Report of April 20, 2021). He also notified the CCW unit. *Id.*, Ex. 1, (at question no. 9). **And most critically: Velasquez was issued a CCW permit**

7

**in August 2021 after the unintentional discharge incident in April 2021**. Having thus met all the "objective" requirements for licensure, and in fact receiving a license thereafter, LASD's subsequent denial of Velasquez's renewal application could only be the result of the "formation of an opinion" about his suitability for a permit. *Id.*, Ex. 1 (CCW Applicant Cover Page).

And regarding the theft of firearms from his vehicle, LASD speculates that he must have failed to lock his vehicle, because there was no damage. But there are ways to break into vehicles without leaving visible damage, such as by wedging the door slightly open and using a rod to hit the unlock button. *See* Robert Vallelunga, *How to Break Into a Car*, WikiHow, Dec. 9, 2023, https://www.wikihow.com/ Break-Into-a-Car (last visited Feb. 23, 2024). Plaintiff Velasquez stored the firearms consistent with California Penal Code section 25610(a), which allows for storage in the locked vehicle's trunk. *See* Decl. of Erick Velasquez in Supp. of Pls.' Mot. for Prelim. Inj., ¶ 6. Furthermore, Plaintiff Velasquez promptly reported the theft to police, as the law requires. Chavez Decl., Ex. 1 (Vernon Police Department May 4, 2023 Report). And although California law makes it a crime to store firearms improperly in a vehicle, Velasquez was not charged with any crime. *See* Cal. Penal Code § 25140 (West 2024).  LASD's speculation about the how and why of Velasquez's victimization—absent some indicia of actual negligence or criminality—is again the sort of subjective consideration forbidden under *Bruen*. 597 U.S. at 38 n.9.Thus, in both circumstances, the first resulting from error and the second resulting from sheer victimization, Velasquez took immediate action to promptly report the incidents to the police. The fact that discretion *allows* LASD to deny Velasquez the permit in the first place is the issue, not *how* LASD's discretion was actually exercised in this circumstance. Even in *Bruen*, that *some* New Yorkers received permits was not good enough for the Supreme Court to consider New York's discretionary requirements constitutional.

And while unintentional discharges and theft of firearms are admittedly problematic situations, the reality is that there is nothing unusual about them. Hypocritically, LASD has a well-documented problem with both, having lost over 100 firearms as of a 2016 report. *See* Tony Saavedra, *Police might not know where their guns are, and the law says that's OK*, Orange Cnty. Reg. (Cal.), (Sept. 28, 2016), https://www.ocregister.com/2016/09/28/police-might-not-know-where-their-guns-are-and-the-law-says-thats-ok/amp/ (last visited Feb. 23, 2024). And following the introduction of a new model of service handgun, many LASD officers had unintentional discharges. *See* Cindy Chang, *Rise in accidental gunshots by L.A. County deputies follows new firearm*, LA Times, (June 13, 2015) https://www.latimes.com/local/california/la-me-sheriff-guns-20150614-story.html (last visited Feb. 23, 2024).

Ostensibly, in order to hide what they know was a subjective denial, LASD marked "other" on the letter they sent Plaintiff Velasquez on the reason for his denial. *See* Chavez Decl., Ex. 1. Mr. Velasquez was only told about the reason for the denial—the theft of his firearms—when he called LASD for an explanation. *See* Velasquez Decl. ¶ 8. This Court should vindicate his right to carry and order LASD to promptly issue him a renewal permit.

### b.  CRPA member Partowashraf.

Every unflattering allegation LASD makes of Plaintiff California Rifle & Pistol Association, Incorporated ("CRPA") member Partowashraf is mere recapitulation of *allegations* his former girlfriend made in an affidavit filed in support of her request for a restraining order against him. LASD Opp. at 6:10-7:2. Mr. Partowashraf vehemently denies the veracity of those allegations, especially because she made them after she attempted to extort him. *See* Decl. of Sherwin David Partowashraf in Supp. of Pls.' Mot. for Prelim. Inj., ¶ 5. Nevertheless, when the state court issued the temporary restraining order against him, he respected the consequences, and surrendered his firearms to the West Valley Police Station. *Id*. at

9

¶ 6. What LASD fails to mention is that, upon a hearing, *the temporary restraining order was dissolved*, and Mr. Partowashraf retrieved his firearms from the police station. *Id*. at ¶¶ 5-6. He disclosed every detail of the ordeal of this stressful and harrowing saga during the CCW permit application process. *Id*. at ¶ 7. LASD should not be allowed to deny a constitutional right based on a *temporary* restraining order, issued upon declaration evidence, which was dissolved upon an actual hearing, and only lasted 24 days. Doing so creates a guilty-when-accused system that flouts fundamental due process standards. Because California Penal Code section 26202(a)(3) commands or allows this result, this Court should rule it unconstitutional.

Clearly, these reasons for denying these individuals carry permits cannot be reconciled with *Bruen*. The fact is that more than just "model citizens" have Second Amendment rights. *See United States v. Daniels*, 77 F.4th 337, 342 (5th Cir. 2023) ("[T]he legislature cannot have unchecked power to designate a group of persons as 'dangerous' and thereby disarm them," which would "render the Second Amendment a dead letter.") *Id*. at 353. And the Third Circuit, sitting en banc, concluded that they were "confident that the Supreme Court's references ... do not mean that every American who gets a traffic ticket is no longer among 'the people'. . . ." *Range v. AG United States*, 69 F.4th 96, 102 (3d Cir. 2023). Finally, as this brief was being finalized, a ruling from the Northern District of California endorsed *Range* and concluded that plaintiffs who were former felons but had those convictions "vacated, set aside, or dismissed, and their right to possess firearms restored" are part of "the People" the Second Amendment applies to. *See* Order Re Summary Judgment, *Linton v. Becerra* (No 18-cv-07653-JD) (N.D. Cal. Dec. 20, 2018), ECF No. 76, at p. 1, 20. If California may not deny former felons with vacated convictions their Second Amendment rights, then certainly a dissolved temporary restraining order that was only in place for a month is not enough to do the same.

