1  C. D. Michel – SBN 144258
   cmichel@michellawyers.com
2  Joshua Robert Dale – SBN 209942
   jdale@michellawyers.com
3  Konstadinos T. Moros – SBN 306610
   kmoros@michellawyers.com
4  Alexander A. Frank – SBN 311718
   afrank@michellawyers.com
5  MICHEL & ASSOCIATES, P.C.
   180 E. Ocean Blvd., Suite 200
6  Long Beach, CA 90802
   Telephone: (562) 216-4444
7
8  Donald Kilmer-SBN 179986
   Law Offices of Donald Kilmer, APC
9  14085 Silver Ridge Road
   Caldwell, Idaho 83607
   Telephone: (408) 264-8489
10 Email: Don@DKLawOffice.com

11 Attorneys for Plaintiffs

12              UNITED STATES DISTRICT COURT

13             CENTRAL DISTRICT OF CALIFORNIA

14 CALIFORNIA RIFLE & PISTOL            CASE NO: 8:23-cv-10169-SPG
   ASSOCIATION, INCORPORATED; THE      (ADSx)
15 SECOND AMENDMENT FOUNDATION;
   GUN OWNERS OF AMERICA, INC.;         REBUTTAL DECLARATION OF
16 GUN OWNERS FOUNDATION; GUN           CLAYTON CRAMER IN
   OWNERS OF CALIFORNIA, INC.;          SUPPORT OF PLAINTIFFS'
17 ERICK VELASQUEZ, an individual;      MOTION FOR PRELIMINARY
   CHARLES MESSEL, an individual;       INJUNCTION
18 BRIAN WEIMER, an individual;
   CLARENCE RIGALI, an individual;      Hearing Date: March 13, 2024
19 KEITH REEVES, an individual, CYNTHIA Hearing Time: 1:30 p.m.
   GABALDON, an individual; and         Courtroom:  5C
20 STEPHEN HOOVER, an individual,       Judge: Hon. Sherilyn Peace Garnett

21              Plaintiffs,

22      v.

23 LOS ANGELES COUNTY SHERIFF'S
   DEPARTMENT; SHERIFF ROBERT
24 LUNA, in his official capacity; LA VERNE
   POLICE DEPARTMENT; LA VERNE
25 CHIEF OF POLICE COLLEEN FLORES,
   in her official capacity; ROBERT BONTA,
26 in his official capacity as Attorney General
   of the State of California and DOES 1-10,
27
                Defendants.
28

────────────────────────────────────────────
       REBUTTAL DECL. OF CLAYTON CRAMER ISO PLFS' MPI

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Cockrum* v. *State*,
 24 Tex. 394, 402, 403 (1859) ........................................................................ 11

*Dred Scott* v. *Sandford*,
 60 U.S. 393, 417 (1857) ............................................................................... 10

*Fenner v. State*,
 3 Vt. 108 (1855). ............................................................................................ 9

*Nunn* v. *State*,
 1 Ga. 243, 250, 251 (1846) ......................................................................... 14

*Owen* v. *State*,
 31 Ala. 387, 388, 389 (1858) ...................................................................... 13

*Simpson* v. *State*,
 5 Yerg. 356, 357 (Tenn. 1833) .................................................................... 11

*Simpson* v. *State*,
 5 Yerg. 356, 359, 360 (Tenn. 1833) ............................................................ 12

*Smith* v. *State*,
 11 La. An. 633, 634 (1856) ......................................................................... 15

*State* v. *Chandler*,
 5 La. An. 489, 490, 491 (1850) ................................................................... 15

*State v. Huntley*,
 25 N.C. 418, 422, 423 (1843) ...................................................................... 13

*State v. Smith*,
 11 La.Ann. 633, 634 (1856). ....................................................................... 16

*Stockdale* v. *State*,
 32 Ga. 225, 227 (1861) .......................................................................... 13, 14

REBUTTAL DECL. OF CLAYTON CRAMER ISO PLFS' MPI

*Watson v. Stone*,

148 Fla. 516, 524 (Fla. 1941) (Buford, J. concurring). ...................................2

**Statutes**

11 Pennsylvania Statutes at Large, 209-12. .....................................................3

12 Pennsylvania Statutes at Large, 416-23 .....................................................3

2 Laws of the State of New-York 191-3 (1792) ..............................................3

3 Records of the Colony of Rhode Island, and Providence Plantations, in New England 31 (1858). ..................................................................................5

4 Statutes at Large of South Carolina 319-20 (1838) ........................................3

5 Records of the Governor and Company of the Massachusetts Bay in New England 211 (1854). ..............................................................................................8

An Act concerning the Kaskaskia Indians, Laws of the Colonial and State Governments, Relating to Indians and Indian Affairs, from 1633 to 1831… 240-1 (1832) ...................................................................................................................4

An Act for the More Effectual Suppression of Drinking Houses and Tippling Shops (1852), ..................................................................................................8, 9

Chandler, 18 The State Records of the Colony of Georgia, 294-5 (1759) ...............6

Charter and General Laws of the Colony and Province of Massachusetts Bay Ch. 91 at 190 (1814). ......................................................................................................6

Mitchell and Flanders, 2 *Statutes at Large of Pennsylvania from 1682 to 1801* 420 (1896). ...................................................................................................................6

**Other Authorities**

Daniel A. Novak, The Wheel of Servitude: Black Forced Labor after Slavery 3 (2021). ........................................................................................4

Forrest McDonald, *A Constitutional History of the United States* 124 (1982) .......14

Ida B. Wells-Barnett, Southern Horrors and Other Writings: the Anti-Lynching Campaign of Ida B. Wells, 1892-1900 66 (2016). ............................................2

REBUTTAL DECL. OF CLAYTON CRAMER ISO PLFS' MPI

Report of the Adjutant-General for the Biennial Period Ending December 1, 1892

    18-19 in Journal of the [Florida] Senate (1893)......................................................3

To Protect One of Their Color, [Bridgewater, N. J.]

