1  C. D. Michel – SBN 144258
   cmichel@michellawyers.com
2  Joshua Robert Dale – SBN 209942
   jdale@michellawyers.com
3  Konstadinos T. Moros – SBN 306610
   kmoros@michellawyers.com
4  Alexander A. Frank – SBN 311718
   afrank@michellawyers.com
5  MICHEL & ASSOCIATES, P.C.
   180 E. Ocean Blvd., Suite 200
6  Long Beach, CA 90802
   Telephone: (562) 216-4444
7
8  Donald Kilmer-SBN 179986
   Law Offices of Donald Kilmer, APC
9  14085 Silver Ridge Road
   Caldwell, Idaho 83607
10 Telephone: (408) 264-8489
   Email: Don@DKLawOffice.com
11
   Attorneys for Plaintiffs
12

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED; et al., | CASE NO: 2:23-cv-10169-SPG (ADSx) |
| Plaintiffs, | **PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY AND UPDATE ON PLAINTIFF PERMIT ISSUANCE STATUS** |
| v. | |
| LOS ANGELES COUNTY SHERIFF'S DEPARTMENT; et al., | Judge: Hon. Sherilyn Peace Garnett |
| Defendants. | |

TO THE COURT AND ALL PARTIES AND THEIR COUNSEL OF RECORD:

Plaintiffs previously notified this Court of the Ninth Circuit's ruling in the matter of *United States v. Duarte,* No. 22-50048, 2024 WL 2068016 (9th Cir. May 9, 2024). Plaintiffs write again to notify this Court that *Duarte* will be reheard en banc and the panel ruling has thus been vacated. *See United States v. Duarte*, No. 22-50048, 2024 WL 3443151, at *1 (9th Cir. July 17, 2024).

Though the Court is likely aware already, out of an abundance of caution Plaintiffs also notify this Court of the Supreme Court's ruling in *United States v. Rahimi*. That ruling is attached for this Court's reference.

Finally, given a few months have passed since the hearing on their motion for preliminary injunction, Plaintiffs also would like to update this Court of the status of the individual plaintiffs[1] and declarants who applied for CCW permits with the Los Angeles County Sheriff's Department:

1. Plaintiff Charles Messel, who applied for his permit on July 1, 2022, received it on May 23, 2024.

2. Plaintiff Brian Weimer, who applied for his permit in January of 2023, has not received it, and reports that he has not yet been scheduled for the initial interview.

3. CRPA member Woodrow Stalter, who submitted a declaration in support of Plaintiffs' motion for preliminary injunction, applied for his permit on July 11, 2022. He received his permit on May 23, 2024.

/ / /

/ / /

---

[1] If this Court opts not to dispense with the wait times aspect of this litigation by granting relief in its upcoming ruling on Plaintiffs' motion for preliminary injunction, Plaintiffs intend to seek leave to amend their complaint to remove Plaintiff Messel and add additional plaintiffs who have applied for a permit but are beyond the 120-day time limit of California Penal Code section 26205.

4.  CRPA member Jack Skadsem, who submitted a declaration in support of Plaintiffs' motion for preliminary injunction, applied for his permit on July 8, 2022. He received it on May 23, 2024.

Respectfully submitted,

Dated: July 29, 2024              **MICHEL & ASSOCIATES, P.C.**

*/s/ C.D. Michel*
C.D. Michel
Counsel for Plaintiffs California Rifle & Pistol Association, Inc., Gun Owners of America, Inc., Gun Owners Foundation, Gun Owners of California, Inc., Erick Velasquez, Charles Messel, Brian Weimer, Clarence Rigali, Keith Reeves, Cynthia Gabaldon, and Stephen Hoover

Dated: July 29, 2024              **LAW OFFICES OF DON KILMER**

*/s/ Don Kilmer*
Don Kilmer
Counsel for Plaintiff The Second Amendment Foundation

(Slip Opinion)                OCTOBER TERM, 2023                 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## UNITED STATES *v.* RAHIMI

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 22–915.  Argued November 7, 2023—Decided June 21, 2024

Respondent Zackey Rahimi was indicted under 18 U. S. C. §922(g)(8), a federal statute that prohibits individuals subject to a domestic violence restraining order from possessing a firearm.  A prosecution under Section 922(g)(8) may proceed only if the restraining order meets certain statutory criteria.  In particular, the order must either contain a finding that the defendant "represents a credible threat to the physical safety" of his intimate partner or his or his partner's child, §922(g)(8)(C)(i), or "by its terms explicitly prohibit[ ] the use," attempted use, or threatened use of "physical force" against those individuals, §922(g)(8)(C)(ii).  Rahimi concedes here that the restraining order against him satisfies the statutory criteria, but argues that on its face Section 922(g)(8) violates the Second Amendment.  The District Court denied Rahimi's motion to dismiss the indictment on Second Amendment grounds.  While Rahimi's case was on appeal, the Supreme Court decided *New York State Rifle & Pistol Assn., Inc.* v. *Bruen*, 597 U. S. 1 (2022).  In light of *Bruen*, the Fifth Circuit reversed, concluding that the Government had not shown that Section 922(g)(8) "fits within our Nation's historical tradition of firearm regulation."  61 F. 4th 443, 460 (CA5 2023).

*Held*: When an individual has been found by a court to pose a credible threat to the physical safety of another, that individual may be temporarily disarmed consistent with the Second Amendment.  Pp. 5–17.

(a) Since the Founding, the Nation's firearm laws have included regulations to stop individuals who threaten physical harm to others from misusing firearms.  As applied to the facts here, Section 922(g)(8) fits within this tradition.

The right to keep and bear arms is among the "fundamental rights necessary to our system of ordered liberty."  *McDonald* v. *Chicago*, 561

2                          UNITED STATES *v.* RAHIMI

Syllabus

U. S. 742, 778.  That right, however, "is not unlimited," *District of Co-
lumbia* v. *Heller*, 554 U. S. 570, 626.  The reach of the Second Amend-
ment is not limited only to those arms that were in existence at the
Founding.  *Heller*, 554 U. S., at 582.  Rather, it "extends, prima facie,
to all instruments that constitute bearable arms, even those that were
not [yet] in existence."  *Ibid*.  By that same logic, the Second Amend-
ment permits more than just regulations identical to those existing in
1791.
 Under our precedent, the appropriate analysis involves considering
whether the challenged regulation is consistent with the principles
that underpin the Nation's regulatory tradition.  *Bruen*, 597 U. S., at
26–31.  When firearm regulation is challenged under the Second
Amendment, the Government must show that the restriction "is con-
sistent with the Nation's historical tradition of firearm regulation."
*Bruen*, 597 U. S., at 24.  A court must ascertain whether the new law
is "relevantly similar" to laws that our tradition is understood to per-
mit, "apply[ing] faithfully the balance struck by the founding genera-
tion to modern circumstances."  *Id*., at 29, and n. 7.  Why and how the
regulation burdens the right are central to this inquiry.  As *Bruen* ex-
plained, a challenged regulation that does not precisely match its his-
torical precursors "still may be analogous enough to pass constitu-
tional muster."  *Id*., at 30.  Pp. 5–8.
  (b) Section 922(g)(8) survives Rahimi's challenge.  Pp. 8–17.
    (1) Rahimi's facial challenge to Section 922(g)(8) requires him to
"establish that no set of circumstances exists under which the Act
would be valid."  *United States* v. *Salerno*, 481 U. S. 739, 745.  Here,
Section 922(g)(8) is constitutional as applied to the facts of Rahimi's
own case.  Rahimi has been found by a court to pose a credible threat
to the physical safety of others, see §922(g)(8)(C)(i), and the Govern-
ment offers ample evidence that the Second Amendment permits such
individuals to be disarmed.  P. 8.
    (2) The Court reviewed the history of American gun laws exten-
sively in *Heller* and *Bruen*.  At common law people were barred from
misusing weapons to harm or menace others.  Such conduct was often
addressed through ordinary criminal laws and civil actions, such as
prohibitions on fighting or private suits against individuals who
threatened others.  By the 1700s and early 1800s, though, two distinct
legal regimes had developed that specifically addressed firearms vio-
lence: the surety laws and the "going armed" laws.  Surety laws were
a form of "preventive justice," 4 W. Blackstone, Commentaries on the
Laws of England 251 (10th ed. 1787), which authorized magistrates to
require individuals suspected of future misbehavior to post a bond.  If
an individual failed to post a bond, he would be jailed.  If the individual
did post a bond and then broke the peace, the bond would be forfeit.

Syllabus

Surety laws could be invoked to prevent all forms of violence, including spousal abuse, and also targeted the misuse of firearms.  These laws often offered the accused significant procedural protections.

The "going armed" laws—a particular subset of the ancient common law prohibition on affrays, or fighting in public—provided a mechanism for punishing those who had menaced others with firearms.  Under these laws, individuals were prohibited from "riding or going armed, with dangerous or unusual weapons, [to] terrify[ ] the good people of the land."  4 Blackstone 149.  Those who did so faced forfeiture of their arms and imprisonment.  Prohibitions on going armed were incorporated into American jurisprudence through the common law, and some States expressly codified them.  Pp. 9–13.

(3) Together, the surety and going armed laws confirm what common sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed.  Section 922(g)(8) is not identical to these founding-era regimes, but it does not need to be.  Like the surety and going armed laws, Section 922(g)(8)(C)(i) applies to individuals found by a court to threaten the physical safety of another.  This prohibition is "relevantly similar" to those founding era regimes in both why and how it burdens the Second Amendment right.  *Id*., at 29.  Section 922(g)(8) restricts gun use to check demonstrated threats of physical violence, just as the surety and going armed laws do.  Unlike the regulation struck down in *Bruen*, Section 922(g)(8) does not broadly restrict arms use by the public generally.

The burden that Section 922(g)(8) imposes on the right to bear arms also fits within the Nation's regulatory tradition.  While the Court does not suggest that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse, see *Heller*, 554 U. S., at 626, Section 922(g)(8) applies only once a court has found that the defendant "represents a credible threat to the physical safety" of another, §922(g)(8)(C)(i), which notably matches the similar judicial determinations required in the surety and going armed laws.  Moreover, like surety bonds of limited duration, Section 922(g)(8) only prohibits firearm possession so long as the defendant "is" subject to a restraining order.  Finally, the penalty—another relevant aspect of the burden—also fits within the regulatory tradition.  The going armed laws provided for imprisonment, and if imprisonment was permissible to respond to the use of guns to threaten the physical safety of others, then the lesser restriction of temporary disarmament that Section 922(g)(8) imposes is also permissible.

The Court's decisions in *Heller* and *Bruen* do not help Rahimi.  While Section 922(g)(8) bars individuals subject to restraining orders from

Syllabus

possessing guns in the home, *Heller* never established a categorical rule that the Constitution prohibits regulations that forbid firearm possession in the home. Indeed, *Heller* stated that many such prohibitions, like those on the possession of firearms by "felons and the mentally ill," are "presumptively lawful." *Heller*, 554 U. S., at 626, 627, n. 26. And the Court's conclusion in *Bruen* that regulations like the surety laws are not a proper historical analogue for a broad gun licensing regime does not mean that they cannot be an appropriate analogue for a narrow one. Pp. 13–15.

(4) The Fifth Circuit erred in reading *Bruen* to require a "historical twin" rather than a "historical analogue." 597 U. S., at 30. The panel also misapplied the Court's precedents when evaluating Rahimi's facial challenge. Rather than consider the circumstances in which Section 922(g)(8) was most likely to be constitutional, the panel instead focused on hypothetical scenarios where the provision might raise constitutional concerns. P. 16.

(5) Finally, the Court rejects the Government's contention that Rahimi may be disarmed simply because he is not "responsible." The Court used this term in *Heller* and *Bruen* to describe the class of citizens who undoubtedly enjoy the Second Amendment right. Those decisions, however, did not define the term and said nothing about the status of citizens who were not "responsible." P. 17.

61 F. 4th 443, reversed and remanded.

ROBERTS, C. J., delivered the opinion for the Court, in which ALITO, SOTOMAYOR, KAGAN, GORSUCH, KAVANAUGH, BARRETT, and JACKSON, JJ., joined. SOTOMAYOR, J., filed a concurring opinion, in which KAGAN, J., joined. GORSUCH, J., KAVANAUGH, J., BARRETT, J., and JACKSON, J., filed concurring opinions. THOMAS, J., filed a dissenting opinion.

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the
United States Reports. Readers are requested to notify the Reporter of
Decisions, Supreme Court of the United States, Washington, D. C. 20543,
pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

No. 22–915

UNITED STATES, PETITIONER *v.* ZACKEY RAHIMI

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[June 21, 2024]

CHIEF JUSTICE ROBERTS delivered the opinion of the
Court.

A federal statute prohibits an individual subject to a do-
mestic violence restraining order from possessing a firearm
if that order includes a finding that he "represents a credi-
ble threat to the physical safety of [an] intimate partner,"
or a child of the partner or individual. 18 U. S. C.
§922(g)(8). Respondent Zackey Rahimi is subject to such an
order. The question is whether this provision may be en-
forced against him consistent with the Second Amendment.

## I
### A

In December 2019, Rahimi met his girlfriend, C. M., for
lunch in a parking lot. C. M. is also the mother of Rahimi's
young child, A. R. During the meal, Rahimi and C. M. be-
gan arguing, and Rahimi became enraged. Brief for United
States 2. C. M. attempted to leave, but Rahimi grabbed her
by the wrist, dragged her back to his car, and shoved her in,
causing her to strike her head against the dashboard.
When he realized that a bystander was watching the alter-
cation, Rahimi paused to retrieve a gun from under the pas-

senger seat.  C. M. took advantage of the opportunity to es-
cape.  Rahimi fired as she fled, although it is unclear
whether he was aiming at C. M. or the witness.  Rahimi
later called C. M. and warned that he would shoot her if she
reported the incident.  *Ibid.*

Undeterred by this threat, C. M. went to court to seek a
restraining order.  In the affidavit accompanying her appli-
cation, C. M. recounted the parking lot incident as well as
other assaults.  She also detailed how Rahimi's conduct had
endangered A. R.  Although Rahimi had an opportunity to
contest C. M.'s testimony, he did not do so.  On February 5,
2020, a state court in Tarrant County, Texas, issued a re-
straining order against him.  The order, entered with the
consent of both parties, included a finding that Rahimi had
committed "family violence."  App. 2.  It also found that this
violence was "likely to occur again" and that Rahimi posed
"a credible threat" to the "physical safety" of C. M. or A. R.
*Id.*, at 2–3.  Based on these findings, the order prohibited
Rahimi from threatening C. M. or her family for two years
or contacting C. M. during that period except to discuss
A. R.  *Id.*, at 3–7.  It also suspended Rahimi's gun license
for two years.  *Id.*, at 5–6.  If Rahimi was imprisoned or
confined when the order was set to expire, the order would
instead terminate either one or two years after his release
date, depending on the length of his imprisonment.  *Id.*, at
6–7.

In May, however, Rahimi violated the order by approach-
ing C. M.'s home at night.  He also began contacting her
through several social media accounts.

In November, Rahimi threatened a different woman with
a gun, resulting in a charge for aggravated assault with a
deadly weapon.  And while Rahimi was under arrest for
that assault, the Texas police identified him as the suspect
in a spate of at least five additional shootings.

The first, which occurred in December 2020, arose from
Rahimi's dealing in illegal drugs.  After one of his customers

Opinion of the Court

"started talking trash," Rahimi drove to the man's home and shot into it. Brief for United States 3. While driving the next day, Rahimi collided with another car, exited his vehicle, and proceeded to shoot at the other car. Three days later, he fired his gun in the air while driving through a residential neighborhood. A few weeks after that, Rahimi was speeding on a highway near Arlington, Texas, when a truck flashed its lights at him. Rahimi hit the brakes and cut across traffic to chase the truck. Once off the highway, he fired several times toward the truck and a nearby car before fleeing. Two weeks after that, Rahimi and a friend were dining at a roadside burger restaurant. When the restaurant declined his friend's credit card, Rahimi pulled a gun and shot into the air.

The police obtained a warrant to search Rahimi's residence. There they discovered a pistol, a rifle, ammunition—and a copy of the restraining order.

B

Rahimi was indicted on one count of possessing a firearm while subject to a domestic violence restraining order, in violation of 18 U. S. C. §922(g)(8). At the time, such a violation was punishable by up to 10 years' imprisonment (since amended to 15 years). §924(a)(2); see Bipartisan Safer Communities Act, Pub. L. 117–159, §12004(c)(2), 136 Stat. 1329, 18 U. S. C. §924(a)(8). A prosecution under Section 922(g)(8) may proceed only if three criteria are met. First, the defendant must have received actual notice and an opportunity to be heard before the order was entered. §922(g)(8)(A). Second, the order must prohibit the defendant from either "harassing, stalking, or threatening" his "intimate partner" or his or his partner's child, or "engaging in other conduct that would place [the] partner in reasonable fear of bodily injury" to the partner or child. §922(g)(8)(B). A defendant's "intimate partner[s]" include his spouse or any former spouse, the parent of his child, and

anyone with whom he cohabitates or has cohabitated. §921(a)(32). Third, under Section 922(g)(8)(C), the order must either contain a finding that the defendant "represents a credible threat to the physical safety" of his intimate partner or his or his partner's child, §922(g)(8)(C)(i), or "by its terms explicitly prohibit[ ] the use," attempted use, or threatened use of "physical force" against those individuals, §922(g)(8)(C)(ii).

Rahimi's restraining order met all three criteria. First, Rahimi had received notice and an opportunity to be heard before the order was entered. App. 2. Second, the order prohibited him from communicating with or threatening C. M. *Id.*, at 3–4. Third, the order met the requirements of Section 922(g)(8)(C)(i), because it included a finding that Rahimi represented "a credible threat to the physical safety" of C. M. or her family. *Id.*, at 2–3. The order also "explicitly prohibit[ed]" Rahimi from "the use, attempted use, or threatened use of physical force" against C. M., satisfying the independent basis for liability in Section 922(g)(8)(C)(ii). *Id.*, at 3.

Rahimi moved to dismiss the indictment, arguing that Section 922(g)(8) violated on its face the Second Amendment right to keep and bear arms. No. 4:21–cr–00083 (ND Tex., May 7, 2021), ECF Doc. 17. Concluding that Circuit precedent foreclosed Rahimi's Second Amendment challenge, the District Court denied his motion. Rahimi then pleaded guilty. On appeal, he again raised his Second Amendment challenge. The appeal was denied, and Rahimi petitioned for rehearing en banc.

While Rahimi's petition was pending, this Court decided *New York State Rifle & Pistol Assn., Inc.* v. *Bruen*, 597 U. S. 1 (2022). In *Bruen*, we explained that when a firearm regulation is challenged under the Second Amendment, the Government must show that the restriction "is consistent with the Nation's historical tradition of firearm regulation." *Id.*, at 24.

Opinion of the Court

In light of *Bruen*, the panel withdrew the prior opinion and ordered additional briefing.  A new panel then heard oral argument and reversed.  61 F. 4th 443, 448 (CA5 2023).  Surveying the evidence that the Government had identified, the panel concluded that Section 922(g)(8) does not fit within our tradition of firearm regulation.  *Id*., at 460–461.  Judge Ho wrote separately to express his view that the panel's ruling did not conflict with the interest in protecting people from violent individuals.  *Id*., at 461–462 (concurring opinion).

We granted certiorari. 600 U. S. ___ (2023)

## II

When a restraining order contains a finding that an individual poses a credible threat to the physical safety of an intimate partner, that individual may—consistent with the Second Amendment—be banned from possessing firearms while the order is in effect.  Since the founding, our Nation's firearm laws have included provisions preventing individuals who threaten physical harm to others from misusing firearms.  As applied to the facts of this case, Section 922(g)(8) fits comfortably within this tradition.

### A

We have held that the right to keep and bear arms is among the "fundamental rights necessary to our system of ordered liberty."  *McDonald* v. *Chicago*, 561 U. S. 742, 778 (2010).  Derived from English practice and codified in the Second Amendment, the right secures for Americans a means of self-defense.  *Bruen*, 597 U. S., at 17.  The spark that ignited the American Revolution was struck at Lexington and Concord, when the British governor dispatched soldiers to seize the local farmers' arms and powder stores.  In the aftermath of the Civil War, Congress's desire to enable the newly freed slaves to defend themselves against former Confederates helped inspire the passage of the Fourteenth

Opinion of the Court

Amendment, which secured the right to bear arms against interference by the States. *McDonald*, 561 U. S., at 771–776. As a leading and early proponent of emancipation observed, "Disarm a community and you rob them of the means of defending life. Take away their weapons of defense and you take away the inalienable right of defending liberty." Cong. Globe, 40th Cong., 2d Sess., 1967 (1868) (statement of Rep. Stevens).

"Like most rights," though, "the right secured by the Second Amendment is not unlimited." *District of Columbia* v. *Heller*, 554 U. S. 570, 626 (2008). In *Heller*, this Court held that the right applied to ordinary citizens within the home. Even as we did so, however, we recognized that the right was never thought to sweep indiscriminately. "From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Ibid*. At the founding, the bearing of arms was subject to regulations ranging from rules about firearm storage to restrictions on gun use by drunken New Year's Eve revelers. Act of Mar. 1, 1783, 1783 Mass. Acts and Laws ch.13, pp. 218–219; 5 Colonial Laws of New York ch. 1501, pp. 244–246 (1894). Some jurisdictions banned the carrying of "dangerous and unusual weapons." 554 U. S., at 627 (citing 4 W. Blackstone, Commentaries on the Laws of England 148–149 (1769)). Others forbade carrying concealed firearms. 554 U. S., at 626.

In *Heller*, our inquiry into the scope of the right began with "constitutional text and history." *Bruen*, 597 U. S., at 22. In *Bruen*, we directed courts to examine our "historical tradition of firearm regulation" to help delineate the contours of the right. *Id.*, at 17. We explained that if a challenged regulation fits within that tradition, it is lawful under the Second Amendment. We also clarified that when the Government regulates arms-bearing conduct, as when the Government regulates other constitutional rights, it

Opinion of the Court

bears the burden to "justify its regulation." *Id.*, at 24.

Nevertheless, some courts have misunderstood the methodology of our recent Second Amendment cases. These precedents were not meant to suggest a law trapped in amber. As we explained in *Heller*, for example, the reach of the Second Amendment is not limited only to those arms that were in existence at the founding. 554 U. S., at 582. Rather, it "extends, prima facie, to all instruments that constitute bearable arms, even those that were not [yet] in existence." *Ibid.* By that same logic, the Second Amendment permits more than just those regulations identical to ones that could be found in 1791. Holding otherwise would be as mistaken as applying the protections of the right only to muskets and sabers.

As we explained in *Bruen*, the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition. 597 U. S., at 26–31. A court must ascertain whether the new law is "relevantly similar" to laws that our tradition is understood to permit, "apply[ing] faithfully the balance struck by the founding generation to modern circumstances." *Id.*, at 29, and n. 7. Discerning and developing the law in this way is "a commonplace task for any lawyer or judge." *Id.*, at 28.

