1
2
3
4
5
6
7

8          **UNITED STATES DISTRICT COURT**

9          **CENTRAL DISTRICT OF CALIFORNIA**

10

11   CALIFORNIA RIFLE & PISTOL                Case No. 2:23-cv-10169-SPG-ADS
     ASSOCIATION, INCORPORATED, et al.,
12                                            **ORDER GRANTING IN PART,**
                        Plaintiffs,           **DENYING IN PART, PLAINTIFFS'**
13                                            **MOTION FOR PRELIMINARY**
              v.                              **INJUNCTION [ECF NO. 20]**
14

15   LOS ANGELES COUNTY SHERIFF'S
     DEPARTMENT, et al.,
16
                        Defendants.
17

18

19        Before the Court is Plaintiffs' California Rifle & Pistol Association, Incorporated;

20   the Second Amendment Foundation; Gun Owners of America, Inc.; Gun Owners

21   Foundation; Gun Owners of California, Inc. (the "Association Plaintiffs"); and individuals

22   Erick Velasquez, Charles Messel, Brian Weimer, Clarence Rigali, Keith Reeves, Cynthia

23   Gabaldon, and Stephen Hoover's (the "Individual Plaintiffs," collectively, "Plaintiffs")

24   motion for a preliminary injunction (the "Motion"). (ECF No. 20). Defendants the Los

25   Angeles ("LA") County Sheriff's Department ("LASD") and Sherriff Robert Luna in his

26   official capacity (collectively the "LA Defendants"); the La Verne Police Department

27   ("LVPD") and La Verne Chief of Police Colleen Flores in her official capacity (collectively

28   the "LV Defendants"); and Robert Bonta in his official capacity as Attorney General of

California (the "State") oppose.  (ECF Nos. 23–25, 27).  Having considered the parties' submissions, the relevant law, the record in this case, and the arguments during the hearing on the Motion, the Court GRANTS, in part, and DENIES, in part, Plaintiffs' Motion.

## I.    BACKGROUND

In California, it is a crime for individuals to carry on their person, in public, or in their vehicle a concealed firearm if they do not possess a concealed carry weapons ("CCW") license.  *See* Cal. Penal Code § 25400.  Before 2022, the California legislature enacted a CCW licensing regime that set various requirements for an individual to apply at the county and municipal levels for a CCW license,[1] including having to make a showing of "good cause."

In June 2022, however, the United States Supreme Court issued the landmark decision of *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), which held that a New York CCW licensing statute that required applicants for a CCW license to show a "proper cause" for obtaining a CCW license violated the Second Amendment because it prevented law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms in public for self-defense.  *Id.* at 31-32.

Given California's then existing "good cause" licensing regime, in approximately 2023, the California legislature, in response to the *Bruen* decision, enacted California Senate Bill 2 ("SB 2"), with the goals of establishing a more uniform and effective licensing process throughout California and addressing the implications from the *Bruen* decision.  SB 2 replaced California's "good cause" requirement with a requirement that the licensing authority, before issuing a license or renewing a license, determine that the applicant is not a disqualified individual based on an assessment of defined criteria.  In particular, California law requires that the licensing authority "shall issue or renew a license" to an applicant who (1) is not a "disqualified person to receive such a license," as

---

[1] The Complaint refers to CCW licenses as CCW permits.  Because the California statutes use the term "license," the Court, in keeping with the language of the CCW statutes, also uses the term "license."

determined in California Penal Code Section 26202; (2) is at least 21 years of age upon "clear evidence" of the person's identity; (3) is a "resident of the county or a city within the county," or the "applicant's principal place of employment or business is in the county or a city within the county and the applicant spends a substantial period of time in that place of employment or business;" (4) completes a course of training; and (5) is the "recorded owner, with the Department of Justice, of the pistol, revolver, or other firearm" for which the license will be issued.  (ECF No. 1 ("Compl.") ¶ 65 (citing Cal. Penal Code §§ 26150(a), 26155(a)).   The licensing authority determines whether an applicant is a "disqualified person" by following a statutory checklist, which includes interviewing the applicant, interviewing three character references, obtaining fingerprints, and conducting a criminal history check.  Cal. Penal Code § 26202(b).  Within 120 days of receiving a completed application, the "licensing authority shall give written notice . . . indicating if the license . . . is approved or denied."  (Compl. ¶ 66 (citing Cal. Penal Code. § 26205)).  The Department of Justice determines the CCW license application fee, *see* (Compl. ¶ 66); however, the local licensing authority "shall charge an additional fee in the amount equal to the reasonable costs for processing the application . . . issuing the license, and enforcing the license."  Cal. Penal Code § 26190(b)(1); *see* (Compl. ¶¶ 69, 74).  The new CCW licensing requirements became effective in January of 2024.

On December 4, 2023, Plaintiffs commenced this action, claiming that their Second Amendment and other constitutional rights have been violated because of the delay, high fees, and other licensing requirements associated with the LA and LV Defendants' processing of CCW applications pursuant to CCW licensing statutes.  *See* (Compl.) Plaintiffs also challenge the California CCW statutes' prohibition of issuing a license to an individual whose residence is outside the state of California, regardless of whether the individual has obtained a CCW license in another state, as being in violation of the Second Amendment, the Fourteenth Amendment's Equal Protection and Due Process Clauses, and Article IV's Privilege and Immunities Clause.  *See* (*id.*).

The Complaint alleges that Association Plaintiffs are non-profit membership organizations representing "members and supporters who reside in Los Angeles County or Laverne," as well as "members and supporters in other states . . . ." (*Id.*, ¶¶ 21-22, 46). Plaintiff the Second Amendment Foundation "has over 720,000 members and supporters nationwide" and Plaintiff Gun Owners of America, Inc. "has more than 2 million members and supporters across the country." (*Id.*, ¶¶ 46-47).[2]

The Complaint alleges the Individual Plaintiffs are "ordinary, law-abiding," adult residents of LA County and the City of La Verne that have either applied for a CCW license but have not received a license or have been dissuaded or prevented from applying. (Compl. ¶ 20). Two of the Individual Plaintiffs, Brian Weimer, who applied for a CCW license in January of 2023, and Charles Messel, who applied for a CCW license on July 1, 2022, reside in LA County and, along with the Association Plaintiffs,[3] have challenged LASD's application of California's CCW statutes, asserting unreasonable delays exceeding 18 months in the issuance of licenses. (ECF No. 20-16 ("Weimer Decl.") ¶¶ 2, 5; ECF No. 20-17 ("Messel Decl.") ¶¶ 2, 5). Based on the parties' representations, as of the date of the hearing on the Motion, neither of the two Individual Plaintiffs has received a CCW license. The Complaint alleges that the delay in issuing licenses to these two Individual Plaintiffs, as well as numerous other individuals on behalf of whom the Association Plaintiffs assert a challenge, violates the Second Amendment. *E.g.*, (Compl. ¶ 125).

Plaintiffs also allege LASD has applied discretionary criteria to deny the CCW applications of other LA County residents. Specifically, Individual Plaintiff Velasquez's application for a CCW license was denied on August 23, 2023, due to an alleged previous theft of Plaintiff Velasquez's firearms, (ECF No. 20-21 ("Velasquez Decl.") ¶¶ 2, 8), and the CCW application of Sherwin David Partowashraf's, who is a member of a Plaintiff

---

[2] The Complaint does not provide membership information for the two other Association Plaintiffs.

[3] The Association Plaintiffs' claims as to delay are addressed in Section III.A.1.a.i., below.

Association, was denied by the LASD because Partowashraf was subject to a previous temporary restraining order. (ECF No. 20-25 ("Partowashraf Decl.") ¶¶ 1, 2–4). The Complaint alleges that LASD's denial of these applications was discretionary, instead of based on objective standards, which Plaintiffs argue violates the Second Amendment. *E.g.*, (Compl. ¶ 125).

Several residents of the City of La Verne challenge the processes required to apply for a CCW license from the LVPD as being too costly or inappropriately based on discretionary criteria. Specifically, Individual Plaintiff Clarence Rigali represents he is a disabled resident of the City of La Verne[4] who lives in a senior citizen mobile home park on a fixed income and is unable to afford the fee required for a CCW license in La Verne. (ECF No. 20-18 ¶¶ 2, 4, 6). Individual Plaintiff Cynthia Gabaldon, a self-employed resident of the City of La Verne and a member of the CPRA, represents she has owned and trained with firearms for most of her life but, due to La Verne's fee, is dissuaded from applying for a CCW license. (ECF No. 20-19 ("Galbadon Decl. ¶¶ 2, 4–5). Jim Carlson, who is a resident of Los Angeles County and a member of the CPRA, represents he applied for and received a CCW license from the LVPD but, after taking the required psychological exam, asserts he does not believe the exam is a reasonable prerequisite to carrying a firearm. (ECF No. 20-23 ("Carlson Decl." ¶¶ 2, 10). Individual Plaintiff Keith Reeves is a resident of the City of La Verne and a member of each of the Association Plaintiffs, with CCW licenses from Arizona and Utah. (ECF No. 20-24 ("Reeves Decl.") ¶¶ 2–4). Plaintiff Reeves represents that in 2016, his CCW application for a license from LVPD was denied and, though he would like to reapply for a license, he cannot afford the fee. (*Id.* ¶ 5). The Complaint alleges that the LVPD licensing process violates the Second Amendment due to its "exorbitant fee" and use of "discretionary criteria" to screen applicants through its psychological exam. *E.g.*, (Compl. ¶ 131).

---

[4] Plaintiffs that reside in the City of La Verne are also Los Angeles County residents. *See, e.g.* (Rigali Decl. ¶ 2)

Finally, other individuals are non-residents of California who wish to, or have attempted to, acquire CCW licenses to lawfully carry a firearm in California but have been deemed ineligible for a CCW license or their application has been denied. For example, David Broady, a Nevada resident and member of the CPRA, frequently travels to California because he owns property in the State and visits family but is unable to obtain a CCW license because he is no longer a California resident. (ECF No. 20-20 ("Broady Decl.") ¶¶ 1, 3–5). Individual Plaintiff Stephen Hoover is a Florida resident who spent a "significant amount of time" in California during summer 2023 and "plan[s] to return for work and/or leisure purposes." (ECF No. 20-26 ("Hoover Decl.") ¶¶ 2–3). Plaintiff Hoover holds a CCW license from Florida, applied for a CCW license in California, but was deemed ineligible because he is not a California resident. (*Id.* ¶ 4). The Complaint alleges that California's residency requirements violate the Second Amendment, the Fourteenth Amendment's Equal Protection and Due Process Clauses, and Article IV's Privileges and Immunities Clause.

Plaintiffs' present Motion requests the Court preliminarily enjoin what they characterize as certain "unconstitutional practices under California's CCW licensing regime that delay or deny Plaintiffs' constitutional right to carry."[5] (ECF 20-1 ("Mot.") at 32). Defendants oppose the Motion. *See* (ECF No. 23 ("LVPD Opp."); ECF No. 25 ("State Opp."); ECF No. 27 ("LASD Opp.")). Plaintiff submitted a reply to each Opposition brief. *See* (ECF No. 32 ("Reply")).