COMBINED REPLY IN SUPPORT OF MOT. FOR PRELIM. INJ.

These Plaintiffs have not been convicted of any disqualifying crime, are not prohibited persons, and cannot be disarmed simply because the government believes them to be generally untrustworthy. And the statute, which permits the discretion that allows this to occur, is unconstitutional.

### B. Attorney General Bonta's Opposition.

#### 1. Not allowing nonresident carry is constitutionally indefensible.

Flying in the face of virtually all the relevant precedents, the State boldly argues that non-residents have no right to carry whatsoever when in California. The State flatly refuses to honor permits issued in other states, and it does not provide a process for nonresidents to even apply for a California CCW permit. The result is that Plaintiff Hoover, as well as CRPA member David Broady, are completely unable to exercise their right to carry when they visit California. Their proposed course of conduct clearly meets the plain text of the Second Amendment, a desire to carry firearms for self-defense when they visit California. *Bruen,* 597 U.S. at 4; *see also Linton*, ECF No. 76, at p. 12 (confirming that denying Second Amendment rights to nonresidents constitutes concrete injury, and California's argument that "only a resident physically present in California may bring a claim for that injury is misdirected.").

The State's arguments in opposition range from weak to misleading. First, the State imagines a race-to-the-bottom scenario wherein one state's ultra-relaxed permit issuance scheme effectively supplants the rest. *See* Def. Rob Bonta's Opp. to Pls.' Mot. for Prelim. Inj. ("State's Opp.") at 6:6-15. But it does not point to any real-world example, because none exist. Every state permit scheme requires a background check (and usually a training course) as a prerequisite to issuing CCW permits. There is no lawful way to maneuver around those requirements (other than permitless carry).

For example, obtaining a Florida CCW required Plaintiff Hoover to

11

"demonstrate competency with a firearm," which can be completed via various approved training courses. *See* Acceptable Firearms Training Documentation, Florida Department of Agriculture and Consumer Services, https://www.fdacs.gov/Consumer-Resources/Concealed-Weapon-License/Applying-for-a-Concealed-Weapon-License/Acceptable-Firearms-Training-Documentation (last visited Feb. 24, 2024). He also had to pass a background check that disqualifies for any felony conviction, violent misdemeanor, a record of drug or alcohol abuse, dishonorable discharge, and much more. *See* Eligibility Requirements for a Florida Concealed Weapon License, Florida Department of Agriculture and Consumer Services, https://www.fdacs.gov/Consumer-Resources/Concealed-Weapon-License/Applying-for-a-Concealed-Weapon-License/Eligibility-Requirements (last visited Feb. 24, 2024). The State's claim that it must discriminate against the permits of other states because they do not sufficiently vet applicants is baseless.

Moreover, if the State's theory were true—that other states issue CCW permits without sufficient due diligence—then those states should expect high crime rates among their permit holders. The State argues as much. *See* State's Opp. at 21:6-10 & n.19. Yet, it presents no data to support such an argument.

The State presents no such data to this Court because the State knows its argument is false and the data does not exist. In separate litigation also involving Attorney General Bonta and Plaintiff CRPA, CRPA presented data from five other states to show that individuals issued CCW permits in those states had nearly nonexistent rates of criminality. One of those five states was the above-referenced Florida. Partly because of that data, the court granted a preliminary injunction. *May v. Bonta*, 2023 WL 8946212, at *19 (C.D. Cal. Dec. 20, 2023). The State asked the Ninth Circuit to stay that injunction, but it refused. *See* Order on Mot. to Consolidate, *May v. Bonta*, No. 23-4356 (9th Cir. Dec. 22, 2023), ECF No. 20.1. Although Plaintiffs set the record straight and educated the State on this data mere weeks ago, the State, without presenting a scintilla of data to the contrary to support

12

their position, makes the same demonstrably false argument here. They have been well aware of this argument but have been unable to muster any data in support because, despite a continent's worth of other sources of such data, none have data supporting the State's speculative and false claim.

Turning to the State's historical analogues, the most glaring deficiency is the almost total lack of Founding era history. In that era, residents of other states could carry firearms and other weapons around the country, so long as they did not do so "to the fear or terror" of the people, as the State notes. State's Opp. at 7:14-19 (citing 1795 Massachusetts law). Carrying of weapons while traveling was not a new or novel problem at the Founding. The lack of Founding era restrictions on nonresident carry unequivocally dooms the State's argument under *Bruen*. The later 19th-century laws that the State presents fare no better. They were almost exclusively concealed carry restrictions which did not affect open carry, thus allowing nonresidents to carry arms openly without a permit. *See, e.g.,* Decl. of Professor Robert Spitzer in Supp. of Def. Rob Bonta's Opp. to Pls.' Mot. for Prelim. Inj., ¶¶ 21-36 (citing 15 laws or ordinances from 1871 through 1896 that required licenses to carry, but almost all explicitly applied only to "concealed" or "hidden" weapons). And when it comes to carry restrictions on nonresidents, the State's expert cites only hunting-related laws (save for one 1899 law pertaining to firearm acquisition), not laws pertaining to peaceable carry for self-defense. *See* Spitzer Decl., at ¶¶ 73-74.