    Courier-News, Jul. 7, 1892, 1 ....................................................................................3

**Qualifications**

1.      My M.A. in History is from Sonoma State University in California.  I teach history at College of Western Idaho.  I have nine published books, mostly scholarly histories of weapons regulation.  My 18 published articles (mostly in law reviews) have been cited in *D.C. v. Heller* (2008), *McDonald v. Chicago* (2010), *Jones v. Bonta* (9th Cir. 2022), *Young v. State* (9th Cir. 2021), *State v. Sieyes* (Wash. 2010), *Senna v. Florimont* (N.H. 2008), and *Mosby v. Devine* (R.I. 2004).

2.      In several cases, my work has been cited in defense of laws limiting firearms ownership: *State v. Roundtree* (Wisc. 2021), *State v. Christen* (Wisc. 2021), and *King v. Sessions* (E.D.Penn. 2018).

**I.      Retention and Compensation**

3.      I have been retained by the California Rifle & Pistol Association to render expert opinions in this case. I am being compensated at a rate of $250 per hour. My compensation is not contingent on the results of my expert analysis or the substance of my opinions or testimony in this matter.

**II.      Summary**

4.      I examine declarations by Spitzer, Rivas, and Vorenberg for misrepresentations of facts. Given time limitations, I can only provide some illustrative examples, and this declaration should not be understood as an exhaustive rebuttal to every last historical claim they make. Attached to this rebuttal declaration is an appendix (Exhibit 4) examining some of the historical laws the State's experts and other Defendants cite in their opposition papers. The appendix was prepared by the Plaintiffs' counsel in consultation with me. I reviewed it in its entirety, including both Defendants' or their experts' description of the historical laws cited, as well as the full copies of the historical laws that the appendix links to, and hereby confirm the appendix as being true and correct.

### III.   Spitzer Declaration

5.     Spitzer cites an 1893 Florida licensing law ¶32 whose purpose was racist.  Florida Supreme Court Justice Buford's concurring opinion in a challenge to the law admitted:

> I know something of the history of this legislation. The original Act of 1893 was passed when there was a great influx of negro laborers in this State drawn here for the purpose of working in turpentine and lumber camps. The same condition existed when the Act was amended in 1901 and the Act was passed for the purpose of disarming the negro laborers and to thereby reduce the unlawful homicides that were prevalent in turpentine and saw-mill camps and to give the white citizens in sparsely settled areas a better feeling of security. The statute was never intended to be applied to the white population and in practice has never been so applied. We have no statistics available, but it is a safe guess to assume that more than 80% of the white men living in the rural sections of Florida have violated this statute. It is also a safe guess to say that not more than 5% of the men in Florida who own pistols and repeating rifles have ever applied to the Board of County Commissioners for a permit to have the same in their possession and there has never been, within my knowledge, any effort to enforce the provisions of this statute as to white people, because it has been generally conceded to be in contravention to the Constitution and non-enforceable if contested.[1] [emphasis added]

6.     A little history helps to explain why Florida likely saw the need for this law about "repeating rifles."   The journalist Ida B. Wells-Barnett explains in SOUTHERN HORRORS AND OTHER WRITINGS: THE ANTI-LYNCHING CAMPAIGN OF IDA B. WELLS, 1892-1900:

> Of the many inhuman outrages of this present year, the only case where the proposed lynching did not occur, was where the men armed themselves in Jacksonville, Fla., and Paducah, Ky, and prevented it. The only times an Afro-American who was assaulted got away has been when he had a gun and used it in self-defense.

> The lesson this teaches and which every Afro-American should ponder well, is that a Winchester rifle should have a place of honor in every black home, and it should be used for that protection which the law refuses to give. When the white man who is always the aggressor knows he runs as great risk of biting the dust every time his Afro-American victim does, he will have greater respect for Afro-American life. The more the Afro-American yields and cringes and begs, the more he has to do so, the more he is insulted, outraged and lynched.[2] [emphasis added]

---

[1] Watson v. Stone, 148 Fla. 516, 524 (Fla. 1941) (Buford, J. concurring).
[2] Ida B. Wells-Barnett, Southern Horrors and Other Writings: the Anti-Lynching Campaign of Ida B. Wells, 1892-1900 66 (2016).

7.     To what 1892 incident was Wells-Barnett referring?

Armed Negroes Surround a Jail to Prevent a Threatened Lynching. Jacksonville, Fla., July 7. Shortly before midnight a mob of seven hundred negroes marched to the Duval County Jail in squads. They were all heavily armed, and immediately took up positions about the various entrances to the prison. The negroes claimed that they received positive information that the whites intended lynching a negro confined in the jail who is charged with having murdered a man last Monday.[3]

8.     Even if the 1893 law was not past the 1868 demarcation set by *Bruen*, defendants being on the side of a lynch mob is hardly a persuasive argument.