Why and how the regulation burdens the right are central to this inquiry. *Id.*, at 29. For example, if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations. Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding. And when a challenged regulation does not precisely match its historical precursors, "it still may be analogous enough to pass constitutional muster." *Id.*, at 30. The law must comport

with the principles underlying the Second Amendment, but it need not be a "dead ringer" or a "historical twin." *Ibid.* (emphasis deleted).[1]

### B

Bearing these principles in mind, we conclude that Section 922(g)(8) survives Rahimi's challenge.

### 1

Rahimi challenges Section 922(g)(8) on its face. This is the "most difficult challenge to mount successfully," because it requires a defendant to "establish that no set of circumstances exists under which the Act would be valid." *United States* v. *Salerno*, 481 U. S. 739, 745 (1987). That means that to prevail, the Government need only demonstrate that Section 922(g)(8) is constitutional in some of its applications. And here the provision is constitutional as applied to the facts of Rahimi's own case.

Recall that Section 922(g)(8) provides two independent bases for liability. Section 922(g)(8)(C)(i) bars an individual from possessing a firearm if his restraining order includes a finding that he poses "a credible threat to the physical safety" of a protected person. Separately, Section 922(g)(8)(C)(ii) bars an individual from possessing a firearm if his restraining order "prohibits the use, attempted use, or threatened use of physical force." Our analysis starts and stops with Section 922(g)(8)(C)(i) because the Government offers ample evidence that the Second Amendment permits the disarmament of individuals who pose a credible threat to the physical safety of others. We need not

_____

[1] We also recognized in *Bruen* the "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." 597 U. S., at 37. We explained that under the circumstances, resolving the dispute was unnecessary to decide the case. *Id.*, at 37–38. The same is true here.

decide whether regulation under Section 922(g)(8)(C)(ii) is also permissible.

2

This Court reviewed the history of American gun laws extensively in *Heller* and *Bruen*.  From the earliest days of the common law, firearm regulations have included provisions barring people from misusing weapons to harm or menace others.  The act of "go[ing] armed to terrify the King's subjects" was recognized at common law as a "great offence." *Sir John Knight's Case*, 3 Mod. 117, 118, 87 Eng. Rep. 75, 76 (K. B. 1686).  Parliament began codifying prohibitions against such conduct as early as the 1200s and 1300s, most notably in the Statute of Northampton of 1328.  *Bruen*, 597 U. S., at 40.  In the aftermath of the Reformation and the English Civil War, Parliament passed further restrictions. The Militia Act of 1662, for example, authorized the King's agents to "seize all Armes in the custody or possession of any person . . . judge[d] dangerous to the Peace of the Kingdome."  14 Car. 2 c. 3, §13 (1662); J. Greenlee, The Historical Justification for Prohibiting Dangerous Persons From Possessing Arms, 20 Wyo. L. Rev. 249, 259 (2020).

The Glorious Revolution cut back on the power of the Crown to disarm its subjects unilaterally.  King James II had "caus[ed] several good Subjects being Protestants to be disarmed at the same Time when Papists were . . . armed." 1 Wm. & Mary c. 2, §6, in 3 Eng. Stat. at Large 440 (1689). By way of rebuke, Parliament adopted the English Bill of Rights, which guaranteed "that the Subjects which are Protestants, may have Arms for their Defence suitable to their Conditions, and as allowed by Law."  §7, *id.*, at 441. But as the document itself memorialized, the principle that arms-bearing was constrained "by Law" remained.  *Ibid.*

Through these centuries, English law had disarmed not only brigands and highwaymen but also political opponents

and disfavored religious groups. By the time of the found-
ing, however, state constitutions and the Second Amend-
ment had largely eliminated governmental authority to dis-
arm political opponents on this side of the Atlantic. See
*Heller*, 554 U. S., at 594–595, 600–603. But regulations tar-
geting individuals who physically threatened others per-
sisted. Such conduct was often addressed through ordinary
criminal laws and civil actions, such as prohibitions on
fighting or private suits against individuals who threatened
others. See 4 W. Blackstone, Commentaries on the Laws of
England 145–146, 149–150 (10th ed. 1787) (Blackstone); 3
*id.*, at 120. By the 1700s and early 1800s, however, two
distinct legal regimes had developed that specifically ad-
dressed firearms violence.

The first were the surety laws. A form of "preventive jus-
tice," these laws derived from the ancient practice of frank-
pledges. 4 *id.*, at 251–253. Reputedly dating to the time of
Canute, the frankpledge system involved compelling adult
men to organize themselves into ten-man "tithing[s]." A.
Lefroy, Anglo-Saxon Period of English Law, Part II, 26 Yale
L. J. 388, 391 (1917). The members of each tithing then
"mutually pledge[d] for each other's good behaviour." 4
Blackstone 252. Should any of the ten break the law, the
remaining nine would be responsible for producing him in
court, or else face punishment in his stead. D. Levinson,
Collective Sanctions, 56 Stan. L. Rev. 345, 358 (2003).

Eventually, the communal frankpledge system evolved
into the individualized surety regime. Under the surety
laws, a magistrate could "oblig[e] those persons, [of] whom
there is a probable ground to suspect of future misbehav-
iour, to stipulate with and to give full assurance . . . that
such offence . . . shall not happen[,] by finding pledges or
securities." 4 Blackstone 251. In other words, the law au-
thorized magistrates to require individuals suspected of fu-
ture misbehavior to post a bond. *Ibid.* If an individual
failed to post a bond, he would be jailed. See, *e.g.*, Mass.

Opinion of the Court

Rev. Stat., ch. 134, §6 (1836).  If the individual did post a
bond and then broke the peace, the bond would be forfeit.  4
Blackstone 253.

Well entrenched in the common law, the surety laws
could be invoked to prevent all forms of violence, including
spousal abuse.  As Blackstone explained, "[w]ives [could]
demand [sureties] against their husbands; or husbands, if
necessary, against their wives."  *Id*., at 254.  These often
took the form of a surety of the peace, meaning that the de-
fendant pledged to "keep the peace."  *Id*., at 252–253; see R.
Bloch, The American Revolution, Wife Beating, and the
Emergent Value of Privacy, 5 Early American Studies 223,
232–233, 234–235 (2007) (Bloch) (discussing peace bonds).
Wives also demanded sureties for good behavior, whereby a
husband pledged to "demean and behave himself well."  4
Blackstone 253; see Bloch 232–233, 234–235, and n. 34.

While communities sometimes resorted to public sham-
ing or vigilante justice to chastise abusers, sureties pro-
vided the public with a more measured solution.  B.
McConville, The Rise of Rough Music, in Riot and Revelry
in Early America 90–100 (W. Pencak, M. Dennis, & S. New-
man eds. 2002).  In one widely reported incident, Susannah
Wyllys Strong, the wife of a Connecticut judge, appeared
before Tapping Reeve in 1790 to make a complaint against
her husband.  K. Ryan, "The Spirit of Contradiction": Wife
Abuse in New England, 1780–1820, 13 Early American
Studies 586, 602 (2015).  Newspapers carried the story in
Connecticut, Massachusetts, and New York.  *Ibid*.  Reeve
ultimately ordered the man to post a bond of £1,000.  *Id*., at
603.

Importantly for this case, the surety laws also targeted
the misuse of firearms.  In 1795, for example, Massachu-
setts enacted a law authorizing justices of the peace to "ar-
rest" all who "go armed offensively [and] require of the of-
fender to find sureties for his keeping the peace."  1795
Mass. Acts ch. 2, in Acts and Resolves of Massachusetts,

12                 UNITED STATES *v.* RAHIMI

Opinion of the Court

1794–1795, ch. 26, pp. 66–67 (1896). Later, Massachusetts
amended its surety laws to be even more specific, authoriz-
ing the imposition of bonds from individuals "[who went]
armed with a dirk, dagger, sword, pistol, or other offensive
and dangerous weapon." Mass. Rev. Stat., ch. 134, §16; see
*ibid.* (marginal note) (referencing the earlier statute). At
least nine other jurisdictions did the same. See *Bruen*, 597
U. S., at 56, and n. 23.

These laws often offered the accused significant proce-
dural protections. Before the accused could be compelled to
post a bond for "go[ing] armed," a complaint had to be made
to a judge or justice of the peace by "any person having rea-
sonable cause to fear" that the accused would do him harm
or breach the peace. Mass. Rev. Stat., ch. 134, §§1, 16. The
magistrate would take evidence, and—if he determined
that cause existed for the charge—summon the accused,
who could respond to the allegations. §§3–4. Bonds could
not be required for more than six months at a time, and an
individual could obtain an exception if he needed his arms
for self-defense or some other legitimate reason. §16.

While the surety laws provided a mechanism for prevent-
ing violence before it occurred, a second regime provided a
mechanism for punishing those who had menaced others
with firearms. These were the "going armed" laws, a par-
ticular subset of the ancient common-law prohibition on af-
frays.

Derived from the French word "affraier," meaning "to ter-
rify," 4 Blackstone 145, the affray laws traced their origin
to the Statute of Northampton, 2 Edw. 3 c. 3 (1328). Alt-
hough the prototypical affray involved fighting in public,
commentators understood affrays to encompass the offense
of "arm[ing]" oneself "to the Terror of the People," T. Bar-
low, The Justice of the Peace: A Treatise 11 (1745). Moreo-
ver, the prohibitions—on fighting and going armed—were
often codified in the same statutes. *E.g.*, 2 Edw. 3 c. 3; Acts
and Laws of His Majesty's Province of New-Hampshire in

Opinion of the Court

New-England 2 (1761).

Whether classified as an affray law or a distinct prohibition, the going armed laws prohibited "riding or going armed, with dangerous or unusual weapons, [to] terrify[] the good people of the land."  4 Blackstone 149 (emphasis deleted).  Such conduct disrupted the "public order" and "le[d] almost necessarily to actual violence."  *State* v. *Huntly*, 25 N. C. 418, 421–422 (1843) (*per curiam*).  Therefore, the law punished these acts with "forfeiture of the arms . . . and imprisonment."  4 Blackstone 149.

In some instances, prohibitions on going armed and affrays were incorporated into American jurisprudence through the common law.  See, *e.g.*, *Huntly*, 25 N. C., at 421–422; *O'Neill* v. *State*, 16 Ala. 65, 67 (1849); *Hickman* v. *State*, 193 Md. App. 238, 253–255, 996 A. 2d 974, 983 (2010) (recognizing that common-law prohibition on fighting in public remains even now chargeable in Maryland).  Moreover, at least four States—Massachusetts, New Hampshire, North Carolina, and Virginia—expressly codified prohibitions on going armed.  1786 Va. Acts ch. 21; 2 Laws of the Commonwealth of Massachusetts from Nov. 28, 1780 to Feb. 28, 1807, pp. 652–653 (1807); Acts and Laws of His Majesty's Province of New-Hampshire in New-England 2 (1761); Collection of All of the Public Acts of Assembly, of the Province of North-Carolina: Now in Force and Use 131 (1751) (1741 statute).

3

Taken together, the surety and going armed laws confirm what common sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed.  Section 922(g)(8) is by no means identical to these founding era regimes, but it does not need to be.  See *Bruen*, 597 U. S., at 30.  Its prohibition on the possession of firearms by those found by a court to present a threat to others fits neatly within the tradition

the surety and going armed laws represent.

Like the surety and going armed laws, Section
922(g)(8)(C)(i) applies to individuals found to threaten the
physical safety of another. This provision is "relevantly
similar" to those founding era regimes in both why and how
it burdens the Second Amendment right. *Id.*, at 29. Section
922(g)(8) restricts gun use to mitigate demonstrated
threats of physical violence, just as the surety and going
armed laws do. Unlike the regulation struck down in
*Bruen*, Section 922(g)(8) does not broadly restrict arms use
by the public generally.

The burden Section 922(g)(8) imposes on the right to bear
arms also fits within our regulatory tradition. While we do
not suggest that the Second Amendment prohibits the en-
actment of laws banning the possession of guns by catego-
ries of persons thought by a legislature to present a special
danger of misuse, see *Heller*, 554 U. S., at 626, we note that
Section 922(g)(8) applies only once a court has found that
the defendant "represents a credible threat to the physical
safety" of another. §922(g)(8)(C)(i). That matches the
surety and going armed laws, which involved judicial deter-
minations of whether a particular defendant likely would
threaten or had threatened another with a weapon.

Moreover, like surety bonds of limited duration, Section
922(g)(8)'s restriction was temporary as applied to Rahimi.
Section 922(g)(8) only prohibits firearm possession so long
as the defendant "is" subject to a restraining order.
§922(g)(8). In Rahimi's case that is one to two years after
his release from prison, according to Tex. Fam. Code Ann.
§85.025(c) (West 2019). App. 6–7.

Finally, the penalty—another relevant aspect of the bur-
den—also fits within the regulatory tradition. The going
armed laws provided for imprisonment, 4 Blackstone 149,
and if imprisonment was permissible to respond to the use
of guns to threaten the physical safety of others, then the
lesser restriction of temporary disarmament that Section

Opinion of the Court

922(g)(8) imposes is also permissible.

Rahimi argues *Heller* requires us to affirm, because Section 922(g)(8) bars individuals subject to restraining orders from possessing guns in the home, and in *Heller* we invalidated an "absolute prohibition of handguns . . . in the home." 554 U. S., at 636; Brief for Respondent 32.  But *Heller* never established a categorical rule that the Constitution prohibits regulations that forbid firearm possession in the home.  In fact, our opinion stated that many such prohibitions, like those on the possession of firearms by "felons and the mentally ill," are "presumptively lawful." 554 U. S., at 626, 627, n. 26.

Our analysis of the surety laws in *Bruen* also does not help Rahimi.  In *Bruen*, we explained that the surety laws were not a proper historical analogue for New York's gun licensing regime. 597 U. S., at 55–60.  What distinguished the regimes, we observed, was that the surety laws "presumed that individuals had a right to . . . carry," whereas New York's law effectively presumed that no citizen had such a right, absent a special need.  *Id.*, at 56 (emphasis deleted).  Section 922(g)(8)(C)(i) does not make the same faulty presumption.  To the contrary, it presumes, like the surety laws before it, that the Second Amendment right may only be burdened once a defendant has been found to pose a credible threat to the physical safety of others.  See *ibid.*

While we also noted that the surety laws applied different penalties than New York's special-need regime, we did so only to emphasize just how severely the State treated the rights of its citizens.  *Id.*, at 57.  But as we have explained, our Nation's tradition of firearm regulation distinguishes citizens who have been found to pose a credible threat to the physical safety of others from those who have not.  The conclusion that focused regulations like the surety laws are not a historical analogue for a broad prohibitory regime like

Opinion of the Court

New York's does not mean that they cannot be an appropriate analogue for a narrow one.

4

In short, we have no trouble concluding that Section 922(g)(8) survives Rahimi's facial challenge. Our tradition of firearm regulation allows the Government to disarm individuals who present a credible threat to the physical safety of others. Section 922(g)(8) can be applied lawfully to Rahimi.

The dissent reaches a contrary conclusion, primarily on the ground that the historical analogues for Section 922(g)(8) are not sufficiently similar to place that provision in our historical tradition. The dissent does, however, acknowledge that Section 922(g)(8) is within that tradition when it comes to the "why" of the appropriate inquiry. The objection is to the "how." See *post*, at 18 (opinion of THOMAS, J.). For the reasons we have set forth, however, we conclude that Section 922(g)(8) satisfies that part of the inquiry as well. See *supra*, at 7, 13–15. As we said in *Bruen*, a "historical *twin*" is not required. 597 U. S., at 30.

For its part, the Fifth Circuit made two errors. First, like the dissent, it read *Bruen* to require a "historical twin" rather than a "historical analogue." *Ibid.* (emphasis deleted). Second, it did not correctly apply our precedents governing facial challenges. 61 F. 4th, at 453. As we have said in other contexts, "[w]hen legislation and the Constitution brush up against each other, [a court's] task is to seek harmony, not to manufacture conflict." *United States* v. *Hansen*, 599 U. S. 762, 781 (2023). Rather than consider the circumstances in which Section 922(g)(8) was most likely to be constitutional, the panel instead focused on hypothetical scenarios where Section 922(g)(8) might raise constitutional concerns. See 61 F. 4th, at 459; *id.*, at 465–467 (Ho, J., concurring). That error left the panel slaying a straw

Opinion of the Court

man.[2]

### 5

Finally, in holding that Section 922(g)(8) is constitutional
as applied to Rahimi, we reject the Government's conten-
tion that Rahimi may be disarmed simply because he is not
"responsible." Brief for United States 6; see Tr. of Oral Arg.
8–11. "Responsible" is a vague term. It is unclear what
such a rule would entail. Nor does such a line derive from
our case law. In *Heller* and *Bruen*, we used the term "re-
sponsible" to describe the class of ordinary citizens who un-
doubtedly enjoy the Second Amendment right. See, *e.g.*,
*Heller*, 554 U. S., at 635; *Bruen*, 597 U. S., at 70. But those
decisions did not define the term and said nothing about the
status of citizens who were not "responsible." The question
was simply not presented.

\*     \*     \*

In *Heller*, *McDonald*, and *Bruen*, this Court did not "un-
dertake an exhaustive historical analysis . . . of the full
scope of the Second Amendment." *Bruen*, 597 U. S., at 31.
Nor do we do so today. Rather, we conclude only this: An
individual found by a court to pose a credible threat to the
physical safety of another may be temporarily disarmed
consistent with the Second Amendment.

The judgment of the Court of Appeals for the Fifth Circuit

————————

[2] Many of the potential faults that the Fifth Circuit identifies in Section
922(g)(8) appear to sound in due process rather than the Second Amend-
ment. *E.g.*, 61 F. 4th, at 459; *id.*, at 465–467 (Ho, J., concurring). As we
have explained, unless these hypothetical faults occur in every case, they
do not justify invalidating Section 922(g)(8) on its face. See *United States*
v. *Salerno*, 481 U. S. 739, 745 (1987) (a facial challenge fails if the law is
constitutional in at least some of its applications). In any event, we need
not address any due process concern here because this challenge was not
litigated as a due process challenge and there is no such claim before us.
See this Court's Rule 14.1(a).

18                    UNITED STATES *v.* RAHIMI

                          Opinion of the Court

is reversed, and the case is remanded for further proceed-
ings consistent with this opinion.

*It is so ordered.*

SOTOMAYOR, J., concurring

# SUPREME COURT OF THE UNITED STATES

————

No. 22–915

————

## UNITED STATES, PETITIONER *v.* ZACKEY RAHIMI

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[June 21, 2024]

JUSTICE SOTOMAYOR, with whom JUSTICE KAGAN joins,
concurring.

Today, the Court applies its decision in *New York State
Rifle & Pistol Assn., Inc.* v. *Bruen*, 597 U. S. 1 (2022), for
the first time. Although I continue to believe that *Bruen*
was wrongly decided, see *id.*, at 83–133 (Breyer, J., joined
by SOTOMAYOR and KAGAN, JJ., dissenting), I join the
Court's opinion applying that precedent to uphold 18
U. S. C. §922(g)(8).

The Court today emphasizes that a challenged regulation
"must comport with the principles underlying the Second
Amendment," but need not have a precise historical match.
*Ante,* at 7–8. I agree. I write separately to highlight why
the Court's interpretation of *Bruen*, and not the dissent's, is
the right one. In short, the Court's interpretation permits
a historical inquiry calibrated to reveal something useful
and transferable to the present day, while the dissent would
make the historical inquiry so exacting as to be useless, a
too-sensitive alarm that sounds whenever a regulation did
not exist in an essentially identical form at the founding.

### I

Even under *Bruen*, this is an easy case. Section 922(g)(8)
prohibits an individual subject to a domestic violence re-
straining order from possessing a firearm, so long as certain
criteria are met. See *ante,* at 3–4. Section 922(g)(8) is

2                 UNITED STATES *v.* RAHIMI

SOTOMAYOR, J., concurring

wholly consistent with the Nation's history and tradition of
firearm regulation.

The Court correctly concludes that "the Second Amend-
ment permits the disarmament of individuals who pose a
credible threat to the physical safety of others." *Ante,* at 8.
That conclusion finds historical support in both the surety
laws, which "provided a mechanism for preventing violence
before it occurred" by requiring an individual who posed a
credible threat of violence to another to post a surety, and
the "going armed" laws, which "provided a mechanism for
punishing those who had menaced others with firearms"
through forfeiture of the arms or imprisonment. *Ante,* at
12. "Taken together, the surety and going armed laws con-
firm what common sense suggests: When an individual
poses a clear threat of physical violence to another, the
threatening individual may be disarmed." *Ante,* at 13. Sec-
tion 922(g)(8)'s prohibition on gun possession for individu-
als subject to domestic violence restraining orders is part of
that "tradition of firearm regulation allow[ing] the Govern-
ment to disarm individuals who present a credible threat to
the physical safety of others," *ante,* at 16, as are the similar
restrictions that have been adopted by 48 States and Terri-
tories, see Brief for United States 34–35, and nn. 22–23 (col-
lecting statutes).

The Court's opinion also clarifies an important methodo-
logical point that bears repeating: Rather than asking
whether a present-day gun regulation has a precise histor-
ical analogue, courts applying *Bruen* should "conside[r]
whether the challenged regulation is consistent with the
*principles* that underpin our regulatory tradition." *Ante,* at
7 (emphasis added); see also *ante,* at 7–8 ("The law must
comport with the principles underlying the Second Amend-
ment, but it need not be a 'dead ringer' or a 'historical twin'"
(quoting *Bruen,* 597 U. S., at 30)). Here, for example,
the Government has not identified a founding-era or
Reconstruction-era law that specifically disarmed domestic

SOTOMAYOR, J., concurring

abusers, see, *e.g.*, Tr. of Oral Arg. 40 (conceding as much),
but it did not need to do so.  Although §922(g)(8) "is by no
means identical" to the surety or going armed laws, *ante*, at
13, it "restricts gun use to mitigate demonstrated threats of
physical violence, just as the surety and going armed laws
d[id]," *ante,* at 14.  That shared principle is sufficient.

## II

The dissent reaches a different conclusion by applying
the strictest possible interpretation of *Bruen*.  It picks off
the Government's historical sources one by one, viewing
any basis for distinction as fatal.  See, *e.g.*, *post*, at 18 (opin-
ion of THOMAS, J.) ("Although surety laws shared a common
justification with §922(g)(8), surety laws imposed a materi-
ally different burden"); *post*, at 25–26 (explaining that
"[a]ffray laws are wide of the mark" because they "expressly
carve out the very conduct §922(g)(8) was designed to pre-
vent (interpersonal violence in the home)").  The dissent
urges a close look "at the historical law's justification as ar-
ticulated during the relevant time period," *post*, at 28, and
a "careful parsing of regulatory burdens" to ensure that
courts do not "stray too far from [history] by eliding mate-
rial differences between historical and modern laws," *post*,
at 15.  The dissent criticizes this Court for adopting a more
"piecemeal approach" that distills principles from a variety
of historical evidence rather than insisting on a precise his-
torical analogue.  *Post*, at 21.