## II.    LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as a matter of right." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008). A movant seeking a

---

[5] Plaintiffs' Complaint and Motion generally do not differentiate between conduct they allege occurred before the changes to California's CCW licensing regime brought about by SB 2 or after the effective date of SB2. The parties' briefing, however, appears to treat Plaintiffs' challenges as being to the application of the current version of the statutes. The Court, thus, also analyzes the issues raised in the Motion based on the current CCW statutory regime.

preliminary injunction must establish that (1) he is likely to succeed on the merits of his claim; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (2) the balance of equities tips in his favor; and (4) a preliminary injunction is in the public interest. *Id.* at 20.  The first *Winter* factor, likelihood of success on the merits, is a "threshold inquiry and is the most important factor in any motion for preliminary injunction." *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023); *see also Disney Enters. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) ("Likelihood of success on the merits 'is the most important' *Winter* factor; if a movant fails to meet this 'threshold inquiry,' the court need not consider the other factors . . . .'" (quoting *All. for the Wild Rockies*, 632 F.3d at 113–35)).  The importance of this factor "holds especially true for cases where a plaintiff seeks a preliminary injunction because of an alleged constitutional violation." *Baird*, 81 F.4th at 1040 (reversing a district court's denial of a preliminary injunction implicating the Second Amendment).  When the government is the non-movant, the last two factors (equities and public interest) merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

When, as here, the movant is not seeking to maintain the status quo pending a determination of the action on the merits, *see Chalk v. U.S. Dist. Court*, 840 F.2d 701, 704 (9th Cir. 1988), but instead is seeking an order requiring the nonmoving party to take action, the movant is seeking a mandatory injunction. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015).  Such injunctions are disfavored. *Id.* (stating that, because a mandatory preliminary injunction "goes well beyond simply maintaining the status quo," it is "particularly disfavored.").  Thus, in the Ninth Circuit, a request for a mandatory preliminary injunction is subject to "heightened scrutiny and should not be issued unless the facts and law clearly favor the moving party." *Dahl v. HEM Pharmaceuticals Corp.*, 7 F.3d 1399, 1403 (9th Cir. 1993); *see also Doe v. Snyder*, 28 F.4th 103, 111 (9th Cir. 2022).  A plaintiff must demonstrate "extreme or very serious damage" will occur unless the requested injunction is granted. *Id.*  "In plain terms, mandatory injunctions should not issue in 'doubtful' cases." *Garcia*, 786 F.3d at 740 (quoting *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1160 (9th Cir. 2011)).

In deciding an application for a preliminary injunction, the Court is permitted to consider the parties' pleadings, declarations, affidavits, and exhibits submitted in support of and in opposition to the application. *See Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988). "If a movant makes a sufficient demonstration on all four *Winter* factors (three when, as here, the third and fourth factors are merged), a court must not shrink from its obligation to enforce his constitutional rights, regardless of the constitutional right at issue." *Baird*, 81 F.4th at 1041 (internal quotation marks omitted and cleaned up); *Brown v. Plata*, 563 U.S. 493, 511 (2011)). "It may not deny a preliminary injunction motion and thereby "allow constitutional violations to continue simply because a remedy would involve intrusion into an agency's administration of state law." *Id.* (internal quotations marks omitted).

## III. DISCUSSION[6]

### A. Likelihood of Success on the Merits

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Supreme Court has repeatedly held this right to "keep and bear arms" is among the "fundamental rights necessary to our system of ordered liberty." *United States v. Rahimi*, 144 S. Ct. 1889, 1891 (2024) (internal quotations marks omitted). The Court has construed the right as guaranteeing an individual's right to carry

---

[6] Requests for judicial notice under Rule 201 of the Federal Rules of Evidence have been filed by Plaintiffs, (ECF Nos. 20-2, 32-6), and LA Defendants, (ECF No. 27-8). Plaintiffs object to LA Defendants' request for judicial notice. *See* (ECF No. 32-11). Because reliance on the Plaintiffs' judicial notice submissions was not necessary to the determinization of the Motion, Plaintiffs' request for judicial notice is denied. LA Defendants' request for judicial noticed is discussed further in this Order. To the extent the Court relies upon a document to which Plaintiffs have objected, the Court overrules the objection for purposes of this Motion; to the extent the Court has not relied on a document to which Plaintiffs have objected, the Court overrules the objection for purposes of this Motion. (ECF Nos. 32-12, 32-13, 32-14).

a handgun for self-defense both inside the home, *see D.C. v. Heller*, 554 U.S. 570 (2008), and outside the home, *Bruen*, 597 U.S. at 20.[7]

    "[L]ike most rights, [however], the right secured by the Second Amendment is not unlimited." *Bruen*, 597 U.S. at 21 (quoting *Heller*, 554 US at 626). Before the *Bruen* decision, the Courts of Appeals had "coalesced" around a "'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny." *Id.* at 17. For the first step, the courts considered whether the regulation was justified because the "challenged law regulate[d] activity falling outside the scope of the right as originally understood." *Id.* at 18. For the second step, courts analyzed how close the challenged law "c[a]me[] to the core of the Second Amendment right and the severity of the law's burden on that right." *Id.* Depending on the severity of the burden, courts applied either strict scrutiny or immediate scrutiny to determine whether the government had established that the means (the burden on the right) justified the ends (the governmental interest). *See id.* at 19.[8]

    The Supreme Court in *Bruen*, however, rejected the two-part means-end scrutiny approach, explaining that its precedent "do[es] not support applying means-end scrutiny in the Second Amendment context." *Id.* at 17, 19. Instead, it held:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that

---

[7] The Fourteenth Amendment's Due Process Clause incorporated the Second Amendment right against the states. *See McDonald v. Chicago*, 561 U.S. 742, 791 (2010).

[8] In particular, the Courts of Appeals relied upon the following framework: "If a core' Second Amendment right is burdened, courts apply strict scrutiny and ask whether the Government can prove that the law is narrowly tailored to achieve a compelling governmental interest.[ ] Otherwise, they apply intermediate scrutiny and consider whether the Government can show that the regulation is substantially related to the achievement of an important governmental interest." *Id.* at 18–19 (internal quotation marks and citations omitted).

the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 24 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50, n.10 (1961)).  In other words, *Bruen* now requires a different "two-step evaluation" in which "[c]ourts must, first, determine whether 'the Second Amendment's plain text covers an individual's conduct.'" *Rahimi*, 144 S. Ct. at 1928 (Jackson, J., concurring) (quoting *Bruen*, 597 U.S. at 24); *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023) (stating first, the threshold inquiry "requires a textual analysis, determining whether the challenger is 'part of "the people" whom the Second Amendment protects,' whether the weapon at issue is "in common use" today for self-defense,' and whether the 'proposed course of conduct' falls within the Second Amendment." (citing *Bruen*, 597 U.S. at 31–33, and *Heller*, 554 U.S. at 580, 627)). If the conduct falls within the Second Amendment, "'[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.'" *Rahimi*, 144 S. Ct. at 1928 (Jackson, J., concurring) (citing *Bruen*, 597 U.S. at 24).

Thus, on a motion for a preliminary injunction, a plaintiff bears the initial "burden of demonstrating the plain text of the Second Amendment covers" the plaintiff's conduct. *Brumback v. Ferguson*, No. 1:22-CV-03093-MKD, 2023 WL 6221425, at *4 (E.D. Wash. Sept. 25, 2023); *see also Baird*, 81 F.4th at 1046 ("[T]he district court's analysis of the first *Winter* factor must include consideration of the question whether the conduct that [the statute] regulates is covered by the text of the Second Amendment.").  If the plaintiff meets this burden, the government must then "show that the restriction 'is consistent with the Nation's historical tradition of firearm regulation.'" *Rahimi*, 144 S. Ct. at 1908 (Gorsuch, J., concurring) (quoting *Bruen*, 597 U.S. at 17).

In determining whether an identified historical regulation is "relevantly similar" to the challenged one, a district court considers "'whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified.'" *Alaniz*, 69 F.4th at 1128 (describing the "two metrics" as "how

and why the regulations burden a law-abiding citizen's right to armed self-defense" (quoting *Bruen*, 597 U.S. at 29)).  In *Rahimi*, the Supreme Court explained that *Bruen*'s historical inquiry is "not meant to suggest a law trapped in amber," but, instead, requires that a court "ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit" and "apply[] faithfully the balance struck by the founding generation to modern circumstances."  *Id.* at 189798 (quoting *Bruen*, 597 U.S. at 29). "[C]entral to this inquiry," are considerations of "[w]hy and how the regulation burdens" the Second Amendment right.  *Id.* at 1898.  For example, even if a law "regulates arms-bearing for a permissible reason," if it "does so to an extent beyond what was done at the founding," it may "not be compatible with the right."  *Id.*  At the same time, if a "challenged regulation does not precisely match its historical precursors," it may still be "analogous enough to pass constitutional muster."  *Id.* (citing *Bruen*, 597 U.S. at 30).  Generally, the law must "comport with the principles underlying the Second Amendment."  *Id.*

In analyzing whether the government has met its burden, "[a] district court should not try to help the government carry its burden by 'sift[ing] . . . historical materials' to find an analogue."  *Baird*, 81 F.4th at 1041 (quoting *Bruen*, 597 U.S. at 60).  "The principle of party presentation instead requires the court to 'rely on the parties to frame the issues for decision.'"  *Id.* (quoting *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020)); *see also Bruen*, 597 U.S. at 25 n.6 ("Courts are . . . entitled to decide a case based on the historical record compiled by the parties.").  Additionally, under "*Winter's* well-settled standards—which apply to Second Amendment claims like any other constitutional claim—courts consider all of the *Winter* factors and assess irreparable harm and the public interest through the prism of whether or not the plaintiff has shown a likelihood of success on the merits."  *Baird*, 81 F.4th at 1044.

This Court thus applies the above Second Amendment framework, as set forth in *Bruen* and *Rahimi,* to each CCW licensing practice challenged by Plaintiffs, keeping in mind the Ninth Circuit's "doubly demanding" standard for granting mandatory preliminary injunctions, which requires Plaintiffs to "establish that the law and facts *clearly favor*

[their] position, not simply that [they are] likely to succeed." *Garcia*, 786 F.3d at 740 (emphasis in original).

          1.    <u>Plaintiffs' Challenges to LASD's Application Process</u>

Under their first claim for relief asserted under the Second Amendment, Plaintiffs assert two theories of liability against the LA Defendants: one based on LASD's delays in processing CCW applications and one based on LASD allegedly "engaging in forbidden suitability determinations." *See* (Compl. ¶ 125). The Motion raises both theories, and the Court considers each in turn.

          a)    *Delay in LASD's Issuance of CCW Licenses*

As outlined above, California law provides that an individual may carry a concealed weapon in public once their CCW license application is approved. Plaintiffs allege, however, that many individuals who have applied for a CCW license with the LASD have been waiting for a decision on their CCW applications for longer than the 120 days contemplated by current California law. *See* (Mot. at 12–17; Compl. ¶ 125).[9] Plaintiffs argue that the delays in LASD's application processing are unconstitutional under the Second Amendment.

As a threshold issue, the Court must classify whether the constitutional challenge being brought by the Plaintiffs is either a facial or as-applied challenge. *See Bucklew v. Precythe*, 587 U.S. 119, 138 (2019) ("[C]lassifying a lawsuit as facial or as-applied affects the extent to which the invalidity of the challenged law must be demonstrated . . . ."). Although as a caveat to the Motion, Plaintiffs state, "[t]o be sure, Plaintiffs do not believe a waiting period of *four months* to exercise a right is remotely constitutional," (Mot. at 15

---

[9] Plaintiffs also allege a claim for declaratory and injunctive relief against the LA Defendants for "violations of the California Penal Code" based on LASD's delays that extend beyond 120 days. (Compl. ¶¶ 143–47). Plaintiffs contend, however, that they "do not seek to enforce state law" by their Motion, only to enforce the Second Amendment. *See* (Reply at 12 n.2). The Court, thus, does not consider Plaintiffs' fourth claim for relief in the Complaint that seeks relief for violations of the California Penal Code.