Another State's expert, Brennan Rivas, claims that open carry was also restricted, but cites only two examples of open carry prohibitions from Texas and West Virginia, the very states the Supreme Court considered outliers in *Bruen*. *See* 597 U.S. at 65 ("In fact, [besides Texas] only one other State, West Virginia, adopted a similar public-carry statute before 1900."). Besides those two laws, Rivas mostly tries to justify why more restrictions *did not* exist but, in the process, admits open carry was permitted. *See, e.g.,* Decl. of Professor Brennan Gardner Rivas in

13

Supp. of Def. Rob Bonta's Opp. to Pls.' Mot. for Prelim. Inj., ¶ 22 (acknowledging a "nineteenth century tendency" of not outlawing open carry because of "honor culture"). Elsewhere, Rivas misrepresents the laws she discusses. For example, she states that an 1838 Virginia law punished "habitual" carrying of deadly weapons (*Id*. at 25), but in the footnote below the text of the law clearly applies only to concealed carry. *Id*.[4]

Other of the State's experts also misrepresent the laws they cite.  Plaintiffs' expert historian has examined the State's experts faulty and inaccurate characterizations of historical laws, has identified such misrepresentations, and describes some of the more egregious examples of misrepresentations. *See* Cramer Decl., ¶¶ 5-53, and Ex. 4. The State also attempts to discredit the many examples of historical "travelers' exceptions" laws that existed, arguing that they were limited and did not apply once someone stopped in a town for more than a short while. State's Opp. at 11:7-9 & n.13 (citing 1887 Terr. of N.M. Laws, § 9). Yet California does not extend even that much leeway; if Plaintiff Hoover carried a firearm on his person while he went on a hike or drove from one town to the next, he would be committing a crime.

The State's historical showing, at most, shows a post-Founding and post-Reconstruction tradition for licensing schemes in general. But the existence of firearms licensing, whether constitutional or not, is not at issue here. Plaintiffs *have licenses* and want California to honor them. The State presents almost no history that would justify excluding nonresidents from the right to carry. The only laws it cites to that effect were, save for one 1896 local ordinance, entirely from the 20th century. The Supreme Court is clear that such late-in-time history is not relevant, as the New York law it overturned in *Bruen* dated to 1911, and the Court explained

---

[4] At least one point Rivas makes supports Plaintiffs as to another aspect of their motion: an 1835 Florida law which charged those who wished to carry the inflation-adjusted equivalent of $320, which amount is much less than the over $1,000 La Verne charges. *See* Rivas Decl., at ¶ 42.

COMBINED REPLY IN SUPPORT OF MOT. FOR PRELIM. INJ.

that it "will not address any of the 20th-century historical evidence. . . ." *Bruen*, 597 U.S. at 66 n.28. What is decisive here is the fact that in the 18th and 19th centuries, numerous state courts, and even the Supreme Court, acknowledged that American citizens generally had the right to carry arms wherever they went, even if restrictions on concealed carry were deemed acceptable so long as open carry was allowed. *See* Cramer Decl., ¶¶ 31-44.

As to caselaw, the State presents only pre-*Bruen* cases for the idea that states may deny nonresidents the right to carry. State's Opp. at 13:13-14:12 (citing *Bach v. Pataki*, 408 F.3d 75, 87 (2d Cir. 2005); *Culp v. Raoul*, 921 F.3d 646, 657 (7th Cir. 2019); and *Peruta v. Cnty. of San Diego*, 758 F. Supp. 2d 1106, 1119–20 (S.D. Cal. 2010), *aff'd*, 824 F.3d 919 (9th Cir. 2016) (en banc)). The one court to grapple with this question after *Bruen* reached a well-reasoned ruling that supports Plaintiffs' arguments; this is likely why the State buried an insufficient rebuttal to it in a footnote rather than analyze it in the body of its opposition. State's Opp. at 14:10-12 & n.16 (discussing *Commonwealth v. Donnell*, No. 2211CR2835 (Mass. Dist. Ct. Aug. 3, 2023)).

The State also contends that a citizen of one of the 27 constitutional carry states would be able to carry in California if this Court grants Plaintiffs their requested injunction. State's Opp. at 6:8-12. But Plaintiffs have sought only reciprocity for their out-of-state issued permits, not reciprocity with the permitless carry some other states allow.

Finally, contrary to the State's assertion, Plaintiffs have repeatedly sought multiple forms of relief, including that nonresidents be permitted to apply for California CCW permits. In fact, there currently is no procedure for a non-resident like Plaintiff Hoover to apply for a permit. *See* Pls.' Mot. for Prelim. Inj. ("Mot.") at 2:17-3:6 ("California law . . . does not allow permits to be issued to out-of-state residents. . . .") and 22:14-19 ("Nonresidents are barred in California from obtaining a CCW permit. . . ."); *and see* Decl. of Stephen Hoover in Supp. of Pls.'

15

Mot. for Prelim. Inj., ¶ 4 (applied for and denied a CCW permit due to not being a California resident); and Complaint at 40:24-41:6 (prayer for relief). Plaintiffs' proposed order likewise seeks multiple forms of relief, including an order that California honor the permits of other states. While Plaintiffs are required under Federal Rule of Civil Procedure 7 to state the relief they seek, they are not required to lay out *every* possible avenue of alternative or lesser relief the Court may craft. Nor would such a list of endless possibilities constitute a "<u>concise</u> statement of the relief or Court action the movant seeks." C.D. Cal. Civ. L.R. 7-4 (emphasis added). The sole case the State cites involves a situation where the relief requested in the motion *contradicted* what was in the Notice of Motion. *Starks v. Cnty. of Los Angeles*, 2022 WL 1344986, at *1 (C.D. Cal. Mar. 28, 2022). There is no such contradiction here. And "if the court can comprehend the basis of the motion and deal fairly with it, technicalities ought to be avoided." *McGarr v. Hayford*, 52 F.R.D. 219, 221 (S.D. Cal. 1971).[5]

But this Court need not bother with alternative forms of relief. It should grant Plaintiffs the primary relief requested and order California to honor other states' permits. Merely ordering the State to accept nonresident applications would be very limited relief. Regardless of whatever relief is provided, the State concedes—nay, it is proud—that it treats out-of-state residents as inferiors by providing them no method to exercise their constitutional right to carry in California. One way or another, that situation must end.