### A.     Gunpowder Storage Laws

9.     In ¶42, Spitzer points to gunpowder storage laws.  Examination of the Founding Era laws demonstrates that the goal was fire prevention, as even the title of Spitzer's secondary source implies: *The Duty to Bear Arms: Historical Militia Law, **Fire Prevention Law**, and the Modern Second Amendment* [emphasis added]. These laws existed because of the public safety hazard involved in keeping large quantities in town, such as South Carolina's 1770 law creating a public powder magazine and directing "That persons living in Charlestown shall store their gunpowder, except the quantity which by law they are allowed to keep in their houses…" were to be stored in the public magazines.   There is no mention what that quantity was.[4]  A 1782 Pennsylvania law prohibited storing more than 30 pounds of gunpowder in Philadelphia or within two miles, except in the public powder magazine.[5]  Minor revisions were made in 1787.[6]  New York limited possession in New York City to 28 pounds, separated into seven-pound containers, except in the public magazine.[7]

---

[3] ***To Protect One of Their Color***, [Bridgewater, N. J.] COURIER-NEWS, JUL. 7, 1892, 1; See ***Report of the Adjutant-General for the Biennial Period Ending December 1, 1892*** 18-19 in JOURNAL OF THE [FLORIDA] SENATE (1893).
[4] 4 STATUTES AT LARGE OF SOUTH CAROLINA319-20  (1838).
[5] 11 PENNSYLVANIA STATUTES AT LARGE, 209-12.
[6] 12 PENNSYLVANIA STATUTES AT LARGE, 416-23.
[7] 2 LAWS OF THE STATE OF NEW-YORK 191-3 (1792).

REBUTTAL DECL. OF CLAYTON CRAMER ISO PLFS' MPI

### B.    Commercial Licensing and Recording

10.    Spitzer at ¶45, in a discussion of commercial firearms sale licensing, misleads: "The earliest commercial licensing law was an 1814 Illinois measure that made it unlawful for whites to engage in commercial activities with Native Americans unless they obtained a license from the governor."  The cited statute does indeed regulate commercial activities, but not *guns*.  It regulated sale to Indians of "any quantity of whiskey, gin, brandy, rum, cider or any other intoxicating agent…"[8] This is such an egregious mischaracterization that I have included an image of the statute in Exhibit 3.

### C.    Those Considered "Vagrants" Or "Unsound"

11.    Spitzer at ¶55 points to an 1865 Mississippi law defining vagrancy rather vaguely, with no clarification that vagrancy in immediate postbellum Confederacy was a method of returning freedmen to a bondage where white farmers purchased their labor from the local government.[9]  As Spitzer acknowledges "Most of these laws were enacted after the Civil War, when, as noted, migration to cities dramatically accelerated."

12.    If Spitzer wants to draw an analogy to laws that disarmed vagrants to California's concealed weapon law, one must ask: does California's law not require proof of residency or permanent address?

13.    If Spitzer is suggesting that laws disarming vagrants were proxies for mental illness, does that mean that the psychological testing that issuing agencies are allowed to require under current California law[10] would fail to identify mentally ill applicants?

---

[8] *An Act concerning the Kaskaskia Indians*, LAWS OF THE COLONIAL AND STATE GOVERNMENTS, RELATING TO INDIANS AND INDIAN AFFAIRS, FROM 1633 TO 1831... 240-1 (1832).
[9] Daniel A. Novak, THE WHEEL OF SERVITUDE: BLACK FORCED LABOR AFTER SLAVERY 3 (2021).
[10] Cal. PC § 26190(e)(1).

REBUTTAL DECL. OF CLAYTON CRAMER ISO PLFS' MPI

### D.   Guns and Intoxication

14.   Spitzer in ¶¶58-72 discusses laws prohibiting possession of firearms while intoxicated.  The deeper problem is that Spitzer has misrepresented many of the colonial laws that supposedly prohibited drinking while armed.  In ¶65: "In a 1655 Virginia law, more general alcohol-fueled revelry was subject to fines for any who would 'shoot any guns at drinking,' though the law carved out two special occasions for regulatory exemption: 'marriages and funerals only excepted.'"  What Spitzer left out is that the concern was not public drinking with guns would hazard colonists but:

> WHEREAS it is much to be doubted , That the comon enemie the Indians , if opportunity serve, would suddenly invade this collony to a totall subversion of the same , and whereas the only means for the discovery of their plotts is by allarms , of which no certainty can be had in respect of the frequent shooting of gunns in drinkings…[11]

15.   The concern was not that some drunk would accidentally or intentionally shoot someone, but that his firing might be mistaken for a warning of Indian attack.  "Boy who cries wolf syndrome" drove this ban.

16.   Spitzer at ¶66 claims:

> In 1636, Rhode Island enacted a measure to punish any who would engage in "shooting out any gun . . . drinking in any tavern alehouse . . . on the first day of the week more than neccesity requireth." Any who did so would find themselves in the stocks or fined five shilling.

17.   What the law *actually* says:

> And bee it further enacted by the authority aforesaid, That any person or persons shall presume to sport, game or play at any manner of game or games, or shooting on the first day of the weeke as aforesaid, or shall sit tippling and drinking in any tavern, ale-house, ordinary or *victualling house on the first day of the weeke, more than necessity requireth;*[12] *[emphasis added]*

---

[11] Hening, 2 STATUTES AT LARGE, Act 119 at 126 (1810), https://books.google.com/books?id=SkIVAAAAYAAJ&newbks=1&newbks_redir=0&dq=%22WHEREAS%20it%20is%20much%20to%20be%20doubted%20%22%20virginia&pg=PR1#v=onepage&q=%22WHEREAS%20it%20is%20much%20to%20be%20doubted%20%22%20virginia&f=false, last accessed February 27, 2024.

[12] 3 RECORDS OF THE COLONY OF RHODE ISLAND, AND PROVIDENCE PLANTATIONS, IN NEW ENGLAND 31 (1858).

REBUTTAL DECL. OF CLAYTON CRAMER ISO PLFS' MPI

18.     This was a Sabbath-keeping law that prohibited sport of all sorts and drinking on Sundays.  It did not prohibit being armed while drunk or even drinking.