If the dissent's interpretation of *Bruen* were the law, then
*Bruen* really would be the "one-way ratchet" that I and the
other dissenters in that case feared, "disqualify[ing] virtu-
ally any 'representative historical analogue' and mak[ing]
it nearly impossible to sustain common-sense regulations
necessary to our Nation's safety and security." 597 U. S., at
112 (Breyer, J., dissenting).  Thankfully, the Court rejects
that rigid approach to the historical inquiry.  As the Court
puts it today, *Bruen* was "not meant to suggest a law

4                      UNITED STATES *v.* RAHIMI

SOTOMAYOR, J., concurring

trapped in amber." *Ante,* at 7.

   This case lays bare the perils of the dissent's approach. Because the dissent concludes that "§922(g)(8) addresses a societal problem—the risk of interpersonal violence—'that has persisted since the 18th century,'" it insists that the means of addressing that problem cannot be "'materially different'" from the means that existed in the 18th century. *Post*, at 7. That is so, it seems, even when the weapons in question have evolved dramatically. See R. Roth, Why Guns Are and Are Not the Problem, in A Right To Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment 117 (J. Tucker, B. Hacker, & M. Vining eds. 2019) (explaining that guns in the 18th century took a long time to load, typically fired only one shot, and often misfired). According to the dissent, the solution cannot be "materially different" even when societal perception of the problem has changed, and even if it is now clear to everyone that the historical means of addressing the problem had been wholly inadequate. Given the fact that the law at the founding was more likely to protect husbands who abused their spouses than offer some measure of accountability, see, *e.g.*, R. Siegel, "The Rule of Love": Wife Beating as Prerogative and Privacy, 105 Yale L. J. 2117, 2154–2170 (1996), it is no surprise that that generation did not have an equivalent to §922(g)(8). Under the dissent's approach, the legislatures of today would be limited not by a distant generation's determination that such a law was unconstitutional, but by a distant generation's failure to consider that such a law might be necessary. History has a role to play in Second Amendment analysis, but a rigid adherence to history, (particularly history predating the inclusion of women and people of color as full members of the polity), impoverishes constitutional interpretation and hamstrings our democracy.

SOTOMAYOR, J., concurring

### III

The Court today clarifies *Bruen*'s historical inquiry and rejects the dissent's exacting historical test.  I welcome that development.  That being said, I remain troubled by *Bruen*'s myopic focus on history and tradition, which fails to give full consideration to the real and present stakes of the problems facing our society today.  In my view, the Second Amendment allows legislators "to take account of the serious problems posed by gun violence," *Bruen*, 597 U. S., at 91 (Breyer, J., dissenting), not merely by asking what their predecessors at the time of the founding or Reconstruction thought, but by listening to their constituents and crafting new and appropriately tailored solutions.  Under the means-end scrutiny that this Court rejected in *Bruen* but "regularly use[s] . . . in cases involving other constitutional provisions," *id.*, at 106, the constitutionality of §922(g)(8) is even more readily apparent.*

To start, the Government has a compelling interest in keeping firearms out of the hands of domestic abusers.  A woman who lives in a house with a domestic abuser is five times more likely to be murdered if the abuser has access to a gun.  See A. Kivisto & M. Porter, Firearm Use Increases Risk of Multiple Victims in Domestic Homicides, 48 J. Am. Acad. Psychiatry & L. 26 (2020).  With over 70 people shot and killed by an intimate partner each month in the United States, the seriousness of the problem can hardly be overstated.  See Centers for Disease Control and Prevention,

—————————

  *By "means-end scrutiny," I refer to the mode of analysis that would permit courts "to consider the State's interest in preventing gun violence, the effectiveness of the contested law in achieving that interest, the degree to which the law burdens the Second Amendment right, and, if appropriate, any less restrictive alternatives."  *Bruen*, 597 U. S., at 131 (Breyer, J., dissenting).  Prior to *Bruen*, the Courts of Appeals would apply a level of means-end scrutiny "'proportionate to the severity of the burden that the law imposes on the right': strict scrutiny if the burden is severe, and intermediate scrutiny if it is not."  *Id.*, at 103.

6                       UNITED STATES *v.* RAHIMI

WISQARS Nat. Violent Death Reporting System, Violent
Deaths Report 2020, https://wisqars.cdc.gov/nvdrs (show-
ing that 863 people were killed with a firearm by a spouse
or other intimate partner in 2020). Because domestic vio-
lence is rarely confined to the intimate partner that receives
the protective order, the Government's interest extends
even further. In roughly a quarter of cases where an abuser
killed an intimate partner, the abuser also killed someone
else, such as a child, family member, or roommate. See S.
Smith, K. Fowler, & P. Niolon, Intimate Partner Homicide
and Corollary Victims in 16 States: National Violent Death
Reporting System, 2003–2009, 104 Am. J. Pub. Health 461,
463–464 (2014). Moreover, one study found that domestic
disputes were the most dangerous type of call for respond-
ing officers, causing more officer deaths with a firearm than
any other type of call. See N. Breul & M. Keith, Deadly
Calls and Fatal Encounters: Analysis of U. S. Law Enforce-
ment Line of Duty Deaths When Officers Responded to Dis-
patched Calls for Service and Conducted Enforcement,
2010–2014, p. 15 (2016).

While the Second Amendment does not yield automati-
cally to the Government's compelling interest, §922(g)(8) is
tailored to the vital objective of keeping guns out of the
hands of domestic abusers. See *ante,* at 3–4, 14. Section
922(g)(8) should easily pass constitutional muster under
any level of scrutiny.

Although I continue to think that the means-end ap-
proach to Second Amendment analysis is the right one, nei-
ther party asks the Court to reconsider *Bruen* at this time,
and that question would of course involve other considera-
tions than whether *Bruen* was rightly decided. Whether
considered under *Bruen* or under means-end scrutiny,
§922(g)(8) clears the constitutional bar. I join in full the
Court's opinion, which offers a more helpful model than the
dissent for lower courts struggling to apply *Bruen*.

Cite as: 602 U. S. ____ (2024)            1

GORSUCH, J., concurring

# SUPREME COURT OF THE UNITED STATES

_____

No. 22–915

_____

## UNITED STATES, PETITIONER *v.* ZACKEY RAHIMI

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[June 21, 2024]

JUSTICE GORSUCH, concurring.

Mr. Rahimi pursues the "most difficult challenge to
mount successfully": a facial challenge. *United States* v.
*Salerno*, 481 U. S. 739, 745 (1987). He contends that 18
U. S. C. §922(g)(8) violates the Second Amendment "in all
its applications." *Bucklew* v. *Precythe*, 587 U. S. 119, 138
(2019). To prevail, he must show "no set of circumstances"
exists in which that law can be applied without violating
the Second Amendment. *Salerno*, 481 U. S., at 745. I agree
with the Court that he has failed to make that showing.
*Ante*, at 8.

That is not because the Constitution has little to say
about the matter. The Second Amendment protects the
"right of the people to keep and bear Arms." "'[T]ext and
history'" dictate the contours of that right. *Ante*, at 6 (quot-
ing *New York State Rifle & Pistol Assn., Inc.* v. *Bruen*, 597
U. S. 1, 22 (2022)). As this Court has recognized, too, the
Amendment's text "'guarantee[s] the individual right to
possess and carry weapons in case of confrontation.'" *Id.*,
at 32 (quoting *District of Columbia* v. *Heller*, 554 U. S. 570,
592 (2008)). And where that "text covers an individual's
conduct," a law regulating that conduct may be upheld only
if it is "consistent with this Nation's historical tradition of
firearms regulation." 597 U. S., at 17; see *ante*, at 6.

In this case, no one questions that the law Mr. Rahimi
challenges addresses individual conduct covered by the text

of the Second Amendment.  So, in this facial challenge, the
question becomes whether that law, in at least some of its
applications, is consistent with historic firearm regulations.
To prevail, the government need not show that the current
law is a "'dead ringer'" for some historical analogue.  *Ante*,
at 8 (quoting *Bruen*, 597 U. S., at 30).  But the government
must establish that, in at least some of its applications, the
challenged law "impose[s] a comparable burden on the right
of armed self-defense" to that imposed by a historically rec-
ognized regulation.  *Id.*, at 29; see *ante*, at 7.  And it must
show that the burden imposed by the current law "is com-
parably justified."  *Bruen*, 597 U. S., at 29; see *ante*, at 7.

Why do we require those showings?  Through them, we
seek to honor the fact that the Second Amendment "codified
a *pre-existing* right" belonging to the American people, one
that carries the same "scope" today that it was "understood
to have when the people adopted" it.  *Heller*, 554 U. S., at
592, 634–635.  When the people ratified the Second Amend-
ment, they surely understood an arms-bearing citizenry
posed some risks.  But just as surely they believed that the
right protected by the Second Amendment was itself vital
to the preservation of life and liberty.  See, *e.g.*, 1 Black-
stone's Commentaries, Editor's App. 300 (St. George Tucker
ed. 1803) (observing that the Second Amendment may rep-
resent the "palladium of liberty," for "[t]he right of self de-
fence is the first law of nature," and "in most governments[,]
it has been the study of rulers to confine this right within
the narrowest limits"); 3 J. Story, Commentaries on the
Constitution of the United States §1890, p. 746 (1833) ("The
right of the citizens to keep and bear arms has justly been
considered, as the palladium of the liberties of a republic").

We have no authority to question that judgment.  As
judges charged with respecting the people's directions in
the Constitution—directions that are "trapped in amber,"
see *ante*, at 7—our only lawful role is to apply them in the
cases that come before us.  Developments in the world may

change, facts on the ground may evolve, and new laws may
invite new challenges, but the Constitution the people
adopted remains our enduring guide.  *Bruen*, 597 U. S., at
27–28; see, *e.g.*, *United States* v. *Jones*, 565 U. S. 400, 404–
405 (2012); *Caetano* v. *Massachusetts*, 577 U. S. 411, 411–
412 (2016) (*per curiam*).  If changes are to be made to the
Constitution's directions, they must be made by the Ameri-
can people.  Nor is there anything remotely unusual about
any of this.  Routinely, litigants and courts alike must con-
sult history when seeking to discern the meaning and scope
of a constitutional provision.  See *post*, at 6–16
(KAVANAUGH, J., concurring) (offering examples).  And
when doing so, litigants and courts "must exercise care."
See *post*, at 3, n. (BARRETT, J., concurring).

Consider just one example.  We have recognized that the
Sixth Amendment enshrines another pre-existing right:
the right of a defendant to confront his accusers at trial.
*Crawford* v. *Washington*, 541 U. S. 36, 54 (2004).  Just as
here, we have recognized that, in placing this right in the
Constitution, the people set its scope, "admitting only those
exceptions established at the time of the founding."  *Ibid.*
And, just as here, when a party asks us to sustain some
modern exception to the confrontation right, we require
them to point to a close historic analogue to justify it.  See
*Giles* v. *California*, 554 U. S. 353, 358–361 (2008).  Just as
here, too, we have expressly rejected arguments that courts
should proceed differently, such as by trying to glean from
historic exceptions overarching "policies," "'purposes,'" or
"values" to guide them in future cases.  See *id.*, at 374–375
(opinion of Scalia, J.).  We have rejected those paths be-
cause the Constitution enshrines the people's choice to
achieve certain policies, purposes, and values "through very
specific means":  the right of confrontation as originally un-
derstood at the time of the founding.  *Id.*, at 375.  As we
have put it, a court may not "extrapolate" from the Consti-
tution's text and history "the values behind [that right], and

GORSUCH, J., concurring

then . . . enforce its guarantees only to the extent they serve
(in the courts' views) those underlying values." *Ibid.* Pro-
ceeding that way, we have warned, risks handing judges a
license to turn "the guarantee of confrontation" into "no
guarantee at all." *Ibid.* As there, so too here: Courts must
proceed with care in making comparisons to historic fire-
arms regulations, or else they risk gaming away an individ-
ual right the people expressly preserved for themselves in
the Constitution's text.

Proceeding with this well in mind today, the Court rightly
holds that Mr. Rahimi's facial challenge to §922(g)(8) can-
not succeed. It cannot because, through surety laws and
restrictions on "going armed," the people in this country
have understood from the start that the government may
disarm an individual temporarily after a "judicial determi-
natio[n]" that he "likely would threaten or ha[s] threatened
another with a weapon." *Ante*, at 14. And, at least in some
cases, the statute before us works in the same way and does
so for the same reasons: It permits a court to disarm a per-
son only if, after notice and hearing, it finds that he "repre-
sents a credible threat to the physical safety" of others.
§§922(g)(8)(A), (g)(8)(C)(i). A court, too, may disarm an in-
dividual only for so long as its order is in effect. §922(g)(8).
In short, in at least some applications, the challenged law
does not diminish any aspect of the right the Second
Amendment was originally understood to protect. See
*Bruen*, 597 U. S., at 24.

I appreciate that one of our colleagues sees things differ-
ently. *Post*, at 6–7 (THOMAS, J., dissenting). But if reason-
able minds can disagree whether §922(g)(8) is analogous to
past practices originally understood to fall outside the Sec-
ond Amendment's scope, we at least agree that is the only
proper question a court may ask. *Post*, at 5. Discerning
what the original meaning of the Constitution requires in
this or that case may sometimes be difficult. Asking that
question, however, at least keeps judges in their proper

GORSUCH, J., concurring

lane, seeking to honor the supreme law the people have ordained rather than substituting our will for theirs.  And whatever indeterminacy may be associated with seeking to honor the Constitution's original meaning in modern disputes, that path offers surer footing than any other this Court has attempted from time to time.  Come to this Court with arguments from text and history, and we are bound to reason through them as best we can. (As we have today.) Allow judges to reign unbounded by those materials, or permit them to extrapolate their own broad new principles from those sources, and no one can have any idea how they might rule.  (Except the judges themselves.)  Faithful adherence to the Constitution's original meaning may be an imperfect guide, but I can think of no more perfect one for us to follow.

Just consider how lower courts approached the Second Amendment before our decision in *Bruen*.  They reviewed firearm regulations under a two-step test that quickly "devolved" into an interest-balancing inquiry, where courts would weigh a law's burden on the right against the benefits the law offered.  See *Rogers* v. *Grewal*, 590 U. S. ___, ___, and n. 1 (2020) (THOMAS, J., joined by KAVANAUGH, J., dissenting from denial of certiorari) (slip op., at 5, and n. 1); see also, *e.g.*, *Peruta* v. *County of San Diego*, 742 F. 3d 1144, 1167–1168, 1176–1177 (CA9 2014); *Drake* v. *Filko*, 724 F. 3d 426, 457 (CA3 2013) (Hardiman, J., dissenting).  Some judges expressed concern that the prevailing two-step test had become "just window dressing for judicial policymaking."  *Duncan* v. *Bonta*, 19 F. 4th 1087, 1148 (CA9 2021) (en banc) (Bumatay, J., dissenting).  To them, the inquiry worked as a "black box regime" that gave a judge broad license to support policies he "[f]avored" and discard those he disliked.  *Ibid.*  How did the government fare under that regime?  In one circuit, it had an "undefeated, 50–0 record." *Id.*, at 1167, n. 8 (VanDyke, J., dissenting).  In *Bruen*, we rejected that approach for one guided by constitutional text

6                        UNITED STATES *v.* RAHIMI

and history.  597 U. S., at 19.  Perhaps judges' jobs would
be easier if they could simply strike the policy balance they
prefer.  And a principle that the government always wins
surely would be simple for judges to implement.  But either
approach would let judges stray far from the Constitution's
promise.  See *Heller*, 554 U. S., at 634.

   One more point:  Our resolution of Mr. Rahimi's facial
challenge to §922(g)(8) necessarily leaves open the question
whether the statute might be unconstitutional as applied in
"particular circumstances."  *Salerno*, 481 U. S., at 751.  So,
for example, we do not decide today whether the govern-
ment may disarm a person without a judicial finding that
he poses a "credible threat" to another's physical safety.
§922(g)(8)(C)(i); see *ante*, at 8.  We do not resolve whether
the government may disarm an individual permanently.
See *ante*, at 14 (stressing that, "like surety bonds of limited
duration, Section 922(g)(8)'s restriction was temporary as
applied to [Mr.] Rahimi").  We do not determine whether
§922(g)(8) may be constitutionally enforced against a per-
son who uses a firearm in self-defense.  Notably, the surety
laws that inform today's decision allowed even an individ-
ual found to pose a threat to another to "obtain an exception
if he needed his arms for self-defense."  *Ante*, at 12; see also
*post*, at 23 (THOMAS, J., dissenting).  Nor do we purport to
approve in advance other laws denying firearms on a cate-
gorical basis to any group of persons a legislature happens
to deem, as the government puts it, "not 'responsible.'"
*Ante*, at 17 (quoting Brief for United States 6); see Tr. of
Oral Arg. 31–32; see also *post*, at 27 (opinion of THOMAS, J.)
("Not a single Member of the Court adopts the Govern-
ment's theory").

   We do not resolve any of those questions (and perhaps
others like them) because we cannot.  Article III of the Con-
stitution vests in this Court the power to decide only the
"'actual cas[e]'" before us, "'not abstractions.'"  *Public
Workers* v. *Mitchell*, 330 U. S. 75, 89 (1947).  And the case

GORSUCH, J., concurring

before us does not pose the question whether the challenged statute is always lawfully applied, or whether other statutes might be permissible, but only whether this one has *any* lawful scope. Nor should future litigants and courts read any more into our decision than that. As this Court has long recognized, what we say in our opinions must "be taken in connection with the case in which those expressions are used," *Cohens* v. *Virginia*, 6 Wheat. 264, 399 (1821), and may not be "stretch[ed] . . . beyond their context," *Brown* v. *Davenport*, 596 U. S. 118, 141 (2022).

Among all the opinions issued in this case, its central messages should not be lost. The Court reinforces the focus on text, history, and tradition, following exactly the path we described in *Bruen*. *Ante*, at 5–8. And after carefully consulting those materials, the Court "conclude[s] *only* this": "An individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." *Ante*, at 17 (emphasis added). With these observations, I am pleased to concur.

# SUPREME COURT OF THE UNITED STATES

_____

No. 22–915

_____

## UNITED STATES, PETITIONER *v.* ZACKEY RAHIMI

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[June 21, 2024]

JUSTICE KAVANAUGH, concurring.

The Framers of the Constitution and Bill of Rights wisely
sought the best of both worlds: democratic self-government
and the protection of individual rights against excesses of
that form of government.  In justiciable cases, this Court
determines whether a democratically enacted law or other
government action infringes on individual rights
guaranteed by the Constitution.  When performing that
Article III duty, the Court does not implement its own
policy judgments about, for example, free speech or gun
regulation.  Rather, the Court interprets and applies the
Constitution by examining text, pre-ratification and post-
ratification history, and precedent.  The Court's opinion
today does just that, and I join it in full.

The concurring opinions, and the briefs of the parties and
*amici* in this case, raise important questions about judicial
reliance on text, history, and precedent, particularly in
Second Amendment cases.  I add this concurring opinion to
review the proper roles of text, history, and precedent in
constitutional interpretation.

I

The American people established an enduring American
Constitution.  The first and most important rule in
constitutional interpretation is to heed the text—that is,
the actual words of the Constitution—and to interpret that

2                UNITED STATES *v.* RAHIMI

KAVANAUGH, J., concurring

text according to its ordinary meaning as originally understood.  The text of the Constitution is the "Law of the Land."  Art. VI.  As a general matter, the text of the Constitution says what it means and means what it says.  And unless and until it is amended, that text controls.

In many important provisions, the Constitution is a document of majestic specificity with "strikingly clean prose."  A. Amar, America's Constitution xi (2005).  Two Houses of Congress.  A House elected every two years.  Senators serve 6-year terms.  Two Senators per State.  A State's equal suffrage in the Senate may not be changed without the State's consent.  A two-thirds House vote to expel a Member of the House.  The same for the Senate.  Appropriations are made by law.  Bicameralism and presentment.  The Presidential veto.  The Presidential pardon.  The President serves a 4-year term.  A maximum of two elected terms for a President.  The salary of a sitting President may not be increased or decreased.  A vote of a majority of the House and two-thirds of the Senate to remove a President.  The President nominates and the Senate confirms principal executive officers.  One Supreme Court.  Tenure and salary protection for Supreme Court and other federal judges.  Two-thirds of each House of Congress together with three-fourths of the States may amend the Constitution.  Congress meets at noon on January 3rd unless otherwise specified by Congress.  The District of Columbia votes in Presidential elections.  The list goes on.

Those and many other constitutional provisions are relatively clear.  And when the "framers of the Constitution employed words in their natural sense; and where they are plain and clear, resort to collateral aids to interpretation is unnecessary and cannot be indulged in to narrow or enlarge the text."  *McPherson* v. *Blacker*, 146 U. S. 1, 27 (1892).

Of course, some provisions of the Constitution are broadly worded or vague—to put it in Madison's words, "more or

KAVANAUGH, J., concurring

less obscure and equivocal." The Federalist No. 37, p. 229 (C. Rossiter ed. 1961). As Chief Justice Rehnquist explained, the Constitution is in some parts "obviously not a specifically worded document but one couched in general phraseology." W. Rehnquist, The Notion of a Living Constitution, 54 Texas L. Rev. 693, 697 (1976).

That is especially true with respect to the broadly worded or vague individual-rights provisions. (I will use the terms "broadly worded" and "vague" interchangeably in this opinion.) For example, the First Amendment provides that "Congress shall make no law" "abridging the freedom of speech." And the Second Amendment, at issue here, guarantees that "the right of the people to keep and bear Arms" "shall not be infringed."

Read literally, those Amendments might seem to grant *absolute* protection, meaning that the government could never regulate speech or guns in any way. But American law has long recognized, as a matter of original understanding and original meaning, that constitutional rights generally come with exceptions.

With respect to the First Amendment, for example, this Court's "jurisprudence over the past 216"—now 233—"years has rejected an absolutist interpretation." *Federal Election Comm'n* v. *Wisconsin Right to Life, Inc.*, 551 U. S. 449, 482 (2007) (opinion of ROBERTS, C. J.); see R. Bork, Neutral Principles and Some First Amendment Problems, 47 Ind. L. J. 1, 21–22 (1971). From 1791 to the present, "the First Amendment has permitted restrictions upon the content of speech in a few limited areas"—including obscenity, defamation, fraud, and incitement. *United States* v. *Stevens*, 559 U. S. 460, 468 (2010) (quotation marks omitted). So too with respect to the Second Amendment: "Like most rights, the right secured by the Second Amendment is not unlimited"; it is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *District of*

KAVANAUGH, J., concurring

*Columbia* v. *Heller*, 554 U. S. 570, 626 (2008).

## II

A recurring and difficult issue for judges, therefore, is how to interpret vague constitutional text. That issue often arises (as here) in the context of determining exceptions to textually guaranteed individual rights. To what extent does the Constitution allow the government to regulate speech or guns, for example?[1]

In many cases, judicial precedent informs or controls the answer (more on that later). But absent precedent, there are really only two potential answers to the question of how to determine exceptions to broadly worded constitutional rights: history or policy.

Generally speaking, the historical approach examines the laws, practices, and understandings from before and after ratification that may help the interpreter discern the meaning of the constitutional text and the principles embodied in that text. The policy approach rests on the philosophical or policy dispositions of the individual judge.