(emphasis in original)), Plaintiffs have not framed the issues in the Motion as a facial challenge to the 120-day waiting period of California's CCW regulatory scheme. Instead, two Individual Plaintiffs that reside in LA County are challenging the LASD's delay in excess of 120 days in assessing their CCW applications. *See* (Weimer Decl. ¶ 5 (January 2023); (Messel Decl. ¶ 5 (July 2022)). The Association Plaintiffs also appear to contend that they are asserting an as-applied challenge on behalf of all individuals who have applied to the LASD for a CCW license whose applications have been pending for more than 120 days, whether the applicants have a membership with one of the Association Plaintiffs or not. *See* (Skadsem Decl. ¶ 6; Stalter Decl. ¶ 10). Plaintiffs ask the Court to enter an order that requires LASD to process all these pending applications for licenses within 120 days. *See* (ECF No. 20-28). The Court thus first considers whether Association Plaintiffs have standing to assert such a broad challenge.

i.  Association Plaintiffs' Challenge Against LASD for Delay

The Association Plaintiffs challenge the LASD's delays of more than 120 days in deciding applications for CCW licenses. In support of their challenge, the Association Plaintiffs have submitted the declarations of just two members, both of whom complain of delays in processing their applications for a CCW license. *See* (ECF No. 20-22 ("Skadsem Decl.") ¶¶ 2, 6; ECF No. 20-27 ("Stalter Decl.") ¶¶ 1–2, 10). The Association Plaintiffs seek a preliminary injunction requiring LASD to grant CCW licenses to all individuals who have applied to LASD for a CCW license, whether these applicants are members of one of the Association Plaintiffs or not. *See* (Mot. at 16) ("[T]his Court should, at a minimum, and in accordance with the statute, order LASD to comply with the statute, and issue permits once applicants have completed their background check and CCW training course or on day 121 from application submission, whichever is later.").

The LA Defendants oppose the Motion, arguing the Association Plaintiffs' request for relief on behalf of all LASD CCW license applicants goes "far beyond" the standing the Association Plaintiffs claim to have in this case. During the hearing on the Motion, Plaintiffs' Counsel argued in response that the Association Plaintiffs have associational standing to raise an as-applied challenge on behalf of all CCW applicants who have applied to the LASD for a CCW license whose applications have been pending for more than 120 days regardless of the applicant's membership status. [10] The Court disagrees.

"An as-applied challenge contends that the law is unconstitutional as applied to the litigant's particular . . . activity, even though the law may be capable of valid application to others." *Foti v. City of Menlo* Park, 146 F.3d 629, 635 (9th Cir. 1998). An as-applied challenge "does not implicate the enforcement of the law against third parties." *Id.*; *see also United States v. Perez-Garcia*, 96 F.4th 1166, 1182 n.13 (9th Cir. 2024) (declining to "take up the question whether the [challenged] firearm condition may theoretically be applied to others because '[a]n as-applied challenge does not implicate the enforcement of the law against third parties'" (quoting *Foti*, 146 F.3d at 635)). As-applied challenges, therefore, consider the constitutionality of a law or practice as applied to the parties in the case.

Here, Plaintiffs have failed to show the Association Plaintiffs have standing to seek the broad relief they request. *See id.*; *see also Ass'n for Accessible Medicines v. Bonta*, No. 2:20-CV-01708-TLN-DB, 2022 WL 463313, at *8 (E.D. Cal. Feb. 15, 2022) (agreeing that an injunction brought as an as-applied challenge only applies to the plaintiff). Even if the Association Plaintiffs have standing to challenge LASD's delays as to the Association Plaintiffs' members, Plaintiffs have specifically rejected this far narrower relief. Instead,

---

[10] During the hearing on the Motion, Plaintiffs' Counsel also stated that he "believe[s] there is precedent that if an association establishes standing on behalf of one of their members, they can challenge the statute generally." Without deciding whether Plaintiffs' proposition is true, this statement alludes to associational standing for a *facial* challenge. Plaintiffs' Counsel, however, affirmed during the hearing that the Motion does not assert a facial challenge to California's CCW statutes.

during the hearing, Plaintiffs' Counsel reaffirmed the broad scope of Plaintiffs' request, saying a "general injunction is called for here" and stated, "it would be sort of confusing" to "limit relief to just the members of the association" because "the application would have to say are you a member of CRPA or something like that." On this record, however, the Association Plaintiffs have not sufficiently demonstrated standing to consider their LASD delay claim. Thus, Plaintiffs have not shown a likelihood of success on the merits of the Association Plaintiffs' claim against LASD for delay, let alone shown under the heightened standard for mandatory preliminary injunctions that the facts and law are clearly in their favor on that claim.[11] The Court therefore denies Plaintiffs' Motion, insofar as it is based on the Association Plaintiffs' challenge asserting unreasonable delay on behalf of all individuals that have applications pending with LASD for a CCW license.

                    ii.    Individual Plaintiffs' Challenge Against LASD's Delay

Two Individual Plaintiffs Weimer and Messel challenge LASD's delay in issuing CCW licenses to them, asserting they both have been waiting for a decision from LASD on their CCW applications for over eighteen months.[12] *See* (Weimer Decl. ¶ 5 (January 2023); Messel Decl. ¶ 5 (July 2022)). To assert their challenge based on delay, these two Individual Plaintiffs must initially show, per *Bruen* and *Rahimi*, that "the plain text of the Second Amendment protects [the Individual Plaintiffs'] proposed course of conduct." *Bruen*, 597 U.S. at 32. On this first prong, the parties disagree on the nature of the course of conduct at issue. The Individual Plaintiffs assert that the proposed conduct protected by the Second Amendment is merely the act of obtaining a CCW license in the first place because LASD's lengthy delays in processing applications have essentially denied the Individuals Plaintiffs the right to such licenses. The LA Defendants, however, argue that the conduct at issue involves acquiring a CCW license within a specific amount of time

---

[11] Because of how broadly Plaintiffs have framed their request for relief—namely, as requesting that all pending CCW applications to the LASD be granted, which Plaintiffs' Counsel reaffirmed during the hearing, members Skadsen's and Stalter's claims also fail.
[12] LA Defendants do not appear to dispute that Individual Plaintiffs Weimer and Messel each have standing to bring their respective challenge.

and contend that the text of the Second Amendment does not cover the timeliness of CCW license issuances. (LASD Opp. at 15). Both parties acknowledge that the Supreme Court has yet to specifically address time limits and delays in obtaining firearm licenses. *See* (Mot. at 14–15; Opp. at 15–19).

The Ninth Circuit has framed *Bruen's* threshold inquiry as a textual analysis that determines "whether the challenger is 'part of "the people" whom the Second Amendment protects,' whether the weapon at issue is "in common use" today for self-defense,' and whether the 'proposed course of conduct' falls within the Second Amendment." *Alaniz*, 69 F.4th at 1128 (citing *Bruen*, 597 U.S. at 31–33). Neither the Supreme Court nor the Ninth Circuit has addressed how to define the proposed course of conduct under the type of circumstances that are presented in this case.[13] *See Rahimi*, 144 S. Ct. at 1929 (Jackson, J., concurring) (identifying still "unresolved questions," including but not limited to: "Who is protected by the Second Amendment, from a historical perspective? To what conduct does the Second Amendment's plain text apply?"); *see also Nat'l Ass'n for Gun Rts., Inc.*

---

[13] It is worth noting, as Justice Jackson did in her *Rahimi* concurrence, *see Rahimi*, 144 S. Ct. at 1926–30 (citing cases), that multiple levels of courts have long been confounded by this first analytical step and, before *Bruen*, many courts of appeals simply skipped the first step by assuming that the Second Amendment was triggered. *See, e.g.*, *Pena v. Lindley*, 898 F.3d 969, 976 (9th Cir. 2018) (noting that "the courts of appeals have spilled considerable ink in trying to navigate the Supreme Court's framework" at step one and thus have decided to "bypass the constitutional obstacle course of defining the parameters of the Second Amendment's individual right in the context of" *Heller*'s "presumptively lawful" regulations). *See also Rahimi,* 144 S. Ct. at 1930 (Jackson, J., concurring) ("[W]hen courts signal they are having trouble with one of our standards, we should pay attention."). But where, as here, the first step under *Bruen* is disputed, this Court will not simply assume that Plaintiffs have met their burden, notwithstanding the difficulties of navigating the first step. *Cf. id.* at 1932 (Thomas, J., dissenting) ("It is undisputed that § 922(g)(8) targets conduct encompassed by the Second Amendment's plain text."); *see generally California Rifle & Pistol Ass'n, Inc. v. City of Glendale*, 644 F. Supp. 3d 610, 621 (C.D. Cal. 2022) (finding on a preliminary injunction that "the Court is unpersuaded that a plaintiff may simply assert a general desire to carry a firearm and thereby force the government to provide historical evidence of regulations addressing every separate location where the ordinance applies").

*v. City of San Jose*, 618 F. Supp. 3d 901, 915 (N.D. Cal. 2022) (noting that "[t]he Supreme Court provided limited guidance on how to define the proposed course of conduct").

Here, based on the record before it, the Court agrees that Individual Plaintiffs' Weimer's and Messel's conduct at issue is appropriately defined as the right to carry a firearm in public for self-defense without unreasonable delay.[14]    The two Individual Plaintiffs assert they have not received a decision on their applications for more than one year—well beyond the CCW statutes' 120-day assessment period—and further contend that Individual Plaintiff Messel's application to LASD has been pending for more than two years.[15]  *See* (Opp. at 15–18).  Although Plaintiffs suggest the LASD's delay in the issuance of a CCW license crosses the line from acceptable to unreasonable after approximately 121 days, the Court does not need to make that determination.  For purposes of determining this Motion, the Court will assume that an LASD application that has been "complete" within the meaning of Section 26205(a)[16] and pending for eighteen months or more crosses

---

[14] The Court acknowledges the LA Defendants' point that the proposed conduct could more appropriately be defined as the right to carry a firearm without waiting for a CCW license. To the extent, however, Plaintiffs' argument can be construed as a request to "*instantaneously*" acquire a license to carry a firearm in public, (Mot. at 13 (emphasis in original)), that argument would necessitate the conclusion that most licensing schemes that require background checks or training courses are unconstitutional.  *Bruen*, however, does not support this conclusion.  *See Bruen, Heller; see also Baird v. Bonta*, No. 2:19-CV-00617-KJM-AC, 2023 WL 9050959, at *22 (E.D. Cal. Dec. 29, 2023) (California may require licenses before carrying firearms in public).

[15] California Penal Code Section 26205(a) states that the licensing authority "shall give" notice of approval or denial "within 120 days of receiving the completed application for a new license, or 30 days after receipt of the information and report from the Department of Justice described in [section 26185(a)(2)], whichever is later."  For license renewals, the licensing authority shall give notice within "120 days of receiving the completed application."  *See also* (Mot. at 15).  Plaintiffs do not adequately address what starting point they are using to determine how long their applications have been pending.