### 2. Psychological examinations are inherently suitability determinations divorced from modern mental health prohibitions.[6]

In *Bruen*, the Supreme Court expressly rejected suitability determinations.

---

[5] The State cynically argues that it lacks adequate notice of a type of injunctive relief that can be imposed on it for providing relief to nonresidents by devoting a significant amount of its opposition brief to discussing the very relief of which it purportedly lacks notice.

[6] Plaintiffs concede that, due to recent changes in California law that took effect on January 1, 2024, there is now an appeals process for CCW denials. They

16

597 U.S. at 15 & 38 n.9. A psychological examination requirement is the quintessential suitability determination, as it inherently requires "appraisal of facts, the exercise of judgment, and the formation of an opinion." *Id*. (quoting *Cantwell v. State of Connecticut*, 310 U.S. 296, 305 (1940)). The State offers several arguments in opposition.

First, it asserts that Plaintiffs do not facially challenge the psychological examination. That is false. Plaintiffs' motion states that Plaintiffs Rigali, Reeves, and Gabaldon do not want to subject themselves to the indignity of such an exam as a precondition of exercising their rights. Mot. at 18 (citing each respective declaration). Plaintiffs' proposed order likewise asks that La Verne be ordered to stop requiring a psychological examination. And Plaintiffs' complaint calls for enjoining the Penal Code section that allows psychological examinations. *See* Complaint at 40:1-3 (prayer for relief).

Next, the State argues that *Bruen* blessed psychological examinations because some of the state shall-issue permitting schemes it approved of had "good moral character" provisions. State's Opp. at 16:2-24. Yet the State does not point to any other state that requires (now or in the past) psychological examinations of applicants. To Plaintiffs' knowledge, none exist. The Supreme Court only juxtaposed New York's discretionary requirement with other states which "often require applicants to undergo a background check or pass a firearms safety course." *Bruen*, 597 U.S. at 38 n.9. Psychological examinations were not within the purview of the *Bruen* opinion, and none of the 43 existing schemes the Court discussed requires one.

Critically, and contrary to the State's arguments, the Second Amendment's plain text is undoubtedly implicated here: Plaintiffs wish to carry without having to

---

waive the portion of their argument that relied on the lack of an appeal avenue, which presented an independent reason to strike the psychological examination.

COMBINED REPLY IN SUPPORT OF MOT. FOR PRELIM. INJ.

subject themselves to an invasive psychological examination.[7] Other courts have ruled that the mere existence of a permit application process to purchase or carry firearms at least implicates the plain text. *Koons*, 2023 WL 3478604, at *18; *Maryland Shall Issue, Inc.,* 86 F.4th at 1045*, reh'g en banc granted,* No. 21-2017 (L), 2024 WL 124290 (4th Cir. Jan. 11, 2024) (firearm purchase permit law implicates plain text of the Second Amendment).

The State also argues that psychological examinations comport with historical tradition. But a New York court ruled recently that a urinalysis requirement not only has no historical analogue, "but forcing an applicant to submit to urinalysis, in essence, requires them to give up their 4th Amendment rights against unlawful searches and seizures to exercise their 2nd Amendment rights." *Kamenshchik v. Ryder, supra,* at p. 7. If a urinalysis requirement is too invasive, then a psychological examination in which an applicant is questioned at length certainly is too.

Nor do the specific historical analogues the State refers to justify the psychological examination. As the State notes, "[p]rior regulation was likely unnecessary because persons of 'unsound mind' were often physically isolated. . . ."[8] State Opp. at 17:25-18:8. That the founding era dealt with the problem through a different method weakens the State's argument because, "if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Bruen*, 597 U.S. at 26-27.

None of the State's analogues involved the preemptive disarmament of

---

[7] La Verne's particular examination has further abuses as well that should independently lead to its being enjoined, even if this Court were to uphold psychological examinations generally. Those issues are discussed *infra* in Part II.C.2.

[8] An analogue to this exists today, but it is not the psychological examination, it is involuntary commitment. And if an individual is involuntarily committed, they lose their right to possess firearms under federal law. 18 U.S.C. § 922(g)(4).

18

people who are "ordinary, law-abiding, adult citizens." *Bruen*, 597 U.S. at 31. All of the laws the State lists governed people who had already demonstrated behavior that led to their disarmament, such as "vagrants" and the intoxicated. State's Opp. at 18:3-11. Nor were these permanent disarmaments, unlike failing a psychological examination which renders the individual completely unable to carry a firearm. *See Mai v. United States*, 974 F.3d 1082, 1090 (9th Cir. 2020) (Bumatay, J., dissenting from denial of en banc) (quoting Henry Care, *English Liberties, or the Free-born Subject's Inheritance* 329 in noting that "judicial officials" were authorized to "lock up" "lunatics" or "other individuals with dangerous mental impairments", but they were "locked up only so long as such lunacy or disorder shall continue, and no longer.").

Most critically, people of unsound mind accessing weaponry is not a new problem, and "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 597 U.S. at 26.

The State also argues that, despite what *Bruen* says, some sort of discretion is permitted. State Opp. at 19:11-16. In support, it cites a Second Circuit case with a currently pending certiorari petition to the Supreme Court. Yet even that ruling, while allowing more discretion than the Supreme Court did, still confined it tightly. "In addressing the catch-all provision, the *Antonyuk* court used words like 'modicum', 'limited', 'minor' and 'modest' in describing the degree of discretion the Licensing Officer could exercise. . . ." *Kamenshchik, supra,* at p. 6 (discussing *Antonyuk v. Chiumento*, 89 F.4th 271, 312 (2d Cir. 2023)). Far worse even than Nassau County's repudiated urinalysis, an invasive, three-hour long psychological examination is far beyond an exercise of "modest" discretion, and it should be enjoined. *See* Decl. of Jim Carlson in Supp. Of Pls.' Mot. For Prelim. Inj., ¶ 9.