19.     Spitzer at ¶66 claims:

In 1663, Massachusetts criminalized any on board of ships docked at any colonial harbor where those on board would "be drunk within their vessels by day or night" and "shoot off any gun after the daylight is past, or on the sabbath day." The fine was a substantial twenty shillings for every gun so fired.

20.     The actual statute:

Sect. 4. Be it also enacted by the authority of this court, that no masters of ships, or seamen, having their vessels riding  within any of our harbours in this jurisdiction, shall presume to drink healths, or suffer any healths to be drunk within their vessels by day or night, or to shoot off any gun after the daylight is past, or on the sabbath day, on penalty for every health twenty shillings, and for every gun so shot twenty shillings.[13] [emphasis added]

21.     As the full statute demonstrates, this law banned *drinking* not being drunk.  A *separate* offense was shooting "after the daylight is past, or on the sabbath day…"  The term "gun" in this period often means cannon, not small arms.  Georgia in 1759 made it unlawful to fire "any great gun or shall arm in the town or harbour of Savannah after Sun Set without leave or permission. from the Governor."  The "shall arm" appears to be a typo for "small arm"; the marginal description is "person firing any great Guns or small arms…"[14]  A similar statute limiting such firing can be found in Pennsylvania, and again it seems limited to cannon: "And that no master or commander of any merchant ship or vessel shall fire, or suffer to be fired, on board his vessel, any ordnance or other gun after eight o'clock in the evening, nor before daylight in the morning…."[15]

22.     At ¶66: "In 1750 Pennsylvania enacted a law "For Suppressing Idleness, Drunkenness, And Other Debaucheries" that punished with "penalties and

---

[13] CHARTER AND GENERAL LAWS OF THE COLONY AND PROVINCE OF MASSACHUSETTS BAY Ch. 91 at 190 (1814).
[14] Chandler, 18 THE STATE RECORDS OF THE COLONY OF GEORGIA 294-5 (1759).
[15] Mitchell and Flanders, 2 STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801 420 (1896).

REBUTTAL DECL. OF CLAYTON CRAMER ISO PLFS' MPI

forfeitures" any who fired guns or set off fireworks without a special license to do so."  He cites this as "1750 Pa. Laws 208, An Act For The More Effectual Preventing Accidents Which May Happen By Fire, And For Suppressing Idleness, Drunkenness, And Other Debaucheries."  As both the marginal note and the last paragraph clearly state, this was a 1751 law.  More importantly, Spitzer misrepresents the law whose text is:

> To the end the provisions already made by our laws, for preventing accidents which may happen by fire in the city of Philadelphia, and several other boroughs and towns, within this province, may be made more generally useful, and to prevent, as much as in us lies, the growing sins of idleness, drunkenness, and other debaucheries, too frequent among us, Be it enacted, that if any person or persons whatsoever, within any county town, or within any other town or borough, in this province, already built and settled, or hereafter to be built and settled, not hitherto restricted nor provided for by our laws, shall set on fire their chimnies to cleanse them, or shall suffer them or any of them to take fire, and blaze out at the top, *or shall fire any gun or other fire-arm, or shall make, or cause to be made, or sell or utter, or offer to expose to sale, any squibs, rockets or other fire-works, or shall cast, throw or fire any squibs, rockets or other fire-works, within any of the said towns or boroughs*, without the governor's special license for the same, every such person, or persons, so offending, shall be subject to the like penalties and forfeitures, and to be recovered in like manner, as in and by an act, passed in the eighth year of the reign of king George the first, entitled, An act for preventing accidents that may happen by fire, are directed to be levied and recovered.

> *If any person or persons whatsoever, shall give or sell any rum, wine, or other strong liquors, at the time of any vendue, to any person or persons attending the same, he, she, or they, so selling or giving any liquors, shall forfeit and pay for the first offence, the sum of four pounds, and for the second and every other offence, the sum of five pounds.* [emphasis added]

> Provided, that every such conviction be made within one month after such offence or offences committed. Passed 9th February, 1751.-1 Sm. L. p. 208. [emphases added]

23.   Shooting firearms in the towns was prohibited.  In addition, this law prohibited selling "any rum, wine, or other strong liquors…."  There was no prohibition on being armed while drunk.

### E.   Alcohol & Militia Musters

24.   Starting at ¶70, Spitzer discusses colonial militia laws that prohibited sales of alcohol in proximity to militia musters:

REBUTTAL DECL. OF CLAYTON CRAMER ISO PLFS' MPI

> A 1679 Massachusetts law prohibited bringing or selling "any wine, strong liquor, cider, or any other inebriating drinckes, excepting beere of a penny a-quart" on and in the proximity of militia training days unless they were licensed to do so "from the hands of two magistrates" or the commanding military officer then present.

25. The footnote provides no identifiable source: "Order p[ro]hibbiting retayling strong drinckes at traynings, Boston, May 28th, 1679. Beer had a lower alcohol content than other alcoholic beverages." I was able to find the statute and as Spitzer claims, it prohibits sale of alcohol in proximity to militia trainings. It does not prohibit being armed while drunk or even while drinking.[16] Spitzer then lists similar prohibitions on sale of alcohol at militia musters in New Jersey, Delaware, Maryland, and Pennsylvania. Spitzer characterizes all of them as bans on sale, not as bans on being armed while drinking or drunk. In ¶71: "These laws restricting the civilian commercial sale of alcohol all pertained to their proximity to militia/military activity."

26. Spitzer claims in ¶70: "Such measures extended into the nineteenth century." In n. 121: "Acts & Resolves of Vermont, 25, no. 24, An Act to Prevent Traffic in Intoxicating Liquors for the Purpose of Drinking, §15 (1852)…." I was unable to find this statute, but case law confirmed this as a general ban on sales of alcohol "in any tent, shanty, hut, or place of any kind for selling refreshments, on or near the ground of any cattle show, agricultural exhibition, military muster, or other public occasion…"[17] Again, this was not a ban on being armed and drunk and was not specific to militia.