History, not policy, is the proper guide.

For more than 200 years, this Court has relied on history when construing vague constitutional text in all manner of constitutional disputes. For good reason. History can supply evidence of the original meaning of vague text. History is far less subjective than policy. And reliance on history is more consistent with the properly neutral judicial

––––––––––

[1] There are two ways to frame this point—either (i) determining the exceptions to a constitutional right or (ii) determining the affirmative scope or contours of that constitutional right. Either way, the analysis is the same—does the constitutional provision, as originally understood, permit the challenged law? This opinion uses the term "exceptions," which underscores that the constitutional baseline is protection of the textually enumerated right. See *Federal Election Comm'n* v. *Wisconsin Right to Life, Inc.*, 551 U. S. 449, 482 (2007) (opinion of ROBERTS, C. J.) (stating in a First Amendment case that "it is worth recalling the language we are applying").

KAVANAUGH, J., concurring

role than an approach where judges subtly (or not so subtly) impose their own policy views on the American people.

Judges are like umpires, as THE CHIEF JUSTICE has aptly explained. And in a constitutional system that counts on an independent Judiciary, judges must act like umpires. To be an umpire, the judge "must stick close to the text and the history, and their fair implications," because there "is no principled way" for a neutral judge "to prefer any claimed human value to any other." R. Bork, Neutral Principles and Some First Amendment Problems, 47 Ind. L. J. 1, 8 (1971). History establishes a "criterion that is conceptually quite separate from the preferences of the judge himself." A. Scalia, Originalism: The Lesser Evil, 57 U. Cin. L. Rev. 849, 864 (1989). When properly applied, history helps ensure that judges do not simply create constitutional meaning "out of whole cloth." A. Scalia, The Rule of Law as a Law of Rules, 56 U. Chi. L. Rev. 1175, 1183 (1989).[2]

Absent precedent, therefore, history guides the interpretation of vague constitutional text. Of course, this Court has been deciding constitutional cases for about 230 years, so relevant precedent often exists. As the Court's opinions over time amply demonstrate, precedent matters a great deal in constitutional interpretation.

I now turn to explaining how courts apply pre-ratification

———————

[2] The historical approach applies when the text is vague. But the text of the Constitution always controls. So history contrary to clear text is not to be followed. See, *e.g.*, *INS* v. *Chadha*, 462 U. S. 919, 945–959 (1983); *Powell* v. *McCormack*, 395 U. S. 486, 546–547 (1969); *Brown* v. *Board of Education*, 347 U. S. 483, 490–495, and n. 5 (1954); cf. Sedition Act of 1798, ch. 74, 1 Stat. 596. In some cases, there may be debate about whether the relevant text is sufficiently clear to override contrary historical practices. See, *e.g.*, *NLRB* v. *Noel Canning*, 573 U. S. 513, 613 (2014) (Scalia, J., concurring in judgment) ("What the majority needs to sustain its judgment is an ambiguous text and a clear historical practice. What it has is a clear text and an at-best-ambiguous historical practice"). The basic principle remains: Text controls over contrary historical practices.

history, post-ratification history, and precedent when analyzing vague constitutional text.

A

*Pre-ratification history.* When interpreting vague constitutional text, the Court typically scrutinizes the stated intentions and understandings of the Framers and Ratifiers of the Constitution (or, as relevant, the Amendments). The Court also looks to the understandings of the American people from the pertinent ratification era. Those intentions and understandings do not necessarily determine meaning, but they may be strong evidence of meaning. See generally, *e.g.*, The Federalist (C. Rossiter ed. 1961); Records of the Federal Convention of 1787 (M. Farrand ed. 1911); Debates on the Federal Constitution (J. Elliot ed. 1836).

Especially for the original Constitution and the Bill of Rights, the Court also examines the pre-ratification history in the American Colonies, including pre-ratification laws and practices. And the Court pays particular attention to the historical laws and practices in the United States from Independence in 1776 until ratification in 1788 or 1791. Pre-ratification American history can shed light on constitutional meaning in various ways.

For example, some provisions of the Constitution use language that appeared in the Articles of Confederation or state constitutional provisions. And when the language that appeared in the Articles of Confederation or in state constitutions is the same as or similar to the language in the U. S. Constitution, the history of how people understood the language in the Articles or state constitutions can inform interpretation of that language in the U. S. Constitution. See, *e.g.*, *Moore* v. *Harper*, 600 U. S. 1, 33 (2023) (the "Framers did not write the Elections Clause on a blank slate—they instead borrowed from the Articles of Confederation" as evidenced by their use of "closely

parallel" language); *District of Columbia* v. *Heller*, 554 U. S. 570, 600–601 (2008) ("Our interpretation is confirmed by analogous arms-bearing rights in state constitutions that preceded and immediately followed adoption of the Second Amendment"); *United States Steel Corp.* v. *Multistate Tax Comm'n*, 434 U. S. 452, 460, and n. 10 (1978) ("The history of interstate agreements under the Articles of Confederation suggests the same distinction between 'treaties, alliances, and confederations' on the one hand, and 'agreements and compacts' on the other," as the distinction made in the Constitution's Treaty and Compact Clauses).

Similarly, other pre-ratification national or state laws and practices may sometimes help an interpreter discern the meaning of particular constitutional provisions. Those pre-ratification American laws and practices formed part of the foundation on which the Framers constructed the Constitution and Bill of Rights. Indeed, the Constitution did not displace but largely co-exists with state constitutions and state laws, except to the extent they conflict with federal law. See Art. VI.

On the other hand, some pre-ratification history can be probative of what the Constitution does *not* mean. The Framers drafted and approved many provisions of the Constitution precisely to depart from rather than adhere to certain pre-ratification laws, practices, or understandings.

For example, the "defects" of the Articles of Confederation inspired some of the key decisions made by the Framers in Philadelphia and by the First Congress in drafting the Bill of Rights. The Federalist No. 37, at 224 (J. Madison); see, *e.g.*, *id.*, at 226 ("the existing Confederation is founded on principles which are fallacious; that we must consequently change this first foundation, and with it the superstructure resting upon it"); *PennEast Pipeline Co.* v. *New Jersey*, 594 U. S. 482, 508 (2021) ("When the Framers met in Philadelphia in the summer of 1787, they sought to create

8                    UNITED STATES *v.* RAHIMI

a cohesive national sovereign in response to the failings of the Articles of Confederation"); *Sosa* v. *Alvarez-Machain*, 542 U. S. 692, 716–717 (2004) ("The Continental Congress was hamstrung by its inability to 'cause infractions of treaties, or of the law of nations to be punished,'" and the "Framers responded by vesting the Supreme Court with original jurisdiction over 'all Cases affecting Ambassadors, other public ministers and Consuls,' and the First Congress followed through" (citation omitted)); *U. S. Term Limits, Inc.* v. *Thornton*, 514 U. S. 779, 803 (1995) ("After the Constitutional Convention convened, the Framers were presented with, and eventually adopted a variation of, a plan not merely to amend the Articles of Confederation but to create an entirely new National Government with a National Executive, National Judiciary, and a National Legislature" (quotation marks omitted)).

The pre-ratification history of America's many objections to British laws and the system of oppressive British rule over the Colonies—identified most prominently in the Declaration of Independence—can likewise inform interpretation of some of the crucial provisions of the original Constitution and Bill of Rights. Compare Declaration of Independence ¶11 (under British rule, the King "made Judges dependent on his Will alone, for the tenure of their offices, and the amount and payment of their salaries") with U. S. Const., Art. III, §1 ("The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office"); see, *e.g.*, The Federalist No. 37, at 226 ("The most that the convention could do" "was to avoid the errors suggested by the past experience of other countries, as well as of our own"); 1 Annals of Cong. 436 (1789) (J. Madison) ("The freedom of the press and rights of conscience, those choicest privileges of the people, are unguarded in the British

KAVANAUGH, J., concurring

Constitution").

This Court has recognized, for example, that no "purpose in ratifying the Bill of Rights was clearer than that of securing for the people of the United States much greater freedom of religion, expression, assembly, and petition than the people of Great Britain had ever enjoyed." *Bridges* v. *California*, 314 U. S. 252, 265 (1941). Ratified as it was "while the memory of many oppressive English restrictions on the enumerated liberties was still fresh," the Bill of Rights "cannot reasonably be taken as approving prevalent English practices." *Ibid.*; see, *e.g.*, *Hosanna-Tabor Evangelical Lutheran Church and School* v. *EEOC*, 565 U. S. 171, 183 (2012) ("Familiar with life under the established Church of England, the founding generation sought to foreclose the possibility of a national church" through the First Amendment's Establishment Clause); *Powell* v. *Alabama*, 287 U. S. 45, 60 (1932) (right to counsel under the Sixth Amendment reflected America's rejection of the English common law rule that a "person charged with treason or felony was denied the aid of counsel").[3]

---

[3]To be sure, as the Court's cases reveal, pre-ratification English law and practices may supply background for some constitutional provisions. But the Constitution, including the Bill of Rights, did not purport to take English law or history wholesale and silently download it into the U. S. Constitution. See, *e.g.*, *Harmelin* v. *Michigan*, 501 U. S. 957, 975 (1991) (opinion of Scalia, J.) ("Unless one accepts the notion of a blind incorporation, however, the ultimate question is not what 'cruell and unusuall punishments' meant in the [English] Declaration of Rights, but what its meaning was to the Americans who adopted the Eighth Amendment"). Therefore, reflexively resorting to English law or history without careful analysis can sometimes be problematic because America had fought a war—and would soon fight another in 1812—to free itself from British law and practices and rid itself of tyrannical British rule. See The Federalist No. 45, p. 289 (C. Rossiter ed. 1961) (J. Madison) ("Was, then, the American Revolution effected, was the American Confederacy formed, was the precious blood of thousands spilt, and the hard-earned substance of millions lavished, not that the people of America should enjoy peace, liberty, and safety," but that they should

KAVANAUGH, J., concurring

The Equal Protection Clause provides another example. Ratified in 1868, that Clause sought to reject the Nation's history of racial discrimination, not to backdoor incorporate racially discriminatory and oppressive historical practices and laws into the Constitution. See generally *Flowers* v. *Mississippi*, 588 U. S. 284 (2019); *Batson* v. *Kentucky*, 476 U. S. 79 (1986); *Loving* v. *Virginia*, 388 U. S. 1 (1967); *Brown* v. *Board of Education*, 347 U. S. 483 (1954).

In short, pre-ratification American history—that is, pre-ratification laws, practices, and understandings—can inform interpretation of vague constitutional provisions in the original Constitution and Bill of Rights. The same principle of looking to relevant pre-ratification history applies when interpreting broadly worded language in the later amendments, including the Fourteenth Amendment ratified in 1868. But in using pre-ratification history, courts must exercise care to rely only on the history that the Constitution actually incorporated and not on the history that the Constitution left behind.

B

*Post-ratification history.* As the Framers made clear, and as this Court has stated time and again for more than two centuries, post-ratification history—sometimes referred to as tradition—can also be important for interpreting vague constitutional text and determining exceptions to individual constitutional rights. When the text is vague and the pre-ratification history is elusive or inconclusive, post-ratification history becomes especially important. Indeed, absent precedent, there can be little else to guide a judge deciding a constitutional case in that situation, unless the judge simply defaults to his or her own policy preferences.

After ratification, the National Government and the state

————————
continue to be subject to the "impious doctrine in the old world, that the people were made for kings, not kings for the people"?).

governments began interpreting and applying the Constitution's text.  They have continued to do so ever since.  As the national and state governments over time have enacted laws and implemented practices to promote the general welfare, those laws and practices have often reflected and reinforced common understandings of the Constitution's authorizations and limitations.

Post-ratification interpretations and applications by government actors—at least when reasonably consistent and longstanding—can be probative of the meaning of vague constitutional text.  The collective understanding of Americans who, over time, have interpreted and applied the broadly worded constitutional text can provide good guidance for a judge who is trying to interpret that same text decades or centuries later.  See, *e.g.*, *Republican Party of Minn.* v. *White*, 536 U. S. 765, 785 (2002) (a "universal and long-established tradition of prohibiting certain conduct creates a strong presumption that the prohibition is constitutional" (quotation marks omitted)); *United States* v. *Midwest Oil Co.*, 236 U. S. 459, 472–473 (1915) ("officers, law-makers and citizens naturally adjust themselves to any long-continued action" of the government "on the presumption that" unconstitutional "acts would not have been allowed to be so often repeated as to crystallize into a regular practice"); *McPherson* v. *Blacker*, 146 U. S. 1, 27 (1892) (when constitutional text is vague, "contemporaneous and subsequent practical construction are entitled to the greatest weight").[4]

─────────

[4] Post-ratification history is sometimes also referred to as tradition, liquidation, or historical gloss.  Those concepts are probably not identical in all respects.  In any event, in applying those concepts in constitutional interpretation, some important questions can arise, such as: (i) the level of generality at which to define a historical practice; (ii) how widespread a historical practice must have been; (iii) how long ago it must have started; and (iv) how long it must have endured.

Although this Court's constitutional precedents routinely rely on post-ratification history, those precedents do not supply a one-size-fits-all

12                       UNITED STATES *v.* RAHIMI

KAVANAUGH, J., concurring

Importantly, the Framers themselves intended that post-ratification history would shed light on the meaning of vague constitutional text. They understood that some constitutional text may be "more or less obscure and equivocal" such that questions "daily occur in the course of practice." The Federalist No. 37, at 228–229. Madison explained that the meaning of vague text would be "liquidated and ascertained by a series of particular discussions and adjudications." *Id.*, at 229. In other words, Madison articulated the Framers' expectation and intent that post-ratification history would be a proper and important tool to help constitutional interpreters determine the meaning of vague constitutional text.

From early on, this Court followed Madison's lead. In 1819, in one of its most important decisions ever, the Court addressed the scope of Article I's Necessary and Proper Clause. *McCulloch* v. *Maryland*, 4 Wheat. 316 (1819). Writing for the Court, Chief Justice Marshall invoked post-ratification history to conclude that Congress's authority to establish a national bank could "scarcely be considered as an open question." *Id.*, at 401. The constitutionality of the

———————

answer to those various methodological questions. See, *e.g.*, *Noel Canning*, 573 U. S., at 522–556; *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 610–611 (1952) (Frankfurter, J., concurring).

And I will not attempt to answer all of those questions here. Respected scholars are continuing to undertake careful analysis. See generally J. Alicea, Practice-Based Constitutional Theories, 133 Yale L. J. 568 (2023); R. Barnett & L. Solum, Originalism After *Dobbs*, *Bruen*, and *Kennedy*: The Role of History and Tradition, 118 Nw. U. L. Rev. 433 (2023); M. DeGirolami, Traditionalism Rising, 24 J. Contemp. Legal Issues 9 (2023); S. Girgis, Living Traditionalism, 98 N. Y. U. L. Rev. 1477 (2023); W. Baude, Constitutional Liquidation, 71 Stan. L. Rev. 1 (2019); C. Bradley, Doing Gloss, 84 U. Chi. L. Rev. 59 (2017); C. Bradley & T. Morrison, Historical Gloss and the Separation of Powers, 126 Harv. L. Rev. 411 (2012); A. Amar, America's Constitution (2005); C. Nelson, Originalism and Interpretive Conventions, 70 U. Chi. L. Rev. 519 (2003); M. McConnell, Tradition and Constitutionalism Before the Constitution, 1998 U. Ill. L. Rev. 173.

national bank had "been recognised by many successive
legislatures," and an "exposition of the constitution,
deliberately established by legislative acts, on the faith of
which an immense property has been advanced, ought not
to be lightly disregarded." *Ibid.* Marshall added:  The
"respective powers of those who are equally the
representatives of the people, are to be adjusted; if not put
at rest by the practice of the government, ought to receive a
considerable impression from that practice." *Ibid.*

In relying on post-ratification history as a proper tool to
discern constitutional meaning, Madison and Marshall
make for a formidable duo.  Moving from distant American
history to more recent times, one can add Justice Scalia.
Throughout his consequential 30-year tenure on this Court,
Justice Scalia repeatedly emphasized that constitutional
interpretation must take account of text, pre-ratification
history, and post-ratification history—the last of which he
often referred to as "tradition."  In his words, when judges
interpret vague or broadly worded constitutional text, the
"traditions of our people" are "paramount." *McDonald* v.
*Chicago*, 561 U. S. 742, 792 (2010) (Scalia, J., concurring).
Constitutional interpretation should reflect "the principles
adhered to, over time, by the American people, rather than
those favored by the personal (and necessarily shifting)
philosophical dispositions of a majority of this Court."
*Rutan* v. *Republican Party of Ill.*, 497 U. S. 62, 96 (1990)
(Scalia, J., dissenting).

The U. S. Reports are well stocked with Scalia opinions
looking to post-ratification history and tradition.[5]  In *Heller*,

—————

[5] Justice Scalia's opinions "made extensive use of post-ratification
history," and "his assessment of post-ratification history" in those
opinions extended "far beyond the time of enactment."  M. Ramsey,
Beyond the Text: Justice Scalia's Originalism in Practice, 92 Notre Dame
L. Rev. 1945, 1957, 1960 (2017). Justice Scalia did not necessarily "use[]
tradition as an independent source of interpretive authority; rather, he
had a very broad view of what traditions might be indicative of original

Justice Scalia wrote for the Court that "a critical tool of constitutional interpretation" is "the examination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period after its enactment or ratification." 554 U. S., at 605 (emphasis in original); see also *ibid.* ("We now address how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century").

*Heller* echoed years of earlier Scalia opinions. To take one: "Where the meaning of a constitutional text (such as 'the freedom of speech') is unclear, the widespread and long-accepted practices of the American people are the best indication of what fundamental beliefs it was intended to enshrine." *McIntyre* v. *Ohio Elections Comm'n*, 514 U. S. 334, 378 (1995) (Scalia, J., dissenting). Or another: A "venerable and accepted tradition is not to be laid on the

———————
meaning." *Id.*, at 1962, n. 79; see, *e.g.*, *NLRB* v. *Noel Canning*, 573 U. S. 513, 584–593, 602–615 (2014) (Scalia, J., concurring in judgment); *District of Columbia* v. *Heller*, 554 U. S. 570, 605–619, 626–628 (2008); *McCreary County* v. *American Civil Liberties Union of Ky.*, 545 U. S. 844, 886–900 (2005) (Scalia, J., dissenting); *Hamdi* v. *Rumsfeld*, 542 U. S. 507, 558–563 (2004) (Scalia, J., dissenting); *Crawford* v. *Washington*, 541 U. S. 36, 47–50 (2004); *Mitchell* v. *United States*, 526 U. S. 314, 334–336, and n. 1 (1999) (Scalia, J., dissenting); *Department of Commerce* v. *United States House of Representatives*, 525 U. S. 316, 347–349 (1999) (Scalia, J., concurring in part); *Clinton* v. *City of New York*, 524 U. S. 417, 465–469 (1998) (Scalia, J., concurring in part and dissenting in part); *Printz* v. *United States*, 521 U. S. 898, 905–918 (1997); *United States* v. *Gaudin*, 515 U. S. 506, 515–519 (1995); *McIntyre* v. *Ohio Elections Comm'n*, 514 U. S. 334, 375–378, and nn. 1–2 (1995) (Scalia, J., dissenting); *Plaut* v. *Spendthrift Farm, Inc.*, 514 U. S. 211, 223–225 (1995); *Board of Ed. of Kiryas Joel Village School Dist.* v. *Grumet*, 512 U. S. 687, 732, 744 (1994) (Scalia, J., dissenting); *Herrera* v. *Collins*, 506 U. S. 390, 427–428 (1993) (Scalia, J., concurring); *Richmond* v. *Lewis*, 506 U. S. 40, 54 (1992) (Scalia, J., dissenting); *Harmelin* v. *Michigan*, 501 U. S. 957, 979–985 (1991) (opinion of Scalia, J.); *Rutan* v. *Republican Party of Ill.*, 497 U. S. 62, 95–97 (1990) (Scalia, J., dissenting); *McKoy* v. *North Carolina*, 494 U. S. 433, 466, 471 (1990) (Scalia, J., dissenting); *Holland* v. *Illinois*, 493 U. S. 474, 481–482, and n. 1 (1990).

examining table and scrutinized for its conformity to some
abstract principle" of "adjudication devised by this Court.
To the contrary, such traditions are themselves the stuff out
of which the Court's principles are to be formed. They are,
in these uncertain areas, the very points of reference by
which the legitimacy or illegitimacy of *other* practices is to
be figured out." *Rutan*, 497 U. S., at 95–96 (Scalia, J.,
dissenting) (emphasis in original).

As leading actors and theorists in the earliest and latest
chapters of the American constitutional story, Madison,
Marshall, and Scalia made clear that courts should look to
post-ratification history as well as pre-ratification history
to interpret vague constitutional text.

For more than two centuries—from the early 1800s to
this case—this Court has done just that. The Court has
repeatedly employed post-ratification history to determine
the meaning of vague constitutional text. Reliance on post-
ratification history "has shaped scores of Court cases
spanning all domains of constitutional law, every era of the
nation's history, and Justices of every stripe." S. Girgis,
Living Traditionalism, 98 N. Y. U. L. Rev. 1477, 1480
(2023); see, *e.g.*, *Consumer Financial Protection Bureau* v.
*Community Financial Services Assn. of America, Ltd.*, 601
U. S. 416, 441–445 (2024) (KAGAN, J., concurring); *Trump*
v. *Anderson*, 601 U. S. 100, 113–115 (2024) (*per curiam*);
*Moore* v. *Harper*, 600 U. S. 1, 22, 32–34 (2023); *Kennedy* v.
*Bremerton School Dist.*, 597 U. S. 507, 535–536, 540–541,
and n. 6 (2022); *New York State Rifle & Pistol Assn., Inc.* v.
*Bruen*, 597 U. S. 1, 35–37, 50–70 (2022); *City of Austin* v.
*Reagan Nat. Advertising of Austin, LLC*, 596 U. S. 61, 75
(2022); *Houston Community College System* v. *Wilson*, 595
U. S. 468, 474–477 (2022); *PennEast Pipeline Co.* v. *New
Jersey*, 594 U. S. 482, 494–497, 508 (2021); *TransUnion
LLC* v. *Ramirez*, 594 U. S. 413, 424–425, 432–434 (2021);
*Torres* v. *Madrid*, 592 U. S. 306, 314 (2021); *Trump* v.
*Mazars USA, LLP*, 591 U. S. 848, 858–862 (2020); *Chiafalo*

16                    UNITED STATES *v.* RAHIMI

KAVANAUGH, J., concurring

v. *Washington*, 591 U. S. 578, 592–597 (2020); *American Legion* v. *American Humanist Assn.*, 588 U. S. 29, 58–66 (2019); *Zivotofsky* v. *Kerry*, 576 U. S. 1, 15–17, 23–28 (2015); *Town of Greece* v. *Galloway*, 572 U. S. 565, 575–579 (2014); *District of Columbia* v. *Heller*, 554 U. S. 570, 605–619, 626–628 (2008); *Crawford* v. *Washington*, 541 U. S. 36, 47–50 (2004); *Apprendi* v. *New Jersey*, 530 U. S. 466, 481–483, and n. 10 (2000); *Medina* v. *California*, 505 U. S. 437, 445–448 (1992); *Holland* v. *Illinois*, 493 U. S. 474, 481–482, and n. 1 (1990); *Marsh* v. *Chambers*, 463 U. S. 783, 786–792 (1983); *Dames & Moore* v. *Regan*, 453 U. S. 654, 678–682 (1981); *Walz* v. *Tax Comm'n of City of New York*, 397 U. S. 664, 676–680 (1970); *Powell* v. *McCormack*, 395 U. S. 486, 522, 541–547 (1969); *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 610–613 (1952) (Frankfurter, J., concurring); *United States* v. *Curtiss-Wright Export Corp.*, 299 U. S. 304, 321–329 (1936); *The Pocket Veto Case*, 279 U. S. 655, 688–691 (1929); *Myers* v. *United States*, 272 U. S. 52, 155–158 (1926); *United States* v. *Midwest Oil Co.*, 236 U. S. 459, 469–475 (1915); *Marshall Field & Co.* v. *Clark*, 143 U. S. 649, 683–692 (1892); *Murray's Lessee* v. *Hoboken Land & Improvement Co.*, 18 How. 272, 279–280 (1856); *McCulloch* v. *Maryland*, 4 Wheat. 316, 400–401 (1819).[6]

_____

[6]The Court has similarly relied on history when deciding cases involving textually unenumerated rights under the Due Process Clause or the Privileges or Immunities Clause. In those contexts, the baseline is 180-degrees different: The text supplies no express protection of any asserted substantive right. The Court has recognized exceptions to that textual baseline, but in doing so has regularly observed that the Fourteenth Amendment "specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition." *Washington* v. *Glucksberg*, 521 U. S. 702, 720–721 (1997) (quotation marks omitted); see, *e.g.*, *Pierce* v. *Society of Sisters*, 268 U. S. 510, 534–535 (1925) ("liberty of parents and guardians to direct the upbringing and education of children under their control").