[16] The Court finds LA Defendants arguments persuasive—at least in the abstract—that a mere delay in issuing a CCW license has not typically been found to violate the Second Amendment.  Indeed, *Bruen* implicitly accepts some sort of waiting period by approving so-called "shall-issue" licensing schemes that include as part of the application process the

the line.  As such, the two Individual Plaintiffs' conduct is presumptively protected by the Second Amendment.  Therefore, the burden shifts to the LA Defendants to establish the second *Bruen* prong.

As stated previously, under the second *Bruen* prong, the LASD Defendants must show LASD's more than 18-month delay, as applied to Individual Plaintiffs Weimer's and Messel's applications, is "consistent with the Nation's historical tradition of firearm regulation."[17]  *Rahimi*, 144 S. Ct. at 1891 (quoting *Bruen*, 597 U.S. at 24).  For the LA

_____

requirement that an applicant take firearms training courses and undergo background checks, which inevitably involve some period of delay between applying for a CCW license and its issuance.  *See Bruen*, 597 U.S. at 38 n.9.  Further, it is not clear from the Supreme Court's Second Amendment jurisprudence whether the proper inquiry for *Bruen*'s first prong is to determine whether the conduct states a Second Amendment *violation,* as opposed to determining whether the requested conduct is simply of the type typically *protected* by the Second Amendment.  *See, e.g.*, *Connecticut Citizens Def. League, Inc. v. Thody*, 664 F. Supp. 3d 235, 253 (D. Conn. 2023), *aff'd*, No. 23-724-CV, 2024 WL 177707 (2d Cir. Jan. 17, 2024) ("[T]he court's qualified immunity inquiry is whether the right to such timely process [under the Second Amendment] is 'clearly established.'  A review of existing case law reveals that the answer is a resounding 'no.'").  Notwithstanding the lack of clarity, neither party here has attempted to provide any analysis as to the text of the Second Amendment even though some of the Supreme Court's older cases had demonstrated a textual analysis as to the Second Amendment.  For example, in *Heller*, the Supreme Court discussed determining the historical scope of the word "bear," and how the Founders would have understood "bearing arms" outside of military service.  *See Heller*, 554 U.S. at 592 (after "[p]utting all of these textual elements together," holding that the words in the Second Amendment "guarantee the individual right to possess and carry weapons in case of confrontation," which was "strongly confirmed by the historical background of the Second Amendment").

[17] Regarding differences between the scope of the constitutional right between 1791 and 1868, the Supreme Court noted that there "is an ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)."  *Bruen*, 597 U.S. at 37–38 (citing A. Amar, The Bill of Rights: Creation and Reconstruction xiv, 223, 243 (1998); K. Lash, Re-Speaking the Bill of Rights: A New Doctrine of Incorporation (Jan. 15, 2021) (manuscript, at 2), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 ("When the people adopted the Fourteenth Amendment into existence, they readopted the original Bill of

Defendants to carry their burden under *Bruen*, they must identify "historical precursors" in effect at the founding that "impos[ed] similar restrictions for similar reasons" and "comport with the principles underlying the Second Amendment." *Rahimi*, 144 S. Ct. at 1898; *see also Baird*, 81 F.4th at 1041–42 (observing that the historical analogue must have been "broadly in effect when the Second or Fourteenth Amendment was ratified").[18]   In particular, the LA Defendants must establish that a historical regulatory regime (1) burdened the individual's Second Amendment rights in a similar way, the "how"; (2) burdened Second Amendment rights for similar reasons, the "why"; and (3) was applicable "when the Second or Fourteenth Amendment was ratified," *Baird*, 81 F. 4th at 1043.  *See Bruen*, 597 U.S. at 29.  This comparative inquiry permits abstracting some level of generality.[19]  The LA Defendants may meet their burden without identifying a specific law

---

Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings")).  However, the Supreme Court did not specifically resolve the question because the right defined in *Bruen*, "the right to keep and bear arms," was "for all relevant purposes, the same with respect to the right to carry them in public. *Id.*

[18] Though "post-enactment history can be an important tool," the history that "matters most is the history surrounding the ratification of the text," and "[h]istory (or tradition) that long postdates ratification does not serve that function." *Rahimi*, 144 S. Ct. at 1924 (Barrett, J., concurring).

[19] Take the Supreme Court's analysis in *Rahimi*.  The challenged regulation in *Rahimi*, Section 922(g)(8), makes it unlawful for an individual who is subject to a domestic violence civil restraining order to possess firearms or ammunition.  *See Rahimi*, 144 S. Ct. at 1930 (Thomas, J., dissenting).  The eight-Justice majority characterized Section 922(g)(8) as one that "disarm[s] individuals who present a credible threat to the safety of others." *Id.* at 1902.  The majority then determined that Section 922(g)(8)'s ban on firearm possession was relevantly similar to the surety and going armed laws because those regimes also targeted individuals who presented credible threats to others' safety—the "why"—and because some of these laws involved a more restrictive penalty, i.e., imprisonment—the "how."  In his dissent, by contrast, Justice Thomas argued that the majority had too broad an approach and thus the historical analogues were not relevantly similar.  For example, as to the "why," Justice Thomas found inapposite various English laws from the late 1600s and 1700s, that the Government argued illustrated a tradition of restricting the rights of dangerous individuals, because the types of dangerous people were different: "the English were concerned about preventing insurrection and armed rebellion," while Section

to serve as the comparator: it may be the case, for example, that several regimes of regulations, "[t]aken together," demonstrate a historical tradition of protecting against a societal problem by burdening the Second Amendment right.[20] *Rahimi*, 144 S. Ct. at 1901. As stated by Justice Barrett, "'[a]nalogical reasoning' under *Bruen* demands a wider lens" than trying to prove that a modern law is "an updated model of a historical counterpart." *Rahimi*, 144 S. Ct. at 1925 (Barrett, J., concurring). "Historical regulations reveal a principle, not a mold." *Id.*

To satisfy their burden, the LA Defendants argue that LASD's licensing regime that "ensures that those bearing arms in the jurisdiction are in fact law-abiding, responsible citizens" is consistent with the historical tradition of firearm regulation. (LASD Opp. at 8). LA Defendants argue, for example, some states "banned concealed weapons or concealed weapon carrying outright." (Opp. at 19 (citing *Baird v. Bonta*, No. 2:19-CV-00617-KJM-AC, 2023 WL 9050959, at *22 (E.D. Cal. Dec. 29, 2023))). The LA Defendants also identify "60 historical statutes that imposed licensing, permitting, or ticketing requirements as a pre-requisite to public carry." (LASD Opp. at 20; ECF Nos. 27-8, 27-9, 27-10).

---

[20] 922(g)(8) is "concerned with interpersonal violence." *Id.* at 1935 (Thomas, J., dissenting). And as to the "how," Justice Thomas found that the early forfeiture laws identified by the Government did not impose a comparable burden on the Second Amendment right because forfeiture of one or some improperly-stored firearms could "still allow[] a person to keep their other firearms or obtain additional ones," which is "in no way equivalent to § 922(g)(8)'s complete prohibition on owning or possessing any firearms." *Id.* at 1937. It is the majority's approach, however, that "settles on just the right level of generality." *Id.* at 1926 (Barrett, J., concurring).

[20] In *Rahimi*, for example, the Supreme Court acknowledged that the historical landscape of surety and going armed laws were "by no means identical" to the modern regulation, Section 922(g)(8). *Rahimi*, 144 S. Ct. at 1901. Nonetheless, "tak[ing] together" the surety and going armed laws, the founding era historical landscape confirmed the "common sense" principle that "[w]hen an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed," and therefore Section 922(g)(8) does not violate the Second Amendment. *Id.*

Plaintiffs respond that the LA Defendants' showing is insufficient.  First, Plaintiffs contend the LA Defendants purportedly rely on laws that post-date both relevant eras.  Second, Plaintiffs argue that, to the extent the LA Defendants cite to laws from the Founding era, those laws are "explicitly racist laws that have no place here."  (Reply at 14).

The Court finds the LA Defendants have not carried their burden to demonstrate that the over 18-month delays imposed on Individual Plaintiffs Weimer and Messel are part of a historic tradition of firearms regulation.  First, Plaintiffs are correct that the only laws from the Founding era to which the LA Defendants cite are those that outlaw carrying based on race, and the LA Defendants do not explain how racial regulations bear on a waiting period.  The LA Defendants otherwise cite to regulations allowing municipal authorities to issue CCW licenses, most of which arose for the first time around the 1870s, *see* (ECF No. 27-9 at 10–16), among various other twentieth century regulations that set forth licensing regimes for CCW licenses.[21]    This is insufficient to carry the LA Defendants' burden.

The LA Defendants also do not explain how any of the laws they identify provide a similar analogue to the LASD's more than 18-month delay in deciding the two Individuals Plaintiffs' applications.  *See* (LASD Opp. at 20 ("LASD has identified 60 historical statutes that imposed licensing, permitting, or ticketing requirements as a pre-requisite to public carry.")).  These statutes appear to merely provide support for the proposition that there is

---

[21]  Plaintiff objects to the LA Defendants' request for judicial notice of a "survey of historical license requirements," a summary document created by Defendants LASD and Luna, arguing that a summary document is not the type of document that can be the subject of judicial notice because "the survey does not purport to quote verbatim legislative enactments."  (ECF No. 32-11 at 4).  The Court tends to agree with Plaintiffs that a document summarizing other public documents is more properly submitted as an exhibit to a sworn declaration rather than as a document to be judicially noticed.  Nevertheless, as described herein, the LA Defendants' arguments have not provided a basis for the Court to consider the contents of the survey document, nor any of the other documents for which the LA Defendants ask the Court to take judicial notice.  Therefore, the LA Defendants' request for judicial notice of ECF No. 27-9 is denied.

a historical tradition for allowing CCW licensing regimes, generally.  This tradition, however, does not appear to involve lengthy delays—let alone delays of 18 months or more.  While these historical licensing schemes sometimes wholly prohibited individuals from carrying a concealed firearm, the LA Defendants do not identify whether, or which, of the cited municipalities or states allowed the *open* carrying of firearms and, consequently, fail to demonstrate that any historical bans or limits on carrying concealed weapons pose the same burden in LA County on individuals (who are prevented from carrying a firearm *anywhere* without a CCW license).  *See, e.g.*, *Alaniz*, 69 F.4th at 1128.

In sum, the LA Defendants' arguments are insufficient to carry their burden.  Plaintiffs have therefore established not only that they are likely to succeed on the merits of their Second Amendment claim, insofar as it challenges LASD 18-month delays as applied to Individual Plaintiffs Weimer and Messel, but also that the facts and law are clearly in their favor as to this challenge.  The Court will therefore address later in this order whether Plaintiffs have satisfied for this particular challenge the remaining *Winter* factors for a preliminary injunction.