**C.    La Verne and Flores's Opposition.[9]**

**1.    *Bruen* expressly prohibits La Verne's high fees.**

The City of La Verne swings for the fences, arguing that *Bruen's* express warning that imposing an exorbitant fee schedule for a carry permit is unconstitutional is irrelevant dicta, and thus its $1,081 threshold for obtaining a carry permit is "reasonable" and constitutional. *See* Defs.' La Verne Police Dep't and La Verne Chief of Police, Coleen Flores' Not. of and Opp. to Pls.' Mot. for Prelim. Inj. ("LV Opp.") at 5:12-16, 6:19-22; *see also* Decl. of Acting Chief Sam Gonzalez in Supp. of Defs.' City of La Verne and La Verne Chief of Police Colleen Flores' to Pls.' Mot. for Prelim. Inj., Ex. 1 (confirming La Verne's fees total $1,081). But La Verne strikes out. Exorbitant permit fees like La Verne's are so plainly unconstitutional precisely because, when the Supreme Court hypothesized what sort of obstructions to issuance that hostile issuing authorities might impose on applicants, high fees are one of only two examples it identified. *Bruen*, 597 U.S. at 38 n.9. Only in the opposition papers of local governments hostile to enumerated rights can the Supreme Court's explicit warning about high fees be characterized as dicta.

Without a doubt, if any other constitutional right were at issue here, La Verne would be too embarrassed to make the "others are doing it, so we can too!" argument in support of its exorbitant fee schedule. While it is true that other issuing authorities in Los Angeles County are also engaged in "massive resistance" with similarly exorbitant fee schedules, that they are not defendants in this action has no bearing on whether La Verne's fee structure survives historical review under *Bruen*. That Birmingham, Prince Edward County, and Jackson resisted complying with

[9] La Verne submitted lengthy objections to Plaintiffs' declarations, making a variety of complaints that they do not comply with the Federal Rules of Evidence. But it is elementary that "[d]ue to the urgency of obtaining a preliminary injunction at a point when there has been limited factual development, the rules of evidence do not apply strictly to preliminary injunction proceedings." *Herb Reed Enterprises, LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013).

20

school integration was no defense to Little Rock post-*Brown*. Similarly, it is no defense here that other issuing authorities in Los Angeles County are also flouting *Bruen's* express warning with exorbitant and unconstitutional fee schedules.

Moreover, La Verne's "fee matrix" does not prove its point at all. *See* Gonzalez Decl., Ex. 1. Several of the included cities' fee schedules, while still clearly unconstitutional, are much less expensive than La Verne's, including Alhambra PD ($719), Claremont PD ($618), Glendale PD ($618), Glendora PD ($493), Irwindale PD ($766), LAPD ($641), LASD ($523), Monrovia PD ($673), Monterey Park PD ($651), Pasadena PD ($707.14), San Marino PD ($766.42), and Whittier PD ($761).[10] *Id*. The least La Verne could have done was impose a fee schedule in line with most other cities in Los Angeles County. But instead, its fee schedule is second only to Hawthorne PD ($1,133), and hundreds of dollars more than the county average and median as the matrix it submitted shows. *Id*.

But in any event, the fee schedules that other Los Angeles County municipalities are imposing are not the proper yardstick. This is not a relative inquiry; it is an absolute one. And prior to *Bruen*, almost none of these cities issued CCW permits to anyone. Even densely populated county authorities like LASD rarely issued permits to civilians. So it is not surprising that these authorities are now obstructing *Bruen* with high fees. Just as courts historically did not look to the jurisdictions most hostile to civil rights to establish the model for integration policy, the Court should not do so here.

In stark contrast to *Bruen*-resisting jurisdictions are the issuing authorities that granted permits to all law-abiding applicants even before *Bruen* required it. For example, the Riverside County Sheriff's Department charges $195, plus the cost of the training course. This includes the cost of fingerprinting, and like most issuing authorities, Riverside does not require a psychological exam. *See* Riverside County

---

[10] The Gonzalez declaration claims a few other cities are also costlier, which La Verne repeats in its brief (LV Opp. at 8:25-9:4), but evidence of those other cities' fees are not included in the matrix La Verne submitted.

21

Sheriff's Department, Permitium, https://riversideca.permitium.com/ccw/start (last visited Feb. 22, 2024). Assuming a $250 training course as La Verne's matrix did, the total expense for a Riverside applicant is therefore $445. While $445 is still a unconstitutional barrier to the exercise of a constitutional right, it is still *less than half* of La Verne's $1,081. And La Verne's fees remain exorbitant, every two years, for each renewal. Assuming a $250 training course, renewals in Riverside are $337, *id.*, while La Verne charges $675 for renewals. And in San Bernardino County, training is done in-house, there is no psychological exam, initial applications cost $396.40, and renewals cost only $192—an absolute comparative bargain compared to La Verne. *See* San Bernardino County Sheriff's Department, Permitium, https://sbcsd.permitium.com/ccw/start (last visited Feb. 22, 2024).

Furthermore, as discussed in the Motion, in comparison to CCW permit issuance in other states, La Verne's fees are even more out of line. Plaintiffs provided examples of the fees in Arizona ($60 plus fingerprinting), Texas ($40), Utah ($53.25), and Washington ($36 plus fingerprinting). Mot. at 10:27-11:16. In their complaint, Plaintiffs also listed off Florida ($55), Minnesota ($100), and Nevada ($100.25). *See* Complaint at ¶ 95. These are the type of states that the Supreme Court had in mind when it referenced 43 states that already have presumptively constitutional shall-issue licensing regimes; not California, which was one of the seven that did not. *Bruen*, 597 U.S. at 38 n.9. Those pre-*Bruen* permit schemes do not create the obstructionist model that hostile Californian municipalities seek to justify here. With more than half the country imposing *no permit requirement or fee schedule whatsoever* between an eligible citizen and their enumerated right to be armed outside of the home, La Verne's $1,081 fee schedule is patently unacceptable.