27. In n. 121: "An Act for the More Effectual Suppression of Drinking Houses and Tippling Shops, §10, Acts & Resolves of the General Assembly of the State of Rhode Island (1853)…" The actual text of §10 is unrelated:

> SEC. 10. All cases arising under this act, whether by action, complaint or indictment, which shall come before the Court of Common Pleas, or Supreme Court, shall take precedence of all other business, except those

---

[16] 5 RECORDS OF THE GOVERNOR AND COMPANY OF THE MASSACHUSETTS BAY IN NEW ENGLAND 211 (1854).

[17] Fenner v. State, 3 Vt. 108 (1855).

REBUTTAL DECL. OF CLAYTON CRAMER ISO PLFS' MPI

criminal cases, in which the parties are actually confined in jail, awaiting trial.[18]

28.   §14 is likely what Spitzer intended.  It uses nearly identical language to the Vermont 1852 statute:

> It shall be the duty of any mayor, alderman, city marshal, city or town sergeant, constable or police officer, of any city or town, if he shall have information that any intoxicating liquors are kept or sold in any tent, shanty, hut or place of any kind for selling refreshments in any public place, on or near the ground of any cattle show, agricultural exhibition, military muster or public occasion of any kind, to search such suspected place, and if such officer shall find upon the premises any intoxicating liquors, he shall seize them and apprehend the keeper or keepers of such place…

29.   Again, like the other statutes Spitzer cites, these are bans on sale of alcohol near militia musters *and other public events*, not bans on being armed while drunk and not specific to militia activities.

## F.   Weapons Restrictions on Non-Residents

30.   Spitzer starting at ¶73 lists hunting statutes that treated non-residents differently, sometimes punishing more severely non-residents for hunting law violations, sometimes treating residents and non-residents completely differently. None of the cited laws impaired the bearing of arms for self-defense.

31.   The first federal decision to discuss the right to keep and bear arms is a well-known case—though it is not well-known for its relevance to the Second Amendment—*Dred Scott v. Sandford* (1857).  The goal of the suit was to establish that slaves taken into free states were thus free.  But the issue of whether free blacks were citizens, and could therefore sue in the Federal courts, had to be resolved first.[19] To that end, it sought to establish that free blacks were citizens of the United States. Justice Taney, writing for the majority, rejected this position:

---

[18] An Act for the More Effectual Suppression of Drinking Houses and Tippling Shops (1852), https://books.google.com/books?id=AWUoAAAAYAAJ&newbks=1&newbks_redir=0&dq=%22All%20cases%20arising%20under%20this%20act%2C%20whether%20by%20action%20%2C%20complaint%20or%20indictment%20%22&pg=PP5#v=onepage&q=%22All%20cases%20arising%20under%20this%20act,%20whether%20by%20action%20,%20complaint%20or%20indictment%20%22&f=false, last accessed October 20, 2023.

[19] Id.

REBUTTAL DECL. OF CLAYTON CRAMER ISO PLFS' MPI

It would give to persons of the negro race, who were recognized as citizens in any one State of the Union, the right to enter every other State whenever they pleased, singly or in companies, without pass or passport, and without obstruction, to sojourn there as long as they pleased, to go where they pleased at every hour of the day or night without molestation, unless they committed some violation of law for which a white man would be punished; and it would give them the full liberty of speech in public and in private upon all subjects upon which its own citizens might speak; to hold public meetings upon political affairs, and to keep and carry arms wherever they went.  And all of this would be done in the face of the subject race of the same color, both free and slaves, inevitably producing discontent and insubordination among them, and endangering the peace and safety of the State.[20]  [emphasis added]

32.    This shows that a citizen of one state was free to "to enter every other State… and to keep and carry arms wherever they went."

**Rivas Declaration**

33.    Dr. Rivas at ¶17 claims:

Even though nineteenth-century case law generally coalesced around the principle that concealed weapon laws were constitutional, that did not mean that people wishing to openly carry deadly weapons as a form of preemptive self-defense were engaging in what was considered constitutionally protected behavior—or acceptable behavior at all.

34.    Here she is utterly wrong.  While most state supreme courts held that *concealed* carry bans were constitutional under state "right to keep and bear arms" provisions, many recognized a right to open carry.  The Texas Supreme Court upheld a sentence enhancement for killing someone with a Bowie knife and specifically recognized a right to carry one with no apparent distinction between open and concealed carry:

The right to carry a bowie-knife for lawful defence is secured, and must be admitted.  It is an exceedingly destructive weapon.  It is difficult to

---

[20] *Dred Scott* v. *Sandford*, 60 U.S. 393, 417 (1857), https://books.google.com/books?id=50j4udLj9PcC&newbks=1&newbks_redir=0&dq=%22It%20would%20give%20to%20persons%20of%20the%20negro%20race%2C%20who%20were%20recognized%20as%20citizens%20in%20any%20one%20State%20of%20the%20Union%2C%20the%20right%20to%20enter%20every%20other%20State%20%22&pg=PA15#v=onepage&q=%22It%20would%20give%20to%20persons%20of%20the%20negro%20race,%20who%20were%20recognized%20as%20citizens%20in%20any%20one%20State%20of%20the%20Union.%20the%20right%20to%20enter%20every%20other%20State%20%22&f=false, last accessed February 26, 2024.