KAVANAUGH, J., concurring

## C

*Precedent.* With a Constitution and a Supreme Court that are both more than two centuries old, this Court and other courts are rarely interpreting a constitutional provision for the first time. Rather, a substantial body of Supreme Court precedent already exists for many provisions of the Constitution.

Precedent is fundamental to day-to-day constitutional decisionmaking in this Court and every American court. The "judicial Power" established in Article III incorporates the principle of *stare decisis*, both vertical and horizontal. As Hamilton stated, to "avoid an arbitrary discretion in the courts, it is indispensable that they should be bound down by strict rules and precedents" that will "unavoidably swell to a very considerable bulk" and "serve to define and point out their duty in every particular case that comes before them." The Federalist No. 78, at 471 (A. Hamilton).

Courts must respect precedent, while at the same time recognizing that precedent on occasion may appropriately be overturned. See, *e.g.*, *Brown*, 347 U. S. 483; *West Coast Hotel Co.* v. *Parrish*, 300 U. S. 379 (1937); see also *Ramos* v. *Louisiana*, 590 U. S. 83, 115–132 (2020) (KAVANAUGH, J., concurring in part). In light of the significant amount of Supreme Court precedent that has built up over time, this Court and other courts often decide constitutional cases by reference to those extensive bodies of precedent.

Even then, however, text and history still matter a great deal. When determining how broadly or narrowly to read a precedent; when determining whether to extend, limit, or narrow a precedent; or in relatively infrequent cases, when determining whether to overrule a precedent, a court often will consider how the precedent squares with the Constitution's text and history. Therefore, the text, as well as pre-ratification and post-ratification history, may appropriately function as a gravitational pull on the Court's interpretation of precedent. See *Free Enterprise Fund*

v. *Public Company Accounting Oversight Bd.*, 537 F. 3d 667, 698 (CADC 2008) (Kavanaugh, J., dissenting) ("We should resolve questions about the scope of those precedents in light of and in the direction of the constitutional text and constitutional history").

But the first stop in this Court's constitutional decisionmaking is the Court's precedents—the accumulated wisdom of jurists from Marshall and Story to Harlan and Taft; from Hughes and Black to Jackson and White; from Rehnquist and O'Connor to Kennedy and Scalia; and so on.

### III

Some say that courts should determine exceptions to broadly worded individual rights, including the Second Amendment, by looking to policy. Uphold a law if it is a good idea; strike it down if it is not. True, the proponents of a policy-based approach to interpretation of broadly worded or vague constitutional text usually do not say so explicitly (although some do). Rather, they support a balancing approach variously known as means-end scrutiny, heightened scrutiny, tiers of scrutiny, rational basis with bite, or strict or intermediate or intermediate-plus or rigorous or skeptical scrutiny. Whatever the label of the day, that balancing approach is policy by another name. It requires judges to weigh the benefits against the burdens of a law and to uphold the law as constitutional if, in the judge's view, the law is sufficiently reasonable or important. See M. Barnes & E. Chemerinsky, The Once and Future Equal Protection Doctrine?, 43 Conn. L. Rev. 1059, 1080 (2011) ("The levels of scrutiny are essentially balancing tests").

To begin, as I have explained, that kind of balancing approach to constitutional interpretation departs from what Framers such as Madison stated, what jurists such as Marshall and Scalia did, what judges as umpires should

strive to do, and what this Court has actually done across
the constitutional landscape for the last two centuries.

The balancing tests (heightened scrutiny and the like)
are a relatively modern judicial innovation in constitutional
decisionmaking. The "tiers of scrutiny have no basis in the
text or original meaning of the Constitution." J. Alicea & J.
Ohlendorf, Against the Tiers of Constitutional Scrutiny,
National Affairs 72, 73 (2019). And before the late 1950s,
"what we would now call strict judicial scrutiny did not
exist." R. Fallon, The Nature of Constitutional Rights: The
Invention and Logic of Strict Judicial Scrutiny 30 (2019).

The Court "appears to have adopted" heightened-scrutiny
tests "by accident" in the 1950s and 1960s in a series of
Communist speech cases, "rather than as the result of a
considered judgment." *Simon & Schuster, Inc.* v. *Members
of N. Y. State Crime Victims Bd.*, 502 U. S. 105, 125 (1991)
(Kennedy, J., concurring in judgment). The Court has
employed balancing only in discrete areas of constitutional
law—and even in those cases, history still tends to play a
far larger role than overt judicial policymaking.[7]

To be clear, I am not suggesting that the Court overrule
cases where the Court has applied those heightened-
scrutiny tests. But I am challenging the notion that those

_____

[7]The Court has articulated a heightened-scrutiny test in some pockets
of free-speech jurisprudence. But even when invoking heightened
scrutiny in that context, the Court still often relies directly on history.
See, *e.g.*, *City of Austin* v. *Reagan Nat. Advertising of Austin, LLC*, 596
U. S. 61, 75 (2022) (a city's regulation of solely off-premises billboards
was within "the Nation's history of regulating off-premises signs" as
"federal, state, and local jurisdictions have repeatedly relied upon on-/off-
premises distinctions" "for the last 50-plus years"); *Perry Ed. Assn.* v.
*Perry Local Educators' Assn.*, 460 U. S. 37, 45–46 (1983) ("In places
which by long tradition" "have been devoted to assembly and debate, the
rights of the State to limit expressive activity are sharply
circumscribed"). The Court has also used heightened scrutiny in certain
equal protection cases. As discussed above, the Equal Protection Clause
rejected the history of racially discriminatory laws and practices.

tests are the ordinary approach to constitutional interpretation. And I am arguing against extending those tests to new areas, including the Second Amendment.

One major problem with using a balancing approach to determine exceptions to constitutional rights is that it requires highly subjective judicial evaluations of how important a law is—at least unless the balancing test itself incorporates history, in which case judges might as well just continue to rely on history directly.

The subjective balancing approach forces judges to act more like legislators who decide what the law should be, rather than judges who "say what the law is." *Marbury* v. *Madison*, 1 Cranch 137, 177 (1803). That is because the balancing approach requires judges to weigh the benefits of a law against its burdens—a value-laden and political task that is usually reserved for the political branches. And that power in essence vests judges with "a roving commission to second-guess" legislators and administrative officers "concerning what is best for the country." W. Rehnquist, The Notion of a Living Constitution, 54 Texas L. Rev. 693, 698 (1976). Stated otherwise, when a court "does not have a solid textual anchor or an established social norm from which to derive the general rule, its pronouncement appears uncomfortably like legislation." A. Scalia, The Rule of Law as a Law of Rules, 56 U. Chi. L. Rev. 1175, 1185 (1989).

Moreover, the balancing approach is ill-defined. Some judges will apply heightened scrutiny with a presumption in favor of deference to the legislature. Other judges will apply heightened scrutiny with a presumption in favor of the individual right in question. Because it is unmoored, the balancing approach presents the real "danger" that "judges will mistake their own predilections for the law." A. Scalia, Originalism: The Lesser Evil, 57 U. Cin. L. Rev. 849, 863 (1989). Under the balancing approach, to use Justice Scalia's characteristically vivid description, if "We The

KAVANAUGH, J., concurring

Court conclude that They The People's answers to a
problem" are unwise, "we are free to intervene," but if we
"think the States may be on to something, we can loosen the
leash." *McDonald* v. *Chicago*, 561 U. S. 742, 803 (2010)
(concurring opinion) (quotation marks omitted).

The balancing approach can be antithetical to the
principle that judges must act like umpires. It turns judges
into players. Justice Black once protested that the Court
should not balance away bedrock free speech protections for
the perceived policy needs of the moment. He argued that
"the balancing approach" "disregards all of the unique
features of our Constitution" by giving "the Court, along
with Congress, a greater power, that of overriding the plain
commands of the Bill of Rights on a finding of weighty
public interest." H. Black, The Bill of Rights, 35 N. Y. U. L.
Rev. 865, 878–879 (1960). Like Justice Black, the Court in
*Heller* cautioned that a "constitutional guarantee subject to
future judges' assessments of its usefulness is no
constitutional guarantee at all." 554 U. S. 570, 634 (2008).

Some respond that history can be difficult to decipher. It
is true that using history to interpret vague text can require
"nuanced judgments," *McDonald*, 561 U. S., at 803–804
(Scalia, J., concurring), and is "sometimes inconclusive,"
Scalia, Originalism: The Lesser Evil, 57 U. Cin. L. Rev., at
864. But at a minimum, history tends to narrow the range
of possible meanings that may be ascribed to vague
constitutional language. A history-based methodology
supplies direction and imposes a neutral and
democratically infused constraint on judicial
decisionmaking.

The historical approach is not perfect. But "the question
to be decided is not whether the historically focused method
is a *perfect means* of restraining aristocratic judicial
Constitution-writing; but whether it is the *best means
available* in an imperfect world." *McDonald*, 561 U. S., at
804 (Scalia, J., concurring) (emphasis in original). And the

historical approach is superior to judicial policymaking. The historical approach "depends upon a body of evidence susceptible of reasoned analysis rather than a variety of vague ethico-political First Principles whose combined conclusion can be found to point in any direction the judges favor." *Ibid.* Moreover, the historical approach "intrudes less upon the democratic process because the rights it acknowledges are those established by a constitutional history formed by democratic decisions; and the rights it fails to acknowledge are left to be democratically adopted or rejected by the people." *Id.*, at 805.

IV

This Court's Second Amendment jurisprudence has carefully followed and reinforced the Court's longstanding approach to constitutional interpretation—relying on text, pre-ratification and post-ratification history, and precedent.

In *Heller*, the Court began with the baseline point that the Second Amendment textually guarantees an individual right. The Court then explained that the Second Amendment right is, of course, "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose" and is subject to "important" limitations. 554 U. S. 570, 626–627 (2008).

Although *Heller* declined to "undertake an exhaustive historical analysis," it recognized a few categories of traditional exceptions to the right. *Id.*, at 626. For example, *Heller* indicated that: (i) "prohibitions on carrying concealed weapons were lawful"; (ii) the Second Amendment attaches only to weapons "in common use" because "that limitation is fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons"; and (iii) "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places

KAVANAUGH, J., concurring

such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms" are presumptively constitutional. *Id.*, at 626–627 (quotation marks omitted).

In *McDonald*, the Court held that the Second Amendment was incorporated against the States. In so holding, the Court reiterated the presumed constitutionality of the "longstanding regulatory measures" identified in *Heller*. 561 U. S. 742, 786 (2010) (plurality opinion).

Then, in *Bruen*, the Court repeated that the "Nation's historical tradition of firearm regulation" guides the constitutional analysis of gun regulations and exceptions to the right to bear arms. 597 U. S. 1, 17 (2022); see *id.*, at 79–81 (KAVANAUGH, J., concurring).

This Court's approach in those three recent Second Amendment cases—and in the Court's opinion today—is entirely consistent with the Court's longstanding reliance on history and precedent to determine the meaning of vague constitutional text. *Heller* rested on "constitutional text and history," *ante*, at 6 (quotation marks omitted), and laid the foundation for *McDonald* and then *Bruen*.

In today's case, the Court carefully builds on *Heller*, *McDonald*, and *Bruen*. The Court applies the historical test that those precedents have set forth—namely, "whether the new law is relevantly similar to laws that our tradition is understood to permit." *Ante*, at 7 (quotation marks omitted). The Court examines "our historical tradition of firearm regulation," *ante*, at 6 (quotation marks omitted), and correctly holds that America's "tradition of firearm regulation allows the Government to disarm individuals who present a credible threat to the physical safety of others," *ante*, at 16. The law before us "fits neatly within the tradition the surety and going armed laws represent." *Ante*, at 13–14.

As the Court's decision today notes, Second Amendment

24                    UNITED STATES *v.* RAHIMI

KAVANAUGH, J., concurring

jurisprudence is still in the relatively early innings, unlike
the First, Fourth, and Sixth Amendments, for example.
That is because the Court did not have occasion to recognize
the Second Amendment's individual right until recently.
See generally *Heller* v. *District of Columbia*, 670 F. 3d 1244,
1269–1296 (CADC 2011) (Kavanaugh, J., dissenting).
Deciding constitutional cases in a still-developing area of
this Court's jurisprudence can sometimes be difficult.  But
that is not a permission slip for a judge to let constitutional
analysis morph into policy preferences under the guise of a
balancing test that churns out the judge's own policy
beliefs.

*            *            *

As exemplified by *Heller*, *McDonald*, *Bruen*, and the
Court's opinion today, constitutional interpretation
properly takes account of text, pre-ratification and post-
ratification history, and precedent.  Those are the tools of
the trade for an American judge interpreting the American
Constitution.  Of course, difficult subsidiary questions can
arise about how to apply those tools, both generally and in
particular cases.  And in some cases, text, history, and
precedent may point in somewhat different directions.  In
law as in life, nothing is perfect.  But in Second Amendment
cases as in other constitutional cases, text, history, and
precedent must remain paramount.

# SUPREME COURT OF THE UNITED STATES

_____

No. 22–915

_____

## UNITED STATES, PETITIONER *v.* ZACKEY RAHIMI

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[June 21, 2024]

JUSTICE BARRETT, concurring.

Despite its unqualified text, the Second Amendment is not absolute. It codified a pre-existing right, and pre-existing limits on that right are part and parcel of it. *District of Columbia* v. *Heller*, 554 U. S. 570, 595, 627 (2008). Those limits define the scope of "the right to bear arms" as it was originally understood; to identify them, courts must examine our "historical tradition of firearm regulation." *New York State Rifle & Pistol Assn., Inc.* v. *Bruen*, 597 U. S. 1, 17, 19 (2022). That evidence marks where the right stops and the State's authority to regulate begins. A regulation is constitutional only if the government affirmatively proves that it is "consistent with the Second Amendment's text and historical understanding." *Id.*, at 26.

Because the Court has taken an originalist approach to the Second Amendment, it is worth pausing to identify the basic premises of originalism. The theory is built on two core principles: that the meaning of constitutional text is fixed at the time of its ratification and that the "discoverable historical meaning . . . has legal significance and is authoritative in most circumstances." K. Whittington, Originalism: A Critical Introduction, 82 Ford. L. Rev. 375, 378 (2013) (Whittington). Ratification is a democratic act that renders constitutional text part of our fundamental law, see Arts. V, VII, and that text "remains law until law-

BARRETT, J., concurring

fully altered," S. Sachs, Originalism: Standard and Procedure, 135 Harv. L. Rev. 777, 782 (2022). So for an originalist, the history that matters most is the history surrounding the ratification of the text; that backdrop illuminates the meaning of the enacted law. History (or tradition) that long postdates ratification does not serve that function. To be sure, postenactment history can be an important tool. For example, it can "reinforce our understanding of the Constitution's original meaning"; "liquidate ambiguous constitutional provisions"; provide persuasive evidence of the original meaning; and, if *stare decisis* applies, control the outcome. See *Vidal* v. *Elster*, 602 U. S. ___, ___–___ (2024) (BARRETT, J., concurring in part) (slip op., at 13–14). But generally speaking, the use of postenactment history requires some justification other than originalism simpliciter.

In *Bruen*, the Court took history beyond the founding era, considering gun regulations that spanned the 19th century. 597 U. S., at 50–70. I expressed reservations about the scope of that inquiry but concluded that the timing question did not matter to *Bruen*'s holding. *Id.*, at 81–83 (concurring opinion). It bears emphasis, however, that my questions were about the time period relevant to discerning the Second Amendment's original meaning—for instance, what is the post-1791 cutoff for discerning how the Second Amendment was originally understood? *Id.*, at 82 ("How long after ratification may subsequent practice illuminate original public meaning?"). My doubts were *not* about whether "tradition," standing alone, is dispositive. *Id.*, at 83 ("[T]oday's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights"). As I have explained elsewhere, evidence of "tradition" unmoored from original meaning is not binding law. *Vidal*, 602 U. S., at ___–___ (BARRETT, J., concurring in part) (slip op., at 13–15). And scattered cases or regulations pulled from history may have little bearing on the meaning

BARRETT, J., concurring

of the text. *Samia* v. *United States*, 599 U. S. 635, 656–657 (2023) (BARRETT, J., concurring in part and concurring in judgment).

"Original history"—*i.e.,* the generally dispositive kind— plays two roles in the Second Amendment context. It elucidates how contemporaries understood the text—for example, the meaning of the phrase "bear Arms." See *Heller*, 554 U. S., at 582–592. It also plays the more complicated role of determining the scope of the pre-existing right that the people enshrined in our fundamental law.\* In Rahimi's case, the Court uses history in this latter way. Call this "original contours" history: It looks at historical gun regulations to identify the contours of the right.

Courts have struggled with this use of history in the wake of *Bruen*. One difficulty is a level of generality problem: Must the government produce a founding-era relative of the challenged regulation—if not a twin, a cousin? Or do founding-era gun regulations yield concrete principles that mark the borders of the right?

Many courts, including the Fifth Circuit, have understood *Bruen* to require the former, narrower approach. But *Bruen* emphasized that "analogical reasoning" is not a "regulatory straightjacket." 597 U. S., at 30. To be *consistent* with historical limits, a challenged regulation need not be

―――――――――

\*To my mind, this use of history walks a fine line between original meaning (which controls) and expectations about how the text would apply (which do not). See Whittington 383 ("Specific expectations about the consequences of a legal rule are distinct from the meaning of the rule itself"). Contemporary government actors might have been "wrong about the consequences of their own constitutional rule," or they "might not have fully and faithfully implemented the adopted constitutional rule themselves." *Id.*, at 384. Thus, while early applications of a constitutional rule can help illuminate its original scope, an interpreter must exercise care in considering them. *Id.*, at 385–386. In the Second Amendment context, particular gun regulations—even if from the ratification era—do not themselves have the status of constitutional law.

4                    UNITED STATES *v.* RAHIMI

an updated model of a historical counterpart. Besides, imposing a test that demands overly specific analogues has serious problems. To name two: It forces 21st-century regulations to follow late-18th-century policy choices, giving us "a law trapped in amber." *Ante*, at 7. And it assumes that founding-era legislatures maximally exercised their power to regulate, thereby adopting a "use it or lose it" view of legislative authority. Such assumptions are flawed, and originalism does not require them.

"Analogical reasoning" under *Bruen* demands a wider lens: Historical regulations reveal a principle, not a mold. See, *e.g.*, 597 U. S., at 28–29 (explaining that the Amendment does not apply only to the catalogue of arms that existed in the 18th century, but rather to all weapons satisfying the "*general definition*" of "bearable arms" (emphasis added)); *id.*, at 30–31 (discussing the "'sensitive places'" principle that limits the right to public carry); cf. *Vidal*, 602 U. S., at ___–___ (BARRETT, J., concurring in part) (slip op., at 7–9); Whittington 386 ("The insight to be gleaned is not the authoritative status of the expected application, but the apparent rule at play given that such an application is expected to follow from it"). To be sure, a court must be careful not to read a principle at such a high level of generality that it waters down the right. Pulling principle from precedent, whether case law or history, is a standard feature of legal reasoning, and reasonable minds sometimes disagree about how broad or narrow the controlling principle should be.

Here, though, the Court settles on just the right level of generality: "Since the founding, our Nation's firearm laws have included provisions preventing individuals who threaten physical harm to others from misusing firearms." *Ante*, at 5; see also *Kanter* v. *Barr*, 919 F. 3d 437, 451, 464–465 (CA7 2019) (Barrett, J., dissenting) ("History is consistent with common sense: it demonstrates that legisla-

Cite as: 602 U. S. ____ (2024)          5

BARRETT, J., concurring

tures have the power to prohibit dangerous people from possessing guns").  Section 922(g)(8)(C)(i) fits well within that principle; therefore, Rahimi's facial challenge fails.  Harder level-of-generality problems can await another day.

# SUPREME COURT OF THE UNITED STATES

_____

No. 22–915

_____

## UNITED STATES, PETITIONER *v.* ZACKEY RAHIMI

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[June 21, 2024]

JUSTICE JACKSON, concurring.

This case tests our Second Amendment jurisprudence as
shaped in particular by *New York State Rifle & Pistol Assn.,
Inc.* v. *Bruen*, 597 U. S. 1 (2022).  I disagree with the meth-
odology of that decision; I would have joined the dissent had
I been a Member of the Court at that time.  See generally
*id.*, at 83–133 (Breyer, J., dissenting).  But *Bruen* is now
binding law.  Today's decision fairly applies that precedent,
so I join the opinion in full.

I write separately because we now have two years' worth
of post-*Bruen* cases under our belts, and the experiences of
courts applying its history-and-tradition test should bear
on our assessment of the workability of that legal standard.
This case highlights the apparent difficulty faced by judges
on the ground.  Make no mistake: Today's effort to clear up
"misunderst[andings]," *ante,* at 7, is a tacit admission that
lower courts are struggling.  In my view, the blame may lie
with us, not with them.