> b)    *Plaintiffs' Challenge of LASD's Denial of Licenses to Velasquez and Partowashraf*

Plaintiffs move for preliminary injunctive relief against the LA Defendants, broadly arguing that "LASD discretionary denials are unconstitutional" because *Bruen* allows only for processes that use "narrow, objective, and definite" standards and "flatly prohibits standards that require the 'appraisal of facts, the exercise of judgment, and the formation of an opinion." (Mot. at 21–22).  Without citing to any legal authority, Plaintiffs argue that "the use of discretionary and subjective criteria should be considered *per se* government misconduct." (*Id.* at 24).  According to the Motion, one individual Plaintiff and one member of an Association Plaintiff (CRPA) suffered from this "*per se* government misconduct."  Specifically, Plaintiffs assert Individual Plaintiff Velasquez's CCW application was denied because "he was the victim of a crime" and CRPA member

Partowashraf's application was denied due to a temporary restraining order ("TRO") filed against him, even though the TRO was "promptly dissolved" thereafter and his firearms returned to him. (*Id.* at 22). In Plaintiffs' view, these denials evidence the LA Defendants' "subjective belief" that Plaintiff Velasquez and Partowashraf were not "model citizens." (Mot. at 23). Plaintiffs thus ask the Court to rule these denials unconstitutional and order LASD to immediately issue CCW licenses to Plaintiff Velasquez and CRPA member Partowashraf.

The LA Defendants contend that LASD's existing CCW licensing scheme relies only upon objective criteria set forth by the California Penal Code that is "designed to ensure that only those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens." Each subsection of Section 26202 simply asks the official to determine whether an applicant for a CCW license satisfies the objective criteria. If an applicant does not satisfy the objective criteria, the applicant's CCW application is denied, and LASD does not exercise any discretion when denying a CCW application. (LASD Opp. at 21).

As applied to Individual Plaintiff Velasquez and CRPA member Partowashraf, the LA Defendants argue that Plaintiffs' challenge fails because each of these denials was based on the LASD's application of objective criteria. Specifically, according to the LA Defendants, CRPA member Partowashraf's denial was based on an application of Section 26202(a)(3), which prohibits CCW licenses from issuing to individuals who are either subject to any restraining order, unless the order "expired or was vacated or otherwise canceled more than five years prior to the receipt" of the CCW license application. (LASD Opp. at 24). CRPA member Partowashraf's restraining order, which was initially issued based on allegations that he used firearms to intimidate a victim, was dissolved on motion of the victim on July 18, 2022, and thus more than five years had not passed under the statute. (*Id.*). The LA Defendants argue that Individual Plaintiff Velasquez was denied a CCW license because his firearms were stolen from the trunk of his car after he left three firearms unsecured and unlocked. Section 26202(a)(9) precludes CCW licenses to individuals whose firearms have been lost or stolen due to the individual's failure to

-23-

comply with federal, state, or local law regarding "storing, transporting, or securing" the firearms.  (LASD Opp. at 24).  Additionally, the LA Defendants assert that Individual Plaintiff Velasquez also purportedly engaged in the reckless use of firearms when, on April 20, 2021, Velasquez "discharged a loaded firearm and unintentionally fired a bullet into the wall," which under Section 26202(a)(5) also precludes the issuance of a CCW license.

Because Plaintiffs' Motion requesting that the Court order LASD to issue CCW licenses to Individual Plaintiff Velasquez and CRPA member Partowashraf seeks relief "beyond simply maintaining the status quo," Plaintiffs must satisfy the heightened standard applied to requests for mandatory preliminary injunctive relief.  *Garcia*, 786 F.3d at 740.  Plaintiffs, however, have not met their burden of showing a likelihood of success on the merits, let alone that the "facts and law clearly favor" their position.  *See Dahl*, 7 F.3d at 1403.

As an initial matter, Plaintiffs' "subjective denial" arguments suffer from a lack of clarity as to the requested scope of relief.  For example, Plaintiffs appear to suggest in their reply brief that the applicable subsections of California Penal Code Section 26202(a), such as Section 26202(a)(3), are facially unconstitutional.  *See* (Reply at 15–18 ("Because California Penal Code section 26202(a)(3) commands or allows this [denial], this Court should rule it unconstitutional.")).  But the question of Section 26202(a)'s constitutionality has not been brought before this Court by Plaintiffs' Motion, and the Court will not consider arguments made for the first time in Plaintiffs' reply brief.  *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007); *see also Baird*, 81 F.4th at 1041 (the "principle of party presentation" requires the court to "rely on the parties to frame the issues for decision" (citation omitted)).  Additionally, to raise a facial challenge, Plaintiffs "must 'establish that *no set of circumstances exists under which the [law] would be valid*,' or show that the law lacks 'a plainly legitimate sweep.'" *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021) (emphasis in original).  Plaintiffs have not met this showing.

Nor have Plaintiffs adequately framed their challenge as an as-applied challenge.  Instead, Plaintiffs contend that LASD's denials of Individual Plaintiff Velasquez and

CRPA member Portowashraf's applications violate the Second Amendment *because* they were discretionary denials. But Plaintiffs have not demonstrated that the LASD's denials were, in fact, discretionary and therefore provide no question for this Court to examine under *Bruen.*

Section 26202(a) provides in relevant part: "Unless a court makes a contrary determination pursuant to Section 26206, an applicant shall be deemed to be a disqualified person and cannot receive or renew a license pursuant to Section 26150, 26155, or 26170 if the applicant:"

. . .

(3) Has been subject to any restraining order, protective order, or other type of court order issued pursuant to the following statutory provisions, unless that order expired or was vacated or otherwise canceled more than five years prior to the licensing authority receiving the completed application:

(A) Section 646.91 or Part 3 (commencing with Section 6240) of Division 10 of the Family Code.
(B) Part 4 (commencing with Section 6300) of Division 10 of the Family Code.
(C) Sections 136.2 and 18100.
(D) Section 527.6, 527.8, or 527.85 of the Code of Civil Procedure.
(E) Section 213.5, 304, 362.4, 726.5, or 15657.03 of the Welfare and Institutions Code.

. . .

(5) Has engaged in an unlawful or reckless use, display, or brandishing of a firearm.

. . .

(9) In the 10 years prior to the licensing authority receiving the completed application for a new license or a license renewal, has experienced the loss or theft of multiple firearms due to the applicant's lack of compliance with federal, state, or local law regarding storing, transporting, or securing the firearm. For purposes of this paragraph, "multiple firearms" includes a loss of more than one firearm on the

same occasion, or the loss of a single firearm on more than one occasion.

Here, Plaintiffs acknowledge that the temporary restraining order against CRPA member Partowashraf was vacated in June 2022, which, according to Section 26202(a)(3), makes Partowashraf a "disqualified person" to obtain a CCW license. *See* (Reply at 18; Partowashraf Decl. ¶ 5). Indeed, Plaintiffs state that Section 26202(a)(3) "commands" the denial on this basis. (Reply at 18).

Similarly, Plaintiffs have not shown that the LA Defendants violated the Second Amendment when LASD denied Individual Plaintiff Velasquez's CCW application.[22] Although Plaintiffs acknowledge that "California law makes it a crime to store firearms improperly in a vehicle," (Reply at 16), they argue that Individual Plaintiff Velasquez was not charged with that crime and that Velasquez represents in his January 2024 declaration that he stored the now-stolen firearms in a "range bag in the locked trunk of [his] car, in compliance with California Penal Code [Section] 25610(a)(1)." (Velasquez Decl. ¶ 6). According to Plaintiffs, LA Defendants must therefore be "speculat[ing]" that Velasquez left the firearms unsecured. (Reply at 16). On this record, however, Plaintiffs, at most, present a factual dispute under Section 26202(a)(9) not ripe for resolution at this stage of the proceedings. Plaintiffs have not shown a likelihood of success or that the facts and law clearly favor their position. Further, Plaintiffs have not clearly demonstrated that the LA Defendants exercised "discretion to deny [the] licenses based on a perceived lack of need or suitability," *Bruen*, 597 U.S. at 13, instead of simply applying the objective criteria set forth in Section 26202(a) and denying the application.

Because Plaintiffs have not established that the facts and law clearly favor their theory that the LA Defendants denied either Plaintiff Velasquez's or CRPA member Partowashraf's application based on LASD's purported use of "subjective" criteria and

---

[22] While the parties dispute whether Section 26202(a)(5), regarding reckless use of a firearm, involves discretionary criteria, the Court need not reach that question, given that a denial based on the firearm thefts is, on its own, sufficient to require a denial of a CCW license under Section 26202(a).

have not even shown a likelihood of success on that issue,[23] Plaintiffs' Motion, insofar as it asserts a challenge based LASD's denial of Individual Plaintiff Velasquez's and CRPA member Portowashraf's CCW applications, is denied.

### 2. Plaintiffs' Challenge of LVPD's CCW Application Process

#### a) *Plaintiffs' Challenge of LVPD's Psychological Test Requirement*

Plaintiffs contend that LVPD's psychological testing requirement is unconstitutional because it is "inherently subjective and discretionary," there is no appeal process, and the administrative burdens of the test dissuade individuals from applying for a CCW license. *See* (Mot. at 24).[24] According to Plaintiffs, the LVPD test involves traveling an hour from La Verne to San Bernadino for an interview from a psychologist who then makes a recommendation to the City of La Verne "based on that individual psychologist's subjective impressions as to whether the person should be entrusted with Second Amendment rights." (*Id.*). Plaintiffs further argue that "[n]othing in the Second Amendment requires Plaintiffs to subject themselves to the indignity of a subjective exam as a precondition to exercise their constitutional rights." (*Id.* at 25).

The LV Defendants contend that LVPD's psychological testing requirement is permissible because *Bruen* did not take up the issue of standard-based personality

---

[23] Even if Plaintiffs had raised a facial challenge to this statute, *Rahimi* appears to foreclose such a challenge because the Supreme Court held that prohibiting individuals subject to domestic violence restraining orders from possessing firearms pursuant to § 922(g)(8) is constitutional under the Second Amendment.

[24] Notwithstanding the Complaint's challenge to California Penal Code Section 26190(e) that allows licensing authorities to require psychological testing in the CCW licensing process, Plaintiffs' instant Motion does not raise such a challenge to the statute. Belatedly, in reply, Plaintiffs argue that the State is wrong that Plaintiffs do not facially challenge Section 26190(e) because Plaintiffs submitted a proposed order asks that "La Verne be ordered to stop requiring a psychological exam," and Plaintiff's Complaint calls for enjoining Section 26190(e). (Reply at 32). This argument primarily regurgitates Plaintiffs' challenge to the LVPD psychological test. While Plaintiffs are not precluded from pursuing their challenge to Section 26190(e), they did not properly raise it in their Motion.

evaluators, *see* (LV Opp. at 10–11), and LVPD's psychological test is part of "taking the steps necessary to confirm that the CCW license applicants are law-abiding citizens that do not pose a danger to themselves, to others or to the community." (*Id.* at 11). The LV Defendants further argue that the MMPI, the psychological test LVPD uses, is a "standardized psychometric test of adult personality and psychopathology with an established rubric" that is widely used, including by LVPD for its law enforcement applicants. (*Id.* at 13). The LV Defendants also dispute that Plaintiffs have proffered any evidence that MMPI is a discretionary tool. (*Id.* at 14).

The Court observes that, in making their arguments, Plaintiffs fail to contend with the *Bruen* framework and have not addressed their burden of establishing the Second Amendment covers the conduct at issue, leaving the Court with no parameters for which to consider their challenge. Further, the Court does not have a sufficient factual record at this stage of the litigation regarding the actual functioning of the MMPI to determine whether Plaintiffs are likely to succeed on the merits of their claim that the LVPD's use of the MMPI involves "open ended discretion." Plaintiffs, therefore, have not carried their initial burden under *Bruen* to raise a challenge to the LVPD's use of psychological testing before issuing a CCW license. The Motion is therefore denied as to that challenge.