La Verne demurs that "exorbitant" means "exceeding the customary or appropriate limits in intensity, quality, amount, or size." LV Opp. at 7:5-6 (citing Merriam-Webster Dictionary). Yet that definition perfectly describes La Verne's

fee schedule, which even exceeds other egregious fee schedules in other LA County municipalities as well as those in virtually every other state. If the cost of voter registration or a permit to protest in a public forum was many multiples more expensive in one state than nearly all the others, such a law would be very short lived. *See, e.g., Sullivan v. City of Augusta*, 511 F.3d 16, 37 (1st Cir. 2007) ($500 overcharge for parade permit fee from city's actual expenses was unconstitutionally excessive); *and see Baldwin v. Redwood City*, 540 F.2d 1360, 1371-72 (9th Cir. 1976) (invalidating as an unconstitutional tax upon the exercise of First Amendment rights a temporary political sign posting fee that bore no reasonable relationship to the actual cost of sign removal). It should be no different with the Second Amendment, which the Supreme Court assures is not a "second class right." *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 780 (2010).

Critically, La Verne invests scant effort in justifying why its fee schedule is significantly higher than most other issuing authorities in California, and absolutely no effort in explaining why its fees are many multiples higher than those of other states. Its core argument is that its fee schedule reflects the supposed reasonable cost it incurs to process applications. LV Opp. at 8:3-15.  This is not only unbelievable, given the aforementioned examples, but is also immaterial. The Supreme Court said fees are exorbitant when they "deny ordinary citizens their right to public carry." *Bruen*, 597 U.S. at 38 n.9.[11] There is no question that many ordinary people cannot afford a $1,081 expense (and another $675 every two years after that), including some of the Plaintiffs. *See* Decl. of Clarence Rigali in Supp. Of Pls.' Mot. For Prelim. Inj., ¶ 6; Decl. of Keith Reeves in Supp. Of Pls.' Mot. For Prelim. Inj., ¶ 5; Decl. of Cynthia Gabaldon in Supp. Of Pls.' Mot. For Prelim. Inj., ¶ 5.

Moreover, La Verne cites <u>no caselaw</u> in support of this argument. Instead, it

---

[11] La Verne complains that the "[t]he Court in *Bruen* simply did not elucidate what constitutes an 'exorbitant' fee" (LV Opp. at 6:25-26), but as this excerpt from the ruling demonstrates, that simply is not true.

COMBINED REPLY IN SUPPORT OF MOT. FOR PRELIM. INJ.

criticizes Plaintiffs citation to an unreported case, *Murphy v. Guerrero*. But *Murphy* is useful for its persuasive and illustrative value, 2016 WL 5508998, at *24 (D. N. Mar. I. Sept. 28, 2016, having dispensed with a $1,000 excise tax because it imposed "a tremendous burden on the rights of responsible law-abiding citizens in the CNMI to obtain handguns." *Id*. Given La Verne's $1,081 fee schedule, it is no wonder that it pleads with the Court to ignore a ruling that found a similar expense a "tremendous burden."

La Verne also ignores another pre-*Bruen* case Plaintiffs cited, *Kwong v. Bloomberg*, which allowed CCW permit fees amounting to a little over $100 per year because they reflected administrative costs. 723 F.3d 160 (2d Cir. 2013). La Verne clearly has no interest in explaining why its fee schedule is so many times that figure. Nor does it address *Invisible Empire Knights of Ku Klux Klan v. City of W. Haven*, which held that, while permit fees may cover administrative costs, such costs should be minor and not likely to inhibit anyone from exercising their rights. 600 F. Supp. 1427, 1434 (D. Conn. 1985) (citing *U. S. Lab. Party v. Codd*, 527 F.2d 118, 119 (2d Cir. 1975)). La Verne also disregards *Bullock v. Carter*, a Supreme Court decision holding that "[t]he city's interest in recouping the costs of its already existing duty of protecting its citizens in the exercise of their constitutional rights cannot justify the massive burden [the expense] imposes upon those rights." 405 U.S. 134, 149 (1972). That is exactly what La Verne is doing here, as it insists that unnecessary, laborious, and redundant vetting of citizens who are *already* eligible to possess firearms is a dire necessity that purportedly justifies its burdensome fee schedule. LV Opp. at 7:10-25. La Verne ignores these authorities because there is no way to distinguish them in good faith. Nor may La Verne fall back on a vague and abstract public safety argument. LV Opp. at 7:10-15. Such arguments are forbidden in the Second Amendment analysis and are displaced by a much simpler question: does the challenged law have a well-subscribed ratification era precursor. *Bruen*, 597 U.S. at 26.

24

La Verne also argues that its police officers did a "studied analysis" and concluded that the fee schedule in place is the cheapest it can possibly be, but does not provide the Court any data or evidence to support this claim, including a copy of the alleged study. *See* LV Opp at 8:16-21; Gonzalez Decl., ¶¶ 5-8. Plaintiffs find it hard to believe that over $1,000 is anywhere close to the lowest La Verne could go if it truly implemented only the "narrow, objective, and definite" standards that *Bruen* allows (597 U.S. at 38 n.9), especially when the DOJ already conducts the required background check, and the training course is completed through an outside vendor. There is little left for La Verne to do besides confirming that an applicant is 21 years old, resides within the issuing authority's jurisdiction, is the recorded owner of the firearms the applicant seeks to carry, and has completed a training course. *See* Cal. Pen. Code § 26155(a) (West 2024). These are simple, administrative tasks that other cities perform for much less cost.  La Verne has not explained for the purpose of meeting its constitutional burden why it performs these simple, administrative tasks at a much higher cost.