10

REBUTTAL DECL. OF CLAYTON CRAMER ISO PLFS' MPI

defend against it, by any degree of bravery, or any amount of skill. The gun or pistol may miss its aim, and when discharged, its dangerous character is lost, or diminished at least. The sword may be parried. With these weapons men fight for the sake of the combat, to satisfy the laws of honor, not necessarily with the intention to kill, or with a certainty of killing, when the intention exists. The bowie-knife differs from these in its device and design; it is the instrument of almost certain death. He who carries such a weapon, for lawful defence, as he may, makes himself more dangerous to the rights of others, considering the frailties of human nature, than if he carried a less dangerous weapon.[21] [emphasis added]

35.    Another example comes from the Tennessee Supreme Court:

William Simpson, laborer, on the first day of April,... 1833, with force and arms,... being arrayed in a warlike manner, then and there in a certain public street and highway situate, unlawfully, and to the great terror and disturbance of divers good citizens of the said state, then and there being, an affray did make, in contempt of the laws of the land, to the evil example of all others in the like case offending, and against the peace and dignity of the state.[22]

36.    The Court disputed the relevance of the Statute of Northampton (1328) by pointing to the Tennessee Constitution's arms guarantee:

But suppose it to be assumed on any ground, that our ancestors adopted and brought over with them this English statute, or portion of the common law, our constitution has completely abrogated it; it says, "that the freemen of this state have a right to keep and to bear arms for their common defence." Article 11, sec. 26. It is submitted, that this clause of our constitution fully meets and opposes the passage or clause in Hawkins, of "a man's arming himself with dangerous and unusual weapons," as being an independent ground of affray, so as of itself to constitute the offence cognizable by indictment. By this clause of the constitution, an express power is given and secured to all the free citizens of the state to keep and bear arms for their defence, without any qualification whatever as to their kind or nature; and it is conceived, that it would be going much too far, to impair by construction or abridgment a constitutional privilege which is so declared; neither, after so solemn an instrument hath said the people may carry arms, can we be permitted

---

[21] *Cockrum* v. *State*, 24 Tex. 394, 402, 403 (1859) https://books.google.com/books?id=N-gaAAAAYAAJ&newbks=1&newbks_redir=0&dq=%22The%20right%20to%20carry%20a%20bowie-knife%20for%20lawful%20defence%20is%20secured%22&pg=PA403#v=onepage&q=%22The%20right%20to%20carry%20a%20bowie-knife%20for%20lawful%20defence%20is%20secured%22&f=false, last accessed February 26, 2024.

[22] *Simpson* v. *State*, 5 Yerg. 356, 357 (Tenn. 1833), https://books.google.com/books?id=RFNI4BifGs8C&newbks=1&newbks_redir=0&dq=%22arrayed%20in%20a%20warlike%20manner%2C%20then%20and%20there%20in%20a%20certain%20%22&pg=PA357#v=onepage&q=%22arrayed%20in%20a%20warlike%20manner,%20then%20and%20there%20in%20a%20certain%20%22&f=false, last accessed February 26, 2024.

REBUTTAL DECL. OF CLAYTON CRAMER ISO PLFS' MPI

to impute to the acts thus licensed such a necessarily consequent operation as terror to the people to be incurred thereby; we must attribute to the framers of it the absence of such a view.[23] [emphasis added]

37.    The Alabama Supreme Court upheld a concealed weapon ban but acknowledged that Legislature's powers were not unlimited:

We do not desire to be understood as maintaining, that in regulating the manner of bearing arms, the authority of the Legislature has no other limit than its own discretion. A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional.[24] [emphasis added]

38.    A few years later, the Alabama Supreme Court again recognized the limits of state regulatory authority.

39.    The opinion, written by Chief Justice Rice, used the precedent of *State v. Reid* (1840) to establish:

That section was not designed to destroy the right, guarantied by the constitution to every citizen, "to bear arms in defense of himself and the State"; nor to require them to be so borne, as to render them useless for the purpose of defense.  It is a mere regulation of the manner in which certain weapons are to be borne...[25] [emphasis added]

40.    A North Carolina Supreme Court decision also demonstrates that the right to open carry was constitutionally protected in a case where it might be easy to have taken the other view.[26]

---

[23] *Simpson* v. *State*, 5 Yerg. 359, 360 (Tenn. 1833), https://books.google.com/books?id=RFNI4BifGs8C&newbks=1&newbks_redir=0&dq=%22arrayed%20in%20a%20warlike%20manner%2C%20then%20the re%20in%20a%20certain%20%22&pg=PA360#v=onepage&q=%22But%20suppos e%20it%20to%20be%20assumed%20on%20any%20ground,%20that%20our%20a ncestors%20adopted%20%22&f=false, last accessed February 26, 2024.

[24] *State* v. *Reid*, 1 Ala. 612, 615, 616, 617 (1840), https://books.google.com/books?id=q19MAQAAMAAJ&newbks=1&newbks_redir =0&dq=%22We%20do%20not%20desire%20to%20be%20understood%20as%20m aintaining%2C%20that%20in%20regulating%20the%20manner%20of%20bearing %20%22&pg=PA46#v=onepage&q=%22We%20do%20not%20desire%22&f=false, last accessed February 26, 2024.

[25] *Owen* v. *State*, 31 Ala. 387, 388, 389 (1858), https://books.google.com/books?id=rLwoAQAAMAAJ&newbks=1&newbks_redir =0&dq=%22That%20section%20was%20not%20designed%20to%20destroy%20th e%20right%2C%20guarantied%20by%20the%20constitution%20%22&pg=PA153 #v=onepage&q=%22That%20section%20was%20not%20designed%20to%20destr oy%20the%20right%22&f=false, last accessed February 26, 2024.