I

The Court today expounds on the history-and-tradition
inquiry that *Bruen* requires.  *Ante*, at 7–8.  We emphasize
that the Second Amendment is "not . . . a law trapped in
amber."  *Ante,* at 7.  It "permits more than just those regu-
lations identical to ones that could be found in 1791"; in-
deed, "a challenged regulation [that] does not precisely

2                    UNITED STATES *v.* RAHIMI

JACKSON, J., concurring

match its historical precursors . . . 'still may be analogous
enough to pass constitutional muster.'"   *Ibid.* (quoting
*Bruen*, 597 U. S., at 30).  Gun regulations need only "com-
port with the principles underlying the Second Amend-
ment." *Ante,* at 7–8.  These clarifying efforts are welcome,
given the many questions *Bruen* left unanswered.

When this Court adopts a new legal standard, as we did
in *Bruen*, we do not do so in a vacuum.  The tests we estab-
lish bind lower court judges, who then apply those legal
standards to the cases before them.  In my view, as this
Court thinks of, and speaks about, history's relevance to the
interpretation of constitutional provisions, we should be
mindful that our common-law tradition of promoting clarity
and consistency in the application of our precedent *also* has
a lengthy pedigree.  So when courts signal they are having
trouble with one of our standards, we should pay attention.
Cf. *Garcia* v. *San Antonio Metropolitan Transit Authority*,
469 U. S. 528, 538–539 (1985).

The message that lower courts are sending now in Second
Amendment cases could not be clearer.  They say there is
little method to *Bruen*'s madness.[1]  It isn't just that *Bruen*'s

———————

[1]See, *e.g.*, *Barris* v. *Stroud Twp.*, ___ Pa. ___, ___, 310 A. 3d 175, 190
(2024) ("[M]ore guidance in this challenging and ever-shifting area of the
law is welcome"); *State* v. *Wilson*, 154 Haw. 8, 21, 543 P. 3d 440, 453
(2024) ("[B]y turning the test into history and nothing else, [*Bruen*] dis-
mantles workable methods to interpret firearms laws"); *United States* v.
*Dubois*, 94 F. 4th 1284, 1293 (CA11 2024) ("We require clearer instruc-
tion from the Supreme Court before we may reconsider the constitution-
ality of [18 U. S. C. §]922(g)(1)"); *United States* v. *Daniels*, 77 F. 4th 337,
358 (CA5 2023) (Higginson, J., concurring) ("[C]ourts, operating in good
faith, are struggling at every stage of the *Bruen* inquiry.  Those struggles
encompass numerous, often dispositive, difficult questions"); *Atkinson* v.
*Garland*, 70 F. 4th 1018, 1024 (CA7 2023) ("[T]he historical analysis re-
quired by *Bruen* will be difficult and no doubt yield some measure of in-
determinancy"); *id.*, at 1036 (Wood, J., dissenting) ("As other courts have
begun to apply *Bruen*, [the] need for further research and further guid-
ance has become clear"); *Gonyo* v. *D. S.*, 210 N. Y. S. 3d 612, 615, 2024
N. Y. Slip Op. 24018 (Jan. 19, 2024) ("Interpretations and applications of

JACKSON, J., concurring

history-and-tradition test is burdensome (though that is no small thing to courts with heavier caseloads and fewer resources than we have).  The more worrisome concern is that lower courts appear to be diverging in both approach and outcome as they struggle to conduct the inquiry *Bruen* requires of them.  Scholars report that lower courts applying *Bruen*'s approach have been unable to produce "consistent, principled results," Brief for Second Amendment Law Scholars as *Amici Curiae* 4, and, in fact, they "have come to conflicting conclusions on virtually every consequential Second Amendment issue to come before them," *id.*, at 4–5; see also *id.*, at 5–6 (collecting examples).  Given this, it appears indisputable that, after *Bruen*, "confusion plagu[es] the lower courts."  *Id.*, at 6.

_____

*Bruen* by lower courts have been widely divergent and thus, very difficult to apply as precedent"); *United States* v. *Sing-Ledezma*, ___ F. Supp. 3d ___, ___, 2023 WL 8587869, *3 (WD Tex. Dec. 11, 2023) ("[T]he Court pauses to join the choir of lower courts urging the Supreme Court to resolve the many unanswered questions left in *Bruen*'s wake"); *United States* v. *Bartucci*, 658 F. Supp. 3d 794, 800 (ED Cal. 2023) ("[T]he unique test the Supreme Court announced in *Bruen* does not provide lower courts with clear guidance as to how analogous modern laws must be to founding-era gun laws.  In the short time post-*Bruen*, this has caused disarray among the lower courts"); *United States* v. *Bullock*, 679 F. Supp. 3d 501, 534 (SD Miss. 2023) (raising methodological questions "in hopes that future judges and justices can answer them with enough detail to enable trial courts to perform their duties"); *Fraser* v. *Bureau of Alcohol, Tobacco, Firearms and Explosives*, 672 F. Supp. 3d 118, 137, n. 20 (ED Va. 2023) ("The Court is staffed by lawyers who are neither trained nor experienced in making the nuanced historical analyses called for by *Bruen*. . . . The analytical construct specified by *Bruen* is thus a difficult one for non-historians"); *United States* v. *Jackson*, 661 F. Supp. 3d 392, 406 (Md. 2023) (noting "the challenges created by *Bruen's* assignment"); *United States* v. *Love*, 647 F. Supp. 3d 664, 670 (ND Ind. 2022) ("By . . . announcing an inconsistent and amorphous standard, the Supreme Court has created mountains of work for district courts that must now deal with *Bruen*-related arguments in nearly every criminal case in which a firearm is found").

JACKSON, J., concurring

## II

This discord is striking when compared to the relative harmony that had developed prior to *Bruen*. To be sure, our decision in *District of Columbia* v. *Heller*, 554 U. S. 570 (2008), which first recognized an individual right to keep and bear arms for self-defense, see *id.*, at 628, was disruptive in its own way. After all, before *Heller*, "[t]he meaning of the Second Amendment ha[d] been considered settled by courts and legislatures for over two centuries," and "judges and legislators . . . properly believed . . . that the Second Amendment did not reach possession of firearms for purely private activities." *Id.*, at 676, n. 38 (Stevens, J., dissenting). Nonetheless, after *Heller*, lower courts took up the necessary work of reviewing burdens on this newly unearthed right. By the time this Court decided *Bruen*, every court of appeals evaluating whether a firearm regulation was consistent with the Second Amendment did so using a two-step framework that incorporated means-end scrutiny. See *Bruen*, 597 U. S., at 103 (Breyer, J., dissenting).

Rejecting that "two-step approach" as having "one step too many," *id.*, at 19, the *Bruen* majority subbed in another two-step evaluation. Courts must, first, determine whether "the Second Amendment's plain text covers an individual's conduct." *Id.*, at 24. If it does, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Ibid.*

No one seems to question that "[h]istory has a role to play in Second Amendment analysis." *Ante,* at 4 (SOTOMAYOR, J., concurring). But, per *Bruen*, courts evaluating a Second Amendment challenge must consider history *to the exclusion of all else*. This means legislators must locate and produce—and courts must sift through—troves of centuries-old documentation looking for supportive historical evidence.[2]

_____

[2]It is not clear what qualifies policymakers or their lawyers (who do

JACKSON, J., concurring

This very case provides a prime example of the pitfalls of *Bruen*'s approach.  Having been told that a key marker of a constitutional gun regulation is "a well-established and representative historical analogue," *Bruen*, 597 U. S., at 30 (emphasis deleted), Rahimi argued below that "there is little or no historical evidence suggesting disarmament for those who committed domestic violence; and there is certainly no tradition of disarming people subject to a no-contact order related to domestic violence."  Supp. Brief for Appellant in No. 21–11001 (CA5), p. 15 (emphasis deleted). The Government then proffered what it maintained were sufficient historical analogues to 18 U. S. C. §922(g)(8), including surety and going armed laws.  Supp. Brief for Appellee in No. 21–11001 (CA5), pp. 23, n. 2, 27–31.  But the Fifth Circuit concluded that the federal statute was unconstitutional because the Government's analogues were not "'relevantly similar.'"  61 F. 4th 443, 460–461 (2023).

Neither the parties nor the Fifth Circuit had the benefit of today's decision, in which we hold that the Government had in fact offered "ample evidence that the Second Amendment permits the disarmament of individuals who pose a credible threat to the physical safety of others."  *Ante,* at 8. But even setting aside whether the historical examples the Government found were sufficiently analogous, just canvassing the universe of historical records and gauging the sufficiency of such evidence is an exceedingly difficult task.[3]

_____

not ordinarily have the specialized education, knowledge, or training of professional historians) to engage in this kind of assessment.  And dutiful legislators are not the only stakeholders who are far outside their depth: *Bruen* also conscripts parties and judges into service as amateur historians, casting about for similar historical circumstances.

[3]The mad scramble for historical records that *Bruen* requires also suggests that only those solutions that States implemented in the distant past comport with the Constitution.  That premise is questionable because, given the breadth of some of the Constitution's provisions, it is likely that the Founders understood that new solutions would be needed over time, even for traditional problems, and that the principles they

6                    UNITED STATES *v.* RAHIMI

JACKSON, J., concurring

Consistent analyses and outcomes are likely to remain elusive because whether *Bruen*'s test is satisfied in a particular case seems to depend on the suitability of whatever historical sources the parties can manage to cobble together, as well as the level of generality at which a court evaluates those sources—neither of which we have as yet adequately clarified.

And the unresolved questions hardly end there. Who is protected by the Second Amendment, from a historical perspective? To what conduct does the Second Amendment's plain text apply? To what historical era (or eras) should courts look to divine a historical tradition of gun regulation? How many analogues add up to a tradition? Must there be evidence that those analogues were enforced or subject to judicial scrutiny? How much support can nonstatutory sources lend? I could go on—as others have. See, *e.g.*, *United States* v. *Daniels*, 77 F. 4th 337, 358–360 (CA5 2023) (Higginson, J., concurring) (providing a similarly nonexhaustive list). But I won't.

III

Maybe time will resolve these and other key questions. Maybe appellate courts, including ours, will find a way to "[b]rin[g] discipline to the increasingly erratic and unprincipled body of law that is emerging after *Bruen*." J. Blocher & E. Ruben, Originalism-by-Analogy and Second Amendment Adjudication, 133 Yale L. J. 99, 174 (2023). Indeed, "[m]any constitutional standards involve undoubted gray

——————

were adopting would allow for such flexibility. See *District of Columbia* v. *Heller*, 554 U. S. 570, 722 (2008) (Breyer, J., dissenting) (expressing doubt that the Framers "intended future generations to ignore [modern-day] matters"). It stifles both helpful innovation and democratic engagement to read the Constitution to prevent advancement in this way. In any event, what we see now is that *Bruen*'s history-and-tradition test is not only limiting legislative solutions, it also appears to be creating chaos.

JACKSON, J., concurring

areas," and "it normally might be fair to venture the assumption that case-by-case development [will] lead to a workable standard." *Garcia*, 469 U. S., at 540 (internal quotation marks and alteration omitted). By underscoring that gun regulations need only "comport with the *principles* underlying the Second Amendment," *ante,* at 7–8 (emphasis added), today's opinion inches that ball forward.

But it is becoming increasingly obvious that there are miles to go.[4]  Meanwhile, the Rule of Law suffers.  That ideal—key to our democracy—thrives on legal standards that foster stability, facilitate consistency, and promote predictability.  So far, *Bruen*'s history-focused test ticks none of those boxes.

*      *      *

I concur in today's decision applying *Bruen*.  But, in my view, the Court should also be mindful of how its legal standards are actually playing out in real life.  We must remember that legislatures, seeking to implement meaningful reform for their constituents while simultaneously respecting the Second Amendment, are hobbled without a clear, workable test for assessing the constitutionality of their proposals.  See Tr. of Oral Arg. 54–57; cf. *Bruen*, 597 U. S., at 90–91 (Breyer, J., dissenting).  And courts, which are currently at sea when it comes to evaluating firearms legislation, need a solid anchor for grounding their constitutional pronouncements.  The public, too, deserves clarity when this Court interprets our Constitution.

---

[4] Extremely pertinent inquiries relevant to consistent application of *Bruen*'s standard await resolution.  For example, in *Bruen* we acknowledged the existence of "an ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)."  597 U. S., at 37.  We saw no need to address the issue in *Bruen*.  *Id.*, at 38.  We similarly decline to resolve that dispute today. *Ante*, at 8, n. 1.

THOMAS, J., dissenting

# SUPREME COURT OF THE UNITED STATES

——————

No. 22–915

——————

## UNITED STATES, PETITIONER *v.* ZACKEY RAHIMI

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[June 21, 2024]

JUSTICE THOMAS, dissenting.

After *New York State Rifle & Pistol Assn., Inc.* v. *Bruen*,
597 U. S. 1 (2022), this Court's directive was clear: A firearm
regulation that falls within the Second Amendment's
plain text is unconstitutional unless it is consistent with the
Nation's historical tradition of firearm regulation. Not a
single historical regulation justifies the statute at issue, 18
U. S. C. §922(g)(8). Therefore, I respectfully dissent.

## I

Section 922(g)(8) makes it unlawful for an individual who
is subject to a civil restraining order to possess firearms or
ammunition. To trigger §922(g)(8)'s prohibition, a restraining
order must bear three characteristics. First, the order
issues after a hearing where the accused "received
actual notice" and had "an opportunity to participate."
§922(g)(8)(A). Second, the order restrains the accused from
engaging in threatening behavior against an intimate partner
or child. §922(g)(8)(B). Third, the order has either "a
finding that [the accused] represents a credible threat to
the physical safety of [an] intimate partner or child," or an
"explici[t] prohibit[ion]" on "the use, attempted use, or
threatened use of physical force against [an] intimate partner
or child." §922(g)(8)(C). If those three characteristics
are present, §922(g)(8) automatically bans the individual

Thomas, J., dissenting

subject to the order from possessing "any firearm or ammu-
nition." §922(g).

Just as important as §922(g)(8)'s express terms is what it
leaves unsaid. Section 922(g)(8) does not require a finding
that a person has ever committed a crime of domestic vio-
lence. It is not triggered by a criminal conviction or a per-
son's criminal history, unlike other §922(g) subsections.
See §§922(g)(1), (9). And, §922(g)(8) does not distinguish
contested orders from joint orders—for example, when par-
ties voluntarily enter a no-contact agreement or when both
parties seek a restraining order.

In addition, §922(g)(8) strips an individual of his ability
to possess firearms and ammunition without any due pro-
cess.[1]  Rather, the ban is an automatic, uncontestable con-
sequence of certain orders. See §922(g) ("It shall be unlaw-
ful for any [qualifying] person [to] possess in or affecting
commerce, any firearm or ammunition"). There is no hear-
ing or opportunity to be heard on the statute's applicability,
and a court need not decide whether a person should be dis-
armed under §922(g)(8). The only process §922(g)(8) re-
quires is that provided (or not) for the *underlying* restrain-
ing order.

Despite §922(g)(8)'s broad scope and lack of process, it
carries strong penalties. Any violation of §922(g)(8) is a fel-
ony punishable by up to 15 years' imprisonment.
§924(a)(8); see also *ante,* at 3. And, a conviction for violat-
ing §922(g)(8) itself triggers a permanent, life-long prohibi-
tion on possessing firearms and ammunition. See
§922(g)(1).

In 2020, Zackey Rahimi and his ex-girlfriend, C. M., en-
tered into a qualifying civil restraining order. App. 1. C. M.
had requested the order and asserted that Rahimi as-
saulted her. See *id.,* at 2. Because the order found that

──────────

[1] Rahimi does not ask the Court to consider, and I do not address,
whether §922(g)(8) satisfies the Due Process Clause.

Cite as: 602 U. S. ____ (2024)          3

THOMAS, J., dissenting

Rahimi presented a credible threat and prohibited him from
using physical force against C. M., the order automatically
triggered §922(g)(8)'s firearms ban.  A year later, officers
discovered firearms in Rahimi's home.  Rahimi pleaded
guilty to violating §922(g)(8).

Before his guilty plea, Rahimi challenged his conviction
under the Second Amendment.  He pointed to *District of
Columbia* v. *Heller*, 554 U. S. 570 (2008), which held that
the Second Amendment protects an individual right to keep
and bear firearms.  Section 922(g)(8), Rahimi argued, vio-
lates that right by penalizing firearms possession.  The Dis-
trict Court rejected Rahimi's claim.  At that time, the
Courts of Appeals, including the Fifth Circuit, applied a
form of means-end scrutiny to Second Amendment claims.
See, *e.g.*, *United States* v. *McGinnis*, 956 F. 3d 747, 753–754
(2020).  Applying Circuit precedent, the Fifth Circuit af-
firmed the District Court.  2022 WL 2070392 (2022).

Roughly two weeks later, this Court issued its opinion in
*New York State Rifle & Pistol Assn., Inc.* v. *Bruen*.  The
Court rejected the means-end-scrutiny approach and laid
out the appropriate framework for assessing whether a fire-
arm regulation is constitutional.  *Bruen*, 597 U. S., at 17–
19.  That framework requires the Government to prove that
the "regulation is part of the historical tradition that delim-
its the outer bounds of the right to keep and bear arms."
*Id.*, at 19.  The Fifth Circuit withdrew its opinion to apply
the correct framework to Rahimi's claim.  Relying on *Bruen*,
the Fifth Circuit concluded that the Government failed to
present historical evidence that §922(g)(8) "fits within our
Nation's historical tradition of firearm regulation."  61 F.
4th 443, 460 (2023).  The Fifth Circuit, accordingly, vacated
Rahimi's conviction.  We granted certiorari.  600 U. S. ___
(2023).

## II

The Second Amendment provides that "[a] well regulated

Militia, being necessary to the security of a free State, the
right of the people to keep and bear Arms, shall not be in-
fringed." As the Court recognizes, *Bruen* provides the
framework for analyzing whether a regulation such as
§922(g)(8) violates the Second Amendment's mandate.
"[W]hen the Second Amendment's plain text covers an indi-
vidual's conduct, the Constitution presumptively protects
that conduct." 597 U. S., at 17. To overcome this presump-
tion, "the government must demonstrate that the regula-
tion is consistent with the Nation's historical tradition of
firearm regulation." *Ibid.* The presumption against re-
strictions on keeping and bearing firearms is a central fea-
ture of the Second Amendment. That Amendment does not
merely narrow the Government's regulatory power. It is a
barrier, placing the right to keep and bear arms off limits
to the Government.

When considering whether a modern regulation is con-
sistent with historical regulations and thus overcomes the
presumption against firearms restrictions, our precedents
"point toward at least two metrics [of comparison]: how and
why the regulations burden a law-abiding citizen's right to
armed self-defense." *Id.,* at 29. A historical law must sat-
isfy both considerations to serve as a comparator. See *ibid.*
While a historical law need not be a "historical twin," it
must be "well-established and representative" to serve as a
historical analogue. *Id.,* at 30 (emphasis deleted).

In some cases, "the inquiry [is] fairly straightforward."
*Id.,* at 26. For instance, "when a challenged regulation ad-
dresses a general societal problem that has persisted since
the 18th century, the lack of a distinctly similar historical
regulation addressing that problem is relevant evidence
that the challenged regulation is inconsistent with the Sec-
ond Amendment. Likewise, if earlier generations ad-
dressed the societal problem, but did so through materially
different means, that also could be evidence that a modern
regulation is unconstitutional." *Id.,* at 26–27.

THOMAS, J., dissenting

The Court employed this "straightforward" analysis in
*Heller* and *Bruen*. *Heller* considered the District of Colum-
bia's "flat ban on the possession of handguns in the home,"
*Bruen*, 597 U. S., at 27, and *Bruen* considered New York's
effective ban on carrying a firearm in public, see *id.*, at 11–
13. The Court determined that the District of Columbia
and New York had "addressed a perceived societal prob-
lem—firearm violence in densely populated communities—
and [they] employed a regulation . . . that the Founders
themselves could have adopted to confront that problem."
*Id.*, at 27. Accordingly, the Court "consider[ed] 'founding-
era historical precedent'" and looked for a comparable reg-
ulation. *Ibid.* (quoting *Heller*, 554 U. S., at 631). In both
cases, the Court found no such law and held the modern
regulations unconstitutional. *Id.*, at 631; *Bruen*, 597 U. S.,
at 27.

Under our precedent, then, we must resolve two ques-
tions to determine if §922(g)(8) violates the Second Amend-
ment: (1) Does §922(g)(8) target conduct protected by the
Second Amendment's plain text; and (2) does the Govern-
ment establish that §922(g)(8) is consistent with the Na-
tion's historical tradition of firearm regulation?

## III

Section 922(g)(8) violates the Second Amendment. First,
it targets conduct at the core of the Second Amendment—
possessing firearms. Second, the Government failed to pro-
duce any evidence that §922(g)(8) is consistent with the Na-
tion's historical tradition of firearm regulation. To the con-
trary, the founding generation addressed the same societal
problem as §922(g)(8) through the "materially different
means" of surety laws. *Id.*, at 26.

## A

It is undisputed that §922(g)(8) targets conduct encom-
passed by the Second Amendment's plain text. After all,

the statute bans a person subject to a restraining order from possessing or using virtually any firearm or ammunition.  §922(g) (prohibiting covered individuals from "possess[ing]" or "receiv[ing] any firearm or ammunition which has been shipped or transported in interstate or foreign commerce").  A covered individual cannot even possess a firearm in his home for self-defense, "the central component of the [Second Amendment] right itself." *Heller*, 554 U. S., at 599 (emphasis deleted).  There is no doubt that §922(g)(8) is irreconcilable with the Second Amendment's text. *Id.*, at 628–629.

It is also undisputed that the Second Amendment applies to Rahimi.  By its terms, the Second Amendment extends to "'the people,'" and that "term unambiguously refers to all members of the political community, not an unspecified subset." *Id.*, at 580.  The Second Amendment thus recognizes a right "guaranteed to 'all Americans.'" *Bruen*, 597 U. S., at 70 (quoting *Heller*, 554 U. S., at 581).  Since Rahimi is a member of the political community, he falls within the Second Amendment's guarantee.

### B

The Government fails to carry its burden of proving that §922(g)(8) is "consistent with the Nation's historical tradition of firearm regulation."  597 U. S., at 24.  Despite canvassing laws before, during, and after our Nation's founding, the Government does not identify even a single regulation with an analogous burden and justification.[2]

The Government's failure is unsurprising given that

_____

[2] I agree with the majority that we need not address the "'ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government).'" *Ante,* at 8, n. 1 (quoting *New York State Rifle & Pistol Assn., Inc.* v. *Bruen*, 597 U. S. 1, 37 (2022)).

THOMAS, J., dissenting

§922(g)(8) addresses a societal problem—the risk of inter-
personal violence—"that has persisted since the 18th cen-
tury," yet was addressed "through [the] materially different
means" of surety laws. *Id.*, at 26. Surety laws were, in a
nutshell, a fine on certain behavior. If a person threatened
someone in his community, he was given the choice to either
keep the peace or forfeit a sum of money. Surety laws thus
shared the same justification as §922(g)(8), but they im-
posed a far less onerous burden. The Government has not
shown that §922(g)(8)'s more severe approach is consistent
with our historical tradition of firearm regulation.