> b)   *Individual Plaintiffs' Challenge to the LVPD's CCW Application Fees*

Plaintiffs argue that LVPD's processing fees for CCW license applications are unconstitutional and ask the Court to prohibit LVPD from imposing fees greater than the "standard DOJ CCW license application fee of $93, with the applicants bearing the cost of the training and live scan requirements." (ECF No. 20-28; Compl. ¶ 131). Plaintiffs argue that LVPD's fees—which purportedly amount to between $900 and $1,200—surpass the fees of other California jurisdictions and are "dramatically more (many orders of magnitude more) than what citizens of other states pay," pointing to fee regimes in Texas, Arizona, Utah, and Washington. (Mot. at 17–18). According to Plaintiffs, *Bruen* "clearly disapproved of" LVPD's fees because the "'exorbitant fees [ ] deny ordinary citizens their

right to public carry.'"  (Mot. at 18 (citing *Bruen*, 597 U.S. at 38 n.9)).[25]  In support,
Plaintiffs submit declarations from several declarants who represent the LVPD's fees have
prohibited them from being able to apply for a CCW license.[26]  Finally, citing to *Invisible
Empire Knights of Ku Klux Klan v. City of W. Haven*, 600 F. Supp. 1427, 1434 (D. Conn.
1985), and *Bullock v. Carter*, 405 U.S. 134, 149 (1972), Plaintiffs ask the Court to consider
other constitutional contexts that have held that "fees cannot inhibit people from exercising
their rights."  (Mot. at 21).[27]

---

[25] Citing *Murphy v. Guerrero*, No. 1:14-CV-00026, 2016 WL 5508998, at *24 (N. Mar. I.
Sept. 28, 2016), Plaintiffs also argue that "under a less stringent standard [than *Bruen*],"
(Mot. At 19), a federal court previously rejected a $1,000 excise tax by finding that the
plaintiff demonstrated that the "tax imposes more than a de minimis burden on his [Second
Amendment] right."  *Guerrero*, 2016 WL 5508998, at *24.  Plaintiffs have not analogized
LVPD's fee, which purportedly aligns specifically with the processing costs of the CCW
license applications, to the $1,000 excise tax imposed only on handguns in *Murphy*.
Further, Plaintiffs have not explained why a district court decision applying now-rejected
means-ends scrutiny should be considered persuasive authority.  *See id.* at *23.
Additionally, Plaintiffs argue that "even pre-*Bruen*" courts had "implicitly recognized that
$1,000 is a constitutionally unreasonable sum to charge for a CCW permit."  (*Id.* at 20
(citing *Kwong v. Bloomberg,* 723 F.3d 160 (2d Cir. 2013))).  The Court similarly sees no
basis to consider an out-of-circuit opinion using means-end scrutiny.

[26] *See* (Rigali Decl. ¶ 6 ("I live in a senior citizen mobile home park on a fixed income . . .
[making] the total expense of getting a CCW permit from [LVPD], which is somewhere
between $900-1100 . . . out of the question for me."); Gabaldon Decl. ¶¶ 5 ("I am self-
employed and have a son in college, so an extra $1,000 expense is too much for me at this
time."); Reeves Decl. ¶ 5 ("I wish to reapply for a permit but cannot afford to do so due to
the excessive application and issuance fees charged by La Verne.")).

[27] Specifically, citing to *Kwong v. Bloomberg*, 723 F.3d 160 (2d Cir. 2013), Plaintiffs
suggest this Court should follow as persuasive authority the 2nd Circuit's pre-*Bruen*
analysis of the constitutionality of a fee on firearm licenses, which considered whether the
fee was "designed to defray (and not exceed) the administrative costs associated with the
licensing scheme."  (Mot. at 20).  Notwithstanding Plaintiffs' subsequent (correct)
statement that this standard was used under the now-repudiated means-ends scrutiny for
the Second Amendment, Plaintiffs argue that LVPD's fees would still fail under that
standard because, unlike in *Kwong*, Plaintiffs have offered evidence that the LVPD's fees
are prohibitively high.  But such an analysis is inconsistent with *Bruen,* which expressly
rejected "means-end scrutiny" as being "inconsistent with *Heller*'s historical approach"

The LVPD Defendants respond that Plaintiffs are "expand[ing] the holding of *Bruen* beyond the issue that was actually considered and ruled upon" and assert that there is no Supreme Court precedent holding that a particular amount of processing fees are unconstitutional. (LVPD Opp. at 7, 11). The LV Defendants also argue that footnote 9 in the *Bruen* opinion, which gratuitously suggests that licensing fees that are "exorbitant" may be unconstitutional, was mere *dicta* and, in any event, the LVPD's fees are neither consistent with the dictionary definition of "exorbitant," (*id.* at 11), nor are they unreasonable. Instead, asserts the LV Defendants, the fee amounts are the amounts "needed to meet the requirements of the State's CCW permitting laws," and the City of La Verne does not profit from the fees. (*Id.* at 12). The LV Defendants also point to several other California jurisdictions that have higher CCW licensing fees than LVPD's fees to argue that "[c]harging applicants for the actual costs involved in processing their CCW permit applications is reasonable and clearly does not 'exceed[] customary or appropriate limits or amounts.'" (*Id.* at 13).

In asserting their respective arguments, neither party has addressed the *Bruen* framework at all. Ignoring their burden under the first *Bruen* prong, Plaintiffs instead cite to pre-*Bruen* tests to argue the unconstitutionality of fees, and do not endeavor to define— or even address—the conduct at issue and whether it falls within the protections of the text of the Second Amendment. The LV Defendants, for their part, have not submitted *any* historical analogues of Founding-era laws that imposed licensing fees and, instead, point to contemporary fees imposed by various jurisdictions within California. *See* (ECF No. 23-4 ¶¶ 6–7, ECF No. 23-5). Similarly, in their Reply, Plaintiffs argue in support of their claims that contemporary comparators, such as current fees imposed in Arizona and Utah, demonstrate that the LVPD's fees are too high. *See* (Reply at 29–33).

---

and held that regulations burdening Second Amendment conduct may be found constitutional "[o]nly if [the] firearm regulation is consistent with this Nation's historical tradition." 597 U.S. at 24.

On this record, Plaintiffs' arguments have provided no basis to grant their request for a preliminary injunction. Thus, the Court declines Plaintiffs' Motion, insofar as it challenges the constitutionality of LVPD's fees.

### 3. Plaintiffs' Challenge of the State's Residency Requirement for CCW Licenses

Among the named Individual Plaintiffs and members of Plaintiff Association are individuals who do not reside in California but have a CCW license from a different state and wish to carry a firearm while traveling in California. (Hoover Decl. ¶ 4; Broady Decl. ¶ 3).[28] Plaintiffs argue that it is unconstitutional for California to use California residency as a requirement to lawfully carry a concealed weapon because it leaves non-Californians, who have the right to carry in other states, with "no ability to exercise the right to carry in this state." (Mot. at 26). Plaintiffs ask the Court to enjoin the State from imposing criminal penalties under California Penal Code Section 25850 against out-of-state Plaintiffs who have licenses issued from other states. *See* (ECF No. 20-28 ¶ 4). Further, Plaintiffs request that the Court order the State to recognize out-of-state CCW licenses. *See* (Reply at 23).[29] Because Plaintiffs seek relief that goes beyond the status quo, Plaintiffs' challenge is subject to "heightened scrutiny" requiring that Plaintiffs show for preliminary injunctive

---

[28] As discussed later in this Order, certain of the Individual Plaintiffs reside in California but possess out-of-state CCW licenses that California does not recognize. Plaintiffs argue that the State's failure to recognize these out-of-state licenses violates the Equal Protection Clause of the Fourteenth Amendment and the Privileges and Immunities Clause of Article IV. Plaintiffs also appear to imply that California's failure to recognize the out-of-state licenses of the Individual Plaintiffs who are California residents also violates the Second Amendment. *See* (Mot. at 26; (Rigali Decl. ¶ 5; Reeves Decl. ¶ 4; Minnich Decl. ¶ 14), The Plaintiffs, however, have not presented any argument in that regard based on the Second Amendment, and the Court will not supply such an argument.

[29] Plaintiffs state that they "have sought only reciprocity for their out-of-state issued permits, not reciprocity with the permitless [sic] carry some other states allow." (*Id.*).

relief the facts and law clearly favor their claims. *Dahl*, 7 F.3d at 1403. With this standard in mind, the Court considers Plaintiffs' challenge under the *Bruen* framework.

As stated previously, under *Bruen*, Plaintiffs have the initial burden to demonstrate they are part of "the people whom the Second Amendment protects," whether the "weapon at issue is in common use today for self-defense," and whether the "proposed course of conduct falls within the Second Amendment." *Alaniz*, 69 F.4th at 1128 (cleaned up) (citing *Bruen*, 597 U.S. at 31–33). Plaintiffs' Motion argues both that the Second Amendment (1) prohibits California from refusing to allow non-residents to apply for a CCW licenses within California; and (2) requires California to recognize CCW licenses from out-of-state. To satisfy the first prong of *Bruen*, Plaintiffs assert "[their] proposed course of conduct clearly meets the plain text of the Second Amendment," namely, "a desire to carry firearms for self-defense when they visit California." (Reply at 19). The State, by contrast, argues that the proper definition of the proposed conduct is "a traveler's right to rely on a foreign license to carry within the State of California." (Bonta Opp. at 11).

Here, Plaintiffs have only demonstrated that the text of the Second Amendment likely applies to the first of its arguments, that non-residents have the right, like California residents, to apply to lawfully carry firearms for self-defense while in public. *See Bruen*, 597 U.S. at 32 ("Nothing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms"). As to the second argument, Plaintiffs have not presented any argument that CCW license reciprocity for out-of-state residents is conduct that falls within the text of the Second Amendment. Instead, Plaintiffs argue that an "analogous issue" was decided by the Supreme Court in *Obergefell v. Hodges,* 576 U.S. 644 (2015), when the Court held that the Fourteenth Amendment prohibits a State from denying a marriage license to couples of the same sex and requires the State to recognize same-sex marriages that were lawfully licensed and performed out-of-state. Plaintiffs only state that the "holding and its logic" should "apply with equal force to the enumerated right to bear arms found in the Second Amendment." (Mot. at 26). But the Supreme Court based its holding in *Obergefell* on the Equal Protection Clause and substantive due process,

and the Court held that there was "no lawful basis for a State to refuse to recognize a lawful same-sex marriage performed in another State on the ground of its same-sex character." *Obergefell*, 576 U.S. at 681.  Here, by contrast, the Supreme Court has recognized in the CCW licensing context that each state may engage in some regulation of firearms.  *See generally Bruen*, 597 U.S. at 13 n.1.  Plaintiffs have therefore failed to show that the circumstances here are analogous to those in *Obergefell*.  As such, Plaintiffs have not shown a likelihood of success on the issue of reciprocity or that the law clearly favors their reciprocity challenge theory under the Second Amendment.  The Court therefore proceeds to the second *Bruen* step only as to Plaintiffs' first argument regarding non-residents having the right to apply for CCW licenses in California.