Finally, and alternatively, La Verne should bear the costs of its decision to conduct any deeper investigation, or to require an unconstitutional psychological examination, not the applicants. Any interest the City has in recouping such costs does not outweigh the massive infringement on its citizens' constitutional rights. *Bullock*, 405 U.S. at 149. Nor does La Verne's claim that it nets only $40 for each application have any bearing here whatsoever. LV Opp. at 2:22-24. *But see Cox v. New Hampshire*, 312 U.S. 569, 576-77 (1941).[12]  Again, what matters is the infringement to the applicant. *Bruen*, 597 U.S. at 38 n.9. The focus is not La Verne's wallet. La Verne's exorbitant fee schedule is unconstitutional, and it must be enjoined.

---

[12]  Contrary to La Verne's claim, in other contexts, a fee is constitutionally appropriate if it *reimburses* a city for its expenses, not nets a city only a modest profit of $40. *See id.*

COMBINED REPLY IN SUPPORT OF MOT. FOR PRELIM. INJ.

**2.      La Verne does not attempt to defend even the more invidious aspects of its unique psychological exam requirement.**

Plaintiffs already discussed the psychological examination's unconstitutionality in Part II.B.2., *supra*. They will not go on at length about it here, nor is it necessary to do so given that La Verne devoted only three paragraphs to attempting to rebut Plaintiffs' argument. LV Opp. at 9:17-10:8.

Nevertheless, it is worth noting that, in addition to challenging the constitutionality of a psychological examination for CCW permitting *generally*, Plaintiffs also took issue with how La Verne's *specific* examination is administered. La Verne did not dispute any of what Plaintiffs argued regarding its examination: that it is administered at a remote location in San Bernardino that takes an hour to get to each way, that it takes several hours, and that it is only offered on weekdays and is thereby inaccessible for people subject to an inflexible Monday through Friday work schedule. Mot. at 17:14-16. La Verne also confirms that the psychological examination is the same one that law enforcement applicants take, but makes no effort to justify why that is necessary in this context. LV. Opp at 9:20-22. Plaintiffs do not seek to be police officers, for whom the possibility of using lethal violence is a core aspect of the job; they are private citizens seeking to be armed in the rare instance they face a gravely violent personal threat in public.

Thus, even if this Court were to uphold the psychological examination requirement in a vacuum, La Verne's implementation has serious problems that it does not bother to defend. La Verne halfheartedly argues about public safety, stating that enjoining its psychological examination requirement will increase the likelihood that dangerous people will get permits. Yet even though most California issuing authorities do not require psychological examinations, La Verne has no examples of a psychologically-troubled person being issued a permit and going on to commit crimes. Quite the opposite, crime among people with CCW permits is exceedingly rare. The Sheriff of Fresno County, a county which has issued permits

26

without regard to "good cause" for many years and does not require a psychological examination, recently said that, out of its over 12,000 residents with CCW permits, none had committed *any* crime, violent or otherwise, in at least two years. *See* Erika D. Smith and Anna Chabria, *Column: California says its new gun law is about public safety. But what about these women?*, LA Times (Jan. 19, 2024), https://www.latimes.com/california/story/2024-01-19/california-gun-concealed-carry-law-women-domestic-violence-newsom.

### D.   The Remaining Preliminary Injunction Factors Favor Plaintiffs

Plaintiffs are likely to succeed on the merits, and in a constitutional case, that makes the remaining preliminary injunction factors something close to a formality. "If a plaintiff bringing such a [constitutional] claim shows he is likely to prevail on the merits, that showing will almost always demonstrate he is suffering irreparable harm as well." *Baird,* 81 F.4th at 1042; *see also id*. at 1044 (quoting *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014)) ("a plaintiff who can show that a statute likely violates the Constitution will also usually show 'that both the public interest and the balance of the equities favor a preliminary injunction.'"). Controlling Ninth Circuit precedent thus commands Plaintiffs' success on the remaining *Winter* factors. Yet even if considered independently of their likelihood of success on the merits, the Plaintiffs clearly prevail on the remaining factors.

As to irreparable harm, LASD argues that because Plaintiffs have not faced a deadly attack in public yet, that means no harm has resulted. LASD Opp. at 21:13-16. Setting aside that LASD would certainly not feel responsible if a Plaintiff stuck in the backlog is injured or killed in a deadly attack because they were unable to defend themselves, it is a basic principle that "the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Similarly, the fact that La Verne does not believe that expenses totaling over $1,000

27

to get a CCW permit are a constitutional violation is immaterial. *See* LV Opp. at 10:10-18. If this Court agrees with Plaintiffs that such expense violates their Second Amendment rights, then they have established irreparable harm.

For its part, the State argues that there is no irreparable harm because nonresidents have long not been able to carry in California in modern history, and the allowance for a psychological examination has also been in place for many years. State's Opp. at 20. Therefore, according to the State, Plaintiffs unreasonably delayed in bringing this motion, and there is no urgency. *Id*. What the State omits is that *Bruen* made Plaintiffs' claims viable, and it is a recent landmark ruling. Further, La Verne's implementation of the challenged psychological exam is only months old. Besides, even if there was unreasonable delay, and there has not been, "[d]elay by itself is not a determinative factor in whether the grant of interim relief is just and proper." *Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019) (quoting *Aguayo for & on Behalf of N.L.R.B. v. Tomco Carburetor Co.*, 853 F.2d 744, 750 (9th Cir. 1988)).

Turning to the next factors, when the government is the defendant as in this case, the last two factors of the balancing of the equities as well as the public interest merge. *Baird*, 81 F.4th at 1040 (citing *Nken v. Holder*, 556 U.S. 418 (2009)). When challenging government action that affects the exercise of constitutional rights, "[t]he public interest . . . tip[s] sharply in favor of enjoining the" law. *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009).

LASD argues that the balance of the equities and the public interest favor it because, essentially, it is trying its best. But as Plaintiffs have established, even if LASD did not receive one more application, at its current pace it would take over four years for it to clear the existing backlog of first-time applicants. Clearly, LASD must devote several times more resources to CCW permit application processing, so it does not continue to violate the Second Amendment rights of the Plaintiffs and

thousands of others.[13] If voter registration took years because only a few public servants were assigned to process registrations, no one would accept the argument that the government was doing its best and could take as long as it needed to get caught up. The constitutional harm would easily be seen as the far greater interest than any difficulty for government. The same applies here because the Second Amendment is not a "second class right." *McDonald*, 561 U.S. at 780.