[26] State v. Huntley, 25 N.C. 418, 422, 423 (1843), https://casetext.com/case/state-v-huntley-36, last accessed February 26, 2024.

REBUTTAL DECL. OF CLAYTON CRAMER ISO PLFS' MPI

41.    The defendant Huntley had ridden about armed while making deaths threats and one of the targets of Huntley's wrath "showed himself once, but for too short a time to enable him to do so, and that he mistook another man for him, and was very near shooting him."[27]

42.    The North Carolina Supreme Court also held that:

> it is to be remembered that the carrying of a gun per se constitutes no offence.  For any lawful purpose—either of business or amusement—the citizen is at perfect liberty to carry his gun.  It is the wicked purpose—and the mischievous result—which essentially constitute the crime.  He shall not carry about this or any other weapon of death to terrify and alarm, and in such manner as naturally will terrify and alarm, a peaceful people.[28]  [emphasis added]

43.    The Georgia Supreme Court also weighed in when considering an 1837 state law that among its regulations prohibited concealed carry of weapons:

> We are of the opinion, then, that so far as the act of 1837 seeks to suppress the practice of carrying certain weapons secretly, that it is valid, inasmuch as it does not deprive the citizen of his natural right of self-defence, or of his constitutional right to keep and bear arms.  But that so much of it, as contains a prohibition against bearing arms openly, is in conflict with the Constitution, and void...[29]  [emphasis in the original]

44.    In *Stockdale* v. *State* (1861), the Georgia Supreme Court cited *Nunn* v. *State* (1846), and held that "it is impossible for one to have and bear about his person a pistol or weapon of any kind, without having some part of the weapon concealed from view," and that, "To enforce the law, as the Court construed it to the jury, would

---

[27] Id., at 285.
[28] Id. at p.287, https://books.google.com/books?id=DtszAQAAMAAJ&newbks=1&newbks_redir=0&dq=%22it%20is%20to%20be%20remembered%20that%20the%20carrying%20of%20a%20gun%20per%20se%20%22&pg=PA287#v=onepage&q=%22it%20is%20to%20be%20remembered%20that%20the%20carrying%20of%20a%20gun%20%22&f=false last accessed February 26, 2024.
[29] *Nunn* v. *State*, 1 Ga. p.243, 250, 251 (1846), https://books.google.com/books?id=668aAAAAYAAJ&newbks=1&newbks_redir=0&dq=%22We%20are%20of%20the%20opinion%2C%20then%2C%20that%20so%20far%20as%20the%20act%20of%201837%20%22&pg=PA252#v=onepage&q=%22We%20are%20of%20the%20opinion,%20then,%20that%20so%20far%20as%20the%20act%20of%201837%20%22&f=false, last accessed February 26, 2024.

be to prohibit the bearing of those arms altogether, and to bring the act within the decision in Nunn's case."[30]

45.     The Louisiana Supreme Court made a series of decisions recognizing the right to openly carry arms in 1850, 1856, and 1858.  In the first case, *State* v. *Chandler* (1850), Chandler was tried and convicted of manslaughter.  The details of the crime are not contained within the Louisiana Supreme Court's decision, but the weapon appears to have been a Bowie knife.  While Chandler's appeal primarily raised self-defense issues, it was also based on his counsel's request that the jury be told "that to carry weapons, either concealed or openly, is not a crime in the State of Louisiana; that the Constitution which guarantees to the citizen the right to bear arms cannot be restricted by the action of the Legislature."

46.     In the Louisiana Supreme Court's opinion:

> This law became absolutely necessary to counteract a vicious state of society, growing out of the habit of carrying concealed weapons, and to prevent bloodshed and assassinations committed upon unsuspecting persons.  It interfered with no man's right to carry arms (to use its own words), "in full open view," which places men upon an equality.  This is the right guaranteed by the Constitution of the United States, and which is calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassination.[31] [emphasis added]

47.     Six years later, in *Smith* v. *State* (1856), the Louisiana Supreme Court seemingly backtracked from that bold statement.  The defendant, J. T. Smith, was convicted of carrying a concealed weapon, even though the weapon was partially

---

[30] *Stockdale* v. *State*, 32 Ga. 225, 227 (1861).  At first glance, it would seem strange that the *Nunn* decision, based at least partly on the Second Amendment, would still remain a valid precedent, since Georgia by this point had left the United States.  However, the Confederacy had pointedly adopted a Constitution "almost word for word" identical to the United States Constitution.  Forrest McDonald, *A Constitutional History of the United States* 124 (1982).

[31] *State* v. *Chandler*, 5 La. An. 489, 490, 491 (1850), https://books.google.com/books?id=wQ88AAAAIAAJ&newbks=1&newbks_redir=0&dq=%22This%20law%20became%20absolutely%20necessary%20to%20counteract%20a%20vicious%20%22&pg=PA600#v=onepage&q=%22This%20law%20became%20absolutely%20necessary%20to%20counteract%20a%20vicious%20%22&f=false, last accessed February 26, 2024.

REBUTTAL DECL. OF CLAYTON CRAMER ISO PLFS' MPI

exposed.  The defendant attempted to use the Second Amendment as a defense.  The Louisiana Supreme Court's response was:

> The statute against carrying concealed weapons does not contravene the second article of the amendments of the Constitution of the United States.  The arms there spoken of are such as are borne by a people in war, or at least carried openly.  The article explains itself.  It is in these words: "A well regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be infringed."  This was never intended to prevent the individual States from adopting such measures of police as might be necessary, in order to protect the orderly and well disposed citizens from the treacherous use of weapons not even designed for any purpose of public defence, and used most frequently by evil-disposed men who seek an advantage over their antagonists, in the disturbances and breaches of the peace which they are prone to provoke.[32]

48.    This decision recognized open carry as a Constitutionally protected mode in a much looser manner than *State v. Chandler* (1850)—though it still recognized that the Second Amendment was a limitation on state laws that prohibited the open carry of arms.