1

The Government does not offer a single historical regula-
tion that is relevantly similar to §922(g)(8). As the Court
has explained, the "central considerations" when compar-
ing modern and historical regulations are whether the reg-
ulations "impose a comparable burden" that is "comparably
justified." *Id.*, at 29. The Government offers only two cate-
gories of evidence that are even within the ballpark of
§922(g)(8)'s burden and justification: English laws disarm-
ing persons "dangerous" to the peace of the kingdom, and
commentary discussing peaceable citizens bearing arms.
Neither category ultimately does the job.

i

The Government points to various English laws from the
late 1600s and early 1700s to argue that there is a tradition
of restricting the rights of "dangerous" persons. For exam-
ple, the Militia Act of 1662 authorized local officials to dis-
arm individuals judged "dangerous to the Peace of the King-
dome." 14 Car. 2 c. 3, §13. And, in the early 1700s, the
Crown authorized lords and justices of the peace to "cause
search to be made for arms in the possession of any persons
whom they judge dangerous, and seize such arms according
to law." Calendar of State Papers Domestic: William III,

1700–1702, p. 234 (E. Bateson ed. 1937) (Calendar William
III).

At first glance, these laws targeting "dangerous" persons
might appear relevant.  After all, if the Second Amendment
right was historically understood to allow an official to dis-
arm anyone he deemed "dangerous," it may follow that
modern Congresses can do the same.  Yet, historical context
compels the opposite conclusion.  The Second Amendment
stems from English resistance *against* "dangerous" person
laws.

The sweeping disarmament authority wielded by English
officials during the 1600s, including the Militia Act of 1662,
prompted the English to enshrine an individual right to
keep and bear arms.  "[T]he Stuart Kings Charles II and
James II succeeded in using select militias loyal to them to
suppress political dissidents, in part by disarming their op-
ponents."  *Heller*, 554 U. S., at 592.  Englishmen, as a re-
sult, grew "to be extremely wary of concentrated military
forces run by the state and to be jealous of their arms." *Id.*,
at 593.  Following the Glorious Revolution, they "obtained
an assurance . . . in the Declaration of Right (which was
codified as the English Bill of Rights), that Protestants
would never be disarmed."  *Ibid.*

The English Bill of Rights "has long been understood to
be the predecessor to our Second Amendment."  *Ibid.*  In
fact, our Founders expanded on it and made the Second
Amendment even more protective of individual liberty.  The
English Bill of Rights assured Protestants "Arms for their
Defence," but only where "suitable to their Conditions and
as allowed by Law."  1 Wm. & Mary, ch. 2, (1688), in 6 Stat-
utes of the Realm 143.  The Second Amendment, however,
contains no such qualifiers and protects the right of "the
people" generally.  In short, laws targeting "dangerous" per-
sons led to the Second Amendment.  It would be passing
strange to permit the Government to resurrect those self-

same "dangerous" person laws to chip away at that Amendment's guarantee.

Even on their own terms, laws targeting "dangerous" persons cannot support §922(g)(8). Those laws were driven by a justification distinct from that of §922(g)(8)—quashing treason and rebellion. The Stuart Kings' reign was marked by religious and political conflict, which at that time were often one and the same. The Parliament of the late 1600s "re-established an intolerant episcopalian church" through legislation targeting other sects, including "[a] fierce penal code" to keep those other sects out of local government and "to criminalize nonconformist worship." Oxford Handbook of the English Revolution 212 (M. Braddick ed. 2015) (Oxford Handbook); see G. Clark, The Later Stuarts 1660–1714, p. 22 (2d ed. 1955). These laws were driven in large part by a desire to suppress rebellion. "Nonconformist ministers were thought to preach resistance to divinely ordained monarchs." Oxford Handbook 212; see Calendar of State Papers Domestic: Charles II, 1661–1662, p. 161 (M. Green ed. 1861) (Calendar Charles II) ("[P]reachers go about from county to county, and blow the flames of rebellion"). Various nonconformist insurrections gave credibility to these fears. See, *e.g.,* Clark, The Later Stuarts, at 22; Privy Council to Lord Newport (Mar. 4, 1661), in Transactions of the Shropshire Archaeological and Natural History Society, Pt. 2, 3d Ser., Vol. 4, p. 161 (1904).

It is in this turbulent context that the English kings permitted the disarming of "dangerous persons." English lords feared that nonconformists—*i.e.,* people with "'wicked and Rebellious Principles'"—had "'furnished themselves with quantities of Arms, and Ammunition'" "'to put in Execution their Trayterus designs.'" Privy Council to Lord Newport (Jan. 8, 1660), in *id.,* at 156; see Calendar Charles II 541 ("The fanatics . . . are high and insolent, and threaten all loyal people; they will soon be in arms"). In response, the Crown took measures to root out suspected rebels, which

10                     UNITED STATES *v.* RAHIMI

included "disarm[ing] all factious and seditious spirits." *Id.*, at 538 (Nov. 1, 1662). For example, following "turbulency and difficulties" arising from the Conventicles Act of 1670, which forbade religious nonconformists from assembling, the lord mayor of London pressed that "a special warrant or commission [was] necessary" empowering commissioners to "resist, fight, kill, and execute such rebels." Calendar of State Papers, Domestic Series, 1670, p. 236 (May 25, 1670) (M. Green ed. 1895) (emphasis deleted). King Charles II ordered the lord mayor "to make strict search in the city and precincts for dangerous and disaffected persons, seize and secure them and their arms, and detain them in custody till our further pleasure." *Id.*, at 237 (May 26, 1670).

History repeated itself a few decades later. In 1701, King William III declared that "great quantities of arms, and other provisions of war" had been discovered in the hands of "papists and other disaffected persons, who disown [the] government," and that such persons had begun to assemble "in great numbers . . . in the cities of London and Westminster." Calendar William III 233. He ordered the lord mayor of London and the justices of the peace to "secur[e] the government" by disarming "any persons whom they judge[d] dangerous," including "any papist, or reputed papist." *Id.*, at 233–234 (emphasis deleted). Similar disarmaments targeting "Papists and Non-jurors dangerous to the peace of the kingdom" continued into the 1700s. Privy Council to the Earl of Carlisle (July 30, 1714), in Historical Manuscripts Comm'n, Manuscripts of the Earl of Westmoreland et al. 10th Report, Appx., Pt. 4, p. 343 (1885). As before, disarmament was designed to stifle "wicked conspirac[ies]," such as "raising a Rebellion in this Kingdom in favour of a Popish Pretender." Lord Lonsdale to Deputy Lieutenants of Cumberland (May 20, 1722), in Historical Manuscripts Commission, Manuscripts of the Earl of Carlisle, 15th Report, Appx., Pt. 6, pp. 39–40 (1897).

THOMAS, J., dissenting

While the English were concerned about preventing insurrection and armed rebellion, §922(g)(8) is concerned with preventing interpersonal violence. "Dangerous" person laws thus offer the Government no support.

ii

The Government also points to historical commentary referring to the right of "peaceable" citizens to carry arms. It principally relies on commentary surrounding two failed constitutional proposals.[3] First, at the Massachusetts convention, Samuel Adams unsuccessfully proposed that the Bill of Rights deny Congress the power "to prevent the people of the United States, who are peaceable citizens, from keeping their own arms." 6 Documentary History of the Ratification of the Constitution 1453 (J. Kaminski & G. Saladino eds. 2000) (Documentary History). Second, Anti-Federalists at the Pennsylvania convention unsuccessfully proposed a Bill of Rights providing a "right to bear arms for the defense of themselves and their own state, or the United States, or for the purpose of killing game." 2 *id.,* at 597–598, ¶7 (M. Jensen ed. 1976). The Anti-Federalists' Bill of Rights would also state that "no law shall be passed for disarming the people or any of them, unless for crimes committed, or real danger of public injury from individuals."

_____

[3]The Government also cites an amendment to the Massachusetts Constitution providing that "the people have a right to keep and to bear Arms for their Own and the Common defence." The Popular Sources of Political Authority: Documents on the Massachusetts Constitution of 1780, p. 624 (O. Handlin & M. Handlin eds. 1966). The Government emphasizes that the amendment's proponents believed they "Ought Never to be deprived" of their arms, so long as they "Continue[d] honest and Lawfull Subjects of Government." *Ibid.* Even if the amendment contemplated disarming dishonest and unlawful subjects, the Government makes no effort to define those terms or explain why they necessarily include the individuals covered by §922(g)(8). In any event, evidence concerning what proponents behind an amendment to a single state constitution believed is too paltry to define the Second Amendment right. See *Bruen,* 597 U. S., at 46.

12          UNITED STATES *v.* RAHIMI

THOMAS, J., dissenting

*Id.*, at 598.

These proposals carry little interpretative weight. To begin with, it is "dubious to rely on [drafting] history to interpret a text that was widely understood to codify a preexisting right." *Heller*, 554 U. S., at 603. Moreover, the States rejected the proposals. Samuel Adams withdrew his own proposal after it "alarmed both Federalists and Anti-federalists." 6 Documentary History 1453 (internal quotation marks omitted).[4] The Pennsylvania Anti-Federalists' proposal similarly failed to gain a majority of the state convention. 2 B. Schwartz, The Bill of Rights: A Documentary History 628 (1971).

The Government never explains why or how language *excluded* from the Constitution could operate to limit the language actually ratified. The more natural inference seems to be the opposite—the unsuccessful proposals suggest that the Second Amendment preserves a more expansive right. After all, the Founders considered, and rejected, any textual limitations in favor of an unqualified directive: "[T]he right of the people to keep and bear Arms, shall not be infringed."

In addition to the proposals, the Government throws in a hodgepodge of sources from the mid-to-late 1800s that use the phrase "peaceable" in relation to firearms. Many of the sources simply make passing reference to the notion. See, *e.g.*, H. R. Rep. No. 30, 39th Cong., 1st Sess., pt. 2, p. 229 (1866) (proposed circular explaining freed slaves "have shown by their peaceful and orderly conduct that they can safely be trusted with fire-arms, and they need them to kill game for subsistence"). Other sources are individual musings on firearms policy. See, *e.g.*, The Sale of Pistols, N. Y. Times, June 22, 1874 (advocating for "including pistols in

———————

[4] When Anti-Federalists renewed Samuel Adams' proposal, not only did the proposal fail, but Adams himself voted against it. 6 Documentary History 1453.

THOMAS, J., dissenting

the law against carrying concealed weapons"). Sources that do discuss disarmament generally describe nonpeaceable citizens as those who threaten the public or government. For example, the Government quotes a Union General's order that "all loyal and peaceable citizens in Missouri will be permitted to bear arms." Headquarters, Dept. of the Missouri, General Orders, No. 86 (Aug. 25, 1863), in The War of the Rebellion: A Compilation of the Official Records of the Union and Confederate Armies, Ser. 1, Vol. 22, Pt. 2, p. 475 (1888). Yet, the Government fails to mention that the Union General's order addresses the "[l]arge numbers of men . . . leaving the broken rebel armies . . . and returning to Missouri . . . with the purpose of following a career of plunder and murder." *Id.*, at 474. The order provided that "all those who voluntarily abandon[ed] the rebel cause" could return to Missouri, but only if they "surrender[ed] themselves and their arms," "[took] the oath of allegiance and [gave] bond for their future good conduct." *Ibid.* By contrast, "all loyal and peaceable citizens in Missouri w[ere] permitted to bear arms" to "protect themselves from violence" and "aid the troops." *Id.*, at 475. Thus, the term "loyal and peaceable" distinguished between the former rebels residing in Missouri who were disarmed to prevent rebellion and those citizens who would help fight against them.

The Government's smorgasbord of commentary proves little of relevance, and it certainly does not establish a "historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 597 U. S., at 19.

iii

The Government's remaining evidence is even further afield. The Government points to an assortment of firearm regulations, covering everything from storage practices to treason and mental illness. They are all irrelevant for purposes of §922(g)(8). Again, the "central considerations"

14          UNITED STATES *v.* RAHIMI

Thomas, J., dissenting

when comparing modern and historical regulations are
whether they "impose a comparable burden" that is "com-
parably justified." *Id.,* at 29 (emphasis deleted; internal
quotation marks omitted). The Government's evidence
touches on one or *none* of these considerations.

The Government's reliance on firearm storage laws is a
helpful example. These laws penalized the improper stor-
age of firearms with forfeiture of those weapons. See, *e.g.,*
Act of Mar. 1, 1783, ch. 46, 1782 Mass. Acts pp. 119–120.
First, these storage laws did not impose a "comparable bur-
den" to that of §922(g)(8). Forfeiture still allows a person to
keep their other firearms or obtain additional ones. It is in
no way equivalent to §922(g)(8)'s complete prohibition on
owning or possessing any firearms.

In fact, the Court already reached a similar conclusion in
*Heller.* The Court was tasked with comparing laws impos-
ing "a small fine and forfeiture of the weapon" with the Dis-
trict of Columbia's ban on keeping functional handguns at
home for self-defense, which was punishable by a year in
prison. 554 U. S., at 633–634. We explained that the for-
feiture laws were "akin to modern penalties for minor pub-
lic-safety infractions like speeding or jaywalking." *Id.,* at
633. Such inconsequential punishment would not have
"prevented a person in the founding era from using a gun
to protect himself or his family." *Id.,* at 634. Accordingly,
we concluded that the burdens were not equivalent. See *id.,*
at 633–634. That analysis applies here in full force. If a
small fine and forfeiture is not equivalent to the District of
Columbia's handgun ban, it certainly falls short of
§922(g)(8)'s ban on possessing any firearm.

The Government resists the conclusion that forfeiture is
less burdensome than a possession ban, arguing that "[t]he
burdens imposed by bans on keeping, bearing, and obtain-
ing arms are all comparable." Reply Brief 10. But, there is
surely a distinction between having *no* Second Amendment
rights and having *some* Second Amendment rights. If self-

THOMAS, J., dissenting

defense is "the central component of the [Second Amendment] right," then common sense dictates that it matters whether you can defend yourself with a firearm anywhere, only at home, or nowhere. *Heller*, 554 U. S., at 599 (emphasis deleted). And, the Government's suggestion ignores that we have repeatedly drawn careful distinctions between various laws' burdens. See, *e.g.*, *id.*, at 632 (explaining that laws that "did not clearly prohibit loaded weapons . . . do not remotely burden the right of self-defense as much as an absolute ban on handguns"); see also *Bruen*, 597 U. S., at 48.

Our careful parsing of regulatory burdens makes sense given that the Second Amendment codifies a right with a "historically fixed meaning." *Id.*, at 28. Accordingly, history is our reference point and anchor. If we stray too far from it by eliding material differences between historical and modern laws, we "risk endorsing outliers that our ancestors would never have accepted." *Id.*, at 30 (internal quotation marks and alteration omitted).

Second, the Government offers no "comparable justification" between laws punishing firearm storage practices and §922(g)(8). It posits that both laws punish persons whose "conduct suggested that he would not use [firearms] responsibly." Brief for United States 24. The Government, however, does not even attempt to ground that justification in historical evidence. See *infra*, at 28–29.

The Government's proposed justification is also far too general. Nearly all firearm regulations can be cast as preventing "irresponsible" or "unfit" persons from accessing firearms. In addition, to argue that a law limiting access to firearms is justified by the fact that the regulated groups should not have access to firearms is a logical merry-go-round. As the Court has made clear, such overly broad judgments cannot suffice. In *Bruen*, New York claimed it could effectively ban public carry because "the island of Manhattan [is] a 'sensitive place.'" 597 U. S., at 31. New

THOMAS, J., dissenting

York defined a "sensitive place" as "all places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available." *Id.*, at 30–31 (internal quotation marks omitted). The Court rejected that definition as "far too broa[d]" as it "would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense." *Id.*, at 31. Likewise, calling a modern and historical law comparably justified because they both prevent unfit persons from accessing firearms would render our comparable-justification inquiry toothless.[5]

In sum, the Government has not identified any historical regulation that is relevantly similar to §922(g)(8).

2

This dearth of evidence is unsurprising because the Founders responded to the societal problem of interpersonal violence through a less burdensome regime: surety laws. Tracing back to early English history, surety laws were a preventative mechanism for ensuring an individual's future peaceable conduct. See D. Feldman, The King's Peace, the Royal Prerogative and Public Order, 47 Cambridge L. J. 101, 101–102 (1988); M. Dalton, The Countrey Justice 140–144 (1619). If someone received a surety demand, he was required to go to a court or judicial officer

---

[5]The Government's other analogies suffer from the same flaws as the firearm storage laws. It cites laws restricting firearm sales to and public carry by various groups such as minors and intoxicated persons; laws confiscating firearms from rioters; and laws disarming insurrectionists and rebels. Brief for United States 22–27. These laws target different groups of citizens, for different reasons, and through different, less onerous burdens than §922(g)(8). See *Bruen*, 597 U. S., at 70 (explaining that regulations "limit[ing] the intent for which one could carry arms, the manner by which one carried arms, or the exceptional circumstances under which one could not carry arms" do not justify "broadly prohibit[ing] the public carry of commonly used firearms for personal defense"). None establishes that the particular regulation at issue here would have been within the bounds of the pre-existing Second Amendment right.

THOMAS, J., dissenting

with one or more members of the community—*i.e.*, sureties—and comply with certain conditions. 4 W. Blackstone, Commentaries on the Laws of England 249–250 (1769) (Blackstone). Specifically, the person providing sureties was required to "keep the peace: either generally . . . or . . . with regard to the person who crave[d] the security" until a set date. *Id.*, at 250. If he kept the peace, the surety obligation dissolved on that predetermined date. See *ibid.* If, however, he breached the peace before that date, he and his sureties would owe a set sum of money. See *id.*, at 249–250. Evidence suggests that sureties were readily available. Even children, who "[we]re incapable of engaging themselves to answer any debt," could still find "security by their friends." *Id.*, at 251.

There is little question that surety laws applied to the threat of future interpersonal violence. "[W]herever any private man [had] just cause to fear, that another w[ould] burn his house, or do him a corporal injury, by killing, imprisoning, or beating him . . . he [could] demand surety of the peace against such person." *Id.*, at 252; see also J. Backus, The Justice of the Peace 25 (1816) (providing for sureties when a person "stands in fear of his life, or of some harm to be done to his person or his estate" (emphasis deleted)).

Surety demands were also expressly available to prevent domestic violence. Surety could be sought by "a wife against her husband who threatens to kill her or beat her outrageously, or, if she have notorious cause to fear he will do either." *Id.*, at 24; see 1 W. Hawkins, Pleas of the Crown 253 (6th ed. 1777) ("[I]t is certain, that a wife may demand [a surety] against her husband threatening to beat her outrageously, and that a husband also may have it against his wife"). The right to demand sureties in cases of potential domestic violence was recognized not only by treatises, but also the founding-era courts. Records from before and after the Second Amendment's ratification reflect that spouses

THOMAS, J., dissenting

successfully demanded sureties when they feared future do-
mestic violence. See, *e.g.*, Records of the Courts of Quarter
Sessions and Common Pleas of Bucks County, Pennsylva-
nia, 1684–1700, pp. 80–81 (1943) (detailing surety de-
manded upon allegations that a husband was "abusive to
[his wife] that she was afraid of her Life & of her Childrns
lifes"); see also *Heyn's Case*, 2 Ves. & Bea. 182, 35 Eng. Rep.
288 (Ch. 1813) (1822) (granting wife's request to order her
husband who committed "various acts of ill usage and
threats" to "find sufficient sureties"); *Anonymous*, 1
S. C. Eq. 113 (1785) (order requiring husband to "enter into
recognizance . . . with two sureties . . . for keeping the peace
towards the complainant (his wife)").

3

Although surety laws shared a common justification with
§922(g)(8), surety laws imposed a materially different bur-
den. Critically, a surety demand did not alter an individ-
ual's right to keep and bear arms. After providing sureties,
a person kept possession of all his firearms; could purchase
additional firearms; and could carry firearms in public and
private. Even if he breached the peace, the only penalty
was that he and his sureties had to pay a sum of money. 4
Blackstone 250. To disarm him, the Government would
have to take some other action, such as imprisoning him for
a crime. See Feldman, 47 Cambridge L. J., at 101.

By contrast, §922(g)(8) strips an individual of his Second
Amendment right. The statute's breadth cannot be over-
stated. For one, §922(g) criminalizes nearly all conduct re-
lated to covered firearms and ammunition. Most funda-
mentally, possession is prohibited, except in the rarest of
circumstances. See, *e.g., United States* v. *Rozier*, 598 F. 3d
768, 771 (CA11 2010) (*per curiam*) (concluding that it was
"irrelevant" whether defendant "possessed the handgun for
purposes of self-defense (in his home)"); *United States* v.

THOMAS, J., dissenting

*Gant*, 691 F. 2d 1159, 1162 (CA5 1982) (affirming conviction of a business owner under §922(g) predecessor statute for briefly possessing a firearm to ward off suspected robbers).  Courts of Appeals have understood "possession" broadly, upholding convictions where a person "picked up . . . three firearms for a few seconds to inspect" each, *United States* v. *Matthews*, 520 F. 3d 806, 807 (CA7 2008), or "made direct contact with the firearm by sitting on it," *United States* v. *Johnson*, 46 F. 4th 1183, 1189 (CA10 2022).  They have also construed §922(g) to bar "constructive possession" of a firearm, including, for example, ammunition found in a jointly occupied home. See, *e.g., United States* v. *Stepp*, 89 F. 4th 826, 832–835 (CA10 2023).

Moreover, §922(g) captures virtually all commercially available firearms and ammunition.  It prohibits possessing a firearm "in or affecting commerce" and "receiv[ing] any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." §922(g).  As courts have interpreted that nexus, if a firearm or ammunition has at any point crossed interstate lines, it is regulated by §922(g).  See *Scarborough* v. *United States*, 431 U. S. 563, 566–567 (1977) (holding §922(g)'s predecessor statute covered firearm that "had previously traveled in interstate commerce"); *United States* v. *Lemons*, 302 F. 3d 769, 772 (CA7 2002) (affirming conviction under §922(g) for possessing firearm that "crossed into Wisconsin after its manufacture at some indeterminate moment in time— possibly years before it was discovered in [the defendant's] possession").[6]  In fact, the statute goes even further by regulating not only ammunition but also all *constituent parts*

––––––––––

[6]The majority correctly declines to consider Rahimi's Commerce Clause challenge because he did not raise it below.  See *Cutter* v. *Wilkinson*, 544 U. S. 709, 718, n. 7 (2005) ("[W]e are a court of review, not of first view").  That said, I doubt that §922(g)(8) is a proper exercise of Congress's power under the Commerce Clause. See *United States* v. *Lopez*, 514 U. S. 549, 585 (1995) (THOMAS, J., concurring).

20                UNITED STATES *v.* RAHIMI

Thomas, J., dissenting

of ammunition—many of which are parts with no danger-
ous function on their own. See 18 U. S. C. §921(a)(17)(A).

These sweeping prohibitions are criminally enforced. To
violate the statute is a felony, punishable by up to 15 years.
§924(a)(8). That felony conviction, in turn, triggers a per-
manent, life-long prohibition on exercising the Second
Amendment right. See §922(g)(1).