As set forth above, the State bears the burden of showing whether California's residency requirements for a CCW license is "consistent with the Nation's historical tradition of firearm regulation."  *Rahimi*, 144 S. Ct. at 1891.  To satisfy this burden, the State contends generally that historical tradition supports locality-based licensing laws. First, the State argues that, generally, "if a person during the founding or Reconstruction eras were carrying a firearm, they would have had to comply with a local jurisdiction's law when they reached its border, regardless of any differing laws in their home state or locality."  (Bonta Opp. at 14).  Defendant also points to public carry laws prohibiting carrying concealed weapons in particular localities to argue that that "virtually every state in the country restricted or criminalized [concealed carry of pistols]."  (ECF No. 25-1 ("Spitzer Decl.") ¶ 18); *see also* (ECF No. 26-3 ("Rivas Decl.") ¶ 16).  According to the State, this "local nature" of restrictions is apparent in various states' municipal laws from 1837, 1849, 1851, and 1870–1917, arguing that it was common for municipalities to have different policies than the state as a whole.  *See* (Bonta Opp. at 15–16; Rivas Decl. ¶¶ 40, 52–54; ECF No. 25-2 ("Vorenberg Decl.") ¶¶ 17–19).

Second, the State argues that several localities' early licensing laws prohibited non-residents from applying for a license to carry a firearm within the locality and points the Court to three laws.  Specifically, in 1910, Georgia made it unlawful for someone to carry

a firearm "without first taking out a license from the Ordinary of the respective counties in which the party resides." (Bonta Opp. at 17 (citing 1910 Ga. Laws 134, No. 432)).  Oregon required, in 1913, that anyone *purchasing* a firearm have a license signed by an official "in the county wherein such person resides." (*Id.* (citing 1913 Or. Laws 497, ch. 256)).  And in 1925, West Virginia required anyone who wanted to carry "dangerous or deadly weapons (including pistols) in West Virginia," to obtain a license to carry by demonstrating both that the applicant had been "a *bona fide* resident of [that] state for at least one year" and "'of the county' in which they filed their application" for sixty days.  (*Id.* (citing W. Va. Acts 25, ch. 3§ 7(a)).  Recognizing that each of these laws came after the Founding and Reconstruction, the State contends that these three laws reflect the "previously settled practices and assumptions" that states and municipalities could enact their own licensing schemes and impose the restrictions on non-residents.  Therefore, the State argues, these laws that purportedly limited firearm licenses to residents "fit[] comfortably within the Nation's history and tradition of firearm regulation."  (*Id.*).

Plaintiffs contend Defendants' showing is inadequate primarily due to an "almost total lack of Founding era history." (Reply at 21).  Plaintiffs argue that, at most, the State has identified a "post-Founding and post-Reconstruction tradition for licensing schemes in general." (*Id.* at 22).  Plaintiffs also point to the "plethora of historical laws" that provided "traveler exceptions to carry laws," which purportedly gave "nonresidents *more* leeway to carry." (Mot. at 28).  For example, in the 1870s, the cities of Sacramento and Oakland enacted laws that made carrying a pistol without a license unlawful, except as to "traveler[s] actually engaged in making a journey."  *See* (Mot. at 28).

As outlined above, for the State to carry its burden, it must establish that a historical regulatory regime (1) burdened the individual's Second Amendment rights in a similar way, the "how"; (2) burdened Second Amendment conduct for similar reasons, the "why"; and (3) was applicable "when the Second or Fourteenth Amendment was ratified," *Baird*, 81 F. 4th at 1043.  Here, the State has only carried its burden as to the "how."

-34-

For clarity and for purposes of this Motion: the present issue is that nonresident Plaintiffs' Second Amendment rights to lawfully carry firearms in public for self-defense are burdened—indeed, entirely barred—by California's statute that allows only Californians to apply for CCW licenses.  The only historical analogues offered by the State that involve a remotely similar method of burdening Second Amendment conduct, namely, limiting exercise of Second Amendment rights to a state's own residents, are the 20th century laws in Georgia, Oregon, and West Virginia.[30]  And, of those, only Georgia's and West Virginia's laws involve a comparable burden—the cited Oregon law dealt only with purchasing firearms, which is distinct from carrying already-owned firearms.  Both Georgia's and West Virginia's laws did limit the ability to carry to their residents, or at least imposed a residency requirement before one could acquire a license to carry.  Georgia, for example, made it unlawful to carry a firearm without first applying for a license "from the Ordinary" of the county in which he presides.  West Virginia imposed residency restrictions on those applying for a license to carry, including demonstrating *bona fide* residency of the State for at least one year and the relevant county (in which the license was pending) for sixty days.  The State has thus demonstrated that the identified analogues satisfy the metric of "how" a "regulation burden[s] a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29; *see also Perez-Garcia,* 96 F.4th at 1184 (finding that Founding-era "pretrial disarmament imposed 'a comparable burden' on defendants'

---

[30] For the purposes of this Motion for preliminary injunctive relief, and with consideration of the burdens specific to that stage of the proceedings, the Court focuses its analysis on the analogues specifically raised by the parties in their briefing.  *See United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020) ("In both civil and criminal cases, in the first instance and on appeal . . . , we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." (citation omitted)); *see also May v. Bonta*, No.: SACV 23-01696, 2023 WL 8946212, at *7 n.5 (C.D. Cal. Dec. 20, 2023) (limiting discussion on a motion for preliminary injunction to specific laws cited within the parties' briefs).

1   Second Amendment rights as the Bail Reform Act's firearm condition imposes on
2   Appellants today").[31]

3         The State has failed, however, to demonstrate the "why" in the analysis—that the
4   Georgia and West Virginia analogues burdened Second Amendment conduct for the same
5   reasons.  The State suggests that requiring individuals to be residents before acquiring a
6   CCW license is justified because it ensures that CCW licenses are only held by law abiding
7   citizens.   *See* (Bonta Opp. at 20).   Though California "continuously monitor[s] the
8   eligibility of CCW license holders," and revokes licenses if an individual "later becomes
9   disqualified," California does not have the ability to continuously monitor the eligibility of
10  non-residents.  (*Id.*)  But the State has not provided the "why" behind the West Virginia or
11  Georgia analogues.  Therefore, the State has provided the Court with no ability to evaluate
12  whether they were enacted for similar reasons as California.  The State's showing is thus
13  insufficient to demonstrate that these laws are relevantly similar.  *See Rupp*, 2024 WL
14  1142061, at *21 (finding regulations insufficiently similar when, even though the presented
15  analogues "used a similar 'how,'" they were "enacted with a somewhat different 'why' in
16  mind").

17        Finally, the State has also not demonstrated that the West Virginia and Georgia
18  analogues derive from the relevant period or even that they represent a consensus or
19  tradition from other states.  As a threshold issue, these laws are only from the 20th century,
20  not the Founding or Reconstruction eras.  *See Bruen*, 597 U.S. at 36–36.  Without
21  identifying any similar laws before *either* the Founding or Reconstruction, the State has
22  not carried its burden at this stage to show that the limitation of CCW licenses to California
23  residents is part of a historical tradition of this Nation.  *See id.* at 66 n.28 ("We will not
24  address any of the 20th-century historical evidence brought to bear by respondents
25  [because] the 20th-century evidence presented by respondents . . . does not provide insight

26

27  [31] *See also Rupp v. Bonta*, --- F. Supp. 3d ---, No. 8:17-cv-00746-JLS-JDE, 2024 WL
28  1142061, at *20 (C.D. Cal. Mar. 15, 2024) (finding the state "identifie[d] four laws that
    banned possession (the same 'how') of dangerous and unusual weapons").

into the meaning of the Second Amendment when it contradicts earlier evidence."). That there were laws from the Founding era demonstrating a (purported) consensus among the states of regulating the manner of carrying within each state does not, as the State argues, speak to whether the States during the Founding era limited the ability to carry firearms to only their residents. The State has pointed the Court to no history on that point.[32] The State has thus failed to demonstrate that it is likely that its residency requirement to apply for a CCW license is part of a historical tradition of this Nation.

The Court will therefore analyze shortly the remaining *Winters* factors as to Plaintiffs' challenge seeking an order allowing non-residents to *apply* for a CCW license, as well as Plaintiffs' challenge regarding the lengthy delay in deciding the two LASD Individual Plaintiffs' LASD applications. For the reasons stated above, the Court denies the Motion as to Plaintiffs' reciprocity challenge that California must recognize out-of-state CCW licenses.

---

[32] Plaintiffs suggest that the infamous *Dred Scott v. Sandford* decision demonstrates that there was a historical tradition of allowing citizens of each State to enter any other state while carrying their firearms based on, as Plaintiffs frame it, then-Chief Justice Taney's concern with freed-slaves' ability to "enter every other State . . . and to keep and carry arms wherever they went." *See* (ECF No. 32-1 ("Cramer Decl.") ¶¶ 31–32). The Court is not persuaded that *Dred Scott* has any precedential value, given both its repugnant historical standing and its holding, or that it even stands for the proposition for which Plaintiffs offer it. For example, Plaintiffs have pulled the phrase "enter every other state" out of a multi-clause sentence (which includes intervening terminal punctuation) to suggest that the clause "entering every other state" modifies the later-clause "to keep and carry arms." *See Dred Scott v. Sandford*, 60 U.S. 393, 417 (1857), *superseded* (1868). To be sure, the Court acknowledges that Justice Thomas similarly references *Dred Scott*. But Justice Thomas does so only to offer it as corroborating evidence of the right to public carry, in general. *See Bruen*, 597 U.S. at 61. There is no question, after *Bruen*, that there is a general right to public carry and there is no question that States may regulate that right. *See Bruen*, 597 U.S. at 13 (implying that shall-issue CCW regimes are currently lawful). In short, precedential value aside, the Court does not find *Dred Scott* relevant to the narrower question presented in the Motion.

4.      Plaintiffs' Due Process Claim Against the LVPD's CCW Psychological Examination Requirement

Plaintiffs argue that LVPD's "psychological exam process" violates "due process protections" because the "current scheme of psychological exams required by LVPD" has no procedural safeguards, such as judicial hearings, evidentiary standards, the right to call supporting witnesses, and the right of appeal.  (Mot. at 25).  The Complaint, however, asserts a due process claim only against the State (whom the Motion does not address), not Defendant LVPD.  Accordingly, the Court does not consider Plaintiffs' due process argument regarding LVPD's psychological testing under this claim and denies the Motion to the extent it seeks to enjoin Defendant LVPD's psychological testing requirement on this ground.[33]

5.      Plaintiffs' Other Constitutional Challenges Brought by Out-of-State Plaintiffs

The Complaint asserts two other claims against the State regarding restrictions on non-residents; one under the Fourteenth Amendment and one under Article IV.  *See* (Compl. ¶¶ 155–67).  In the Motion, Plaintiffs argue that (1) California's "policy of denying

_____

[33] The Court also questions whether a substantive due process claim is the appropriate vehicle for a right that is enumerated in the Bill of Rights.  The Supreme Court has been "reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this uncharted area are scarce and open-ended." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (citation omitted).  Consistent with this sentiment, the Supreme Court has also declined to analyze a constitutional claim using a substantive due process analysis "if the claim is covered by a specific constitutional provision." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998); *see also Fontana v. Haskin*, 262 F.3d 871, 882 (9th Cir. 2001) (same); *Clifton v. United States Dep't of Just.*, 615 F. Supp. 3d 1185, 1205 (E.D. Cal. 2022) (declining to consider a substantive due process challenge to a claim regarding the right to bear arms "because plaintiff's substantive due process claim is duplicative of his Second Amendment claim"); *Baird v. Becerra*, No. 2:19-cv-00617-KJM-AC, 2020 WL 5107614, at *9 (E.D. Cal. Aug. 31, 2020) (rejecting a plaintiff's "attempt to shoehorn [the] Second Amendment claims into a substantive due process claim").

out-of-state residents the ability to lawfully exercise" their right to be armed in public violates the Equal Protection Clause of the Fourteenth Amendment because the residency requirement is a "regulation and classification[] that impose[s] a penalty or impermissible burden on the right to travel" without a "compelling government interest," and (2) that "California's refusal to honor the CCW permits/licenses issued by its sister states" violates the Privileges and Immunities Clause of Article IV of the Constitution by discriminating based on residency.  (Mot. at 27); *see also* (Compl. ¶¶ 160, 167).