LASD also argues that no injunction should issue because the standard for mandatory injunctions is higher. LASD Opp. at 7:15-8:5, 21:20-23:8. But that is immaterial here because this is not a close case, "the facts and law clearly favor the moving party." *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Trust,* 636 F.3d 1150, 1160 (9th Cir.2011) (quoting *Anderson v. United States,* 612 F.2d 1112, 1114 (9th Cir.1979)). Besides, if LASD is unable or unwilling to process applications faster, then Plaintiffs requested a form of non-mandatory relief: letting applicants who have already waited for four months carry while there application is pending. LASD argues that this would allow "criminals, mentally ill, drug addicts" and other prohibited people to carry. LASD Opp. at 23:4-8. Plaintiffs suspect that such individuals are not applying for CCW permits, and LASD presents no evidence of the commonality of such applicants. Regardless, Plaintiffs proposed order makes clear that this protection after 120 days would only apply to applicants who have submitted a livescan to the Department of Justice and who are not otherwise prohibited from owning firearms (like criminals, drug addicts, and those who were involuntarily committed are under federal law).

The State cites to unnamed and unattached studies that purportedly conclude that more carry of firearms leads to more crime. State's Opp. at 21:3-10. But as

---

[13] LASD also argues that any relief should be limited to the Plaintiffs in this action. LASD Opp. at 24:7-17. This is an unserious suggestion because four different associations are Plaintiffs who have associational standing. *See Oregon Advoc. Ctr. v. Mink,* 322 F.3d 1101, 1109 (9th Cir. 2003). Each of their members are entitled to relief. Presumably, LASD is not going to ask each applicant if they are a member of one of the Plaintiffs, and then process such individuals faster than others.

COMBINED REPLY IN SUPPORT OF MOT. FOR PRELIM. INJ.

Plaintiffs have argued, numerous courts (including one in this district) have found that those issued CCW permits have exceedingly low homicide rates, based on government crime data from several different states. *See May*, 2023 WL 8946212, at *19; *Wolford v. Lopez*, 2023 WL 5043805, at *32; and *Koons*, 2023 WL 3478604, at *108. The State honoring permits issued by other states presents no danger, and certainly not a large enough one to justify denying the right of law-abiding Americans to carry in this state. Similarly, La Verne's fear of mass shootings, LV Opp. at 10:27-11:2, makes no sense in this context. Mass killers are not seeking CCW permits before committing their atrocities. If anything, the possibility of the harm of mass shooters is another reason why Plaintiffs want to be able to exercise their right to carry in a constitutionally timely and affordable manner so they can defend themselves should they find themselves, as others have, in such a horrific scenario.

## III.   CONCLUSION

For these reasons as well as those presented in the opening brief and all supporting documents, Plaintiffs pray this Court will vindicate the constitutional right to bear arms.

Respectfully Submitted,

Dated: February 28, 2024              **MICHEL & ASSOCIATES, P.C.**

*/s/ C.D. Michel*
C.D. Michel
Counsel for Plaintiffs


Dated: February 28, 2024              **LAW OFFICES OF DON KILMER**

*/s/ Don Kilmer*
Don Kilmer
Counsel for Plaintiff The Second Amendment Foundation

COMBINED REPLY IN SUPPORT OF MOT. FOR PRELIM. INJ.

**ATTESTATION OF E-FILED SIGNATURES**

I, C.D. Michel, am the ECF User whose ID and password are being used to file this COMBINED REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION. In compliance with Central District of California L.R. 5-4.3.4, I attest that all signatories are registered CM/ECF filers and have concurred in this filing.

Dated: February 28, 2024                     /s/ C.D. Michel
                                             C.D. Michel

**LOCAL RULE 11-6.2 CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Plaintiffs, certifies that this brief does not exceed 30 pages in length using Times New Roman 14-point font, which complies with this Court's order of February 8, 2024 (Dkt. No. 22).

Dated: February 28, 2024                     /s/ C.D. Michel
                                             C.D. Michel

**CERTIFICATE OF SERVICE**
IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

Case Name: *California Rifle and Pistol Association, et al., v. Los Angeles County Sheriff's Dep't, et al.*

Case No.:    8:23-cv-10169-SPG (ADSx)

IT IS HEREBY CERTIFIED THAT:

      I, the undersigned, am a citizen of the United States and am at least eighteen years of age. My business address is 180 East Ocean Boulevard, Suite 200, Long Beach, California 90802.

      I am not a party to the above-entitled action. I have caused service of:

**COMBINED REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

on the following parties, as follows:

Mark R Beckington
Jane E. Reilley
Christina R.B. Lopez, Deputy Attorney General
California Department of Justice
Office of the Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1230
jane.reilley@doj.ca.gov
Christina.Lopez@doj.ca.gov

*Attorney for Defendant Robert Bonta*

Henry Michael Nikogosyan
Ryan M. Chabot
WILMER CUTLER PICKERING HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
mark.selwyn@wilmerhale.com
ryan.chabot@wilmerhale.com

*Attorneys for Defendants Los Angeles County Sheriff's Department and Sheriff Robert Luna*

Bruce A. Lindsay
Monica Choi Arredondo
JONES MAYER
3777 N. Harbor Blvd.
Fullerton, CA  92835
bal@jones-mayer.com
mca@jones-mayer.com

*Attorneys for Defendants La Verne Police Department and La Verne Chief of Police Colleen Flores*

by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

      I declare under penalty of perjury that the foregoing is true and correct.

Executed February 28, 2024

*Christina Castron*
Christina Castron

CERTIFICATE OF SERVICE