49.    This decision can be misread as a prohibition on open carry as Dr. Rivas did in ¶19: a partially visible weapon was a violation of the concealed carry law because it was "the result of accident or want of capacity in the pocket to contain, or clothes fully to cover the weapon, and not the extremely unusual case of the carrying of such weapon in full open view, and partially covered by the pocket or clothes."[33]

---

[32] *Smith* v. *State*, 11 La. An. 633, 634 (1856), https://books.google.com/books?id=E3ZFAQAAMAAJ&newbks=1&newbks_redir=0&dq=%22The%20statute%20against%20carrying%20concealed%20weapons%20does%20not%20contravene%20the%20second%20article%20of%20the%20amendments%20of%20the%20Constitution%20of%20the%20United%20States%22&pg=PA633#v=onepage&q=%22The%20statute%20against%20carrying%20concealed%20weapons%20does%20not%20contravene%20the%20second%20article%20of%20the%20amendments%20of%20the%20Constitution%20of%20the%20United%20States%22&f=false, last accessed February 26, 2024.
[33] *State v. Smith*, 11 La.Ann. 633, 634 (1856)., https://books.google.com/books?id=E3ZFAQAAMAAJ&newbks=1&newbks_redir=0&dq=%22the%20result%20of%20accident%20or%20want%20of%20capacity%20in%20the%20pocket%20to%20contain%22&pg=PA633#v=onepage&q=%22the%20result%20of%20accident%20or%20want%20of%20capacity%20in%20the%20pocket%20to%20contain%22&f=false, last accessed February 26, 2024.

REBUTTAL DECL. OF CLAYTON CRAMER ISO PLFS' MPI

What was "extremely unusual" was a "weapon in full open view, and partially covered by the pocket or clothes." [34]

**Vorenberg Declaration**

50.    Vorenberg at ¶7 describes his declaration as having "with a special focus on the period during Reconstruction when the Fourteenth Amendment to the U.S. Constitution was created, ratified, and enforced (1863-1883)."  While his argument that "The 'era of the Fourteenth Amendment" is here defined as the period roughly from 1863 to 1883," would be an interesting assertion for a book about the Fourteenth Amendment and I do not dispute his reasoning for this claim, the *Bruen* decision is very clear that the ending date for the question of what laws have some relevance is the year that the Fourteenth Amendment was ratified.  I would also take exception to his claim:

> In the 1870s, the U.S. Supreme Court began to issue decisions that curtailed the impact of the Fourteenth Amendment, especially its potential for delivering broad civil rights to all Americans. The capstone decision of this nature came in 1883 with the Civil Rights Cases, so I take 1883 as a constitutional endpoint of the era of the Fourteenth Amendment.

51.    Why the *Civil Rights Cases* and not *Plessy* v. *Ferguson* (1896) or any of a number of 20th century cases that curtailed delivery of broad civil rights?  Why not include *McDonald v. Chicago* (2010), which finally incorporated the Second Amendment against the states?  Apparently because he needs the 1868-1883 period to make his argument for restrictive firearms laws, many of which are after 1868.

52.    At ¶25, Vorenberg argues that marriage laws were state-based, not locale-based.  This is definitely news after *Loving* v. *Virginia* (1967).  Rights now recognized under the Bill of Rights are because of the Fourteenth Amendment no longer allows "state-based" laws: among others homosexual sex bans, one man/one woman marriage laws, and so forth.

---

[34] Id.

53.     At ¶28, Vorenberg gives examples of laws before the Fourteenth Amendment that regulated firearms possession and carrying. Vorenberg does not acknowledge that states of the former Confederacy often regulated guns in ways that worked to the detriment of the freedmen and this was one reason for Congress to pass the Fourteenth Amendment.

_____
Clayton Cramer
Declarant

REBUTTAL DECL. OF CLAYTON CRAMER ISO PLFS' MPI

## CERTIFICATE OF SERVICE
### IN THE UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

Case Name: *California Rifle and Pistol Association, et al., v. Los Angeles County Sheriff's Dept., et al.*

Case No.:    8:23-cv-10169-SPG (ADSx)

IT IS HEREBY CERTIFIED THAT:

I, the undersigned, am a citizen of the United States and am at least eighteen years of age. My business address is 180 East Ocean Boulevard, Suite 200, Long Beach, California 90802.

I am not a party to the above-entitled action. I have caused service of:

**REBUTTAL DECLARATION OF CLAYTON CRAMER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

on the following parties, as follows:

Mark R Beckington
Jane E. Reilley
Christina R.B. Lopez, Deputy Attorney General
California Department of Justice
Office of the Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1230
jane.reilley@doj.ca.gov
Christina.Lopez@doj.ca.gov

***Attorney for Defendant Robert Bonta***

Henry Michael Nikogosyan
Ryan M. Chabot
WILMER CUTLER PICKERING HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
mark.selwyn@wilmerhale.com
ryan.chabot@wilmerhale.com

***Attorneys for Defendants Los Angeles County Sheriff's Department and Sheriff Robert Luna***

Bruce A. Lindsay
Monica Choi Arredondo
JONES MAYER
3777 N. Harbor Blvd.
Fullerton, CA  92835
bal@jones-mayer.com
mca@jones-mayer.com

***Attorneys for Defendants La Verne Police Department and La Verne Chief of Police Colleen Flores***

by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

I declare under penalty of perjury that the foregoing is true and correct.

Executed February 28, 2024.

Christina Castron

CERTIFICATE OF SERVICE