The combination of the Government's sweeping view of
the firearms and ammunition within its regulatory reach
and the broad prohibition on any conduct regarding covered
firearms and ammunition makes §922(g)(8)'s burden un-
mistakable: The statute revokes a citizen's Second Amend-
ment right while the civil restraining order is in place. And,
that revocation is absolute. It makes no difference if the
covered individual agrees to a no-contact order, posts a
bond, or even moves across the country from his former do-
mestic partner—the bar on exercising the Second Amend-
ment right remains. See *United States* v. *Wilkey*, 2020 WL
4464668, *1 (D Mont., Aug. 4, 2020) (defendant agreed to
Florida protection order so he could "'just walk away'" and
was prosecuted several years later for possessing firearms
in Montana).

That combination of burdens places §922(g)(8) in an en-
tirely different stratum from surety laws. Surety laws pre-
serve the Second Amendment right, whereas §922(g)(8)
strips an individual of that right. While a breach of a surety
demand was punishable by a fine, §922(g)(8) is punishable
by a felony conviction, which in turn permanently revokes
an individual's Second Amendment right. At base, it is dif-
ficult to imagine how surety laws can be considered rele-
vantly similar to a complete ban on firearm ownership, pos-
session, and use.

This observation is nothing new; the Court has already
recognized that surety laws impose a lesser relative burden
on the Second Amendment right. In *Bruen*, the Court ex-

Thomas, J., dissenting

plained that surety laws merely "provide financial incentives for responsible arms carrying." 597 U. S., at 59. "[A]n accused arms-bearer 'could go on carrying without criminal penalty' so long as he 'post[ed] money that would be forfeited if he breached the peace or injured others.'" *Id.*, at 56–57 (quoting *Wrenn* v. *District of Columbia*, 864 F. 3d 650, 661 (CADC 2017); alteration in original). As a result, we held that surety laws were not analogous to New York's effective ban on public carry. 597 U. S., at 55. That conclusion is damning for §922(g)(8), which burdens the Second Amendment right even more with respect to covered individuals.

Surety laws demonstrate that this case should have been a "straightforward" inquiry. *Id.*, at 27. The Government failed to produce a single historical regulation that is relevantly similar to §922(g)(8). Rather, §922(g)(8) addresses a societal problem—the risk of interpersonal violence—"that has persisted since the 18th century," yet was addressed "through [the] materially different means" of surety laws. *Id.*, at 26.

## C

The Court has two rejoinders, surety and affray laws. Neither is a compelling historical analogue. As I have explained, surety laws did not impose a burden comparable to §922(g)(8). And, affray laws had a dissimilar burden *and* justification. The Court does not reckon with these vital differences, asserting that the disagreement is whether surety and affray laws must be an exact copy of §922(g)(8). *Ante*, at 16. But, the historical evidence shows that those laws are worlds—not degrees—apart from §922(g)(8). For this reason, the Court's argument requires combining aspects of surety and affray laws to justify §922(g)(8). This piecemeal approach is not what the Second Amendment or our precedents countenance.

22              UNITED STATES *v.* RAHIMI

THOMAS, J., dissenting

1

Despite the foregoing evidence, the Court insists that surety laws in fact *support* §922(g)(8). To make its case, the Court studiously avoids discussing the full extent of §922(g)(8)'s burden as compared to surety laws. The most the Court does is attack *Bruen*'s conclusion that surety laws were less burdensome than a public carry ban. The Court reasons that *Bruen* dealt with a "broad prohibitory regime" while §922(g)(8) applies to only a subset of citizens. *Ante,* at 15–16. Yet, that was only one way in which *Bruen* distinguished a public carry ban from surety laws' burden. True, *Bruen* noted that, unlike the public carry ban, surety laws did not restrict the general citizenry. But, *Bruen* also plainly held that surety laws did not "constitut[e] a 'severe' restraint on public carry, let alone a restriction tantamount to a ban." 597 U. S., at 59. In fact, that conclusion is repeated throughout the opinion. *Id.*, at 55–59 (surety laws "were not *bans* on public carry"; "surety laws did not *prohibit* public carry"; surety laws "were not viewed as substantial restrictions on public carry"; and "surety statutes did not directly restrict public carry"). *Bruen*'s conclusion is inescapable and correct. Because surety laws are not equivalent to an effective ban on public carry, they do not impose a burden equivalent to a complete ban on carrying *and* possessing firearms.

Next, the Court relies on affray laws prohibiting "riding or going armed, with dangerous or unusual weapons, [to] terrif[y] the good people of the land." 4 Blackstone 149 (emphasis deleted). These laws do not justify §922(g)(8) either. As the Court concedes, why and how a historical regulation burdened the right of armed self-defense are central considerations. *Ante*, at 7. Affray laws are not a fit on either basis.

First, affray laws had a distinct justification from §922(g)(8) because they regulated only certain public conduct that injured the entire community. An affray was a

"common Nusanc[e]," 1 Hawkins, Pleas of the Crown, at 135, defined as "the fighting of two or more persons in some public place, to the terror of his majesty's subjects," 4 Blackstone 145. Even though an affray generally required "actual violence," certain other conduct could suffice. 1 R. Burn, The Justice of the Peace, and Parish Officer 13 (2d ed. 1756). As relevant here, an affray included arming oneself "with dangerous and unusual weapons, in such a manner as [to] naturally cause a terror to the people"—*i.e.*, "going armed." *Ibid.* Many postfounding going armed laws had a self-defense exception: A person could "go armed with a[n] . . . offensive and dangerous weapon" so long as he had "reasonable cause to fear an assault or other injury." Mass. Rev. Stat., ch. 134, §16 (1836); see also 1838 Terr. of Wis. Stat. §16, p. 381; 1851 Terr. of Minn. Rev. Stat., ch. 112, §18.

Affrays were defined by their public nature and effect. An affray could occur only in "some public place," and captured only conduct affecting the broader public. 4 Blackstone 145. To that end, going armed laws did not prohibit carrying firearms at home or even public carry generally. See *Bruen*, 597 U. S., at 47–50. Instead, they targeted only public carry that was "accompanied with such circumstances as are apt to terrify the people." 1 Burn, Justice of the Peace, at 13; see *Bruen*, 597 U. S., at 50 (explaining that going armed laws "prohibit bearing arms in a way that spreads 'fear' or 'terror' among the people").

Affrays were intentionally distinguished from assaults and private interpersonal violence on that same basis. See *Cash* v. *State*, 2 Tenn. 198, 199 (1813) ("It is because the violence is committed in a public place, and to the terror of the people, that the crime is called an affray, instead of assault and battery"); *Nottingham* v. *State*, 227 Md. App. 592, 602, 135 A. 3d 541, 547 (Md. 2016) ("[U]nlike assault and battery," affray is "not a crime against the person; rather, affray is a crime against the public" (internal quotation

Thomas, J., dissenting

marks omitted)).  As treatises shortly before the founding explain, "there may be an Assault which will not amount to an Affray; as where it happens in a private Place, out of the hearing or seeing of any, except the Parties concerned; in which Case it cannot be said to be to the Terror of the People."  1 Hawkins, Pleas of the Crown, at 134; see 1 Burn, Justice of the Peace, at 13.  Affrays thus did not cover the very conduct §922(g)(8) seeks to prevent—interpersonal violence in the home.

Second, affray laws did not impose a burden analogous to §922(g)(8).  They regulated a niche subset of Second Amendment-protected activity.  As explained, affray laws prohibited only carrying certain weapons ("dangerous and unusual") in a particular manner ("terrifying the good people of the land" without a need for self-defense) and in particular places (in public).  Meanwhile, §922(g)(8) prevents a covered person from carrying any firearm or ammunition, in any manner, in any place, at any time, and for any reason.  Section 922(g)(8) thus bans *all* Second Amendment-protected activity.  Indeed, this Court has already concluded that affray laws do not impose a burden "analogous to the burden created by" an effective ban on public carry.  *Bruen*, 597 U. S., at 50.  Surely, then, a law that imposes a public and private ban on a covered individual cannot have an analogous burden either.

The Court counters that since affray laws "provided for imprisonment," they imposed a lesser burden than §922(g)(8)'s disarmament.  *Ante*, at 14.  But, that argument serves only to highlight another fundamental difference: Affray laws were criminal statutes that penalized past behavior, whereas §922(g)(8) is triggered by a civil restraining order that seeks to prevent future behavior.  Accordingly, an affray's burden was vastly harder to impose.  To imprison a person, a State had to prove that he committed the crime of affray beyond a reasonable doubt.  The Constitu-

THOMAS, J., dissenting

tion provided a bevy of protections during that process—including a right to a jury trial, counsel, and protections against double jeopardy. See Amdts. 5, 6.

The imposition of §922(g)(8)'s burden, however, has far fewer hurdles to clear. There is no requirement that the accused has actually committed a crime; instead, he need only be prohibited from threatening or using force, or pose a "credible threat" to an "intimate partner or child." §922(g)(8)(C). Section 922(g)(8) thus revokes a person's Second Amendment right based on the suspicion that he *may* commit a crime in the future. In addition, the only process required before that revocation is a hearing on the underlying court order. §922(g)(8)(A). During that civil hearing—which is not even about §922(g)(8)—a person has fewer constitutional protections compared to a criminal prosecution for affray. Gone are the Sixth Amendment's panoply of rights, including the rights to confront witnesses and have assistance of counsel, as well as the Fifth Amendment's protection against double jeopardy. See *Turner* v. *Rogers*, 564 U. S. 431, 441 (2011) ("[T]he Sixth Amendment does not govern civil cases"); *Hudson* v. *United States*, 522 U. S. 93, 99 (1997) ("The [Double Jeopardy] Clause protects only against the imposition of multiple *criminal* punishments for the same offense"). Civil proceedings also do not require proof beyond a reasonable doubt, and some States even set aside the rules of evidence, allowing parties to rely on hearsay. See, *e.g.,* Wash. Rule Evid. 1101(c)(4) (2024) (providing the state rules of evidence "need not be applied" to applications for protection orders (boldface and capitalization deleted)); Cal. Civ. Proc. Code Ann. §527.6(i) (West Supp. 2024) (judge "shall receive any testimony that is relevant" and issue order based on clear and convincing evidence). The differences between criminal prosecutions and civil hearings are numerous and consequential.

Affray laws are wide of the mark. While the Second Amendment does not demand a historical twin, it requires

THOMAS, J., dissenting

something closer than affray laws, which expressly carve out the very conduct §922(g)(8) was designed to prevent (interpersonal violence in the home). Nor would I conclude that affray laws—criminal laws regulating a specific type of public carry—are analogous to §922(g)(8)'s use of a civil proceeding to bar all Second Amendment-protected activity.

### 2

The Court recognizes that surety and affray laws on their own are not enough. So it takes pieces from each to stitch together an analogue for §922(g)(8). *Ante,* at 13. Our precedents foreclose that approach. The question before us is whether a single historical law has both a comparable burden and justification as §922(g)(8), not whether several laws can be cobbled together to qualify. As *Bruen* explained, "determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations"—the historical and modern regulations—"are 'relevantly similar.'" 597 U. S., at 28–29. In doing so, a court must consider whether that single historical regulation "impose[s] a comparable burden on the right of armed self-defense *and* whether that burden is comparably justified." *Id.,* at 29 (emphasis added).

The Court's contrary approach of mixing and matching historical laws—relying on one law's burden and another law's justification—defeats the purpose of a historical inquiry altogether. Given that imprisonment (which involved disarmament) existed at the founding, the Government can always satisfy this newly minted comparable-burden requirement. See *ante,* at 14–15. That means the Government need only find a historical law with a comparable justification to validate modern disarmament regimes. As a result, historical laws fining certain behavior could justify completely disarming a person for the same behavior. That

Cite as: 602 U. S. ____ (2024)            27

is the exact sort of "regulatory blank check" that *Bruen* warns against and the American people ratified the Second Amendment to preclude. 597 U. S., at 30.

Neither the Court nor the Government identifies a single historical regulation with a comparable burden and justification as §922(g)(8). Because there is none, I would conclude that the statute is inconsistent with the Second Amendment.

### IV

The Government, for its part, tries to rewrite the Second Amendment to salvage its case. It argues that the Second Amendment allows Congress to disarm anyone who is not "responsible" and "law-abiding." Not a single Member of the Court adopts the Government's theory. Indeed, the Court disposes of it in half a page—and for good reason. *Ante,* at 17. The Government's argument lacks any basis in our precedents and would eviscerate the Second Amendment altogether.

### A

The Government's position is a bald attempt to refashion this Court's doctrine. At the outset of this case, the Government contended that the Court has already held the Second Amendment protects only "responsible, law-abiding" citizens. Brief for United States 6, 11–12. The plain text of the Second Amendment quashes this argument. The Amendment recognizes "the right of the *people* to keep and bear Arms." (Emphasis added.) When the Constitution refers to "the people," the term "unambiguously refers to all members of the political community." *Heller*, 554 U. S., at 580; see also *id*., at 581 (beginning its analysis with the strong "presumption that the Second Amendment right . . . belongs to all Americans"). The Government's claim that the Court already held the Second Amendment protects

28                  UNITED STATES *v.* RAHIMI

                          THOMAS, J., dissenting

only "law-abiding, responsible citizens" is specious at best.[7]
See *ante*, at 17.

At argument, the Government invented yet another posi-
tion.  It explained that when it used the term "responsible"
in its briefs, it *really* meant "not dangerous."  See Tr. of Oral
Arg. 10–11.  Thus, it posited that the Second Amendment
protects only law-abiding and *non-dangerous* citizens.  No
matter how many adjectives the Government swaps out,
the fact remains that the Court has never adopted anything
akin to the Government's test.  In reality, the "law-abiding,
dangerous citizen" test is the Government's own creation,
designed to justify every one of its existing regulations.  It
has no doctrinal or constitutional mooring.

The Government finally tries to cram its dangerousness
test into our precedents.  It argues that §922(g)(8) and its
proffered historical laws have a shared justification of dis-
arming dangerous citizens.  The Government, however,
does not draw that conclusion by examining the historical
justification for each law cited.  Instead, the Government
simply looks—from a modern vantage point—at the mix of
laws and manufactures a possible connection between them
all.  Yet, our task is to "assess whether modern firearms
regulations are consistent with the Second Amendment's
text and *historical* understanding."  *Bruen*, 597 U. S., at 26
(emphasis added).  To do so, we must look at the historical
law's justification as articulated during the relevant time
period—not at modern *post-hoc* speculations.  See, *e.g.*, *id.*,
at 41–42, 48–49; *Heller*, 554 U. S., at 631–632.  As I have
explained, a historically based study of the evidence reveals
that the Government's position is untenable.  *Supra*, at 7–

---

  [7]The only conceivably relevant language in our precedents is the pass-
ing reference in *Heller* to laws banning felons and others from possessing
firearms.  See 554 U. S., at 626–627, and n. 26.  That discussion is dicta.
As for *Bruen*, the Court used the phrase "ordinary, law-abiding citizens"
merely to describe those who were unable to publicly carry a firearm in
New York.  See, *e.g.*, 597 U. S., at 9, 15, 31–32, 71.

13.

As it does today, the Court should continue to rebuff the Government's attempts to rewrite the Second Amendment and the Court's precedents interpreting it.

## B

The Government's "law-abiding, dangerous citizen" theory is also antithetical to our constitutional structure. At bottom, its test stems from the idea that the Second Amendment points to general principles, not a historically grounded right. And, it asserts that one of those general principles is that Congress can disarm anyone it deems "dangerous, irresponsible, or otherwise unfit to possess arms." Brief for United States 7. This approach is wrong as a matter of constitutional interpretation, and it undermines the very purpose and function of the Second Amendment.

The Second Amendment recognizes a pre-existing right and that right was "enshrined with the scope" it was "understood to have when the people adopted [the Amendment]." *Heller*, 554 U. S., at 634–635. Only a subsequent constitutional amendment can alter the Second Amendment's terms, "whether or not future legislatures or . . . even future judges think [its original] scope [is] too broad." *Id.,* at 635.

Yet, the Government's "law-abiding, dangerous citizen" test—and indeed any similar, principle-based approach—would hollow out the Second Amendment of any substance. Congress could impose any firearm regulation so long as it targets "unfit" persons. And, of course, Congress would also dictate what "unfit" means and who qualifies. See Tr. of Oral Arg. 7, 51. The historical understanding of the Second Amendment right would be irrelevant. In fact, the Government posits that Congress could enact a law that the Founders explicitly rejected. See *id.,* at 18 (agreeing that

30          UNITED STATES *v.* RAHIMI

THOMAS, J., dissenting

modern judgment would override "[f]ounding-[e]ra applications"). At base, whether a person could keep, bear, or even possess firearms would be Congress's policy choice under the Government's test.

That would be the direct inverse of the Founders' and ratifying public's intent. Instead of a substantive right guaranteed to every individual *against* Congress, we would have a right controlled *by* Congress. "A constitutional guarantee subject to future judges' [or Congresses'] assessments of its usefulness is no constitutional guarantee at all." *Heller*, 554 U. S., at 634. The Second Amendment is "the very *product* of an interest balancing by the people." *Id.*, at 635. It is this policy judgment—not that of modern and future Congresses—"that demands our unqualified deference." *Bruen*, 597 U. S., at 26.

The Government's own evidence exemplifies the dangers of approaches based on generalized principles. Before the Court of Appeals, the Government pointed to colonial statutes "disarming classes of people deemed to be threats, including . . . slaves, and native Americans." Supp. Brief for United States in No. 21–11001 (CA5), p. 33. It argued that since early legislatures disarmed groups considered to be "threats," a modern Congress has the same authority. *Ibid.* The problem with such a view should be obvious. Far from an exemplar of Congress's authority, the discriminatory regimes the Government relied upon are cautionary tales. They warn that when majoritarian interests alone dictate who is "dangerous," and thus can be disarmed, disfavored groups become easy prey. One of many such examples was the treatment of freed blacks following the Civil War. "[M]any of the over 180,000 African-Americans who served in the Union Army returned to the States of the old Confederacy, where systematic efforts were made to disarm them and other blacks." *McDonald* v. *Chicago*, 561 U. S. 742, 771 (2010). Some "States formally prohibited African-Americans from possessing firearms." *Ibid.* And,

THOMAS, J., dissenting

"[t]hroughout the South, armed parties . . . forcibly took firearms from newly freed slaves." *Id.*, at 772. "In one town, the marshal took all arms from returned colored soldiers, and was very prompt in shooting the blacks whenever an opportunity occurred." *Ibid.* (alterations and internal quotation marks omitted). A constitutional amendment was ultimately "necessary to provide full protection for the rights of blacks." *Id.*, at 775.

The Government peddles a modern version of the governmental authority that led to those historical evils. Its theory would allow federal majoritarian interests to determine who can and cannot exercise their constitutional rights. While Congress cannot revive disarmament laws based on race, one can easily imagine a world where political minorities or those with disfavored cultural views are deemed the next "dangers" to society. Thankfully, the Constitution prohibits such laws. The "very enumeration of the [Second Amendment] right takes out of the hands of government . . . the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Heller*, 544 U. S., at 634.

The Court rightly rejects the Government's approach by concluding that any modern regulation must be justified by specific historical regulations. See *ante*, at 10–15. But, the Court should remain wary of any theory in the future that would exchange the Second Amendment's boundary line—"the right of the people to keep and bear Arms, shall not be infringed"—for vague (and dubious) principles with contours defined by whoever happens to be in power.

*          *          *

This case is not about whether States can disarm people who threaten others. States have a ready mechanism for disarming anyone who uses a firearm to threaten physical violence: criminal prosecution. Most States, including Texas, classify aggravated assault as a felony, punishable

32                    UNITED STATES *v.* RAHIMI

THOMAS, J., dissenting

by up to 20 years' imprisonment.  See Tex. Penal Code Ann.
§§22.02(b), 12.33 (West 2019 and Supp. 2023).  Assuming
C. M.'s allegations could be proved, Texas could have con-
victed and imprisoned Rahimi for every one of his alleged
acts.  Thus, the question before us is not whether Rahimi
and others like him can be disarmed consistent with the
Second Amendment.  Instead, the question is whether the
Government can strip the Second Amendment right of any-
one subject to a protective order—even if he has never been
accused or convicted of a crime.  It cannot.  The Court and
Government do not point to a single historical law revoking
a citizen's Second Amendment right based on possible in-
terpersonal violence.  The Government has not borne its
burden to prove that §922(g)(8) is consistent with the Sec-
ond Amendment's text and historical understanding.

The Framers and ratifying public understood "that the
right to keep and bear arms was essential to the preserva-
tion of liberty."  *McDonald*, 561 U. S., at 858 (THOMAS, J.,
concurring in part and concurring in judgment).  Yet, in the
interest of ensuring the Government can regulate one sub-
set of society, today's decision puts at risk the Second
Amendment rights of many more.  I respectfully dissent.

1
2

**CERTIFICATE OF SERVICE**
IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

3
4

Case Name: *California Rifle and Pistol Association, et al., v. Los Angeles County Sheriff's Dept., et al.*

5

Case No.:    2:23-cv-10169-SPG (ADSx)

6

IT IS HEREBY CERTIFIED THAT:

7
8

  I, the undersigned, am a citizen of the United States and am at least eighteen years of age. My business address is 180 East Ocean Boulevard, Suite 200, Long Beach, California 90802.

9

  I am not a party to the above-entitled action. I have caused service of:

10

**PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY AND UPDATE ON PLAINTIFF PERMIT ISSUANCE STATUS**

11

on the following parties, as follows:

12
13

See attached Service List.

14

by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

15
16

  I declare under penalty of perjury that the foregoing is true and correct.

17

Executed July 29, 2024.

18
19
20

Laura Palmerin

21
22
23
24
25
26
27
28

CERTIFICATE OF SERVICE

## SERVICE LIST

1

2   Mark R Beckington
    Jane E. Reilley
3   jane.reilley@doj.ca.gov
    Christina R.B. Lopez,
4   christina.lopez@doj.ca.gov
    California Department of Justice
5   Office of the Attorney General
    300 South Spring Street, Suite 1702
6   Los Angeles, CA 90013-1230

7       *Attorneys for Defendant Rob Bonta*

8   Mark Selwyn
    mark.selwyn@wilmerhale.com
9   WILMER CUTLER PICKERING HALE AND DORR LLP
    2600 El Camino Road
10  Palo Alto, CA 94306

11  Alan Schoenfeld
    alan.schoenfeld@wilmerhale.com
12  Noah Levine
    noah.levine@wilmerhale.com
13  Ryan Chabot
    ryan.chabot@wilmerhale.com
14  WILMER CUTLER PICKERING HALE AND DORR LLP
    7 World Trade Center
15  250 Greenwich Street
    New York, NY 10007
16
17      *Attorneys for Defendants Los Angeles County Sheriff's Department and Sheriff Robert Luna*

18

19  Bruce A. Lindsay
    bal@jones-mayer.com
20  Monica Choi Arredondo
    mca@jones-mayer.com
21  JONES MAYER
    3777 N. Harbor Blvd.
22  Fullerton, CA 92835

23      *Attorneys for Defendants La Verne Police Department and La Verne Chief of Police Colleen Flores*

24

25

26

27

28