Though Plaintiffs suggest that they have asserted their CCW license reciprocity contention under their Privileges and Immunities claim for relief, the Complaint does not do so.  The Complaint asserts only that "California's law of refusing to accept CCW *applications* from citizens of other states" violates the Privileges and Immunities clause. *See* (Compl. ¶¶ 162–67 (emphasis added)).[34]  Accordingly, the Court will not address Plaintiffs' reciprocity argument, which, in the Motion, is the only argued basis for Plaintiff's asserted Privileges and Immunities Clause violation.  *See generally Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) ("The necessary factual averments are required with respect to each material element of the underlying legal theory. . . ." (internal quotation marks, alteration, and citation omitted)).

Furthermore, because the Court already found that Plaintiffs are likely to succeed on the merits of their Second Amendment claim alleging that California's residency requirement for CCW applications is unconstitutional, the Court does not address whether that residency requirement also violates the Fourteenth Amendment or the Privileges and Immunities Clause.[35]

---

[34] Under their Equal Protection claim, Plaintiffs similarly have only challenged the residency requirement for CCW applications and have not explicitly raised a reciprocity challenge. *See* (Compl. ¶¶ 155–61).

[35] The Court is also not persuaded though that Plaintiffs have met their burden, at least as presented in this Motion, to demonstrate a likelihood of success as to either of these claims. As to Plaintiff's Fourteenth Amendment claim, Plaintiffs offer no more than a conclusory paragraph in its opening Motion (and nothing in Reply) to argue that California's residency requirement for applications burdens the right to travel by burdening the right to be armed

### B.   Irreparable Harm

Because the only claims for which Plaintiffs have shown they have a likelihood of success concern (1) LA Defendants' delay as to Individual Plaintiffs Weimer and Messel and (2) California's residency requirement for CCW applications, the only Defendants' arguments the Court considers for the remaining *Winters* factors are those of the State and the LA Defendants.

Plaintiffs argue that they face irreparable harm because their Second Amendment rights will be violated absent preliminary injunctive relief. In opposition, LA Defendants argue that Plaintiffs make no showing of irreparable harm outside of their assertion that they suffered constitutional violations. For its part, the State argues that the challenged laws have been in effect for "many years," and Plaintiffs delay in requesting injunctive relief demonstrates a lack of urgency and cuts against their claims of irreparable harm. (Bonta Opp. at 27).

To obtain a preliminary injunction, a plaintiff must show that irreparable harm is likely in the absence of preliminary relief. *Winter*, 555 U.S. at 20. "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also Goldie's Bookstore, Inc. v. Superior Ct. of State of Cal.*, 739 F.2d 466, 472 (9th Cir. 1984) ("An alleged constitutional infringement will often alone constitute irreparable harm."). Although a delay, alone, in seeking injunctive relief "is not a determinative factor in whether the grant of interim relief is just and proper," *Miller for & on Behalf of N.L.R.B. v. California Pac. Med. Ctr.*, 991 F.2d 536, 544 (9th Cir. 1993),

---

in public. As to the Privileges and Immunities claim, as described above, Plaintiffs similarly offer no more than a three-sentence paragraph in the Motion (and again, nothing in Reply) that California's failure to "honor the CCW permits" of its "sister states" frustrates the "constitutionally mandated policy" of "bar[ring] discrimination based on their status as a citizen of another state." (Mot. at 27). These two paragraphs do very little, if anything, to demonstrate that these claims have a likelihood of success on the merits, let alone that the law and facts clearly favor these claims.

*on reh'g*, 19 F.3d 449 (9th Cir. 1994), such delay is weighed against the moving party because an injunction is "sought upon the theory that there is an urgent need for speedy action to protect the [party's] rights." *Lydo Enterprises, Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984); *see also Oakland Trib., Inc. v. Chron. Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) (stating that a "long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm").

For the reasons described above, Plaintiffs have demonstrated a likely Second Amendment violation due to LASD's delay as to the two Individual Plaintiffs and based on California's residency requirement.  That likely constitutional violation therefore weighs heavily in favor of a finding of irreparable harm.  *See*, *e.g.*, *Elrod*, 427 U.S. at 373. As to the State's delay argument, Plaintiffs' only response is that "*Bruen* made Plaintiffs' claims viable."  (Reply at 36).  But *Bruen* has been the law since June 2022, almost two years ago, and Plaintiff Hoover was denied his California CCW license based on residency in the summer of 2023.  *See* (Hoover Decl. ¶ 4).[36]

Notwithstanding, the likely deprivation of Plaintiffs' constitutional rights is sufficient to demonstrate irreparable harm.  *See* (Hoover Decl. ¶ 4, Broady Decl. ¶¶ 3–4); *see also Baird*, 81 F.4th at 1047 (instructing the district court in a Second Amendment case that, "[b]ecause even a brief deprivation of a constitutional right causes irreparable injury, the district court must quickly determine whether the *Winter* factors favor issuance of a preliminary injunction in this case, and if so, not 'shrink from [its] obligation to enforce [their] constitutional rights."  (first citing *Cuviello v. City of Vallejo*, 944 F.3d 816, 831–34 (9th Cir. 2019), and second citation omitted)).  And, as to the State's delay argument, Plaintiffs are correct that, before *Bruen*, the Supreme Court had not yet held that individuals had a general right to carry *outside* the home.  Thus, the possible rights that could be

---

[36] On the other hand, Plaintiff Broady is newly a nonresident of California and, up until he left in 2020, was able to carry while he was here.  *See* (Broady Decl. ¶¶ 3–4).

1    vindicated regarding a CCW license pre-*Bruen* were different. Accordingly, the record

2    supports a finding of irreparable harm absent preliminary injunctive relief.

3    **C.    Balance of Equities and Public Interest**

4        When, as in this case, the government is a party, the analysis of the remaining two

5    *Winter* factors merges. *See Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th

6    Cir. 2014) (citing *Nken*, 556 U.S. at 435). The balance of equities factor focuses on "the

7    effect on each party of the granting or withholding of the requested relief." *Winter*, 555

8    U.S. at 24. By contrast, "[t]he public interest inquiry primarily addresses impact on non-

9    parties rather than parties." *League of Wilderness Defs./Blue Mountains Biodiversity*

10   *Project. v. Connaughton*, 752 F.3d 755, 756 (9th Cir. 2014) (quoting *Sammartano v. First*

11   *Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002)).

12       In a recent case that considered *Bruen*'s impact on the preliminary injunction factors,

13   the Ninth Circuit noted that a plaintiff who can show that a statute "likely violates the

14   Constitution" will also "usually show 'that both the public interest and the balance of the

15   equities favor a preliminary injunction.'" *Baird*, 81 F.4th at 1044 (first citation omitted,

16   also citing *Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 757–58

17   (9th Cir. 2019) (recognizing that a showing of likelihood of success on the merits of a

18   constitutional claim "compels a finding" that the balance of hardships and the public

19   interest favor issuance of a preliminary injunction)). The Ninth Circuit specifically

20   instructed that, if plaintiffs established a likely violation of the Second Amendment under

21   *Bruen*, a district court "must account for the impact that determination has on the remaining

22   *Winter* factors when it analyzes each of them," and "recogniz[e] that, in cases involving a

23   constitutional claim, a likelihood of success on the merits usually establishes irreparable

24   harm, and strongly tips the balance of equities and public interest in favor of granting a

25   preliminary injunction." *Id.* at 1048 (citations omitted).

26       Plaintiffs argue that Defendants "cannot suffer harm from an injunction that merely

27   ends an unlawful practice." (Mot. at 30). Further, Plaintiffs contend that an injunction is

28   in the public interest because individuals with CCW licenses have "exceedingly low

1   homicide rates," and thus allowing nonresidents to apply for CCW licenses will not harm

2   the public. (Reply at 38). Disputing Defendants' suggestion that more CCW licenses will

3   increase gun violence, Plaintiffs assert that the more individuals who are allowed to

4   lawfully carry concealed weapons, the more likely it is that these individuals can stop

5   criminals, such as "[m]ass killers," before "committing their atrocities." (*Id.*).

6       In response, the State argues that a state always suffers "a form of irreparable injury"

7   when a court enjoins a statute, "enacted by representatives of its people." (Bonta Opp. at

8   27). The State also argues that an injunction would harm Defendants' interest in promoting

9   public safety by limiting the right to carry to only "law-abiding, responsible citizens." *See*

10  (*id.*).   LA Defendants argue that forcing the LASD into the "impracticable,

11  unadministrable, and frankly impossible task" of processing the "nearly 10,000 permit

12  backlog within 120 days" would lead to the reckless issuance of CCW licenses to

13  individuals who possibly should not hold them. *See* (LASD Opp. at 28–29).

14      The Court finds that the third and fourth *Winters* factors are satisfied, as Plaintiffs

15  have established that their constitutional rights have been violated.   A constitutional

16  violation "strongly tips the balance of equities and public interest in favor of granting a

17  preliminary injunction." *Baird*, 81 F.4th at 1048; *see also Cal. Chamber of Commerce v.*

18  *Council for Educ. and Research on Toxics*, 29 F.4th 468, 482 (9th Cir. 2022) ("It is always

19  in the public interest to prevent the violation of a party's constitutional rights." (cleaned

20  up)).   Neither the State nor LA Defendants' arguments counteract that balance.   Concerns

21  for the public safety, to be sure, are important.   But the State does not explain how an order

22  enjoining only the residency requirement for applications, which would still require

23  nonresidents to apply for a CCW license in accordance with California law, would impact

24  public safety.   And LA Defendants' (justified) concerns over the practicalities of

25  processing 10,000 applications do not apply to processing the two applications discussed

26  in this Order.

27      Therefore, Plaintiffs have satisfied all of the *Winters* factors for their challenges as

28  to the LASD's delay of the two LASD Individual Plaintiffs as specified above and as to

the California residency requirement for applying for CCW licenses. Accordingly, the Court grants the Motion only as to these challenges.

## IV.    CONCLUSION

For the foregoing reasons, the Court GRANTS, in part, and DENIES, in part, Plaintiffs' Motion for a preliminary injunction. The Court further ORDERS:

(1)    Within twenty-one (21) calendar days of the date this Order is entered on the docket, Defendants must file their response to the Complaint pursuant to the Court's December 26, 2023, Order on the parties' stipulation to extend each Defendants' time to answer the Complaint, *see* (ECF No. 17); and

(2)    Within thirty (30) calendar days of this Order being entered on the docket, Plaintiffs must meet and confer with the State and the LA Defendants to submit a proposed order entering the preliminary injunction consistent with the specific findings made in this Order.

**IT IS SO ORDERED.**

DATED:  August 20, 2024

_____
HON. SHERILYN PEACE GARNETT
UNITED STATES DISTRICT JUDGE